**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein *(*admitted *Pro Hac Vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

*[Additional Counsel Appear on Signature Page]*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: RENOVACARE, INC. SECURITIES LITIGATION | Master File No. 2:21-cv-13766-BRM-ESK<br><br>**AMENDED COMPLAINT**<br><br><u>CLASS ACTION</u> |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................... 1

II.   JURISDICTION AND VENUE ..................................................... 5

III.  PARTIES ....................................................................................... 6

IV.   BACKGROUND AND SUBSTANTIVE ALLEGATIONS ....................... 11

    A.    Origins of RenovaCare ...................................................... 11

    B.    RenovaCare Had Close Ties to StreetAuthority and Solicited StreetAuthority for an Undisclosed Promotional Campaign ........................................................................... 13

        1.    Confidential Witness Accounts Corroborate RenovaCare's Involvement in Creating and Paying for the Predictions Report. .............................. 15

        2.    Unbeknownst to Investors, Rayat Was Closely Involved in Managing Development of the Promotional Campaign. ............................................. 21

    C.    RenovaCare Represents That Its Disclosure Controls Are Effective but Fails to Publicly Disclose Its Ongoing Promotional Campaign with StreetAuthority and Betancourt. ........................................................................ 24

    D.    Rayat and StreetAuthority Carry Out RenovaCare's Promotional Campaign. ...................................................... 24

    E.    Rayat Arranges Payment for StreetAuthority's Promotional Campaign by Funneling Money Through Undisclosed Third-Party Investor Relations Companies. ................... 26

    F.    StreetAuthority's Promotional Campaign, Under Rayat's Direction, Highly Touted RenovaCare's SkinGun. ............................ 29

    G.    StreetAuthority's RenovaCare Promotional Campaign Successfully Inflated RenovaCare's Stock Price. ................ 33

    H.    RenovaCare Continued to Misrepresent in Subsequent SEC Filings That Its Disclosure Controls Were Effective While Continuing to Conceal Rayat's Involvement with StreetAuthority. ................................................................. 33

i

I.    RenovaCare and Rayat Made and Issued a Materially False Press Release Denying Their Involvement in StreetAuthority's Promotional Campaign When Confronted by OTC Markets...................................................36

J.    Defendants Continue Misleading Investors About RenovaCare's Disclosure Controls in Spite of OTC Markets' Letter. ......................................................54

K.    Rayat and His Associates Attempted to Profit, and Did Profit, from StreetAuthority's Promotion Campaign of RenovaCare. ......................................................55

L.    Over a Year Later, Defendants Admit in SEC Filings That RenovaCare's Disclosure Controls and Procedures Were Not Effective................................................57

M.    Defendants Failed to Adequately Respond to or Clarify a Scathing Report Published by an Investigative Reporting Website Regarding RenovaCare's Business Operations and Undisclosed Stock Promotion Practices....................................60

N.    The Individual Defendants Violated the Company's Ethics Policies by Failing to Reveal Their Promotional Campaign Activities with StreetAuthority.........................................68

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....................................................77

A.    August 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls and Failed to Disclose the Stock Promotion Risk.....................................78

B.    October 18, 2017 Prospectus Supplement Failed to Disclose Stock Promotion Risk...........................................79

C.    November 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls. .........................80

D.    Defendants' January 8, 2018 Statement Responding to OTC Markets' Letter..........................................................80

E.    February 12, 2018 Form S-1 Filing Failed to Disclose Stock Promotion Risk..................................................83

F.    February 27, 2018 Form 8-K Filing Omitted Disclosure of the Promotional Campaign with StreetAuthority. ..........................84

G.    March 13, 2018 Form 10-K Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls. ..........................85

H.    April 6, 2018 Form S-1/A Filing Failed to Disclose Stock Promotion Risk. ....................................................................85

I.    April 25, 2018 Prospectus Filing Failed to Disclose Stock Promotion Risk. ....................................................................87

J.    April 12, 2019 Form 10-K Filing Failed to Disclose Stock Promotion Risk ....................................................................88

K.    May 14, 2020 Form 10-K Filing Failed to Disclose Stock Promotion Risk. ....................................................................89

L.    Defendants' February 12, 2018 Response to the StreetSweeper Article. ...........................................................89

M.    Defendants' March 5, 2018 Press Release Regarding Short-Sellers. ..................................................................90

VI.    THE TRUTH EMERGES ..........................................................91

A.    The SEC Complaint Alleging That Defendants Committed Securities Fraud by Failing to Disclose RenovaCare's Promotional Campaign with StreetAuthority. ...................................................................91

B.    RenovaCare's Responsive Press Release Fails to Rebut Any Allegations in the SEC Complaint and Fails to Address Allegations Concerning the StreetAuthority Promotional Campaign........................................................93

VII.    LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS .........................95

VIII.    PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS...........................97

IX.    NO SAFE HARBOR ...............................................................100

X.    ADDITIONAL SCIENTER ALLEGATIONS ..............................101

XI.    LOSS CAUSATION ...............................................................101

COUNT I  (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)............................104

COUNT II  (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants and Betancourt)................................................106

iii

903150.1

COUNT III  (Violation of Section 10(b) of the Exchange Act and Rule 10b5(a) and (c) Promulgated Thereunder Against All Defendants)................................................................................108

XII.    PRAYER FOR RELIEF ...........................................................110

XIII.   DEMAND FOR TRIAL BY JURY .........................................110

Lead Plaintiff Diana Deidan ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through Lead Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through Lead Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by RenovaCare, Inc. ("RenovaCare" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) pleadings, papers, investigations, and any documents filed, and publicly available, in *SEC v. Rayat and RenovaCare, Inc.*, No. 1:21-cv-04777 (S.D.N.Y.); (c) review and analysis of press releases and media reports issued by and disseminated by RenovaCare; (d) news stories, analyst reports, and other public information concerning RenovaCare and/or the industry within which it operates; (e) information obtained from confidential witnesses; and (f) review of other publicly available information concerning RenovaCare.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired RenovaCare securities between August 14, 2017, and May 28, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against Defendants RenovaCare, Harmel Rayat, Thomas Bold,

1

Capitol Information Group, Inc. d/b/a StreetAuthority.com (formerly StreetAuthority, LLC), and Lou Betancourt (collectively, "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act") for making false and misleading statements regarding RenovaCare's business, disclosure controls, and procedures in various public statements and SEC filings. Specifically, Defendants failed to disclose RenovaCare's concealed promotional campaign with stock promoter StreetAuthority, LLC, which when discovered, triggered a regulatory investigation, the initiation of a pending lawsuit by the SEC, and a downgrade of RenovaCare's stock by OTC Markets Group, Inc., thereby causing harm to investors because of a significant drop in RenovaCare's stock price in reaction to these revelations.

2.      RenovaCare is a development stage company that has not generated any revenue since its inception and has no commercialized products. Its activities primarily consist of research and development, business development, and capital raises. It owns the CellMist System, which consists of a treatment method for cell isolation for the regeneration of human skin cells and other tissues (the CellMist Solution), and an experimental solution sprayer medical device to deliver healing cells to burn wound treatment areas (the SkinGun).

3.      Between July 2017 and January 2018, the Company's controlling shareholder and Chairman, Harmel Rayat ("Rayat"), unbeknownst to investors,

2

arranged, and caused RenovaCare to pay for, a promotional campaign with StreetAuthority, LLC,[1] an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters. Notably, StreetAuthority, LLC was co-founded, owned, and operated by a long-time friend of Rayat, Lou Betancourt.[2] The secret promotional campaign led by Rayat was designed to increase RenovaCare's stock price and trading volume.

4.      Specifically, Rayat was closely involved in directing the promotion, distribution, and editing of promotional materials, and arranged to funnel payments to StreetAuthority, LLC through third-party companies to conceal RenovaCare's involvement in the publishing campaign.

5.      When OTC Markets Group, Inc.[3] ("OTC Markets") requested in January 2018 that RenovaCare explain its relationship to the promotional campaign, Rayat and RenovaCare drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying and concealing Rayat's and the company's involvement in the promotion.

---

[1] https://www.streetauthority.com/ (last accessed Feb. 2, 2022).
[2] *See* https://www.loubetancourt.com/about (last accessed Feb. 3, 2022); https://www.linkedin.com/in/lou-betancourt-44a7554 (last accessed Feb. 3, 2022).
[3] OTC Markets Group, Inc. is an American financial market providing price and liquidity information for almost 10,000 over-the-counter securities. *See* https://www.otcmarkets.com/index.html (last accessed Feb. 3, 2022).

3

6.    On May 28, 2021, the SEC issued a litigation release stating that RenovaCare was being charged with securities fraud because of the undisclosed promotional campaign.[4] On this news, the Company's stock price fell $0.66, or 24.8%, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

7.    On February 26, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity. The Company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

8.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the

---

[4] This complaint is the result of the SEC's ongoing investigation and document production to date in the SEC action. *See* https://www.sec.gov/litigation/litreleases/2021/lr25102.htm (last accessed Feb. 3, 2022); https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Feb. 11, 2022) (describing SEC's "three-plus years" investigation and documents provided to the SEC to date); *see also SEC v. Rayat and RenovaCare, Inc.*, No. 1:21-cv-04777 (S.D.N.Y.), ECF No. 1 ("SEC Complaint"). Lead Plaintiff notes that that the SEC Complaint generically refers to "RenovaCare's CEO" but does not specify the name of the CEO during the relevant time period. Lead Plaintiff notes that Defendant Thomas Bold was RenovaCare's CEO from December 2013 to June 2018 and Defendant Harmel Rayat was RenovaCare's CEO from June 2018 to November 2019, as specified herein.

Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) at the direction of Rayat, RenovaCare engaged in a promotional campaign to issue misleading statements to artificially inflate the Company's stock price, and RenovaCare paid StreetAuthority, LLC to publish positive reports about the Company during the Class Period; (ii) when OTC Markets inquired, RenovaCare and Rayat issued a materially false and misleading press release claiming that no director, officer, or controlling shareholder had any involvement in the StreetAuthority, LLC's promotional materials; (iii) as a result of the foregoing, the Company's disclosure controls and procedures were defective; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

10.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.   PARTIES

14.     Lead Plaintiff Diana Deidan, as set forth in original certifications filed in this matter, incorporated by reference herein, purchased RenovaCare securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

6

15.     Named Plaintiff Thomas Agostinelli, as set forth in original certifications filed in this matter, purchased RenovaCare securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Named Plaintiff Marc Jay Gannon, as set forth in original certifications filed in this matter, purchased RenovaCare securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant RenovaCare is incorporated under the laws of Nevada with its principal executive offices located in Roseland, New Jersey. RenovaCare is a development stage company with no revenues but claims to be developing a "SkinGun" medical device and "CellMist" system for the treatment of skin burns through the rapid regeneration of skin cells.[5] RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc." On May 20, 1999, the Company changed its name to "WhatsOnline.Com, Inc.," and Rayat became, and ever since has been, the company's majority and controlling shareholder. The Company later made several other name changes, until January 7, 2014, when it

---

[5] https://www.renovacareinc.com/2016/05/video-ultra-gentle-renovacare-skingun-sprayer/ (last accessed Feb. 3, 2022).

7

changed its name to RenovaCare. RenovaCare's common stock trades on the over-the counter market ("OTC") under the symbol "RCAR."

18.     Defendant Rayat, a Canadian citizen residing in Vancouver, British Columbia, was the Chairman of the Board of RenovaCare from March 2018 to October 2020 and was reappointed to that position in March 2021. Rayat also served as the Company's Chief Executive Officer ("CEO") from June 2018 to November 2019. Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999. As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or 81.3 percent of the company's outstanding shares of common stock. Through his family office, Kalen Capital Corporation, Rayat has invested over $20 million in RenovaCare since 2013. In 2000, Rayat had settled a case with the SEC in which he was charged with violating Section 17(b) of the Securities Act. *SEC v. EquityAlert.Com, Inc. and Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).[6]

19.     Defendant Thomas Bold ("Bold"), a citizen of Germany, was the Company's CEO from December 2013 to June 2018, the Company's President

---

[6] *See also* https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (discussing Rayat's background in founding and controlling several publicly traded companies that lacked adequate disclosures surrounding company financials and insider trading and had questionable operations; and noting that "We noted that the same lack of disclosure at RenovaCare, the other company where Rayat is a controlling shareholder.") (last accessed Feb. 3, 2022).

from December 2013 to March 2019, and the Company's interim Chief Financial Officer ("CFO") from September 2016 to October 2018. On March 30, 2019, Defendant Bold resigned his position as the Company's President and as a member of the Board. Defendant Bold continued to provide consulting services to the Company pursuant to an at will consulting agreement.[7] During the years ended December 31, 2017, 2018, and 2019, the Company recognized expenses related to Defendant Bold's consulting services and for his performance as CFO of $378,700, $100,000, and $43,000, respectively.

20.    Defendant Capitol Information Group, Inc. d/b/a StreetAuthority.com (formerly StreetAuthority, LLC) (hereinafter referred as "StreetAuthority") was, at all relevant times. an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters during the time period at issue in this Complaint. StreetAuthority, LLC was co-founded, owned, and operated at all relevant times by Lou Betancourt. In early 2019, StreetAuthority, LLC was acquired[8] by Investing Daily,[9] a division of Capitol Information Group, Inc. ("CIG"),[10] an online and print publishing

---

[7] https://www.sec.gov/Archives/edgar/data/1016708/000147793213005947/jani_ex103.htm (last accessed Feb. 3, 2022).

[8] *See* https://www.prlog.org/12750823-investing-daily-continues-rapid-growth-by-acquiring-10-street-authority-investment-publications.html (last accessed Feb. 9, 2022).

[9] https://www.investingdaily.com/ (last accessed Feb. 9, 2022).

[10] https://www.capinfogroup.com/ (last accessed Feb. 9, 2022).

903150.1

company serving various markets. After the acquisition, StreetAuthority, LLC's domain name StreetAuthority.com became a division of CIG and began operating as a fictitious business name (d/b/a) for CIG. [11]

21.     Defendant Lou Betancourt ("Betancourt") was a co-founder of, and at all relevant times, owned, operated, and was a control person of Defendant StreetAuthority. Upon information and belief, Betancourt is a long-time friend of Rayat and, as corroborated by Confidential Witness accounts herein, led StreetAuthority's promotional campaign on behalf of RenovaCare.

22.     Defendants Rayat and Bold (referred to collectively herein as the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers and institutional investors—i.e., the market, as well as the reports issued by StreetAuthority promoting RenovaCare. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

---

[11] https://capinfogroup.com/history/ (last accessed Feb. 9, 2022).

disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.    BACKGROUND AND SUBSTANTIVE ALLEGATIONS

## A.    Origins of RenovaCare

23.    RenovaCare is a development stage company that has not generated any revenue since its inception and has no commercialized products. Its activities primarily consist of research and development, business development, and capital raises. It owns the CellMist System, which consists of a treatment method for cell isolation for the regeneration of human skin cells and other tissues (the CellMist Solution), and an experimental solution sprayer medical device to deliver regenerative stem cells to burn wound treatment areas (the SkinGun).

24.    According to investigative reporting website Sharesleuth, "RenovaCare [has] limited cash, no revenue, and relatively low spending on research and development" and has "stayed alive through infusions from Rayat, most recently in 2018, when SEC filings show that he put $34 million into [RenovaCare and another company controlled by Rayat]."[12] On November 29,

---

[12] https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (last accessed Feb. 3, 2022).

11

2018, Rayat invested $15.5 million to fund regulatory submissions and clinical trials for the SkinGun.[13]

25.    A *Seeking Alpha* article from TheStreetSweeper notes that RenovaCare is operated by one full-time employee and three part-time contractors, including the Company's CEO.[14] The Company has "[n]o sales; little cash; big operating losses; and auditors expressed doubt the company can continue as a going concern."[15] The Company's CellMist system including the SkinGun was acquired on July 12, 2013, for $400,000.[16] CellMist is not FDA approved for human use and remained in the clinical trial stage as of mid-2021.[17] Clinical trials remain ongoing and are estimated to be completed by 2023.[18]

26.    RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc." On May 20, 1999, the company changed its name to "WhatsOnline.Com, Inc.," and Rayat became, and ever since has been, the

---

[13] https://www.renovacareinc.com/2018/11/renovacare-chairman-invests-15-and-one-half-million-dollars-to-fund-skingun-regulatory-submissions-and-clinical-trials/ (last accessed Feb. 3, 2022).

[14] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Feb. 3, 2022).

[15] *Id.*

[16] *See id.*

[17] *Id.*; https://www.renovacareinc.com/2021/06/renovacare_clinical_trial_to_start_at_us_burn_centers/ (last accessed Feb. 3, 2022); https://www.renovacareinc.com/2021/07/renovacare_provides_update_on_clinical_trial_for_the_skingun_and_cellmist_system_for_wound_healing/ (last accessed Feb. 3, 2022).

[18] https://www.clinicaltrials.gov/ct2/show/NCT04890574?term=renovacare&draw=2&rank=1 (last accessed Feb. 3, 2022).

Company's majority and controlling shareholder. The Company later made several other name changes, until January 7, 2014, when it changed its name to RenovaCare.

27.    RenovaCare's common stock trades on the over-the counter ("OTC") market under the symbol "RCAR."[19]

## B.    RenovaCare Had Close Ties to StreetAuthority and Solicited StreetAuthority for an Undisclosed Promotional Campaign.

28.    The non-disclosure fraud described herein originates from RenovaCare and Rayat's close ties to StreetAuthority, whose CEO, owner, and operator during the Class Period, Lou Betancourt, was a long-time friend of Rayat and RenovaCare shareholder.[20]

29.    Prior to the Class Period, on or about July 26, 2017, while he was RenovaCare's controlling shareholder,[21] Rayat solicited StreetAuthority's owner,

---

[19] During the Class Period, the Company's stock constituted a penny stock because it did not meet any of the exceptions from the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.

[20] According to a *Seeking Alpha* article entitled "RenovaCare: Many Catalysts, Untold Downside," written during the Class Period, Betancourt owned 2,100 shares of RenovaCare common stock at the time of publication of the Predictions Report and promotional campaign discussed herein. *See* https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Feb. 3, 2022).

[21] By July 2017, Rayat owned approximately 65 percent of RenovaCare's stock (approximately 52 million shares) and was the company's controlling shareholder. As of May 2020, Rayat controlled 75% of RenovaCare: https://www.sec.gov/Archives/edgar/data/1016708/000117184320003732/f10k_050620.htm#a_025

13

who at all relevant times discussed herein is believed to be Betancourt based on Confidential Witness accounts discussed below, to start a promotional campaign for RenovaCare.[22] The campaign also included promotions for another company that Rayat controlled.[23] That day, Rayat spoke to Betancourt on the phone, and later emailed marketing materials related to RenovaCare's SkinGun to Betancourt.[24] Rayat was interested in the promotion because he wanted to increase RenovaCare's stock price and trading volume, which would benefit him and his close associates who owned the Company's stock.[25]

---

(last accessed Feb. 3, 2022). As of December 2020, Rayat controlled 72% of RenovaCare: https://www.sec.gov/Archives/edgar/data/0001016708/000117184321002192/f10k_032321.htm (last accessed Feb. 3, 2022). As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or 81.3 percent of the company's outstanding shares of common stock.

[22] *See* SEC Compl., ¶ 18.

[23] Upon information and belief, this company is believed to be SolarWindow Technologies, Inc., where Rayat acted as Chairman of the Board of Directors. This company's stock is quoted on the OTC Markets (OTC ticker symbol: WNDW) and purports to be developing and marketing windows for residential and commercial buildings that generate electricity from solar energy. During the Class Period, Rayat was a controlling shareholder of this company. *See* https://www.solarwindow.com/2018/03/solarwindow-board-directors-elects-majority-stockholder-harmel-s-rayat-chairman/ and https://www.businesswire.com/news/home/20180315005583/en/SolarWindow-Board-of-Directors-Elects-Majority-Stockholder-Harmel-S.-Rayat-as-Chairman (discussing Rayat's appointment as Chairman of the Board and longtime involvement in the company) (last accessed Feb. 3, 2022); https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (discussing, in relevant part, Rayat's ownership of SolarWindow and RenovaCare) (last accessed Feb. 3, 2022).

[24] *See* SEC Compl., ¶ 18.

[25] *See* SEC Compl., ¶ 15.

903150.1

30.     On July 28, 2017, Betancourt suggested to Rayat that StreetAuthority feature RenovaCare and Rayat's other company in StreetAuthority's annual "Predictions Report." Betancourt noted that this could "create awareness of both companies" and persuade StreetAuthority subscribers to invest in RenovaCare and the other company. Betancourt further stated that StreetAuthority was interested in "partnering up" with Rayat to advertise on various online media platforms. In response, Rayat agreed it was a "great idea," and then arranged to discuss the proposal in more detail.[26]

### 1.     Confidential Witness Accounts Corroborate RenovaCare's Involvement in Creating and Paying for the Predictions Report.

31.     Confidential Witness ("CW") 1, a former Marketing Assistant and Advertising Coordinator who worked in StreetAuthority's Austin, Texas, headquarters from September 2016 to February 2018 and reported to StreetAuthority's Marketing Manager who in turn reported to Betancourt, described Street Authority's Predictions Report as a report that featured the "big hitters." According to CW 1 the report "typically… had different levels where you could pay for these packages and it would tell you what the best stocks to invest in are, and there were a couple differently priced ones." CW 1 further stated that such

---

[26] *See* SEC Compl., ¶ 19.

15

reports ran "maybe twice a year" and were designed to feature the "big hitters." CW 1 stated that companies could pay to be featured in the Predictions Report.

32.     CW 1 corroborated the existence of RenovaCare's promotional campaign and stated that CW 1 learned about StreetAuthority's promotional campaign with RenovaCare during a meeting toward the end of CW 1's tenure with StreetAuthority: "I think it was around the holidays [in 2017] when they talked about it or shortly after[.]" When asked about Betancourt's involvement, CW 1 stated that Betancourt attended StreetAuthority's weekly managers' meetings (attended by managers from editorial, marketing, and advertising) and that staff "would have to run everything by him."

33.     CW 2, a former Graphic Designer who worked at StreetAuthority in the company's headquarters from April 2016 to 2019 and was responsible for building most of the graphics supplied by StreetAuthority's editorial team and updating StreetAuthority's website, also corroborated the existence of StreetAuthority's Predictions Report promotional campaign with RenovaCare. CW 2 stated that CW 2 remembered StreetAuthority's promotional campaign with RenovaCare for its SkinGun product, including the before-and-after photos of a patient who purportedly recovered from severe burns in just a few days after using the SkinGun.

16

34.    CW 2 stated that CW 2 received the before-and-after photos from StreetAuthority's editorial team and posted them to the company's website: "I … remember working on some graphics for that," continuing, "That's basically the content I was provided. [I was] the graphic designer [and was told], 'We want to use these pictures to be on the site.' … I do remember some of that stuff… I do remember the company providing those graphics to be added to the site…. They were some before-and-after pictures…. I believe it was like an infomercial, before-and-after kind of thing." CW 2 continued that CW 2 would have received the before-and-after pictures from CW 2's supervisors on StreetAuthority's editorial team. Recalling directives from supervisors, CW 2 remembered supervisors stating, "'OK, here's some pictures that you need to post.'" CW 2 said the before-and-after photos were likely sent directly to StreetAuthority from RenovaCare or taken from RenovaCare's website. CW 2 also said there was no discussion within StreetAuthority about the validity of the RenovaCare before-and-after photos. Instead, CW 2 commented, "Sometimes when we work under pressure, we just post the pictures. There was never any kind of meetings or any kind of discussion about where these pictures came from. They provided me them, and my job as a graphic designer was to post them."

35.     CW 2 also posted substantive content about RenovaCare to StreetAuthority's website, including text that was sent to CW 2 in a Microsoft Word document.

36.     Additionally, CW 3, a former Marketing Manager who worked at StreetAuthority from October 2016 to February 2020, also corroborated the existence of and RenovaCare's payment for the promotional campaign. CW 3 worked in the company's Austin, Texas, headquarters and was responsible for managing the production of new and existing products; tracking analytics and performance; writing and managing marketing emails; and editing daily web marketing content. CW 3 remembered seeing the before-and-after photos of a patient who purportedly recovered from severe burns in just a few days after using RenovaCare's SkinGun.

37.     When asked about the promotional campaign, CW 3 said CW 3 likely first learned about the RenovaCare promotional campaign in fall 2017 or possibly even earlier: "They got started on that one [(the Predictions Report)] pretty early because that one is a bit more involved and required more writeups." Corroborating CW 1, CW 3 said CW 3 would have learned about the promotional campaign about three months prior to the writing and release of the Predictions Report, likely during a meeting that included CEO Lou Betancourt: "We would have been talking about the writing of the predictions and talking about the stocks

18

themselves. We had a thing where we would go through all of them and look at them. [The report] was usually written and finished and proofread by the middle of November, and then [we] started promoting it immediately for Black Friday or Cyber Monday."

38.    CW 3 further recalled StreetAuthority publishing the RenovaCare Predictions Report in StreetAuthority's Top Stock Advisors. CW 3 stated, "One of the primary forms of advertising or getting people to sign up for products was to do longform copy on various stocks…. RenovaCare was, if I remember correctly, in our [2018] Predictions Report. We all thought it was really cool – because conceptionally it is very cool…. [RenovaCare] sent us promotional materials, and then we just incorporated that into our [2018] Predictions Report. And then we promoted that for maybe six months."

39.    CW 3 further stated that RenovaCare also sent StreetAuthority some research related to its SkinGun. Additionally, CW 3 was "90% sure" that StreetAuthority's promotional campaign for RenovaCare was limited to the Predictions Report. CW 3 continued that there were no questions or issues raised about the validity of the before-and-after photos or any other materials about RenovaCare.

40.    Additionally, CW 3 recalled that StreetAuthority simultaneously ran a promotional campaign for another company controlled by RenovaCare CEO

903150.1

Harmel Rayat called SolarWindow Technologies,[27] and that SolarWindow was promoted as a "top stock." CW 3 commented that the Predictions Report articles on featured stocks like RenovaCare were typically about four pages of text and the 2018 Predictions Report featured RenovaCare, SolarWindow Technologies, and 11 other stocks.

41.     Of the stocks featured in StreetAuthority's Predictions Reports, CW 3 could not recall StreetAuthority receiving payments from any companies *other than from RenovaCare* and SolarWindow Technologies. CW 3 further stated that StreetAuthority's work featuring RenovaCare and SolarWindow Technologies in its Predictions Report was "basically identical to any other stock that … our analysts would pick out and promote … *other than we were being paid some commission or whatever to do so*." (Emphasis added.)

42.     When asked specifically about Rayat's involvement in the promotional campaign, CW 3 stated that StreetAuthority CEO Betancourt referred to Rayat during meetings: "We all knew who Harmel [Rayat] was. *I think Harmel asked Lou or invited Lou to do a paid placement … I knew that they were friends prior to that. Lou was like, 'Yeah, Harmel has these companies, and we really*

---

[27] *See supra* fn. 23 above (describing Rayat's involvement in SolarWindow Technologies and RenovaCare).

***like them, so we're going got put them in the Predictions Report.***'" (Emphasis added.)

43.     When asked about the impact of the promotional campaign, CW 3 stated, "In theory, all paid placements [with StreetAuthority] – they did have significant positive effect on [companies'] trading."

### 2.    Unbeknownst to Investors, Rayat Was Closely Involved in Managing Development of the Promotional Campaign.

44.     Between July 28 and August 31, 2017, Rayat discussed the details of the promotion with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August, 2017.[28] He had frequent contact with StreetAuthority and RenovaCare employees and consultants in the United States, over the phone, email, and other interstate means in furtherance of StreetAuthority's promotion. Rayat actively worked with StreetAuthority to create StreetAuthority's promotional materials, including the Predictions Report. He regularly provided information to StreetAuthority to use for its promotion, and he reviewed and commented on draft promotional materials prior to their release.

45.     As will be discussed further below, Rayat also arranged for RenovaCare to pay StreetAuthority $50,000 per month for the promotional

---

[28] *See* SEC Compl., ¶ 20.

903150.1

campaign and arranged for the payment to be made through third party companies for the fraudulent purpose of concealing Rayat's and the RenovaCare's involvement.[29]

46.    Section 17(b) of the Securities Act imposes a duty to disclose that a stock promoter received consideration for promoting a company's securities. 15 U.S.C. §77q(b). Section 17(b) provides that:

> It shall be unlawful for any person, by the use any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicly to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication, which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

47.    The SEC has also issued investor bulletins alerting investors to the use of stock promoters that state that, to protect investors from being misled by such materials, the federal securities laws require stock promoters to disclose the entity that retained them and the amount and type of any payments that they received as compensation for their engagement.

48.    StreetAuthority never disclosed Rayat and RenovaCare's promotional campaign in furtherance of disseminating the Predictions Report to investors, nor

---

[29] *See* SEC Compl., ¶ 17.

did it disclose that it was receiving payments from them in exchange for publishing the Reports. However, the Predictions Report and promotional campaign freely circulated to StreetAuthority's subscriber base as intended by Rayat and the other Defendants.



**SPECIAL REPORT**

# 13 Shocking Investment Predictions for 2018

### ...From The Research Team Whose Annual Predictions Have Returned Up To 569%

### #1: RenovaCare, Inc. [Ticker: RCAR]

**Wednesday, February 7, 2018**

On behalf of the research staff at *Game-Changing Stocks*, we'd like to thank you for requesting our new investment report.

Today we'd like to share with you the name and trading symbol of one of the most urgent stock recommendations we have ever made. It is an opportunity that our six-man research team believes offers explosive profit potential in 2018 and beyond.

Image: StreetAuthority Report to promote RenovaCare, dated February 7, 2018.[30]

---

[30] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Feb. 3, 2022).

903150.1

C.    **RenovaCare Represents That Its Disclosure Controls Are Effective but Fails to Publicly Disclose Its Ongoing Promotional Campaign with StreetAuthority and Betancourt.**

49.    On August 14, 2017, the beginning of the Class Period and well after Rayat had solicited StreetAuthority for the Predictions Report promotional campaign, RenovaCare filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017. That quarterly report stated, in relevant part:

> **Disclosure Controls and Procedures**
>
> … Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

50.    However, the Form 10-Q never disclosed RenovaCare's ongoing publishing arrangement with StreetAuthority that was already underway. Nor is there any mention of StreetAuthority or risk factors associated with the promotion.

D.    **Rayat and StreetAuthority Carry Out RenovaCare's Promotional Campaign.**

51.    Then, on September 4, 2017, shortly after Rayat traveled to StreetAuthority's headquarters in Austin, Texas, Betancourt emailed Rayat to discuss several different marketing strategies in which StreetAuthority could

24

promote RenovaCare and asked if Rayat was "interested in exploring and participating in this marketing program."[31]

52.     Later that day, Rayat responded that "nothing would make me happier than working with [Betancourt and other StreetAuthority representatives] in spreading the word to investors and dramatically improving [RenovaCare's]… awareness in the investment community, which I wholeheartedly believe will help [RenovaCare] raise additional capital and get senior listings, which in turn will allow institutional investors to jump in." Rayat further noted that he was "very interested in exploring how [they could] work together," and suggested they speak the next day.[32]

53.     The planning and discussions between Rayat and StreetAuthority about RenovaCare's promotional campaign continued into October 2017. By at least September 2017, StreetAuthority began drafting materials for its RenovaCare promotion, and it publicly released the promotion on or about October 24, 2017. StreetAuthority disseminated the promotional materials in emails to its subscriber base, as well as on the internet more broadly in banners advertisements on internet search engines, social media sites, and other internet platforms. A key piece of the promotion were certain periodic reports such as an annual "Predictions Report" for

---

[31] *See* SEC Compl., ¶ 21.
[32] *See* SEC Compl., ¶ 22.

903150.1

the next calendar year, of which the success of RenovaCare's products were StreetAuthority's lead "predictions."[33]

## E. Rayat Arranges Payment for StreetAuthority's Promotional Campaign by Funneling Money Through Undisclosed Third-Party Investor Relations Companies.

54.    However, before StreetAuthority launched its promotion of RenovaCare, Betancourt and Rayat orally agreed that StreetAuthority would receive $100,000 per month for the promotion. StreetAuthority agreed to use that money to pay for advertising and other distribution costs relating to the publication and dissemination of its promotion of RenovaCare and SolarWindow.[34]

55.    Rather than have RenovaCare pay StreetAuthority directly, Rayat arranged to pay StreetAuthority through a third-party investor relations company that Rayat had hired in the past for other promotional campaigns ("Investor Relations Company A"). Rayat arranged for RenovaCare to pay Investor Relations Company A $2,500 per month, and the only service Investor Relations Company A provided in exchange for this money was to prepare invoices and route payments between RenovaCare and StreetAuthority.[35]

56.    Rayat devised this deceptive payment scheme on behalf of RenovaCare to conceal from the investing public that RenovaCare was, in fact,

---

[33] *See* SEC Compl., ¶ 31.
[34] *See* SEC Compl., ¶ 24.
[35] *See* SEC Compl., ¶ 25.

903150.1

paying StreetAuthority for the promotion. Rayat knew, or was reckless in not

knowing, that StreetAuthority would have to disclose in its promotional materials

any payments RenovaCare made to StreetAuthority pursuant to Section 17(b) of

the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(b). Relatedly, in

2000, Rayat had settled a case with the Commission in which he was charged with

violating Section 17(b) of the Securities Act. *SEC v. EquityAlert.Com, Inc. and*

*Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).[36, 37]

57.    For example, the disclosures in StreetAuthority's RenovaCare

promotional materials pursuant to Securities Act Section 17(b) stated that

StreetAuthority did "not receive any direct cash payments in connection with the

production of paid advertisements" for RenovaCare. Rayat, however, arranged for

the investor relations company, not RenovaCare, to make the direct payments to

StreetAuthority. Rayat's payment arrangement—that concealed the company's and

its controlling shareholder's involvement in and potential financial incentives to

---

[36] Rayat was previously chairman of EquityAlert.com, a financial information website in the late 1990s/early 2000s. EquityAlert.com was involved in an unlawful stock promoter scheme similar to the instant case. There, Rayat acted as the promoter company (similar to StreetAuthority here) to promote small cap companies' stocks with the intention to capitalize on the promotion by selling unregistered securities given to EquityAlert.com by the promoted companies when the stock price rose. *See* https://www.sec.gov/litigation/admin/33-8306.htm (last accessed Feb. 3, 2022); https://www.wsj.com/articles/SB937602605516369098 (last accessed Feb. 3, 2022); https://www.seclaw.com/emailpumpanddump1003/ (last accessed Feb. 3, 2022).

[37] *See* SEC Compl., ¶ 26.

StreetAuthority in promoting the stock—had the effect of reducing investor skepticism regarding the truthfulness of the campaign by making it appear to investors that StreetAuthority was offering an objective and fair assessment of RenovaCare's stock.[38]

58.    Throughout StreetAuthority's campaign, RenovaCare continued to secretly funnel money through Investor Relations Company A to Street Authority, until another investor relations company that Rayat selected ("Investor Relations Company B"), replaced Investor Relations Company A on or around January 4, 2018.[39] In all, by January 4, 2018, RenovaCare paid approximately $90,000 to StreetAuthority through these two investor relations companies.

59.    RenovaCare's CEO approved all of the payments from RenovaCare to Investor Relations Company A and Investor Relations Company B, while he knew, or was reckless in not knowing, that they were ultimately going to StreetAuthority for the promotion. On November 9, 2017, for example, RenovaCare's CEO approved the company to pay $46,000 to Investor Relations Company A based on invoices Investor Relations Company A sent RenovaCare's CEO charging the company $43,500 for the StreetAuthority promotion and $2,500 for Investor Relations Company A's monthly retainer.[40]

---

[38] *See* SEC Compl., ¶ 27.
[39] *See* SEC Compl., ¶ 28.
[40] *See* SEC Compl., ¶ 29.

903150.1

60.     Notably, and as discussed further below, Defendants only publicly disclosed the existence of and payment to these investor relations companies *for the first time* in RenovaCare's January 8, 2018 press release responding to the OTC Markets inquiry (well after StreetAuthority's campaign had begun).

## F.     StreetAuthority's Promotional Campaign, Under Rayat's Direction, Highly Touted RenovaCare's SkinGun.

61.     StreetAuthority's promotional materials highly touted RenovaCare. For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains."[41]

62.     In describing the basis for its recommendation, StreetAuthority's promotional materials described a case study of one patient who had severe burns on his arm ("Patient A") that the SkinGun purportedly healed *in three days*. The promotional materials further showed the following purported "before" and "after" SkinGun-treatment pictures of Patient A,[42] which was discussed and corroborated by CWs 2 and 3 above:

---

[41] *See* SEC Compl., ¶ 33.
[42] *See* SEC Compl., ¶ 34.

29



63.     However, the SkinGun did not heal Patient A's wounds in three days; after treatment, Patient A's skin remained discolored for over a year. Furthermore, the "before" photo was *not* Patient A's arm, and the "after" picture was taken ***approximately five years*** after Patient A's injury, not three days.[43]

64.     As corroborated by CW 3, Rayat provided materials containing these false pictures and claims about Patient A's SkinGun treatment to StreetAuthority. For example, on July 26, 2017, Rayat emailed RenovaCare marketing materials to StreetAuthority that contained Patient A's false before-and-after pictures, and on September 21, 2017, Rayat emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun healed Patient A's arm in three days.[44]

65.     When sending these materials to StreetAuthority, Rayat knew that it would be disseminated to investors and knew, or was reckless in not knowing, that the materials contained false information. Notably, RenovaCare employees had

---

[43] *See* SEC Compl., ¶ 35.
[44] *See* SEC Compl., ¶ 36.

903150.1

discussed the actual results of Patient A's treatment with Rayat, and sent Rayat an accurate summary of his treatment, as early as July 23, 2014. The summary Rayat received that day explained that Patient A's arm took months to heal, and it contained accurate pictures illustrating the treatment, and not the pictures of Patient A that Rayat later sent to StreetAuthority.[45]

66.    StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA [Food and Drug Administration]. … RenovaCare has submitted a 510(k) filing to the FDA, which permits the marketing of a medical device. Now it's just a matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country."[46]

67.    However, at the time, RenovaCare did not have a pending 510(k) filing with the FDA; in fact, it had only applied to the FDA for approval to use in clinical studies, not in general clinic or hospital settings, and RenovaCare had withdrawn that application more than a year earlier.[47]

68.    Additionally, prior to the release of the StreetAuthority promotion, Rayat reviewed draft promotional materials that contained these false claims but did nothing to correct them. For example, on October 3, 2017, Betancourt emailed Rayat a draft Predictions Report that contained the false statements and pictures

---

[45] *See* SEC Compl., ¶ 37.
[46] *See* SEC Compl., ¶ 38.
[47] *See* SEC Compl., ¶ 39.

concerning Patient A's SkinGun treatment and the SkinGun's status with the FDA. After reviewing the draft, Rayat called Betancourt to suggest at least one change concerning the possibility of the FDA's approval of the SkinGun, but he did not suggest that StreetAuthority correct the false statements in the draft. StreetAuthority subsequently made Rayat's suggested change to its promotional materials.[48]

69.　In addition, internal StreetAuthority documents reflect three versions of draft StreetAuthority promotions of RenovaCare dated October 10, 2017, that are entitled "Harmel changes," including one draft that contained an internal comment from a StreetAuthority representative indicating that he was deleting certain language in the draft because the deleted language contained something that "Har[m]el doesn't want us to talk about."[49]

70.　When reviewing the draft promotional materials concerning RenovaCare, Rayat knew, or was reckless in not knowing, that the statements about the FDA approval were false. Shortly before that time, in an email between Rayat and an acquaintance on April 14, 2017, Rayat discussed RenovaCare's regulatory strategy, and Rayat explained that RenovaCare did not have a pending 510(k) application.[50]

---

[48] *See* SEC Compl., ¶ 40.
[49] *See* SEC Compl., ¶ 41.
[50] *See* SEC Compl., ¶ 42.

**G.**    **StreetAuthority's RenovaCare Promotional Campaign Successfully Inflated RenovaCare's Stock Price.**

71.    All in all, StreetAuthority's promotional campaign of RenovaCare that Rayat solicited, concealed the payments for, and worked closely with StreetAuthority to create and distribute was a success. During the course of the promotional campaign, internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority. For instance, one of the several online platforms StreetAuthority used to promote RenovaCare alone generated over 20,000 clicks from internet users.[51]

72.    RenovaCare stock saw an uptick in volume and price that correlated with StreetAuthority's promotional campaign. On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase.[52]

**H.**    **RenovaCare Continued to Misrepresent in Subsequent SEC Filings That Its Disclosure Controls Were Effective While Continuing to Conceal Rayat's Involvement with StreetAuthority.**

73.    From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to their subscriber base.[53] However, Defendants continued to conceal its ongoing

---

[51] *See* SEC Compl., ¶ 45.
[52] *See* SEC Compl., ¶ 46.
[53] *See* SEC Compl., ¶ 43.

903150.1

relationship with StreetAuthority and misrepresent the effectiveness of its disclosure controls.

74.    On November 14, 2017, RenovaCare filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017. That quarterly report stated, in relevant part:

### Disclosure Controls and Procedures

Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

75.    Despite the above representation about effective disclosure controls, and similar to RenovaCare's Form 10-Q for the period ended June 30, 2017, Defendants failed to disclose RenovaCare's ongoing publishing arrangement with StreetAuthority. Nor is there any mention of StreetAuthority or risk factors associated with the promotion.

76.    Rayat continued to be involved in the drafting of StreetAuthority's promotional materials; and remained closely involved in its distribution and dissemination but did not disclose this to the investing public. For example:

903150.1

a.  At an in-person meeting at StreetAuthority's headquarters in Austin, Texas, on or around November 27, 2017, Rayat and several StreetAuthority representatives reviewed StreetAuthority's distribution and dissemination of the promotional materials. The StreetAuthority representatives discussed the various advertisements they were running with Rayat, and Rayat gave directions to StreetAuthority on how it could more effectively run the campaign. Rayat also provided additional edits to StreetAuthority's promotional materials. After the meeting, StreetAuthority implemented at least some of Rayat's directions.

b.  On or around December 3, 2017, Rayat sent StreetAuthority new advertisements that he wanted StreetAuthority to disseminate, and StreetAuthority representatives incorporated those advertisements into the promotional campaign.

c.  On or around December 15, 2017, Rayat approved a change in StreetAuthority's format for how StreetAuthority advertised its promotion on one online platform.[54]

---

[54] *See* SEC Compl., ¶ 44.

35

I.    **RenovaCare and Rayat Made and Issued a Materially False Press Release Denying Their Involvement in StreetAuthority's Promotional Campaign When Confronted by OTC Markets.**

77.    The truth began to emerge on or around January 2, 2018, when OTC Markets, which supervised the OTCQB Tier in which RenovaCare's stock was quoted, learned of StreetAuthority's promotion.

78.    OTC Markets has a strict disclosure policy regarding company promotions, as the motivation to provide false information through such campaigns could severely impact the integrity of the OTC Markets.[55] OTC Markets' policy states, in relevant part, that:

a.    "Public availability of adequate current information is a core principal of OTC Markets Group's disclosure-based philosophy and the OTCQX and OTCQB Rules. Reputable public companies are expected to release quickly to the public any news or information which might reasonably be expected to materially affect the market for its securities."

b.    "***Management of a public company also has the responsibility to dispel unfounded rumors, misinformation or false statements which result in unusual market activity.***

---

[55] *OTC Markets' Group Policy on Stock Promotion*: https://www.otcmarkets.com/files/OTC_Markets_Group_Policy_on_Stock_Promotion.pdf (last accessed Feb. 3, 2022).

36

*Misleading and manipulative promotion clearly fall into this area of concern and must be immediately addressed.*"

c.    "Digital marketing has made it easier for investor relations professionals to reach millions of investors, but technology can also be abused by anonymous market manipulators for fraudulent promotional campaigns that harm the integrity of public markets and defraud investors."

d.    "Fraudulent promotional campaigns disseminate misleading information in a variety of manners, including e-mails, newsletters, social media outlets, press releases, videos, telephone calls, and/or hard mailers."

e.    "Common characteristics of misleading and manipulative promotion:

- *Fail to clearly identify the sponsor of the promotion, and/or the promotion is sponsored or paid for by anonymous, unidentifiable 3rd parties*

* * *

- Provide little or no factual information about the company, omit material information

* * *

37

- Urge the investor to take action immediately as not to miss out on a great opportunity

- Fail to provide details or disclosures about the risk associated with the issuers security"

f. "***Anonymous paid promotion is often associated with unregulated parties or 'financiers' that have acquired securities in private market transactions and wish to generate demand so they can sell their shares in the public markets at inflated prices***"

g. "A company whose security is being promoted may not be directly involved or even aware of a promotion campaign for their securities, ***however all public companies have an obligation to provide accurate disclosure to investors and quickly address any misleading information that could affect the trading market for their securities.***"

h. "Misleading and manipulative promotion of companies with little or no assets or business activity is of concern to OTC Markets. Anonymous paid promotion of these companies may raise red flags with regulators."

(Emphases added.)

79.     As a result, companies that violate the disclosure policies can be removed from OTCQB Tier and relegated to the more risky OTC Pink Open Market Tier, which could have a material impact on the stock's trading and negatively affect its price. OTC Markets will also refer companies to the SEC, FINRA, or other regulatory agencies "when we have concerns relating to stock promotion."

80.     Similarly, OTC Markets' *Stock Promotion: Best Practices for Issuers* policy[56] states, in relevant part, the following:

> a.     "The OTCQX Rules and OTCQB Standards require companies to make adequate, current information publicly available. ***Companies that sponsor or pay for promotion or other IR services are responsible for ensuring the accuracy of any disclosure or other materials associated with those services. The materials must also include appropriate disclosure that clearly identifies the promoter or IR firm's relationship to the issuer.***"
>
> b.     "Be wary of shareholders who have gained significant control of a company's shares, and are in possession, or are coming

---

[56] https://www.otcmarkets.com/files/Best_Practices_for_Issuers_Stock_Promotion.pdf (last accessed Feb. 3, 2022).

39

into possession, of unrestricted shares – ***they may have an incentive to induce promotion secretly ("pump") in order to sell (dump) their freely tradable shares on the open market.***"

c.    "We have strong concerns regarding anonymous third-party promotion. Promoting or paying to promote a stock secretly, without adequate disclosure, is a significant source of misleading and manipulative information that harms market integrity."

d.    "If a company pays someone, directly or indirectly through an intermediary, to publish or publicize articles about its stock, this relationship and payment should be disclosed to the investing public."

e.    "***Ongoing payments and agreements for promotion or IR services should be disclosed as part of the issuer's typical reporting.*** The identity of any IR firm engaged by the issuer must be disclosed in a timely manner, including on the issuer's 'Company Profile' page on www.OTCMarkets.com and in in other disclosure materials, where required."

f.    "***If your company was the subject of anonymous third-party promotion, you should identify the source of the promotion to***

40

> ***understand who may be attempting to manipulate the market for your security.***"

(Emphasis added.)

81.    Additionally, Pink Sheets LLC ("Pink Sheets"), the leading provider of pricing and financial information for the OTC securities market (and referenced in the OTC Markets *Stock Promotion: Best Practices for Issuers* policy), petitioned the SEC to take immediate action to protect investors from "deceptive activities by securities promoters and their sponsors."[57] Pink Sheets advocated that "Promotional materials must identify promoters ***and their sponsors, and the nature and amount of consideration paid for the promotion***." (Emphasis added.)

82.    Consistent with the above policies, on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the company make public disclosures relating to StreetAuthority's promotional campaign given RenovaCare's ongoing promotional activities.

83.    OTC Markets' January 3, 2018 letter demanded that RenovaCare issue a press release concerning its involvement in the StreetAuthority promotion, including:[58]

---

[57] https://www.sec.gov/rules/petitions/petn4-519.pdf (last accessed Feb. 3, 2022).

[58] *See* SEC Compl., ¶ 50.

41

a.    "the date on which the Company became aware of the promotional activities";

b.    "[a] written summary of the Company's understanding of the promotional activities," and "*[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material*";

c.    "*whether the company has editorial control over the content in the promotional materials*"; and

d.    "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been *involved in any way (including payment of a third-party) with the creation or distribution of promotional materials* related to the Company and its securities."

(Emphases added).

42

84.     In response, Rayat was instrumental in drafting and disseminating RenovaCare's press release in response to OTC Market's demand. Rayat was in the best position to provide the substantive detail in response to OTC Market's inquiry because, on behalf of RenovaCare, he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with them to create and disseminate the promotion.[59]

85.     On January 3, 2018, Rayat had several conference calls with RenovaCare's CEO, RenovaCare's director and outside counsel ("RenovaCare's Director"), and a third-party consultant to discuss the company's strategy in responding to OTC Markets.[60]

86.     By at least January 4, 2018, Rayat began working on a draft of the press release to respond to the issues raised by OTC Markets.[61]

87.     On January 4, 2018, Rayat again had several conference calls with RenovaCare's Director, RenovaCare's CEO, and a third-party consultant to discuss the draft press release.[62]

88.     On January 5, 2018, RenovaCare's Director emailed Rayat, RenovaCare's CEO, and a third-party consultant to request a follow-up conference

---

[59] *See* SEC Compl., ¶ 51.
[60] *See* SEC Compl., ¶ 52.
[61] *See* SEC Compl., ¶ 53.
[62] *See* SEC Compl., ¶ 54.

43

call in the next few days "to discuss/review and edit the revised draft" of the press release. Shortly thereafter, Rayat replied to suggest they talk on January 7, 2018, and noted that he would send his comments on the draft press release later by the following day. That day, Rayat also had several calls with RenovaCare's Director to discuss the draft.[63]

89.    On January 7, 2018, Rayat, RenovaCare's CEO, and RenovaCare's Director again discussed RenovaCare's draft press release, and a draft press release dated shortly after the call contained only minor differences from the draft the company would ultimately issue. [64]

90.    On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final version of the draft press release and instructed the Company to add its boilerplate "about us" and "disclaimer" language to the draft.[65] A few minutes later, at 1:14 p.m., RenovaCare's CEO forwarded the draft press release to Investor Relations Company B, noting that it was the final draft of the press release. As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us" and "disclaimer" language, then issue the press release at 3:45 p.m.[66]

---

[63] *See* SEC Compl., ¶ 55.

[64] *See* SEC Compl., ¶ 56.

[65] *See* SEC Compl., ¶ 57.

[66] *See* SEC Compl., ¶ 58.

44

91.    Rayat possessed the knowledge required to answer OTC Market's inquiry regarding the StreetAuthority campaign and had ultimate control of the content and dissemination of the press release to the public. Rayat's continuous involvement in the press release's drafting, culminating in his January 8, 2018 email to RenovaCare's CEO, followed by the CEO's response, demonstrates Rayat's authority and control over the content of the statement and his intent to disseminate it to the public.[67]

92.    On January 8, 2018, RenovaCare issued its press release statement response to OTC Markets.[68] It was not signed by any individual. Specifically, the Company stated the following:

> [O]n January 3rd, 2018, OTC Markets . . . informed the Company that OTC Markets had become aware of promotional activities concerning the Company.
>
> OTC Markets provided an example, dated January 2nd, 2018, of the promotional material for reference. It is the Company's understanding that the material provided was part of an annual predictions report used in part to generate new subscribers for various newsletters owned by StreetAuthority LLC, an independent publisher founded in 2001. ***The Company had no editorial control over the content*** and was one of thirteen companies independently selected, researched and mentioned. The annual

---

[67] *See* SEC Compl., ¶59.

[68] The press release is entitled "RenovaCare Comments On Recent Market Activity." *See* https://www.renovacareinc.com/2018/01/renovacare-comments-recent-market-activity/ (last accessed Feb. 3, 2022); https://www.sec.gov/Archives/edgar/data/0001016708/000147793218000202/rcar_ex992.htm (last accessed Feb. 3, 2022).

predictions report was disseminated during the last quarter of 2017. During this time, 2,190,000 shares traded, only 2% more than the average quarterly volume of 2,139,375 shares during all of 2017.

Subsequently, later in the 4th quarter, a material announcement regarding a failed challenge to a RenovaCare patent was made public. On December 20th, 2017, a press release was issued by Avita Medical Limited disclosing that its petition for an Inter Partes Review with the Patent Trial and Appeal Board ("PTAB") to invalidate all claims in U.S. Patent No. 9,610,430 (owned by the Company) was denied. This press release was followed by an article in Stockhead on December 21st, 2017, which more fully reported on the PTAB denying Avita Medical Limited's petition, and, thereby, upholding the patentability of RenovaCare's technology.

After the issuance of Avita Medical's press release and the follow-up article in Stockhead on December 21st, 2017, the trading volume of the Company's common stock increased 84% to 62,829 shares per day between December 20th and December 29th, versus 32,720 per day previously between December 1st through December 19th, 2017.

***The Company is not affiliated in any way with the authors of the annual predictions report or its publisher.*** The Company issues press releases in the regular course of business and includes in its filings (the "SEC Filings") with the [SEC] the material business activities of the Company, and investors are encouraged to rely on the information provided directly by the Company in such press releases and SEC Filings.

***In the report, the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading***, even though the report has significantly simplified the descriptions of the clinical indications and outcomes related to the use of the Company's cell spray for the treatment of burns and

46

wounds, and used promotional, advisory and superfluous language in describing the Company, its products and its stock. Moreover, the author comments on the Company's interaction with the U.S. Food and Drug Administration and the performance of RenovaCare's stock. The Company does not know the basis for such opinions or conclusions arrived-at by the author. Investors are reminded to rely upon the Company's own statements, press releases, and filings with the SEC for information related to these matters.

Following notification from OTCQB Markets, the Company immediately made inquiries of its executive officers, directors, controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities) and third-party service providers regarding their involvement in the creation or distribution of promotional materials related to the Company and its securities.

***To the Company's knowledge, the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly:***

- ***not been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities***; and

- **not** sold or purchased (other than in than in private placements conducted by the Company as described below) any shares of common stock of the Company within the last 90 days. The Company's former service provider, Inspiren Media LLC, originally acquired 5,000 shares of the Company on July 25th, 2008 and sold on January 3rd, 2018, after termination of its agreement with the Company. All activity in the Company's common stock by the Company's

47

> executive officers, directors and controlling shareholders has been disclosed by such officer, director and shareholder in the Company's SEC Filings.
>
> ***The Company was not involved in the creation, or directing the dissemination, of the report.*** Through its investor relations agencies, the Company paid $90,005.25 between October 24th, 2017 and January 2nd, 2018, as part of its contractual agreement to pay for out of pocket costs, including reimbursement of dissemination related costs, incurred by the investor relations agency.
>
> Between the period January 1st, 2017, and November 11th, 2017, the Company retained Omnicor Media LLC to provide public, media and investor relations services. Between the period October 16th, 2017 and December 31st, 2017, the Company retained INspiren LLC to provide public, media and investor relations agencies. Since January 1st, 2018, Damaak Group LLC has been providing public, media and investor relations services to the Company.

(Emphases added.)

93.    Rather than fairly and accurately disclose Rayat's and RenovaCare's continuous and ongoing relationship with StreetAuthority from the outset of StreetAuthority's promotional campaign, the January 8 Press Release contained numerous material misrepresentations and omissions that concealed Rayat's and RenovaCare's involvement in it.

94.    First, the January 8 Press Release stated that RenovaCare conducted an inquiry of all relevant persons, including controlling shareholders such as Rayat, "regarding their involvement in the creation or distribution of promotional

materials," and stated that "the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities." (emphasis in original).

95.    This statement was materially false. As discussed herein and corroborated by confidential witness accounts, Rayat was involved in the creation of StreetAuthority's promotional materials by providing information to StreetAuthority from the outset and reviewing and commenting on drafts before and during the promotion. Rayat was also involved in the distribution of StreetAuthority's promotional materials by consulting with StreetAuthority on several occasions concerning its distribution strategy and suggesting and approving changes to the promotion that StreetAuthority implemented.

96.    In addition, Rayat, RenovaCare's CEO, and the Company's third-party investor relations companies were all involved in the distribution of StreetAuthority's promotional materials by arranging for and working together to pay StreetAuthority $50,000 per month to cover StreetAuthority's distribution costs for the promotion.

49

97.     Second, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher." This was materially false. As discussed herein, RenovaCare was affiliated with StreetAuthority because the company was paying StreetAuthority $50,000 per month to run StreetAuthority's promotion, including its annual Predictions Report. The company was also affiliated with StreetAuthority because Rayat had been working closely with StreetAuthority on the promotion as RenovaCare's agent as corroborated by confidential witness accounts.

98.     Third, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of StreetAuthority's RenovaCare-related promotional materials. This was materially false. As discussed herein, Rayat, acting as an agent for the company, reviewed and commented on StreetAuthority's promotional materials before and throughout StreetAuthority's promotional campaign, and on several occasions, StreetAuthority incorporated Rayat's changes before publicly releasing the promotional materials.

99.     Fourth, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report." This statement was materially false. As discussed herein and corroborated by confidential witness accounts, Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report by providing information to

50

StreetAuthority to include in the report and by reviewing and commenting on drafts before and during the promotion. Rayat, on behalf of RenovaCare, was also involved in directing the dissemination of the report by discussing StreetAuthority's plan for disseminating the promotional materials and suggesting and approving changes to its dissemination on several occasions. In addition, RenovaCare provided StreetAuthority the funding for the dissemination of StreetAuthority's promotional materials.

100.    Fifth, the January 8 Press Release contained material omissions, including specific information required by OTC Markets, that, if addressed, would have required Rayat and RenovaCare to admit to some awareness and involvement in StreetAuthority's campaign. Under OTC Markets policies regarding stock promoters (see Section IV. I above), OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities," and yet the company failed to disclose that Rayat, on behalf of the company, was aware of the campaign since at least July 2017, and that RenovaCare's CEO was aware of the campaign by at least November 2017 when he authorized RenovaCare to pay Investor Relations Company A for expenses relating to the promotion.

101.    The misrepresentations and omissions in the January 8 Press Release were material. The potential for small companies with illiquid and low-priced shares to fund false promotional campaigns to increase company's stock price and

51

trading volume to benefit corporate insiders and controlling shareholders, as was done here, is precisely why RenovaCare's false January 8 Press Release is material. As cited above at length, OTC Markets' disclosure policies seek to address this very issue. RenovaCare's compliance with OTC Markets' policies on company promotions, if violated, could result in the Company's removal from the OTCQB Tier and be relegated to the lesser traded OTC Pink Open Market Tier, which would certainly have a substantial impact on RenovaCare's stock trading and negatively affect its price. In fact, on February 26, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity.[69] The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

---

[69] As described in *OTC Markets Group Policy on Stock Promotion* (see above), "OTC Markets Group designates certain securities with 'Caveat Emptor' and places a skull and crossbones icon next to the stock's ticker symbol as it appears on OTC Markets Group's websites, data feeds and social media, as notice of a potential public interest concern associated with the security, and to caution investors to exercise additional care and perform thorough due diligence before making any investment decision. OTC Markets Group may designate a security undergoing promotion as Caveat Emptor, if, in OTC Markets Group's determination, the stock promotion presents a public interest concern or if the company has not made adequate current information available to investors." *See* https://www.otcmarkets.com/files/OTC_Markets_Group_Policy_on_Stock_Promotion.pdf (last accessed Feb. 3, 2022).

102.    Consistent with OTC Markets' disclosure policies, a reasonable investor would have wanted to know, in making an investment in RenovaCare stock, that RenovaCare's controlling shareholder was assisting and paying for a promotional campaign that encouraged investors to purchase RenovaCare stock. A reasonable investor would have also wanted to know that Rayat was covering up the source of the funding for the promotional campaign.

103.    RenovaCare and Rayat knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public. Given his personal participation in the StreetAuthority promotion in the months leading up to the January 8 Press Release, Rayat knew, or was reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions that he approved in the final draft and sent to RenovaCare's CEO with instructions prior to disseminating it to the investing public.

104.    As an agent and controlling shareholder of RenovaCare, and the individual acting on behalf of RenovaCare with respect to the promotion, Rayat's knowledge is imputed to RenovaCare. Furthermore, by January 8, 2018, RenovaCare's CEO was aware that the company was involved with StreetAuthority's promotional campaign, as he had previously approved several payments to the investor relations companies that he knew, or was reckless in not

knowing, that related to the StreetAuthority promotion. The company also relied upon Rayat's knowledge of the promotional campaign when preparing the January 8 Press Release, included his substantive comments on the press release, and followed his directions when disseminating it to the public.

105.   Despite the above, on January 12, 2018, RenovaCare publicly filed a Form 8-K with the SEC, signed by RenovaCare's CEO, that attached a copy of the January 8, 2018 Press Release without correction or amendment,[70] which further misled investors as to RenovaCare's intimate involvement in StreetAuthority's promotional campaign.

## J.    Defendants Continue Misleading Investors About RenovaCare's Disclosure Controls in Spite of OTC Markets' Letter.

106.   Defendants continued to mislead investors about the effectiveness of the Company's disclosure controls on February 27, 2018, when RenovaCare filed its Form 8-K with the SEC for the period ended February 21, 2018.[71] Despite the ongoing StreetAuthority promotion, OTC Markets letter, and February 26 OTC Markets downgrading action, RenovaCare again failed to acknowledge the existence of its relationship with StreetAuthority. Further, the Company failed to

---

[70] https://www.sec.gov/Archives/edgar/data/0001016708/000147793218000202/rcar_ex992.htm (last accessed Feb. 3, 2022).

[71] https://www.sec.gov/Archives/edgar/data/0001016708/000147793218001040/rcar_8k.htm (last accessed Feb. 3, 2022).

903150.1

provide an adequate response to an investigative reporting website (*see* Section

IV.M below).

107.    Defendants continued to mislead investors about the effectiveness of

the Company's disclosure controls on March 13, 2018, when RenovaCare filed its

annual report on Form 10-K with the SEC for the period ended December 31,

2017. That annual report stated, in relevant part:

> **Evaluation of and Report on Internal Control over Financial Reporting**
>
> Based on [an] evaluation, management, after evaluating the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), have concluded that, as of December 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

108.    Despite the above representation about effective disclosure controls,

Defendants failed to disclose RenovaCare's ongoing publishing arrangement with

StreetAuthority. Nor is there any mention of StreetAuthority or risk factors

associated with the promotion.

**K.    Rayat and His Associates Attempted to Profit, and Did Profit, from StreetAuthority's Promotion Campaign of RenovaCare.**

109.    Rayat attempted to and his associates did profit from RenovaCare's

involvement in StreetAuthority's promotional campaign. Rayat made several

attempts to take advantage of the impact of StreetAuthority's RenovaCare

903150.1

promotion. Before the StreetAuthority campaign began, Rayat engaged in several transactions to increase his RenovaCare stock holdings at below-market prices. On June 28, 2017, Rayat exercised warrants that granted his holding company, Kalen Capital, over 114,000 shares, and on July 21, 2017, Rayat purchased another 410,000 shares from RenovaCare through a private placement at a price of $2.44 per share when the stock was trading over $3.00 per share.[72]

110.   At the same time Rayat was working with StreetAuthority on the RenovaCare promotion, Rayat attempted to sell at least 500,000 RenovaCare shares through at least two brokerages. Before the promotional materials were issued, Rayat had acquired 524,000 shares of RenovaCare stock at below-market prices by exercising warrants and through a private placement. The promotional scheme caused the price of RenovaCare stock to rise from $3.10 per share in October 2017 to $4.91 per share by January 5, 2018. However, the first brokerage closed Rayat's account before any sales could be made, and the compliance department of the second brokerage denied his request to open an account. For these reasons, the sales were never made.[73]

111.   A number of Rayat's close associates also sought to benefit, and did benefit, from the increased stock price during this period. For example, right before

---

[72] *See* SEC Compl., ¶ 76.
[73] *See* SEC Compl., ¶ 77.

903150.1

the StreetAuthority promotion began, on October 16, 2017, Cindy Bains ("Bains"), Rayat's friend, purchased 900,000 shares directly from the company at a below-market price of $2.50 per share through a private placement by the company.[74]

112.  In addition, while StreetAuthority's promotion was active, on February 12, 2018, RenovaCare filed a Form S-1 Registration Statement with the SEC seeking to register over 4 million restricted shares for public sale, including 2.42 million that Rayat owned, and Bain's 900,000 shares that she just purchased in October 2017 at a below-market price.[75]

113.  Rayat's other close associates successfully sold shares during the StreetAuthority promotion. For example, Rayat's long-time friend and the office manager of Rayat's real estate firm, Jeet Sidhu, sold millions of dollars in RenovaCare stock at historically high prices while StreetAuthority's promotion was active.[76]

## L.  Over a Year Later, Defendants Admit in SEC Filings That RenovaCare's Disclosure Controls and Procedures Were Not Effective.

114.  On April 12, 2019, over a year after Defendants denied the statements in OTC Markets' letter, RenovaCare finally admitted its disclosure controls and procedures were ineffective. On that day, RenovaCare filed its annual report on

---

[74] *See* SEC Compl., ¶ 78.
[75] *See* SEC Compl., ¶ 79.
[76] *See* SEC Compl., ¶ 80.

Form 10-K with the SEC for the period ended December 31, 2018. That annual

report stated, in relevant part:

> Based upon [an] evaluation, our Principal Executive Officer and Acting Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that **_our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting_** as discussed and defined in Management's Report on Internal Control over Financial Reporting referred to below.
>
> *  *  *
>
> Management has identified the following material weaknesses in our internal control over financial reporting:
>
> - **_Ineffective control environment_** due to an insufficient number of independent board members, insufficient oversight of work performed, and the lack of compensating controls over financial reporting due to limited personnel;
>
> - **_Ineffective design, implementation, and documentation of internal controls_** impacting financial statement accounts and general controls over technology pertaining to user access and segregation of duties, banking and disbursements, and financial accounting system applications; and
>
> - **_Ineffective monitoring controls_** related to the financial close and reporting process, including management's risk assessment process and its identification, evaluation, and timely remediation of control deficiencies.

(Emphases added.)

115.   Following this disclosure, on May 14, 2020, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019, repeating the ineffectiveness of the Company's disclosure controls. That annual report stated, in relevant part:

> Based upon [an] evaluation, our [CEO] and Acting Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that ***our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting*** as discussed and defined in Management's Report on Internal Control over Financial Reporting referred to below.
>
> * * *
>
> Management identified the following material weaknesses in our internal control over financial reporting as of December 31, 2019:
>
> ***Because of the Company's limited resources, there are limited controls over information processing.***

(Emphases added.)

> On March 31, 2021, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020, that again repeated the ineffectiveness of the Company's disclosure controls. That annual report stated, in relevant part:
>
> Based upon [an] evaluation, our [CEO] and Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that ***our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting*** as discussed and defined in Management's

Report on Internal Control over Financial Reporting referred to below.

\* \* \*

Management identified the following material weaknesses in our internal control over financial reporting as of December 31, 2020:

**_Because of the Company's limited resources, there are limited controls over information processing._**

(Emphases added.)

## M. Defendants Failed to Adequately Respond to or Clarify a Scathing Report Published by an Investigative Reporting Website Regarding RenovaCare's Business Operations and Undisclosed Stock Promotion Practices.

116.   In addition to the above, on February 12, 2018, an investigative reporting website, TheStreetSweeper, published an article entitled "RenovaCare: Many Catalysts, Untold Downside" on _Seeking Alpha_[77] that exposed deficiencies with RenovaCare's business operations, products, financials, insider trading practices, and, more relevant here, RenovaCare's questionable response to OTC Markets' letter relating to StreetAuthority's promotional campaign (the "StreetSweeper Article").

117.   The StreetSweeper Article raised questions about the Company's operations and highlighted that despite being a roughly $600 million market cap

---

[77] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Feb. 3, 2022).

company, RenovaCare "is operated by one full-time employee and three part-time

contractors … including the CEO"; that the SkinGun was "acquired on the cheap

[(for only $400,000)] and has not been presented to the FDA for approval"; that

[within its 35 years of existence,] RenovaCare had no sales, little cash, big

operating losses, and auditors expressed doubt that the company could continue as

a going concern; that RenovaCare had "***[h]eavy, sometimes misleading***

***promotions, questioned by [OTC Markets]***"; that Rayat, RenovaCare's controlling

stockholder was a foreign stock promoter who was formerly in trouble with the

SEC[78]; and RenovaCare's operations were suspicious when compared to confirmed

financial/operations data from RenovaCare's industry competitor. (Emphasis

added.)

118.    The StreetSweeper Article stated that RenovaCare "has not responded

to the questions TheStreetSweeper emailed several times to the company,

including those about Mr. Rayat's ownership or his SEC settlements." Further, the

author commented on Rayat's past history as a stock promoter for EquityAlert.com

that, "These stock-promotion-related incidents don't directly affect RenovaCare,

but investors and potential investors need to be aware of the majority owner's

[(Rayat's)] history."

---

[78] The article describes the SEC action against Rayat for his unlawful stock promoter role while operating EquityAlert.com in the late 1990s/early 2000s. *See* fn. 36 above (discussing EquityAlert.com and Rayat).

119.    The StreetSweeper Article also summarized OTC Markets' investigation into RenovaCare's promotional activities and OTC Markets' January 3, 2018 letter. The author wrote, "The exchange over which the stock trades came knocking at RenovaCare's door on Jan. 3 about 'promotional activities concerning the company.' The OTC had noticed promoters StreetAuthority and Stockhead said some really nice things about RenovaCare. A huge spike in trading volume and stock price followed those pumps, OTC noted. StreetAuthority, for example, wrote about [RenovaCare as] 'The most spectacular medical breakthrough of 2018.' The promoter added 'RenovaCare has submitted a 510-K filing to the FDA… Now it's just a matter of waiting on the FDA.' But wait. The application *has not* been submitted. *RenovaCare could have requested that StreetAuthority fix the error, but there's no evidence that has happened*, Instead, RenovaCare's 8-K reveals another issue of concern…." (Emphasis added.)

120.    Regarding RenovaCare's promotional campaign, The StreetSweeper Article continued on and questioned RenovaCare's response to the OTC Markets letter in its January 12, 2018 8-K filing where RenovaCare denied any involvement in the creation, or directing the dissemination, of the StreetAuthority promotional campaign but stated that RenovaCare paid $90,005.25 to investor relations

companies.[79] The author pointed out the contradictory nature of RenovaCare's response and posed a rhetorical statement to readers: "So, RenovaCare states it had **no influence** on creating the promoter's report … even though the company **paid $90,000** for the report." (Emphasis in original.) The author provided the following report screenshot of an example of StreetAuthority's ongoing promotional campaign for RenovaCare, citing StreetAuthority as the source:



## 13 Shocking Investment Predictions for 2018

### ...From The Research Team Whose Annual Predictions Have Returned Up To 569%

### #1: RenovaCare, Inc. [Ticker: RCAR]

**Wednesday, February 7, 2018**

On behalf of the research staff at *Game-Changing Stocks*, we'd like to thank you for requesting our new investment report.

Today we'd like to share with you the name and trading symbol of one of the most urgent stock recommendations we have ever made. It is an opportunity that our six-man research team believes offers explosive profit potential in 2018 and beyond.

---

[79] https://www.sec.gov/Archives/edgar/data/1016708/000147793218000202/rcar_ex992.htm (last accessed Feb. 3, 2022).

121.   The StreetSweeper Article also highlighted that StreetAuthority, in its disclosures in RenovaCare's promotional campaign, was paid by RenovaCare for the promotion through a third party investor relations company, Damaak Group LLC. This payment "include[d] $50,000 per month for 'investment predictions' reports." The author also noted that StreetAuthority disclosed that Betancourt, StreetAuthority's president, owns 2,100 shares of RenovaCare common stock. The author commented, "**Solid companies aren't typically promoted by professional promoters**." (Emphasis added.)

122.   The StreetSweeper Article concluded that it was awaiting a response to its questions from RenovaCare and that "RenovaCare still hasn't answered our multiple emails or calls seeking comment." Additionally, the author stated, "We do have grave concerns about this company's future and expect to share management's answers with investors…. Right now – considering RenovaCare's part-time CEO, stalled product, heavy promotions, OTC questions, majority shareholder concerns, low financial condition and poor comparison to its nearest rival – we're having a hard time justifying a fraction of its current market valuation."

123.   On the same day as publication of the StreetSweeper's February 12, 2018 article, RenovaCare issued a press release entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, Streetsweeper, Affiliated with Felon Convicted

903150.1

of Securities Fraud."[80] RenovaCare's response was inadequate because it failed to use this opportunity to clarify or specifically address the article's contents. Instead, RenovaCare maintained its innocence and continued misleading investors until the truth was finally revealed by the SEC's May 28, 2021 complaint (discussed in Section VI (The Truth Emerges) below), which ultimately caused RenovaCare's inflated stock price to drop and thereby harm investors.

124.    Specifically, RenovaCare stated in its response that the StreetSweeper Article was "spreading 'short and distort' commentary on companies it targets for short selling, in this case RenovaCare." The Company quoted Defendant Thomas Bold and stated, "'We will not be distracted by the irresponsible and nefarious actions of these short sellers and a handful of internet posters…. 'We have an obligation to expose those who prey on our shareholders for short-term profits and attempt to damage the public trust.'" The Company then threw in a red herring and commented, "'Meanwhile, our clinical and regulatory teams continue to make incredible strides, with our next major milestone being our initial FDA filing. We are determined to bring our breakthrough stem cell therapy to market with the ongoing strong support of our shareholders.'" The Company then provided pictures

---

[80] https://www.renovacareinc.com/2018/02/renovacare-issues-stern-response-to-admitted-short-seller-streetsweeper-affiliated-with-felon-convicted-of-securities-fraud/ (last accessed Feb. 3, 2022).

of burn victims who allegedly successfully recovered using the SkinGun and touted its technology.

125.   In further retaliation and in reaction to the drop in its stock price on February 27, 2018,[81] on March 5, 2018, RenovaCare issued a follow-up press release, entitled "RenovaCare Takes Action to Protect Shareholder Interests,"[82] attacking TheStreetSweeper using *ad hominem* arguments, failing once again to address the content of the StreetSweeper Article. The retaliatory press release stated that RenovaCare "has received video evidence showing what appears to be predatory trading practices of several FINRA member firms in its stock." Although not mentioning TheStreetSweeper by name, the response was very likely aimed at TheStreetSweeper.[83]

126.   Specifically, the press release stated that "RenovaCare has informed investigatory agents of FINRA about these extensive and, in the Company's opinion, potentially illegal, ongoing predatory trading practices, engaged in by

---

[81] *See* Section IV.J above (discussing RenovaCare's Form 8-K for the period ended February 21, 2018 and accompanying stock drop).

[82] https://www.renovacareinc.com/2018/03/renovacare-takes-action-protect-shareholder-interests/ (last accessed Feb. 3, 2022).

[83] For example, RenovaCare states in the press release the following: "As reported to stockholders on February 12, 2018, a known 'short and distort' syndicate has engaged in an ongoing smear campaign of disseminating grossly misleading, inaccurate and distorted facts and misinformation, including false allegations of insider seller." The StreetSweeper Article was published on February 12, 2018.

903150.1

certain FINRA member firms, as more fully shown in the video." The Company speculated that "These firms may be covertly collaborating with the short seller syndicate targeting the Company." RenovaCare continued, "The Company is proceeding with the filing of a formal complaint regarding these 'bear raid' trading practices with both FINRA and the SEC and will explore all potential private legal remedies available to it."

127.   The press release further stated that "These short sellers spread false rumors and innuendos of impropriety with business affiliates, partners, and collaborators to disparage the good reputation of RenovaCare and thereby enhancing their profit at the expense of Company stockholders. Often, this is accomplished by the 'short and distort' syndicate enlisting members of the media and others, who may unwittingly write stories based on the grossly misleading and inaccurate statements of fact." RenovaCare then falsely advocated its position in protecting shareholders: "RenovaCare strongly believes that it has an obligation to protect its stockholders from adverse financial and reputational harm caused by these unfounded and potentially illegal activities. Such actions undermine the integrity of the Company, its management and its majority stockholder, Kalen Capital Corporation."

128.   Despite RenovaCare's lengthy attacks on TheStreetSweeper's motivations, RenovaCare failed to use the press release to address any of the

903150.1

StreetSweeper Article's investigation, especially as related to StreetAuthority's promotional campaign. A reasonable investor would have expected that RenovaCare would at least address some of the substance in the StreetSweeper Article. RenovaCare had a perfect opportunity to clarify its promotional activities but failed to do so. Instead, RenovaCare continued to mislead investors by omitting any sort of explanation, meaningful response, or clarification related to StreetAuthority's promotion. Contrary to RenovaCare's representation in the press release that it sought to protect shareholders, investors would only learn about the truth of the promotional campaign once the SEC brought its May 28, 2021 action and investors were harmed when RenovaCare's stock price dropped in response (discussed more fully below).

**N.    The Individual Defendants Violated the Company's Ethics Policies by Failing to Reveal Their Promotional Campaign Activities with StreetAuthority.**

129.    Notwithstanding the above, the Individual Defendants, as officers and/or directors of RenovaCare, were bound by the Company's Code of Corporate Governance and Ethics (the "Code of Corporate Governance and Ethics"),[84] which sets out basic principles to guide, as well as specific requirements to bind, all directors, officers, and employees of RenovaCare, who are required to know and

---

[84] https://uploads.renovacareinc.com/wp-content/uploads/2021/06/23164403/Code-of-Corporate-Governance-And-Ethics.pdf (last accessed Feb. 3, 2022).

903150.1

conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

130.    The Code of Corporate Governance and Ethics specifically states that it "applies to all employees, officers and directors of RenovaCare Technologies, Inc., its subsidiaries and affiliates."

131.    To further illustrate the importance and binding nature of the specific requirements placed upon Individual Defendants, the Code of Corporate Governance and Ethics states that:

> RenovaCare's reputation depends on you maintaining the highest standards of conduct in all business endeavors. You have a *personal responsibility* to protect this reputation, to "do the right thing," and to act with honesty and integrity in all dealings with customers, business partners and each other. *You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice*.
>
> \*       \*       \*
>
> *You are accountable for reading, understanding and adhering to this [Code of Corporate Governance and Ethics]*. Further, compliance with all laws, rules and regulations related to Company activities is mandatory and your conduct must be such as to avoid even the appearance of impropriety.

(Emphases added.)

132.    In a section titled, "Conflicts of Interest," the Code of Corporate Governance and Ethics states the following:

69

> ***Company policy prohibits conflicts of interest***. A "conflict of interest" occurs when your private interest interferes in any way with the interests of RenovaCare.
>
> *    *    *
>
> You owe a duty to RenovaCare to advance its legitimate interests. ***You are prohibited from*** competing with the Company and from ***using corporate property, information or position for personal opportunities or gain.*** You may not use or offer for use RenovaCare resources (time, technology, property or information) for non RenovaCare business.

(Emphases added.)

133.  The section of the Code of Corporate Governance and Ethics titled

"Financial Management and Disclosure" states the following:

> The Company must disclose to the SEC, current security holders and the investing public information that is required, and any additional information that may be necessary to ensure the required disclosures are not misleading or inaccurate. ***The Company requires you to participate in the disclosure process, which is overseen by the [CFO] and/or [CEO].***
>
> *    *    *
>
> ***Officers and employees must fully comply with their disclosure responsibilities in an accurate and timely manner or be subject to discipline of up to and including termination of employment.***

(Emphases added.)

134.  In a section titled, "Accounting Standards," the Code of Corporate

Governance and Ethics states the following:

70

RenovaCare maintains its accounting records and prepares its financial statements in accordance with accounting principles generally accepted in the U.S. (GAAP) and with statutory accounting principles, as promulgated by the [SEC] and other regulating authorities. ***If you are aware or have reason to believe that there are violations of either law or policy regarding the Company's financial records or operations, you are obligated to report such information promptly.***

(Emphases added.)

135.    The section of the Code of Corporate Governance and Ethics titled "Reporting of Any Illegal or Unethical Behavior; Points of Contact" states further the Individual Defendants' duty to disclose:

If you are aware of any illegal or unethical behavior or if you believe that an applicable law, rule or regulation or this [Code of Corporate Governance and Ethics] has been violated, the matter must be promptly reported to the [CEO], the [CFO] or the Corporate Ethics & Compliance Committee.

136.    Upon information and belief, the Company maintained versions of the Code of Corporate Governance and Ethics during the Class Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

137.    The Individual Defendants, as officers and/or directors of RenovaCare, were also bound by the Company's Code Ethics (the "Code of

71

Ethics"),[85] which, similar to the Company's Code of Corporate Governance and Ethics, sets out basic principles to guide, as well as specific requirements to bind, all directors, officers, and employees of RenovaCare, who are required to know and conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

138.   The Code of Ethics specifically states that it "applies to all [o]fficers, [d]irectors, and [e]mployees of the company and its affiliates."

139.   In a section titled, "Standard of Conduct," the Code of Ethics states the following:

> RenovaCare insists that all aspects of its business operations be conducted with honesty, integrity, fairness and with respect for those affected by its business activities. Similarly, RenovaCare expects the same in its relationships among those with whom it does business.
>
> All [e]mployees are expected to maintain and promote integrity and honesty in all business transactions. Employees must conduct themselves according to the highest ethical standards and are expected to apply ethical business practices in the administrative and financial affairs of RenovaCare business operations.
>
> There is no Code of Ethics that can expect to define suitable behavior for each situation, nor should it seek to do so. As such, [e]mployees are expected to exercise vigilance and make considered judgment of what is right and proper in any particular situation.

---

[85] https://uploads.renovacareinc.com/wp-content/uploads/2021/06/23174631/Code-of-Ethics.pdf (last accessed Feb. 3, 2022).

903150.1

> While carrying out the business operations of RenovaCare, [e]mployees are expected to be accountable, truthful, trustworthy, conscientious, and committed to the highest standards of ethical business practices. ***As such, [e]mployees are required to avoid all impropriety as well as the appearance of impropriety when conducting RenovaCare business operations.***

(Emphasis added.)

140.    In a section titled, "Accuracy and Completeness of Accounting Records," the Code of Ethics states the following:

> RenovaCare's accounting and supporting documents must accurately and completely describe and represent the nature and result of RenovaCare's business operations. ***The results and activities of RenovaCare's operations must be presented in a fair and unbiased manner.***
>
> *        *        *
>
> ***Misappropriation, wrongful allocation, or improper use of the Company's assets and property, or the false entry to records and reports by any [e]mployee or by others must be reported to Board of RenovaCare.***

(Emphases added.)

141.    The section of the Code of Ethics titled "Accurate and Timely Communications" states the Individual Defendants' duty to disclose:

> RenovaCare expects [e]mployees to be ***completely truthful and forthright in all internal and external interactions and communications, whether with shareholders, clients, government agencies, or others.***
>
> ***Employees will ensure that all statements are accurate and complete with no misrepresentations which may mislead or misinform.*** In all cases, [e]mployees are

> expected to provide full, prompt and accurate disclosure
> to governmental agencies.

(Emphases added.)

142.    The section of the Code of Ethics titled "Disclosure Of Personal

Interest" further states the regarding the Individual Defendants' duty to disclose:

> RenovaCare [e]mployees are expected to fully disclose
> any personal interest(s) which could impinge or might
> reasonably be considered by others to conflict with their
> business dealings with industry.
>
> ***RenovaCare [e]mployees must not engage in personal
> activities and financial interests that may conflict with
> their responsibilities and obligations to the Company*** or
> give assistance to competitors, in conflict with the interests
> of RenovaCare or its clients.

(Emphasis added.)

143.    In the section titled "Annual Acknowledgment," the Company sets

forth the requirement that each employee shall "sign a statement annually that he

or she has read and understands RenovaCare's Code of Ethics."

144.    To further demonstrate the Company's intention of making the Code

of Ethics and its specific requirements binding on the RenovaCare employees, as

well as the Individual Defendants, the Code of Ethics requires that the signed

annual acknowledgment include a statement from the employee affirming "that he

or she is in full compliance with the [Code of Ethics]."

145.    The Individual Defendants, because of their positions of control and

authority as directors and/or officers of RenovaCare, were able to, and did, directly

74

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RenovaCare.

146.   Because of their advisory, executive, managerial, and directorial positions with RenovaCare, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of RenovaCare.

147.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RenovaCare and was at all times acting within the course and scope of such agency.

148.   By failing to promptly disclose and continue concealing RenovaCare's promotional campaign with StreetAuthority, the Individual Defendants were in violation of the ethics policies for the reasons discussed herein.

149.   To discharge their duties, the officers and directors of RenovaCare were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of RenovaCare were required to, among other things:

      a.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its

75

legal authority and disseminating truthful and accurate statements to the investing public;

b.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

d.      remain informed as to how RenovaCare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws; and

e.      ensure that RenovaCare was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

150.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances[86] under which they were made, not misleading, and Defendants knew, or at least recklessly disregarded, that their representations were false and misleading at the time they made their representations for the following reasons as set for in more detail in Section IV above. Specifically, Defendants failed to disclose to investors that: (i) at the direction of Rayat, RenovaCare engaged in a promotional campaign to issue misleading statements to artificially inflate the Company's stock price; (ii) when the OTC Markets inquired, RenovaCare and Rayat issued a materially false and misleading press release claiming that no director, officer, or controlling shareholder had any involvement in the purported third party's promotional materials; (iii) as a result of the foregoing, the Company's disclosure controls and procedures were defective; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.[87]

---

[86] To the extent a false or misleading statement by Defendants that is identified in the paragraphs above is not repeated in this section, it is incorporated by reference.

[87] The statements quoted in this section in **_bold and italicized_** typeface are materially false or misleading for the reasons set forth herein. Additionally, as

77

903150.1

**A.    August 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls and Failed to Disclose the Stock Promotion Risk.**

151.    The Class Period begins on August 14, 2017, when RenovaCare filed

its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017.

This report was signed by Defendant Bold, and stated, in relevant part:

> Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

152.    Defendants' representations concerning the effectiveness of

RenovaCare's disclosure controls was materially false and misleading for the

reasons set forth in Section IV.C. above.

153.    Defendants' representations were also materially false and misleading

because there Defendants fail to disclose and omit that that the promotional

campaign, and any consequences associated with it as discussed herein, was a risk

---

specifically indicated below, many of the identified statements are alleged to have been false or misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

903150.1

factor to the Company's stock price. Instead, Defendants simply state under Item 1A (Risk Factors): "Smaller reporting companies are not required to provide the information required by this item" and do not disclose *any* risk factors (Defendants do this in all of the Company's 10-Q filings during the Class Period).

154.   From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials, including the aforementioned Predictions Report, on the internet and to its subscriber base.

**B.    October 18, 2017 Prospectus Supplement Failed to Disclose Stock Promotion Risk.**

155.   On October 18, 2017, RenovaCare filed a Prospectus Supplement to RenovaCare's Prospectus dated May 17, 2017. The Prospectus Supplement was signed by Defendant Bold. There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

156.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV above.

**C.    November 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls.**

157.   On November 14, 2017, RenovaCare filed its quarterly report on

Form 10-Q with the SEC for the period ended September 30, 2017. The report was

signed by Defendant Bold and stated, in relevant part:

> Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

158.   Defendants' representations concerning the effectiveness of

RenovaCare's disclosure controls was materially false and misleading for the

reasons set forth in Section IV.H. above.

**D.    Defendants' January 8, 2018 Statement Responding to OTC Markets' Letter.**

159.   On January 8, 2018, RenovaCare issued an unsigned statement

"comment[ing] on recent market activity." Specifically, the Company issued a

press release stating:

> [O]n January 3rd, 2018, OTC Markets . . . informed the Company that OTC Markets had become aware of promotional activities concerning the Company.

80

OTC Markets provided an example, dated January 2nd, 2018, of the promotional material for reference. It is the Company's understanding that the material provided was part of an annual predictions report used in part to generate new subscribers for various newsletters owened by StreetAuthority LLC, an independent publisher founded in 2001. ***The Company had no editorial control over the content*** and was one of thirteen companies independently selected, researched and mentioned. The annual predictions report was disseminated during the last quarter of 2017. During this time, 2,190,000 shares traded, only 2% more than the average quarterly volume of 2,139,375 shares during all of 2017.

Subsequently, later in the 4th quarter, a material announcement regarding a failed challenge to a RenovaCare patent was made public. On December 20th, 2017, a press release was issued by Avita Medical Limited disclosing that its petition for an Inter Partes Review with the Patent Trial and Appeal Board ("PTAB") to invalidate all claims in U.S. Patent No. 9,610,430 (owned by the Company) was denied. This press release was followed by an article in Stockhead on December 21st, 2017, which more fully reported on the PTAB denying Avita Medical Limited's petition, and, thereby, upholding the patentability of RenovaCare's technology.

After the issuance of Avita Medical's press release and the follow-up article in Stockhead on December 21st, 2017, the trading volume of the Company's common stock increased 84% to 62,829 shares per day between December 20th and December 29th, versus 32,720 per day previously between December 1st through December 19th, 2017.

***The Company is not affiliated in any way with the authors of the annual predictions report or its publisher.*** The Company issues press releases in the regular course of business and includes in its filings (the "SEC Filings") with the [SEC] the material business activities of the Company, and investors are encouraged to rely on the

information provided directly by the Company in such press releases and SEC Filings.

*In the report, the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading*, even though the report has significantly simplified the descriptions of the clinical indications and outcomes related to the use of the Company's cell spray for the treatment of burns and wounds, and used promotional, advisory and superfluous language in describing the Company, its products and its stock. Moreover, the author comments on the Company's interaction with the U.S. Food and Drug Administration and the performance of RenovaCare's stock. The Company does not know the basis for such opinions or conclusions arrived-at by the author. Investors are reminded to rely upon the Company's own statements, press releases, and filings with the SEC for information related to these matters.

Following notification from OTCQB Markets, the Company immediately made inquiries of its executive officers, directors, controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities) and third-party service providers regarding their involvement in the creation or distribution of promotional materials related to the Company and its securities.

*To the Company's knowledge, the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly:*

- **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities; and

82

- **not** sold or purchased (other than in than in private placements conducted by the Company as described below) any shares of common stock of the Company within the last 90 days. The Company's former service provider, Inspiren Media LLC, originally acquired 5,000 shares of the Company on July 25th, 2008 and sold on January 3rd, 2018, after termination of its agreement with the Company. All activity in the Company's common stock by the Company's executive officers, directors and controlling shareholders has been disclosed by such officer, director and shareholder in the Company's SEC Filings.

The Company was not involved in the creation, or directing the dissemination, of the report. Through its investor relations agencies, the Company paid $90,005.25 between October 24th, 2017 and January 2nd, 2018, as part of its contractual agreement to pay for out of pocket costs, including reimbursement of dissemination related costs, incurred by the investor relations agency.

(Emphases added.)

160.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV.I. above.

**E.    February 12, 2018 Form S-1 Filing Failed to Disclose Stock Promotion Risk.**

161.    The Company filed its Form S-1 on February 12, 2018. The From S-1 was signed by Defendant Bold. It is materially misleading and false because of the same deficiencies in the October 18, 2017 Prospectus Supplement filing (see

above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

### F.    February 27, 2018 Form 8-K Filing Omitted Disclosure of the Promotional Campaign with StreetAuthority.

162.    On February 27, 2018, RenovaCare filed its Form 8-K with the SEC for the period ended February 21, 2018. The Form 8-K was signed by Defendant Bold. RenovaCare again failed to acknowledge or describe its relationship with StreetAuthority. Further, the Company failed to provide an adequate response to investigative reporting website TheStreetSweeper's February 12, 2018 *Seeking Alpha* article, as discussed herein. Thus, RenovaCare misrepresented the risks associated with its ongoing promotional campaign by completely omitting discussion of it and risks associated with negative reporting surrounding it.

163.    Defendants' February 27, 2018 Form 8-K were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV.J. above.

### G.   March 13, 2018 Form 10-K Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls.

164.   On March 13, 2018, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2017. The From 10-K was signed by Defendant Bold. That annual report stated, in relevant part:

> Based on [an] evaluation, management, after evaluating the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), have concluded that, as of December 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

165.   Defendants' representations concerning the effectiveness of RenovaCare's disclosure controls was materially false and misleading for the reasons set forth in Section IV.J. above.

### H.   April 6, 2018 Form S-1/A Filing Failed to Disclose Stock Promotion Risk.

166.   The Company filed its Form S-1/A on April 6, 2018. The Form S-1/A was signed by Defendants Bold and Rayat. It is materially misleading and false because of the same deficiencies in the October 18, 2017, Prospectus Supplement filing (see above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company.

85

167.   Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

168.   Defendants, however, informed the market that RenovaCare's stock would be quoted by OTC Markets using the caveat emptor designation. RenovaCare states, in relevant part, the following in its filing:

> Prior to February 26, 2018, our stock was included for trading on the OTCQB; on February 23, 2018 we received an email notification from OTC Markets Group, Inc. (the "**OTC Markets**") which regulates the OTCQB informing us that effective immediately, our stock would be quoted on the OTCPINK and that a caveat emptor designation would be assigned to our stock. This action was taken by OTC Markets pursuant to Section 4.2 of the OTCQB Standards, which generally provide that the OTC Markets may remove the Company's securities from trading on the OTCQB market immediately and at any time, without notice, if OTC Markets, in its sole and absolute discretion, believes that the continued inclusion of the Company's securities would impair the reputation or the integrity of OTC Markets or be detrimental to the interests of investors. ***Such concerns may include but are not limited to promotion, spam or disruptive corporate actions even when adequate current information is available.***
>
> *         *         *
>
> While the Company is addressing the OTC Markets concerns, there is no assurance that it will be able to do so to the satisfaction of the OTC Markets. In the event we do not submit an application for listing on the OTCQB or if we do and the application is not approved, we expect that

86

our stock will continue to trade on the OTCPINC, which could adversely affect the market liquidity of our common stock.

(Emphases added.)

169.    Although Defendants mention the OTC Markets' investigation, this statement is false and misleading and omits material facts because it failed to disclose the underlying reason for the OTC Markets' investigation (the promotional campaign and the risks it would cause (two risks being the OTC Markets downgrade and SEC action)). Rather, Defendants misled the market and gloss over the promotional campaign as the primary risk and cause for the OTC Markets investigation by stating: "***Such concerns may include <u>but are not limited to</u> promotion, spam or disruptive corporate actions even when adequate current information is available***." (Emphasis and underlining added.)

I.    **April 25, 2018 Prospectus Filing Failed to Disclose Stock Promotion Risk.**

170.    The Company filed its Prospectus on April 25, 2018. It is materially misleading and false because of the same deficiencies in the October 18, 2017 Prospectus Supplement filing (see above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no

87

903150.1

discussion of unlawful stock promotion as a risk that could cause such

downgrading.

171.   The Prospectus also provides the exact same, non-specific disclosure

of the OTC Markets' investigation that was previously disseminated in the

Company's April 6, 2018 Form S-1/A, and also did not explain the underlying

reason (the promotional campaign and the associated risks) for the OTC Markets

investigation. Because of this, this disclosure was false and misleading for the

same reasons as the April 6 Form S-1/A filing.

**J.    April 12, 2019 Form 10-K Filing Failed to Disclose Stock Promotion Risk.**

172.   The Company filed its Form 10-K on April 19, 2019. The Form 10-K

was signed by Defendant Ryat. It is materially misleading and false because of the

same deficiencies in the October 18, 2017 Prospectus Supplement filing (see

above). There is no mention in the "Risks Relating to this Offering of Securities"

and "Risks Related To Ownership of Our Common Stock" sections that the stock

promotion campaign was a risk factor to the Company. Additionally, even though

Defendants mention RenovaCare's stock being listed on OTC Markets and the

possibility of being downgraded, there is no discussion of unlawful stock

promotion as a risk that could cause such downgrading.

903150.1

**K.    May 14, 2020 Form 10-K Filing Failed to Disclose Stock Promotion Risk.**

173.    The Company filed its Form 10-K on May 14, 2020. The Form 10-K was signed by Defendant Rayat. It is materially misleading and false because of the same deficiencies in the October 18, 2017 Prospectus Supplement filing (see above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

**L.    Defendants' February 12, 2018 Response to the StreetSweeper Article.**

174.    On February 12, 2018, RenovaCare issued a press release entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, Streetsweeper, Affiliated with Felon Convicted of Securities Fraud."

175.    Specifically, RenovaCare stated in its response that the StreetSweeper Article was "spreading 'short and distort' commentary on companies it targets for short selling, in this case RenovaCare." The Company quoted Defendant Thomas Bold and stated, "'We will not be distracted by the irresponsible and nefarious actions of these short sellers and a handful of internet posters…. 'We have an

obligation to expose those who prey on our shareholders for short-term profits and attempt to damage the public trust.'"

176.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV.M. above. Specifically, RenovaCare failed to make any disclosure of its ongoing promotional campaign relationship and payment arrangement with StreetAuthority.

**M.    Defendants' March 5, 2018 Press Release Regarding Short-Sellers.**

177.   On March 5, 2018, RenovaCare issued a press release entitled "RenovaCare Takes Action to Protect Shareholder Interests." In discussing the StreetSweeper Article, the press release stated that "These short sellers spread false rumors and innuendos of impropriety with business affiliates, partners, and collaborators to disparage the good reputation of RenovaCare and thereby enhancing their profit at the expense of Company stockholders. Often, this is accomplished by the 'short and distort' syndicate enlisting members of the media and others, who may unwittingly write stories based on the grossly misleading and inaccurate statements of fact."

178.   RenovaCare then advocated its position in protecting shareholders: "RenovaCare strongly believes that it has an obligation to protect its stockholders

903150.1

from adverse financial and reputational harm caused by these unfounded and potentially illegal activities. Such actions undermine the integrity of the Company, its management and its majority stockholder, Kalen Capital Corporation."

179.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV.M. above. Specifically, RenovaCare failed to make any disclosure of its ongoing promotional campaign relationship and payment arrangement with StreetAuthority. This directly contradicts RenovaCare's representation that it "strongly believes that it has an obligation to protect its stockholders from adverse financial and reputational harm[.]" If RenovaCare sought to protect investors, it would have disclosed its paid promotional campaign with StreetAuthority and investors would have avoided being harmed when their share prices dropped as a result of the SEC's May 28, 2018 action brought almost three years after this press release was issued.

## VI.    THE TRUTH EMERGES

**A.    The SEC Complaint Alleging That Defendants Committed Securities Fraud by Failing to Disclose RenovaCare's Promotional Campaign with StreetAuthority.**

180.   The truth emerged on May 28, 2021, when the SEC issued a litigation release stating that RenovaCare was being charged with alleged securities fraud because of RenovaCare's undisclosed promotional campaign with StreetAuthority.

According to the complaint, between July 2017 and January 2018, Rayat "arranged, and caused RenovaCare to pay for, a promotional campaign designed to increase the company's stock price." In January 2018, when OTC Markets had requested that RenovaCare explain its relationship to the promotion, the complaint alleges that "Rayat and RenovaCare then drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying Rayat's and the company's involvement in the promotion."

181.    Specifically, "Rayat was closely involved in directing the promotion and editing promotional materials," by providing "false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device." Among other things, these promotional materials described a patient who purportedly recovered from severe burns in ***three days*** using RenovaCare's SkinGun, when in reality, the "before" and "after" pictures were taken ***five years*** apart. The materials also claimed that SkinGun "could soon be approved by the FDA [U.S. Food and Drug Administration] …. RenovaCare has submitted a 510(k) filing to the FDA …." However, at the time, the Company did not have a pending 510(k) application and had withdrawn its only application (seeking approval for use in clinical studies).

182.    The SEC complaint also alleged that Rayat arranged for monthly payments to the publisher "to be made through third parties for the fraudulent

92

purpose of concealing Rayat's and the company's involvement." According to the complaint, Rayat knew or was reckless in not knowing that the publisher was required to disclose payments from RenovaCare pursuant to Section 17(b) of the Securities Act of 1933, especially because in 2000, Rayat had settled a case with the SEC for violating the same statute.

183.   On this news, the Company's stock price fell $0.66, or 24.8%, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

**B.    RenovaCare's Responsive Press Release Fails to Rebut Any Allegations in the SEC Complaint and Fails to Address Allegations Concerning the StreetAuthority Promotional Campaign.**

184.   On June 1, 2021, RenovaCare issued a press release entitled "RenovaCare Responds to SEC Complaint"[88] broadly stating that "it intends to vigorously defend itself and its stockholders against" the SEC's allegations. Although RenovaCare stated that it "looks forward to presenting tangible evidence in support of its position," the Company did not describe what tangible evidence contradicted any of the SEC's allegations or the allegations contained herein related to the covert promotional campaign carried out by Defendants.

185.   Instead, the Company side-stepped addressing the SEC's allegations and states a red herring, touting that it "was granted full investigational Device

---

[88] https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Feb. 3, 2022).

Exemption by the FDA, enabling the Company to conduct a clinical trial to evaluate the safety and feasibility of its SkinGun™ and CellMist™ System for the treatment of burn wounds using skin cells obtained directly from the patient." The Company further stated that it intended to "initiate the clinical trial soon at four U.S. burn centers" to maintain investor optimism.

186.   In a further effort to distract investors from the SEC lawsuit, the Company reiterated that "The Company's SkinGun™ and CellMist™ System has been developed as a potential alternative to skin grafting and other treatment options, such as in vitro cultured skin epithelial cells that require a specialized and expensive external laboratory. In late 2019, RenovaCare was issued a patent allowing the Company's novel SkinGun™ device to spray a variety of tissues and cells, thus opening the door for its potential application in the regeneration of other tissues, beyond skin[.]"

187.   RenovaCare has not provided any further follow-up responses to the SEC's litigation and has not yet completed FDA clinical trials to evaluate the safety and feasibility of its SkinGun. RenovaCare has also not publicly responded to the SEC's allegations concerning its undisclosed promotional campaign with StreetAuthority, which is described by the allegations herein.

903150.1

## VII.   LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

188.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired RenovaCare securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

189.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RenovaCare's shares actively traded on the OTC. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of RenovaCare shares were traded publicly during the Class Period on the OTC. Record owners and other members of the Class may be identified from records maintained by RenovaCare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

190.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

191.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

192.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of RenovaCare; and

    c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

193.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.  PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

194.   The market for RenovaCare's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, RenovaCare's securities traded at artificially inflated prices during the Class Period. On February 21, 2018, the Company's share price closed at a Class Period high of $10.65 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of RenovaCare's securities and market information relating to RenovaCare, and have been damaged thereby.

195.   During the Class Period, the artificial inflation of RenovaCare's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RenovaCare's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive

assessment of RenovaCare and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

196.   At all relevant times, the market for RenovaCare's securities was an efficient market for the following reasons, among others:

    a.   RenovaCare shares met the requirements for listing, and were listed and actively traded on the OTC, a highly efficient and automated market;

    b.   As a regulated issuer, RenovaCare filed periodic public reports with the SEC and/or the OTC;

    c.   RenovaCare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

       d.     RenovaCare was followed by securities analysts employed by

brokerage firms who wrote reports about the Company, and

these reports were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public

marketplace.

197.   As a result of the foregoing, the market for RenovaCare's securities

promptly digested current information regarding RenovaCare from all publicly

available sources and reflected such information in RenovaCare's share price.

Under these circumstances, all purchasers of RenovaCare's securities during the

Class Period suffered similar injury through their purchase of RenovaCare's

securities at artificially inflated prices and a presumption of reliance applies.

198.   A Class-wide presumption of reliance is also appropriate in this action

under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part,

grounded on Defendants' material misstatements and/or omissions. Because this

action involves Defendants' failure to disclose material adverse information

regarding the Company's business operations and financial prospects—information

that Defendants were obligated to disclose—positive proof of reliance is not a

prerequisite to recovery. All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    NO SAFE HARBOR

199.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of RenovaCare who knew that the statement was false when made.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

200.   As alleged herein, Defendants acted with scienter since Defendants

knew that the public documents and statements issued or disseminated in the name

of the Company were materially false and/or misleading; knew that such

statements or documents would be issued or disseminated to the investing public;

and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal

securities laws. As set forth elsewhere herein in detail, the Individual Defendants,

by virtue of their receipt of information reflecting the true facts regarding

RenovaCare, their control over, and/or receipt and/or modification of

RenovaCare's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary

information concerning RenovaCare, participated in the fraudulent scheme alleged

herein.

201.   Lead Plaintiff reincorporates and repeats the above substantive

allegations relating to Defendants' scienter in this section.

## XI.    LOSS CAUSATION

202.   The market for RenovaCare's securities was open, well-developed

and efficient at all relevant times. As a result of these materially false and/or

misleading statements, and/or failures to disclose, RenovaCare's securities traded

at artificially inflated prices during the Class Period. Lead Plaintiff and other

903150.1

members of the Class purchased or otherwise acquired RenovaCare's securities

relying upon the integrity of the market price of the Company's securities and

market information relating to RenovaCare, and have been damaged thereby.

203.   During the Class Period, Defendants materially misled the investing

public, thereby inflating the price of RenovaCare's securities, by publicly issuing

false and/or misleading statements and/or omitting to disclose material facts

necessary to make Defendants' statements, as set forth herein, not false and/or

misleading. The statements and omissions were materially false and/or misleading

because they failed to disclose material adverse information and/or misrepresented

the truth about RenovaCare's business, operations, and prospects as alleged herein.

204.   At all relevant times, the material misrepresentations and omissions

particularized in this Complaint directly or proximately caused or were a

substantial contributing cause of the damages sustained by Lead Plaintiff and other

members of the Class. As described herein, during the Class Period, Defendants

made or caused to be made a series of materially false and/or misleading

statements about RenovaCare's financial well-being and prospects. These material

misstatements and/or omissions had the cause and effect of creating in the market

an unrealistically positive assessment of the Company and its financial well-being

and prospects, thus causing the Company's securities to be overvalued and

artificially inflated at all relevant times. Defendants' materially false and/or

misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

205.   Consequently because of the allegations described herein, on February 26, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity. The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

206.   Then, on May 28, 2021, the SEC issued a litigation release stating that RenovaCare was being charged with securities fraud because the truth was revealed of the Company's undisclosed promotional campaign with StreetAuthority.[89] In response to the SEC action, on June 1, 2021, RenovaCare issued a press release entitled "RenovaCare Responds to SEC Complaint"[90] broadly stating that "it intends to vigorously defend itself and its stockholders

---

[89] https://www.sec.gov/litigation/litreleases/2021/lr25102.htm (last accessed Feb. 3, 2022); *see also SEC v. Rayat and RenovaCare, Inc.*, No. 1:21-cv-04777 (S.D.N.Y.).

[90] https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Feb. 3, 2022).

903150.1

against" the SEC's allegations. The Company's stock price fell $0.66, or 24.8%, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

207.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

208.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase RenovaCare's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

209.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for RenovaCare's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary

104

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

210. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about RenovaCare, as specified herein.

211. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of RenovaCare's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired RenovaCare's securities during the Class Period at artificially high prices and were damaged thereby.

212. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace

903150.1

known the truth regarding the problems that RenovaCare was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their RenovaCare securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

213.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

214.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants and Betancourt)

215.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

216.   The Individual Defendants and Betancourt acted as controlling persons of RenovaCare and/or StreetAuthority within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company and/or StreetAuthority's operations and intimate knowledge of the false

106

financial statements filed by the Company with the SEC and disseminated to the

investing public, the Individual Defendants and Betancourt had the power to

influence and control and did influence and control, directly or indirectly, the

decision-making of the Company and/or StreetAuthority, including the content and

dissemination of the various statements which Lead Plaintiff contends are false and

misleading. By virtue of their high-level positions, the Individual Defendants and

Betancourt had the power and authority to cause and prevent the Company and/or

StreetAuthority from engaging in the conduct complained of herein.

217.   In particular, the Individual Defendants and Betancourt had direct and

supervisory involvement in the day-to-day operations of the Company and/or

StreetAuthority and, therefore, had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised

the same.

218.   As set forth above, Individual Defendants and/or Betancourt each

violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder by their acts and omissions as alleged in this Complaint. By virtue of

their position as controlling persons, the Individual Defendants and Betancourt are

liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

result of Defendants' and Betancourt's wrongful conduct, Lead Plaintiff and other

903150.1

members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

## COUNT III

### (Violation of Section 10(b) of the Exchange Act
### and Rule 10b5(a) and (c) Promulgated Thereunder
### Against All Defendants)

219.   This Count is brought solely and exclusively under the provisions of

Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Count nor

prove in this case that each of the Defendants made any misrepresentations or

omissions of material fact for which they may also be liable under Rule 10b-5(b)

and/or any other provisions of law. Plaintiffs repeat and re-allege each and every

allegation contained in the foregoing paragraphs as if fully set forth herein.

220.   During the Class Period, Defendants carried out a common plan,

scheme, and unlawful course of conduct that was intended to, and did: (i) deceive

the investing public, including Plaintiffs and the Class; (ii) artificially inflate the

market price of RenovaCare securities; and (iii) cause Plaintiff to purchase

RenovaCare securities at artificially inflated prices.

221.   In furtherance of this unlawful plan, scheme and course of conduct,

Defendants employed devices, schemes and artifices to defraud, and knowingly

and/or recklessly engaged in acts, transactions, practices, and courses of business

that operated as a fraud and deceit upon Plaintiffs and the Class in connection with

903150.1

their purchases of RenovaCare stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

222.   Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included furnishing statements that were used in stock promotional materials that did not disclose that StreetAuthority was being paid to issue these materials to its subscriber base, reviewing and approving the reports that were actually disseminated to investors, and failing to disclose that the Company was paying stock promoters to create stock promotions.

223.   Plaintiffs and the Class reasonably relied upon the integrity of the market in which RenovaCare securities traded.

224.   During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased RenovaCare securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

225.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of RenovaCare securities during the Class Period.

226.   By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to

109

Plaintiffs and the Class for damages suffered in connection with their purchases of RenovaCare securities during the Class Period.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XIII.  DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  February 11, 2022       Respectfully submitted,

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

 _/s/ Bruce D. Greenberg_
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for the Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (admitted *Pro Hac Vice*)
Wesley Wong
Lucas E. Gilmore
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
wesleyw@hbsslaw.com
lucasg@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*Pro Hac Vice*)
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

111

903150.1

**POMERANTZ LLP**
Thomas H. Przybylowski
Jeremy A. Lieberman
(admitted *pro hac vice*)
J. Alexander Hood II
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
tprzybylowski@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff Diana
Deidan*