**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein *(*admitted *Pro Hac Vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

*[Additional Counsel Appear on Signature Page]*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: RENOVACARE, INC. SECURITIES LITIGATION | Master File No. 2:21-cv-13766(BRM)(ESK)<br><br>**SECOND AMENDED COMPLAINT**<br><br><u>CLASS ACTION</u> |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE ................................................................. 13

III.  PARTIES .................................................................................................... 14

IV.  BACKGROUND ALLEGATIONS ........................................................... 25

      A.    Origins of RenovaCare ................................................................... 25

      B.    RenovaCare's Suspicious and Nonperforming Medical Business .................................................................................... 26

V.   DEFENDANTS' SCHEME TO MANIPULATE RENOVACARE'S STOCK PRICE AND PROFIT THROUGH A CONCEALED STOCK PROMOTION CAMPAIGN AND MARKET MANIPULATION ................................................................. 29

      A.    Defendants Planned Early on for RenovaCare's Stock Promotion Scheme with StreetAuthority by Accumulating RenovaCare Stock at Below-Market Prices with the Intention to Later Sell to the Public ..................................... 30

            1.    Between 2007 and 2013, Rayat sold millions of RenovaCare shares to Sidhu and Bhogal, but retained a financial interest. ....................................... 31

            2.    In anticipation of the Predictions Campaign, Rayat and Sidhu orchestrated additional below-market sales of RenovaCare stock. ..................................... 32

            3.    Sidhu worked with the other Defendants to open brokerage accounts with free-trading RenovaCare shares. ..................................................................... 34

            4.    With Sidhu's help, Rayat sought to open accounts with five different brokers to sell RenovaCare and SolarWindow shares. ..................................... 36

      B.    After Developing an Aggressive Investor Relations Program, Rayat Solicited StreetAuthority to Promote RenovaCare While Defendants Intended to Sell and Sold ................ 38

1.    Bhogal, Rayat, and Sidhu developed an aggressive investor relations program that provided the basis for the Predictions Campaign with StreetAuthority. ...............39

2.    In July 2017, Rayat approached StreetAuthority to promote RenovaCare. ...............................................42

3.    Confidential Witness accounts corroborate Rayat and RenovaCare's solicitation of StreetAuthority and involvement in creating and paying for the Predictions Report....................................................46

4.    Unbeknownst to investors, Rayat was closely involved in managing development and execution of the promotional campaign. ...................................52

5.    Notwithstanding RenovaCare and Rayat's nondisclosure, StreetAuthority and Betancourt had a duty to disclose the paid RenovaCare stock promotional campaign but did not. ...........................................57

C.    RenovaCare Represents That Its Disclosure Controls Are Effective but Fails to Publicly Disclose Its Ongoing Promotional Campaign with StreetAuthority and Betancourt ...................................................................60

D.    Rayat Concealed Payments for StreetAuthority's Promotional Campaign by Funneling Money Through Undisclosed Third-Party Investor Relations Companies and Providing Inadequate Disclaimers.................................61

E.    StreetAuthority's Promotional Campaign, Under Rayat's Direction, Highly Touted Materially False Statements About RenovaCare's SkinGun ...................................68

F.    StreetAuthority's RenovaCare Promotional Campaign Successfully Inflated RenovaCare's Stock Price ...............72

G.    Shortly After the Predictions Campaign was Launched, Defendants Began Selling RenovaCare Shares....................73

H.    RenovaCare Continued to Misrepresent in Subsequent SEC Filings That Its Disclosure Controls Were Effective While Continuing to Conceal Rayat's Involvement with StreetAuthority ...................................................76

I.      RenovaCare and Rayat Made and Issued a Materially
        False Press Release Denying Their Involvement in
        StreetAuthority's Promotional Campaign When
        Confronted by OTC Markets....................................................77

J.      Defendants Continue Misleading Investors About
        RenovaCare's Disclosure Controls in Spite of OTC
        Markets's Letter ...................................................................99

K.      Defendants Failed to Adequately Respond to or Clarify a
        Scathing Report Published by an Investigative Reporting
        Website Regarding RenovaCare's Business Operations
        and Undisclosed Stock Promotion Practices...........................100

L.      After Issuing the January 8 Press Release, Defendants
        Restarted the Predictions Campaign and Resumed
        Trading .................................................................................109

        1.      Defendants restarted the StreetAuthority
                promotion. ..................................................................109

        2.      Defendants resumed their coordinated trading. .....................110

        3.      Rayat and Bhogal caused RenovaCare to issue
                press releases to counteract negative press and
                complement the Predictions Campaign ...................................111

        4.      Defendants supported the scheme through
                manipulative trading. ..........................................................115

        5.      On February 9, 2018, RenovaCare filed a new
                Form S-1 with the SEC seeking to register millions
                of restricted shares owned by Defendants. ............................117

        6.      In February 2018, the stock promotion scheme
                collapsed........................................................................118

M.      The Scheme's Final Result: the Defendants Reaped
        Millions ................................................................................119

        1.      RenovaCare's share price and trading volume
                increased dramatically during the Predictions
                campaign. ..................................................................119

        2.      Defendants reaped millions from their sales of
                RenovaCare shares at artificially inflated prices. ...................119

3.    Defendants Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta, Ltd. received ill-gotten gains. ...........................................................121

N.    Over a Year After the Stock Promotion Scheme Collapsed, Defendants Admit in SEC Filings That RenovaCare's Disclosure Controls and Procedures Were Not Effective ...................................................................123

O.    Defendants Rayat and Bold Violated the Company's Ethics Policies by Failing to Reveal Their Promotional Campaign Activities with StreetAuthority........................................125

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................................................134

A.    August 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls and Failed to Disclose the Stock Promotion Risk....................................135

B.    October 18, 2017 Prospectus Supplement Failed to Disclose Stock Promotion Risk............................................................136

C.    November 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls ........................137

D.    Defendants' January 8, 2018 Statement Responding to OTC Markets' Letter (the January 8 Press Release)........................138

E.    February 12, 2018 Form S-1 Filing Failed to Disclose Stock Promotion Risk............................................................141

F.    February 27, 2018 Form 8-K Filing Omitted Disclosure of the Promotional Campaign with StreetAuthority .........................141

G.    March 13, 2018 Form 10-K Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls ........................142

H.    April 6, 2018 Form S-1/A Filing Failed to Disclose Stock Promotion Risk............................................................143

I.    April 25, 2018 Prospectus Filing Failed to Disclose Stock Promotion Risk............................................................145

J.    April 12, 2019 Form 10-K Filing Failed to Disclose Stock Promotion Risk............................................................146

K.    May 14, 2020 Form 10-K Filing Failed to Disclose Stock Promotion Risk............................................................146

L.  Defendants' February 12, 2018 Response to the StreetSweeper Article .........................................................146

M.  Defendants' March 5, 2018 Press Release Regarding Short-Sellers ...................................................................148

VII.  THE TRUTH EMERGES ....................................................149

A.  Corrective Disclosure: the SEC Complaint Alleging That Defendants Committed Securities Fraud by Failing to Disclose RenovaCare's Promotional Campaign with StreetAuthority .................................................................149

B.  RenovaCare's Responsive Press Release Fails to Rebut Any Allegations in the SEC's Initial Complaint and Fails to Address Allegations Concerning the StreetAuthority Promotional Campaign ....................................................152

VIII.  LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ......................153

IX.  PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS..........................155

X.  NO SAFE HARBOR .......................................................159

XI.  ADDITIONAL SCIENTER ALLEGATIONS ..........................................159

XII.  LOSS CAUSATION .......................................................160

COUNT I (Violations of Section 9(e) of the Exchange Act Against Bhogal, Sidhu, and Fleming) ...........................................163

COUNT II (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants).....................164

COUNT III (Violation of Section 10(b) of the Exchange Act and Rule 10b5(a) and (c) Promulgated Thereunder Against All Defendants)...........................................................166

COUNT IV (Violations of Section 20(a) of the Exchange Act Against Defendants Rayat, Bold, and Betancourt) ....................................168

COUNT V (Violations of Section 20(b) of the Exchange Act Against Rayat, Bhogal, Sidhu, and Fleming) ..........................................170

XIII.  PRAYER FOR RELIEF ....................................................171

XIV.  DEMAND FOR TRIAL BY JURY ..........................................171

Lead Plaintiff Diana Deidan ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through Lead Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through Lead Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by RenovaCare, Inc. ("RenovaCare" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) pleadings, papers, investigations, and any documents filed, and publicly available, in *SEC v. Rayat, et al.*, No. 1:21-cv-04777-LJL (S.D.N.Y.); (c) review and analysis of press releases and media reports issued by and disseminated by RenovaCare; (d) news stories, analyst reports, and other public information concerning RenovaCare and/or the industry within which it operates; (e) information obtained from confidential witnesses; and (f) review of other publicly available information concerning RenovaCare.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired RenovaCare securities between August 14, 2017, and May 28, 2021, inclusive (the "Class Period"). Lead Plaintiff pursues claims against Defendants RenovaCare, Harmel Rayat ("Rayat"), Thomas

Bold ("Bold"), Jatinder Bhogal ("Bhogal"), Jeetenderjit Singh Sidhu ("Sidhu"),

Sharon Fleming ("Fleming"), Capitol Information Group, Inc. d/b/a

StreetAuthority.com (formerly StreetAuthority, LLC) ("StreetAuthority"), Lou

Betancourt ("Betancourt"), Treadstone Financial Group Ltd. ("Treadstone Ltd."),

Treadstone Financial Group LLC ("Treadstone LLC"), Blackbriar Asset

Management Ltd. ("Blackbriar Ltd."), and 1420527 Alberta Ltd. ("Alberta Ltd.")

(collectively, "Defendants") under Sections 9(e), 10(b), 20(a), and 20(b) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5(b)

and Rule 10b-5(a) and (c) for making false and misleading statements regarding

RenovaCare's business, disclosure controls, and procedures in various public

statements and SEC filings. Specifically, this case concerns a longstanding,

concealed, and wide-reaching fraudulent stock promotion scheme to increase the

share price and trading volume of RenovaCare's common stock that was never

disclosed to investors.

2.    RenovaCare is a purported medical and development stage company

that has not generated any revenue since its inception and has no commercialized

products. Its activities primarily consist of research and development, business

development, and capital raises. It owns the CellMist System, which consists of a

treatment method for cell isolation for the regeneration of human skin cells and

other tissues (the "CellMist Solution"), and an experimental solution sprayer

2

medical device to deliver healing cells to burn wound treatment areas (the "SkinGun").

3.      From at least 2007 to 2018, Rayat, a majority and controlling shareholder of RenovaCare, set the foundation for and orchestrated the concealed scheme along with three long-time friends and business associates—Bhogal, Sidhu, and Fleming. This foundation included the arranged sale of below-market value RenovaCare stock to certain Defendants associated with Rayat, the establishment of an aggressive investor relations program, and the establishment of brokerage accounts held by various entities so that RenovaCare's stock could be sold once the Company's stock price was pumped.

4.      With this foundation in place, Defendants Fleming, Betancourt, and StreetAuthority assisted in the fraudulent scheme by acting as paid RenovaCare stock promoters who acted at Rayat's direction. The scheme was concealed and perpetrated through false and misleading disclosures to the market in violation of Rule 10b-5(b). Additionally, Defendants Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. were entities controlled by Bhogal and Sidhu and assisted in the fraud by transacting in RenovaCare stock once the stock price became artificially inflated due to the stock promotion campaign. Bhogal, Sidhu, and Fleming also engaged in manipulative trading to maintain RenovaCare's artificially inflated stock price in violation of Section 9(e). Ultimately, this

3

coordinated scheme led by Rayat, whereby Defendants acted directly and indirectly with each other, caused Defendants Bhogal, Sidhu, and Fleming to be illegally enriched with more than $7 million in trading proceeds; caused Rayat's financial interests to be illegally enriched; and caused RenovaCare to pay over $90,000 in service fees to Fleming, Betancourt, StreetAuthority,[1] and other investor relations consultants to execute the concealed stock promotion campaign—all without investors' knowledge and in violation of Rule 10b-5(a) and (c), Section 20(a), and Section 20(b).

5.     When the concealed stock promotion campaign was finally discovered in January 2018, the discovery triggered a regulatory investigation, the initiation of a pending lawsuit by the SEC, and a downgrade of RenovaCare's stock by OTC Markets Group, Inc. ("OTC Markets"),[2] the entity that supervised the exchange on which RenovaCare stock was listed, in February 2018, thereby causing harm to investors because of a significant drop in RenovaCare's stock price in reaction to these revelations.

6.     Defendants' fraudulent scheme, which was essentially a "pump and dump" designed to artificially increase the share price and trading volume of

---

[1] https://www.streetauthority.com/ (last accessed Nov. 11, 2022).

[2] OTC Markets Group, Inc. is an American financial market providing price and liquidity information for almost 10,000 over-the-counter securities. *See* https://www.otcmarkets.com/index.html (last accessed Nov. 9, 2022).

RenovaCare stock to permit Defendants to sell shares at an inflated price, involved a number of steps, including: (i) accumulating millions of shares of RenovaCare stock at below-market prices and distributing them among the Defendants and Rayat's associates; (ii) coordinating the registration of restricted shares for resale and depositing them as "free trading" shares in brokerage accounts in the United States and Canada; (iii) promoting RenovaCare stock to investors through a paid third-party promotional campaign via Defendants StreetAuthority and Betancourt while intending to sell and selling the Company's stock—a practice known as "scalping"; (iv) disseminating materially false statements in a Company press release and a Form 8-K filed with the SEC, both of which denied any involvement in the promotional campaign orchestrated and funded by Defendants RenovaCare, Rayat, Bhogal, Sidhu, and Fleming; (v) orchestrating RenovaCare press releases to coincide with the third-party promotion; and (vi) manipulative trading across multiple accounts to support the share price and trading volume of RenovaCare stock while selling over one million of shares to monetize the scheme.

7.     In organizing and executing this fraudulent scheme, Rayat and his associates (Bhogal, Sidhu, and Fleming) were playing a long game that started in 2007 and lasted until the scheme finally collapsed after the StreetAuthority promotional campaign was revealed and OTC Markets downgraded RenovaCare's stock in February 2018.

8.    Initially, and no later than 2007, Rayat transferred shares of RenovaCare and other penny stocks to Sidhu, Bhogal, and others. Rayat retained a financial interest in the shares he transferred—either in the form of debt obligations or preferred shares in the entities that received the shares. This allowed Rayat to profit from the sale of shares by others during subsequent promotional activity for RenovaCare's stock.

9.    As part of their long game, Rayat, Bhogal, Sidhu, and Fleming acted through and used RenovaCare as a vehicle for fraud, including during the StreetAuthority campaign in partnership with Betancourt. Bhogal—Rayat's friend and long-time business associate, and a large shareholder of RenovaCare stock who also served as a consultant to the Company—played a central part in creating and maintaining RenovaCare's "investor relations" operation, including developing a company website, managing a series of third-party investor relations consultants, and managing the timing and content of RenovaCare's public press releases. Sidhu—Rayat's long-time business associate, and a former member of RenovaCare's board of directors—coordinated the registration and deposit of Defendants' RenovaCare shares. Fleming—a third party investor relations consultant to RenovaCare—was an active participant in promoting and facilitating the concealment of RenovaCare's funding of the StreetAuthority promotional campaign.

6

10.     No later than 2015, RenovaCare's investor relations program was in place, and Defendants Rayat, Bhogal, Sidhu, and Flemming engaged a series of third-party promoters to tout the Company and its common stock in focused promotional campaigns intended to increase its stock price and trading volume to permit them to profit. This experience would prove useful when RenovaCare engaged StreetAuthority in July 2017—the basis of the scheme in this lawsuit.

11.     Between July 2017 and February 2018, Rayat, unbeknownst to investors, arranged, and caused RenovaCare to pay for, a stock promotional campaign with StreetAuthority, an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters.

12.     Notably, StreetAuthority was co-founded, owned, and operated by Betancourt,[3] a long-time friend of Rayat. The secret promotional campaign was led by Rayat and was designed to increase RenovaCare's stock price and trading volume.

13.     Specifically, the promotional campaign focused on RenovaCare stock and the Company's experimental medical device called the "SkinGun." Each year, StreetAuthority built a promotional campaign called the "Predictions Campaign"

---

[3] *See* https://www.loubetancourt.com/about (last accessed Nov. 9, 2022); https://www.linkedin.com/in/lou-betancourt-44a7554 (last accessed Nov. 9, 2022).

around an annual "Predictions Report" for the next calendar year. After Rayat

approached StreetAuthority and offered to fund the campaign, RenovaCare and

another company owned by Rayat, SolarWindow Technologies, Inc., became

StreetAuthority's lead "predictions."

14.     Rayat was closely involved in directing the promotion, distribution,

and editing of promotional materials, and arranged to funnel payments to

StreetAuthority through third-party companies—one being owned by Fleming—to

conceal RenovaCare's involvement in the publishing campaign. He organized,

financed, and directed StreetAuthority's efforts, which included a steady stream of

"research" reports, emails, and advertisements that encouraged investors to buy

RenovaCare stock.

15.     During this RenovaCare-funded promotional blitz, Bhogal was

responsible for and worked on several misleading press releases issued by the

Company that did not disclose the publishing campaign, all while knowing that

StreetAuthority was promoting RenovaCare. Meanwhile, Fleming was busy

concealing RenovaCare's involvement with and funding of StreetAuthority's

promotional campaign by acting as an investor relations consultant that prepared

and routed payments between the Company and StreetAuthority.

16.     Rayat also knowingly provided materially false information to

StreetAuthority for use in its promotional campaign aimed at "pumping" the share

8

price and trading volume of RenovaCare stock. This included false "before and after" pictures of a burn patient that was treated with a SkinGun prototype.

17.    In the end, Defendants Rayat, Bhogal, Sidhu, and Fleming sought to profit from StreetAuthority's promotional campaign as they had done in prior campaigns. Rayat, Bhogal, Sidhu, and Fleming intended to sell, and all but Rayat sold, RenovaCare stock while the StreetAuthority promotional campaign was ongoing—the textbook definition of scalping. During this time, Bhogal, Sidhu, and Fleming's RenovaCare stock trading tracked key events in the StreetAuthority promotional campaign as well as each other's trading activity.

18.    While the Predictions Campaign was active, Bhogal sold millions-of-dollars of RenovaCare shares through Defendant Alberta Ltd., a company in which Rayat held a substantial financial interest. Later in the scheme, Bhogal also placed at least two orders to buy RenovaCare stock that were intended to manipulate the market and maintain the Company's artificially inflated share price.

19.    Sidhu also sold millions-of-dollars of RenovaCare shares during the fraudulent scheme, using multiple brokerage accounts, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

20.    Fleming sold over 50,000 RenovaCare shares during the fraudulent scheme, and engaged in manipulative trading to further artificially inflate the market for RenovaCare stock.

21.     While the scheme was ongoing, Defendants RenovaCare, Rayat, Bhogal, Sidhu, and Fleming also took steps to deny and conceal their role in the Predictions Campaign when confronted by OTC Markets. On January 8, 2018, when OTC Markets requested that RenovaCare explain its relationship to the promotional campaign, Rayat, Bhogal, and RenovaCare drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying and concealing any involvement in the promotion.

22.     After issuing their January 8, 2018 response to OTC Markets, Defendants Rayat, Bhogal, Sidhu, and Fleming—undeterred in their efforts to profit from the scheme—continued onward with their promotional campaign; heavily traded RenovaCare's stock in order to profit from the promotion's positive effect on the stock price; and engaged in manipulative trading practices to maintain the stock's artificially inflated price.

23.     During this time, Bhogal, Sidhu, and Fleming sold millions of shares of RenovaCare stock at artificially inflated prices and made over $7 million in ill-gotten gains, either directly or through Defendants Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd., which were entities they owned and controlled and in which Rayat had substantial financial interests. At this point, Fleming, Betancourt, StreetAuthority, and other investor relations consultants had also been paid over $90,000 by RenovaCare in service fees.

24.     On February 23, 2018, Defendants' scheme came crashing down when OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity. The Company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

25.     On April 12, 2019, over a year after RenovaCare issued the January 8, 2018 Press Release denying the statements in OTC Markets's letter, RenovaCare admitted in SEC filings that its disclosure controls and procedures were ineffective. However, by this time, the damage had already been done to RenovaCare investors; RenovaCare's stock price had not recovered since the OTC Markets downgrade in February 2018 due to the undisclosed stock promotion scheme.

26.     Then, on May 28, 2021, part of the truth was revealed to investors. On that day, the SEC issued a litigation release stating that RenovaCare was being charged with securities fraud because of the undisclosed promotional campaign.[4]

---

[4] *See* https://www.sec.gov/litigation/litreleases/2021/lr25102.htm (last accessed Nov. 11, 2022); https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Nov. 9, 2022) (describing SEC's "three-plus years" investigation and documents provided to the SEC to date).

On this news, the Company's stock price fell $0.66, or 24.8 percent, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

27.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) at the direction of Rayat, RenovaCare engaged in a promotional campaign to issue misleading statements to artificially inflate the Company's stock price, and RenovaCare, with Rayat, Bhogal, Sidhu, and Fleming's assistance, paid StreetAuthority and Betancourt to publish positive reports about the Company during the Class Period; (ii) when OTC Markets inquired, RenovaCare, Rayat, and Bhogal issued a materially false and misleading press release claiming that no director, officer, or controlling shareholder had any involvement in the StreetAuthority promotional materials; (iii) as a result of the foregoing, the Company's disclosure controls and procedures were defective; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or

---

Since issuing its litigation release, the SEC filed an initial complaint on May 28, 2021, conducted factual discovery on the Defendants named herein, and thereafter filed an amended complaint on August 30, 2022 (cited herein as the "SEC Complaint" or "SEC Compl."), supporting the allegations herein. *See SEC v. Rayat, et al.*, No. 1:21-cv-04777-LJL (S.D.N.Y.), ECF No. 118 (Amended Complaint).

lacked a reasonable basis. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Defendants were illegally enriched, and Lead Plaintiff and other Class members have suffered significant losses and damages. By this action, Lead Plaintiff, on behalf of herself and the Class members she seeks to represent, seek to obtain a recovery for, *inter alia*, the substantial losses that she suffered as a result of the fraudulent scheme, course of conduct, and actionably false and misleading statements and conduct alleged herein, as well as disgorgement by Defendants of the massive ill-gotten gains that they reaped in connection with their concealed, fraudulent stock promotion campaign, artificial stock inflation, and market manipulation activities.

## II.    JURISDICTION AND VENUE

28.    The claims asserted herein arise under Sections 9(e), 10(b), 20(a), and 20(b) of the Exchange Act (15 U.S.C. §§ 78i(a), 78j(b), 78t(a), and 78t(b)) and Rule 10b-5(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

30.     Venue is proper in this Judicial District pursuant to 28 U.S.C.

§ 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The

Company's principal executive offices are in this Judicial District. In addition,

substantial acts in furtherance of the alleged fraud or the effects of the fraud have

occurred in this Judicial District. Many of the acts charged herein, including the

dissemination of materially false and/or misleading information, occurred in

substantial part in this Judicial District. Further, the StreetAuthority promotional

campaign discussed herein, which included material misrepresentations and

omissions, was directed at and had a substantial effect on investors, including those

in this District and throughout the United States.

31.     In connection with the acts, transactions, and conduct alleged herein,

Defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the U.S. mail, interstate telephone communications,

and the facilities of a national securities exchange.

### III.    PARTIES

**A.    Plaintiffs**

32.     Lead Plaintiff Diana Deidan, as set forth in original certifications filed

in this matter, incorporated by reference herein, purchased RenovaCare securities

during the Class Period and suffered damages as a result of the federal securities

law violations and false and/or misleading statements and/or material omissions alleged herein.

33.    Named Plaintiff Thomas Agostinelli, as set forth in original certifications filed in this matter, purchased RenovaCare securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

34.    Named Plaintiff Marc Jay Gannon, as set forth in original certifications filed in this matter, purchased RenovaCare securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B.    Defendants**

35.    Defendant RenovaCare is incorporated under the laws of Nevada with its principal executive offices located in Roseland, New Jersey. RenovaCare was and is a development stage company with no revenues but claims to be developing a "SkinGun" medical device and "CellMist" system for the treatment of skin burns through the rapid regeneration of skin cells.[5] RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc." On May 20, 1999, the Company changed its name to "WhatsOnline.Com, Inc.," and Rayat became,

---

[5] https://www.renovacareinc.com/2016/05/video-ultra-gentle-renovacare-skingun-sprayer/ (last accessed Nov. 11, 2022).

and ever since has been, the company's majority and controlling shareholder. The Company later made several other name changes, until January 7, 2014, when it changed its name to RenovaCare and changed its purported business focus to medical devices. RenovaCare's common stock trades on the over-the counter market ("OTC") under the symbol "RCAR."

36.     Defendant Rayat, a Canadian citizen residing in Vancouver, British Columbia, was the Chairman of the Board of RenovaCare from March 2018 to October 2020 and was reappointed to that position in March 2021. Rayat also served as the Company's Chief Executive Officer ("CEO") from June 2018 to November 2019 and was reappointed as CEO in March 2022. He was also appointed as President and Chief Financial Officer in March 2022.[6] Rayat has been the majority and controlling shareholder of RenovaCare, Inc. since at least 1999. As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or approximately 81.3 percent of the company's outstanding shares of common stock, either individually or through his wholly owned family office-holding companies, Kalen Capital Corporation and Kalen Capital Holdings LLC.

---

[6] *See* https://www.renovacareinc.com/2022/03/renovacare_announces_management_changes/ (last visited Nov. 9, 2022).

37.    Through his family office, Kalen Capital Corporation, Rayat has purportedly invested over $20 million in RenovaCare since 2013. In 2000, Rayat had settled a case with the SEC in which he was charged with violating Section 17(b) of the Securities Act. *SEC v. EquityAlert.Com, Inc. and Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000).[7]

38.    Defendant Thomas Bold ("Bold"), a citizen of Germany, was the Company's CEO from December 2013 to June 2018, the Company's President from December 2013 to March 2019, and the Company's interim Chief Financial Officer ("CFO") from September 2016 to October 2018. On March 30, 2019, Defendant Bold resigned his position as the Company's President and as a member of the Board. Defendant Bold continued to provide consulting services to the Company pursuant to an at-will consulting agreement.[8] During the years ended December 31, 2017, 2018, and 2019, the Company recognized expenses related to

---

[7] *See also* https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (discussing Rayat's background in founding and controlling several publicly traded companies that lacked adequate disclosures surrounding company financials and insider trading and had questionable operations; and stating: "We noted the same lack of disclosure at RenovaCare, the other company where Rayat is a controlling shareholder.") (last accessed Nov. 9, 2022).

[8] https://www.sec.gov/Archives/edgar/data/1016708/000147793213005947/jani_ex103.htm (last accessed Nov. 9, 2022).

Defendant Bold's consulting services and for his performance as CFO of $378,700, $100,000, and $43,000, respectively.

39.    Defendant Bhogal is a Canadian citizen and resident of Vancouver. During the Relevant Period, Bhogal, individually or through companies he owned and controlled—including Defendant Alberta Ltd.—owned and controlled millions of shares of RenovaCare common stock. He received this stock in transactions financed or arranged by Rayat, in exchange for debt or equity obligations to Rayat. Bhogal served as a "strategic advisor" to RenovaCare through his wholly owned consulting firm Vector Asset Management, Inc. from August 1, 2013, through June 26, 2018, when he was appointed RenovaCare's Chief Operating Officer. During the Predictions Campaign, Bhogal transacted in RenovaCare shares in furtherance of the scheme.

40.    Defendant Sidhu is a Canadian citizen and resident of Vancouver. During the Relevant Period, Sidhu, individually or through companies he owned and controlled—including Defendants Blackbriar Ltd., Treadstone Ltd., and Treadstone LLC—owned and controlled millions of shares of RenovaCare common stock. He received this stock either directly from Rayat, or in transactions financed by Rayat, in exchange for debt or equity obligations. Sidhu served on the Board of Directors of RenovaCare's predecessor entity from September 2008

through 2010. During the Predictions Campaign, Sidhu transacted in RenovaCare shares in furtherance of the scheme.

41.    Defendant Fleming (a/k/a Sharon Hebgin) is a California resident and served as a third-party investor relations consultant to RenovaCare through her wholly owned consulting firm Inspiren LLC ("Inspiren"). During the Predictions Campaign, Fleming transacted in RenovaCare shares in furtherance of the scheme.

42.    Defendant Capitol Information Group, Inc. d/b/a StreetAuthority.com (formerly StreetAuthority, LLC) was, at all relevant times, an online financial publishing and research company based in Austin, Texas, that sold subscriptions to its investment research bulletins and newsletters during the time period at issue in this Complaint. StreetAuthority was co-founded, owned, and operated at all relevant times by Lou Betancourt, a long-time friend of Rayat. In early 2019, StreetAuthority was acquired[9] by Investing Daily,[10] a division of Capitol Information Group, Inc. ("CIG"),[11] an online and print publishing company serving various markets. After the acquisition, StreetAuthority's domain name

---

[9] *See* https://www.prlog.org/12750823-investing-daily-continues-rapid-growth-by-acquiring-10-street-authority-investment-publications.html (last accessed Nov. 9, 2022).

[10] https://www.investingdaily.com/ (last accessed Nov. 9, 2022).

[11] https://www.capinfogroup.com/ (last accessed Nov. 9, 2022).

19

StreetAuthority.com became a division of CIG and began operating as a fictitious business name (d/b/a) for CIG.[12]

43.    Defendant Lou Betancourt was a co-founder of, and at all relevant times, owned, operated, and was a control person of Defendant StreetAuthority. Betancourt is a long-time friend of Rayat and, as corroborated by Confidential Witness accounts herein, led StreetAuthority's promotional campaign to pump up RenovaCare's stock price on behalf of RenovaCare and the other Defendants.

44.    Defendants Rayat and Bold, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers and institutional investors—i.e., the market, as well as the reports issued by StreetAuthority promoting RenovaCare. Rayat and Bold were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Rayat and Bold knew that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations

---

[12] https://capinfogroup.com/history/ (last accessed Nov. 9, 2022).

which were being made were then materially false and/or misleading. Rayat and Bold are liable for the false statements pleaded herein.

45.     Defendant Treadstone Financial Group Ltd., f/k/a 1422688 Alberta Ltd. ("Treadstone Ltd.") is a Canadian entity nominally owned and controlled by Sidhu's brother. However, Treadstone Ltd. is actually owned, controlled by, and is an alter ego of Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu sold certain of these RenovaCare shares and then wired the proceeds from an account in the United States to an account in Canada, generating ill-gotten gains as to which Treadstone Ltd. has no legitimate claim.

46.     Defendant Treadstone Financial Group LLC ("Treadstone LLC"), a subsidiary of Treadstone Ltd., is a Delaware corporation nominally controlled by Sidhu's brother. However, Treadstone LLC is actually owned, controlled by, and is an alter ego of Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu transferred certain RenovaCare shares from Treadstone Ltd. to an account in the United States in Treadstone LLC's name, sold the shares, and then wired the proceeds to Treadstone Ltd.'s account in Canada, generating ill-gotten gains as to which Treadstone LLC has no legitimate claim.

47.     Defendant Blackbriar Asset Management Ltd., f/k/a Fargo West Investments Ltd., ("Blackbriar Ltd.") is a Canadian entity owned, controlled by, and is an alter ego of Sidhu, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Sidhu sold certain of these RenovaCare shares through U.S.-based exchanges, generating ill-gotten gains as to which Blackbriar Ltd. has no legitimate claim.

48.     Defendant 1420527 Alberta Ltd. ("Alberta Ltd.") is a Canadian entity owned, controlled by, and is an alter ego of Bhogal, through which he owned shares of RenovaCare common stock. During the fraudulent scheme, Bhogal sold certain of these RenovaCare shares in an account in Alberta Ltd.'s name through U.S.-based exchanges, and then wired the proceeds through U.S.-based financial institutions to its account in Canada, generating ill-gotten gains as to which Alberta Ltd. has no legitimate claim.

**C.     Other Relevant Individuals and Entities**

49.     SolarWindow Technologies, Inc. is a company that purports to be developing windows that generate electricity from solar energy. During the relevant period, Rayat was a controlling shareholder of SolarWindow, and Bhogal and Sidhu were also substantial shareholders. Bhogal served as a consultant to SolarWindow from February 1, 2014, through his company Vector Asset Management LLC, and became a Director on August 1, 2017. Sidhu was an

employee of SolarWindow before 2010. Fleming was an investor relations consultant to SolarWindow during the Predictions Campaign. SolarWindow was featured in the Predictions Campaign with RenovaCare based on Rayat's agreement with Betancourt, and similarly paid StreetAuthority through the same third-party investor relations consultants such as Fleming.

50.     Investor Relations Consultant 1 ("IRC 1"), a long-time business associate of Rayat, Fleming, and Bhogal, and was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than 2014. He was replaced by Fleming to work on the Predictions Campaign around the time it began.

51.     Investor Relations Consultant 2 ("IRC 2"), a long-time friend and business associate of both Rayat and Bhogal, and was a third-party provider of investor relations services to Rayat and RenovaCare beginning no later than December 2017, when he was selected by Rayat and Bhogal to replace Fleming on the Predictions Campaign.

52.     1420527 Alberta LLC ("Alberta LLC"), a subsidiary of Alberta Ltd., was a Delaware corporation owned and controlled by Bhogal. During the fraudulent scheme, Bhogal transferred RenovaCare shares between Alberta Ltd. and Alberta LLC and sold shares in an account owned by Alberta Ltd.

53.     Boston Financial Group Ltd. ("Boston Financial") is a Canadian entity owned and controlled by Bhogal and his wife that received restricted shares of RenovaCare common stock from Rayat in exchange for preferred shares in Boston Financial.

54.     Vector Asset Management Ltd. ("Vector") is a Canadian company owned and controlled by Bhogal, through which Bhogal worked as a consultant to RenovaCare from August 1, 2013, until June 2018.

55.     Wolverhampton Holdings LLC ("Wolverhampton") is a Delaware company owned and controlled by Bhogal that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat.

56.     Blackbriar Asset Management LLC ("Blackbriar LLC"), a Delaware corporation owned and controlled by Sidhu, was used to open accounts in the United States and receive RenovaCare shares from Blackbriar Ltd.

57.     Collingwood Holdings, LLC ("Collingwood") is a Delaware company owned and controlled by Sidhu that purchased shares of RenovaCare common stock in June 2013 from a friend of Rayat with the proceeds of a loan from Rayat. During the fraudulent scheme, Sidhu transferred certain of Collingwood's RenovaCare shares into one or more accounts in his own name and sold shares.

58.     Kalen Capital Corporation ("Kalen Corp.") is a Canadian company owned and controlled by Rayat and headquartered in Vancouver, British Columbia, through which he owns and controls a substantial portion of his holdings of RenovaCare and other penny stocks, as well as financial interests with Sidhu, Bhogal, and Fleming and entities they owned and controlled. Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen Corp., including one or more attempts to open brokerage accounts to sell RenovaCare shares.

59.     Kalen Capital Holdings LLC ("Kalen LLC"), a subsidiary of Kalen Corp., is a U.S.-based company owned and controlled by Rayat. Certain of the acts or transactions described here were undertaken by Rayat on behalf of Kalen LLC, including one or more attempts to open brokerage accounts to sell RenovaCare shares.

## IV.    BACKGROUND ALLEGATIONS

### A.    Origins of RenovaCare

60.     RenovaCare was and is a development stage company that has not generated any revenue since its inception and has no commercialized products. Its activities primarily consist of research and development, business development, and capital raises. It owns the CellMist System, which consists of a treatment method for cell isolation for the regeneration of human skin cells and other tissues

(the "CellMist Solution"), and an experimental solution sprayer medical device to deliver regenerative stem cells to burn wound treatment areas (the "SkinGun").

61.    RenovaCare was originally incorporated in Utah on July 14, 1983, as "Far West Gold, Inc." On May 20, 1999, the company changed its name to "WhatsOnline.Com, Inc.," and Rayat became, and ever since has been, the Company's majority and controlling shareholder. The Company later made several other name changes, until January 7, 2014, when it changed its name to RenovaCare. RenovaCare's common stock trades on the over-the counter ("OTC") market under the symbol "RCAR."[13]

## B.    RenovaCare's Suspicious and Nonperforming Medical Business

62.    According to investigative reporting website Sharesleuth, "RenovaCare [has] limited cash, no revenue, and relatively low spending on research and development" and has "stayed alive through infusions from Rayat, most recently in 2018, when SEC filings show that he purportedly put $34 million

---

[13] During the Class Period, the Company's stock was a penny stock because it did not meet any of the exceptions to the definition of a "penny stock" pursuant to Exchange Act Section 3(a)(51), 15 U.S.C. § 78c(a)(51), and Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1. SEC Compl. ¶ 18. Until August 3, 2016, RenovaCare had securities registered with the SEC pursuant to Exchange Act Section 12(g), at which time it filed a Form 15 to terminate the registration. Thereafter, RenovaCare continued to regularly file forms with the SEC, including Forms 8-K.

into [RenovaCare and another company controlled by Rayat, SolarWindow]."[14] On November 29, 2018, Rayat purportedly invested $15.5 million to fund regulatory submissions and clinical trials for the SkinGun.[15]

63.    A *Seeking Alpha* article from TheStreetSweeper in 2018 notes that RenovaCare is operated by one full-time employee and three part-time contractors, including the Company's CEO.[16] The Company has "[n]o sales; little cash; big operating losses; and auditors expressed doubt the company can continue as a going concern."[17] The Company's CellMist system, including the SkinGun, was acquired on July 12, 2013, for $400,000.[18] CellMist is not FDA-approved for human use and remained in the clinical trial stage as of mid-2021.[19] Clinical trials remain ongoing and were estimated to be completed by November 2022.[20]

---

[14] https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (last accessed Nov. 9, 2022).

[15] https://www.renovacareinc.com/2018/11/renovacare-chairman-invests-15-and-one-half-million-dollars-to-fund-skingun-regulatory-submissions-and-clinical-trials/ (last accessed Nov. 9, 2022).

[16] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Nov. 9, 2022).

[17] *Id.*

[18] *See id.*

[19] *Id.*; https://www.renovacareinc.com/2021/07/renovacare_provides_update_on_clinical_trial_for_the_skingun_and_cellmist_system_for_wound_healing/ (last accessed Nov. 9, 2022).

[20] https://www.clinicaltrials.gov/ct2/show/NCT04890574?term=renovacare&draw=2&rank=1 (last accessed Nov. 9, 2022).

64.     However, as of March 2022, the Company "is taking steps to streamline its clinical, research and development, and administrative operations in order to reduce costs."[21] This means that the Company "has suspended patient enrollment in its clinical study and plans to reduce its administrative overhead."[22]

65.     Most recently, on March 24, 2022, RenovaCare reported that its then current CEO and CFO had resigned, leaving Rayat solely as interim President, CEO, CFO, and Secretary.[23]

66.     On May 3, 2022, RenovaCare announced the discontinuation of research and development of its SkinGun. Specifically, the Company announced "the termination of its July 1, 2020 Strategic Research and Development Agreement with StemCell Systems GmbH (SCS) and the closure of the RenovaCare R&D Innovation Center in Berlin, Germany. This decision ceases on-going development of the prototype for the closed, automated Cell Isolation Device and the portable, disposable SkinGun™ spray device. Development may resume at SCS or other Contract Manufacturing Organizations, upon the

---

[21] https://www.renovacareinc.com/2022/03/renovacare_provides_clinical_and_corporate_update/ (last visited Nov. 9, 2022).

[22] *See id.*

[23] https://www.renovacareinc.com/2022/03/renovacare_announces_management_changes/ (last visited Nov. 9, 2022).

availability of adequate funds."[24] Given that research and development have ceased for development of its SkinGun, there is no assurance that the Company's operations or clinical studies will continue or that RenovaCare will remain in business.[25]

## V. DEFENDANTS' SCHEME TO MANIPULATE RENOVACARE'S STOCK PRICE AND PROFIT THROUGH A CONCEALED STOCK PROMOTION CAMPAIGN AND MARKET MANIPULATION

67. Defendants' scheme to manipulate RenovaCare's stock price through a concealed stock promotion campaign with StreetAuthority in violation of Rule 10b-5(a) and (c) began early on in 2007 and continued until February 2018, though the truth of the scheme never fully emerged until the SEC filed its action against Defendants in May 2021.

68. Prior to RenovaCare's involvement with StreetAuthority, Defendants Rayat, Bhogal, Sidhu, and Fleming had already set an elaborate foundation early on to capitalize and execute the scheme so they could ensure that they profited once RenovaCare's stock price was pumped.

---

[24]

https://www.renovacareinc.com/2022/05/renovacare_announces_termination_of_stemcell_systems_research_and_development_agreement/ (last visited Nov. 9, 2022).

[25] *See id.*

69.     Once StreetAuthority began promoting RenovaCare's stock, Defendants worked together in a coordinated fashion to pump up RenovaCare's stock price and made materially false and misleading statements about their involvement in the stock promotion in violation of Rule 10b-5(b). Defendants Bhogal, Sidhu, and Fleming also manipulated RenovaCare's stock price to maintain the pumped price through manipulative trading in violation of Section 9(e).

70.     Defendants' coordinated scheme was non-public and unknown to investors. Defendants executed this scheme directly and/or indirectly through each other while Rayat and Bold were still in control of RenovaCare and Betancourt was in control of StreetAuthority, thereby violating Sections 20(a) and (b).

71.     Ultimately, Defendants were able to illegally enrich themselves at the expense of investors through the scheme and walked away with at least over $7 million in trading proceeds due to the unlawful artificial inflation of RenovaCare's stock price.

**A.    Defendants Planned Early on for RenovaCare's Stock Promotion Scheme with StreetAuthority by Accumulating RenovaCare Stock at Below-Market Prices with the Intention to Later Sell to the Public**

72.     The first part of Defendants' scheme included the sale of below-market price RenovaCare stock to themselves and registering restricted shares so that Defendants could later re-sell RenovaCare stock to the public.

**1.    Between 2007 and 2013, Rayat sold millions of RenovaCare shares to Sidhu and Bhogal, but retained a financial interest.**

73.    Between 2007 and 2013, Rayat sold millions of RenovaCare shares to entities owned and controlled by Sidhu and Bhogal, or financed their purchase of shares from other business associates. These transactions allowed Bhogal and Sidhu to acquire millions of shares of RenovaCare stock for little or no money, and in exchange, Rayat received debt or equity interests that permitted him to maintain a financial interest in any later sale of these shares:

| Date | Entity | Beneficial Owner | RCAR Shares Purchased | Rayat Role | Rayat Financial Interest |
|---|---|---|---|---|---|
| Dec. 31, 2007 | Blackbriar, Ltd. (Defendant) | Jeet Sidhu | 1,250,000 | Sold Shares | Preferred Shares of Blackbriar Ltd. redeemable for $1,062,500 |
| Dec. 31, 2007 | Boston Financial Group Ltd. | Jatinder Bhogal | 2,500,000 | Sold Shares | Preferred Shares of Boston Financial Group redeemable for $2,215,000 |
| Sept. 8, 2008 | Alberta Ltd. (Defendant) | Jatinder Bhogal | 3,000,000²⁶ | Sold Shares | Preferred Shares of Alberta Ltd. redeemable for $8,351,000 |
| Sept. 8, 2008 | Treadstone Ltd. (Defendant) | Jeet Sidhu | 1,250,000²⁷ | Sold Shares | Preferred Shares of Treadstone Ltd. redeemable for $3,741,500 |
| June 1, 2013 | Wolverhampton Holdings LLC | Jatinder Bhogal | 822,000 | Financed Purchase | $425,000 loan at 4.7% annual interest |

[26] Alberta Ltd. also received 2.8 million shares of SolarWindow and shares in three other companies in this transaction.

[27] Treadstone Ltd. also received 1.25 million restricted shares of SolarWindow and shares of three other companies in this transaction.

31

| Date | Entity | Beneficial Owner | RCAR Shares Purchased | Rayat Role | Rayat Financial Interest |
|------|--------|------------------|----------------------|------------|--------------------------|
|  |  |  |  | from third party |  |
| June 1, 2013 | Collingwood Holdings LLC | Jeet Sidhu | 1,962,000 | Financed purchase from third party | $1,200,000 loan at 4.7% annual interest |

SEC Compl. ¶ 46.

74.    Defendants also obtained shares in private transactions with the Company. In 2008, for example, Fleming acquired 300,000 RenovaCare shares in a private placement. By October 2017, she still owned 153,630 shares of RenovaCare. SEC Compl. ¶ 47.

75.    Rayat also loaned substantial sums to Bhogal and Fleming. In March 2013, for example, Rayat loaned $548,000 to Vector, the company through which Bhogal managed RenovaCare's investor relations operation. In 2013, Rayat loaned Fleming $500,000 to allow her to purchase an interest in a stock promotion company. SEC Compl. ¶ 48.

**2.    In anticipation of the Predictions Campaign, Rayat and Sidhu orchestrated additional below-market sales of RenovaCare stock.**

76.    In advance of StreetAuthority's Predictions Campaign, Defendants engaged in several transactions that provided them with additional stock at below-market prices. On June 28, 2017, for example, Rayat exercised warrants that granted Kalen over 114,000 RenovaCare shares at below-market prices. In July

2017, Rayat purchased 410,000 RenovaCare shares, and he solicited several friends to purchase another 50,250 shares. Sidhu assisted Rayat and RenovaCare in completing this private sale of RenovaCare shares, including by coordinating documentation of the transactions. SEC Compl. ¶ 49.

77.    In October 2017, shortly before the Predictions Campaign began, Rayat directed RenovaCare to engage in another private sale of shares to Rayat's friends and associates at below-market prices. After another friend decided not to invest, Sidhu stepped in and purchased those shares, despite already owning millions of RenovaCare shares at a significantly lower cost basis. Sidhu's participation allowed RenovaCare to publicly announce that the offering was fully subscribed, and he substantially assisted Rayat and RenovaCare in executing the transaction. Among other things, Sidhu worked with Rayat to solicit one of Rayat's friends to invest over $2 million ("Friend A"), and assisted her in completing the transaction. Sidhu later assisted Friend A in registering her shares for resale while the Predictions Campaign was ongoing. Later, Friend A purchased and sold RenovaCare stock on the open market during the promotional campaign. SEC Compl. ¶ 50.

78.    The proceeds of the July and October 2017 financings—funding exclusively provided by Rayat and his friends and associates—were the primary

source of funds RenovaCare used to pay StreetAuthority for the promotional campaign. SEC Compl. ¶ 51.

### 3. Sidhu worked with the other Defendants to open brokerage accounts with free-trading RenovaCare shares.

79.    Beginning no later than 2013, Bhogal, Rayat, Fleming, and Sidhu closely coordinated their brokerage accounts. Bhogal and Sidhu had accounts with the same U.S. broker-dealer ("Broker-Dealer A") that held shares of RenovaCare and other penny stocks that they both obtained through transactions involving Rayat, and Fleming also opened an account with Broker-Dealer A pursuant to Rayat's recommendation. Sidhu, who had online access to Bhogal's and Rayat's accounts, regularly managed their brokerage accounts. SEC Compl. ¶ 52.

80.    Sidhu would frequently review Bhogal's and Rayat's accounts, including their RenovaCare holdings, when he logged into his own accounts. For example, on January 23, 2017, Sidhu logged in and viewed all three accounts. SEC Compl. ¶ 53.

81.    In early 2017, Broker-Dealer A closed a number of Sidhu's and Bhogal's accounts. Sidhu coordinated the transfer of shares between entities to prepare the shares for sale at another brokerage. On February 10, 2017, he sent instructions to RenovaCare's transfer agent to move the shares between the various entities he and Bhogal controlled as follows: (i) Collingwood shares to Sidhu; (ii) Alberta LLC's shares to Alberta Ltd.; (iii) Wolverhampton shares to Boston

Financial; and (iv) Blackbriar Ltd. received shares from Blackbriar LLC. SEC Compl. ¶ 54.

82.    By April 2017, Sidhu and Bhogal were working together to deposit RenovaCare shares with another U.S. broker-dealer ("Broker-Dealer B"). Sidhu deposited shares from Collingwood into a new account in his name with Broker-Dealer B. With Sidhu's assistance, Bhogal opened an account in Alberta Ltd.'s name and deposited shares. SEC Compl. ¶ 55.

83.    As of April 2017, the RenovaCare shares in both Sidhu's and Bhogal's Broker- Dealer B accounts were restricted from sale pursuant to the Federal securities laws. SEC Compl. ¶ 56.

84.    By May 2017, in coordination with RenovaCare's outside counsel and a member of the Company's board of directors ("RenovaCare's Director"), Bhogal and Sidhu asked RenovaCare to register their shares so that they could be sold. SEC Compl. ¶ 57.

85.    On June 6, 2017, RenovaCare amended a Form S-1 Registration Statement already pending with the SEC to add Sidhu's and Bhogal's shares to the list of shares that the company sought to register for resale. The prior version of the S-1 had sought to register approximately 2 million RenovaCare shares owned by Rayat and other friends and associates. SEC Compl. ¶ 58.

86.     As of June 2017, Bhogal owned 5.5 million RenovaCare shares, Sidhu owned over 3.3 million RenovaCare shares, and Fleming owned over 100,000 RenovaCare shares. SEC Compl. ¶ 59.

87.     On July 5, 2017, the SEC declared RenovaCare's June 6, 2017 S-1 effective, which removed any restrictions on the ability of Rayat, Bhogal, Sidhu, and other friends and associates of Rayat to sell their shares. SEC Compl. ¶ 60.

88.     Shortly thereafter, Sidhu contacted Broker-Dealer B to remove the restricted legend from his and Bhogal's RenovaCare shares. On July 17, 2017, Sidhu informed Bhogal that both accounts were cleared to sell their RenovaCare stock. They would wait to sell, however, until shortly after the Predictions Campaign commenced. SEC Compl. ¶ 61.

**4.     With Sidhu's help, Rayat sought to open accounts with five different brokers to sell RenovaCare and SolarWindow shares.**

89.     In anticipation of the Predictions Campaign, Rayat repeatedly tried to open brokerage accounts that would allow him to sell his RenovaCare shares. Although his efforts were ultimately unsuccessful, they demonstrate Rayat's intention to sell RenovaCare stock during the planned promotional campaign. While these efforts were ongoing, he repeatedly asked Sidhu to track his holdings and assist him in preparing information needed to open the accounts. SEC Compl. ¶ 62.

90.    Rayat also coordinated accounts openings with Bhogal and Sidhu. On June 6, 2017, Rayat received account opening forms from a foreign financial institution. After Rayat forwarded the email to Sidhu, Sidhu replied, "Which entity am I filling this out for?" Rayat responded, "[Kalen Capital] for me … and whatever company [Bhogal] has his shares in." SEC Compl. ¶ 63.

91.    In addition, between August 2017 and November 2017, Rayat had on-going discussions with at least four different brokerage firms concerning opening accounts. For example, on or around September 1, 2017, while he was in Austin, Texas, visiting StreetAuthority to discuss the Predictions Campaign, he discussed opening an account with one of these firms. He had previously informed this firm he intended to sell 500,000 RenovaCare shares. SEC Compl. ¶ 64.

92.    Similarly, on October 19, 2017—days before the Predictions Campaign began— Rayat told another brokerage firm that he intended to sell 2.5 million to 5 million RenovaCare shares over the next two years. SEC Compl. ¶ 65.

93.    By November 2017, however, all four brokerages had either declined to open an account or closed the account before Rayat could sell his stock. Thus, Rayat was unable to sell his RenovaCare stock during the Predictions Campaign. SEC Compl. ¶ 66.

94.    Nonetheless, Rayat's beneficial interest in entities owned by Bhogal and Sidhu, including several that sold RenovaCare shares during the

StreetAuthority promotional campaign, allowed Rayat to profit from the scheme.

SEC Compl. ¶ 67.

**B.    After Developing an Aggressive Investor Relations Program, Rayat Solicited StreetAuthority to Promote RenovaCare While Defendants Intended to Sell and Sold**

95.    After accumulating below-market price RenovaCare shares through

the coordinated related-party transactions described above, the second part of

Defendants' scheme was to aggressively promote RenovaCare while intending to

sell and selling RenovaCare shares, a fraudulent practice referred to as "scalping."

SEC Compl. ¶ 68.

96.    By 2015, Rayat and Bhogal had developed a robust "investor

relations" operation within RenovaCare that included a company website and a

steady stream of press releases touting the company's prospects, despite the

Company's lack of revenue or any commercially available product. Rayat and

Bhogal also hired and worked with a series of third-party investor relations

consultants, including Fleming, IRC 1, and IRC 2, through whom they

orchestrated, funded, and directed paid promotional campaigns through third-party

promoters such as StreetAuthority. SEC Compl. ¶ 68.

1.    **Bhogal, Rayat, and Sidhu developed an aggressive investor relations program that provided the basis for the Predictions Campaign with StreetAuthority.**

97.    As of 2013, RenovaCare was known as Janus Resources Inc. and purported to be in the business of oil-and-gas production. By the middle of 2013, Bhogal and Rayat decided to radically alter RenovaCare's business plan by purchasing the technology related to the SkinGun. SEC Compl. ¶ 69.

98.    Bhogal received a "finder's fee" for this transaction, after which he shifted his attention to building and managing RenovaCare's investor relations and press relations operations, working as a RenovaCare consultant through Vector, his consulting company. He had regular contact with Rayat, IRC 1, Fleming, and RenovaCare's CEO, attended RenovaCare Board meetings, worked closely with IRC 1 and others to develop RenovaCare's website, and directed the timing and content of RenovaCare's press releases. SEC Compl. ¶ 70.

99.    Fleming was actively involved in promoting RenovaCare beginning no later than 2014, working initially through an investor relations company called Gold Key Media, and later through her own company, Inspiren, the publisher of "The Cheap Investor," an investor-focused newsletter she purchased in a transaction that Rayat financed. On May 11, 2015, for example, Fleming copied Rayat and IRC 1 on an email in which she referred to RenovaCare as "the new

sponsor" of The Cheap Investor in response to a question regarding approval of an

"RCAR promo piece" in the newsletter. SEC Compl. ¶ 71.

100.   The Cheap Investor disseminated paid promotions of RenovaCare

from at least October 2015 to July 2016. During that period, Sidhu, Bhogal, and

Fleming collectively sold over 600,000 RenovaCare shares. SEC Compl. ¶ 72.

101.   By October 2015, Rayat had worked with Sidhu, Bhogal, Fleming,

and others to develop RenovaCare's "investor relations" strategy that would

temporarily increase the price and trading volume of RenovaCare shares as they

sold shares. SEC Compl. ¶ 73.

102.   For example, on or around October 9, 2015, Sidhu discussed the

process with RenovaCare's CEO, and later forwarded wire instructions to him to

be used to pay IRC 1 for his investor relations services. SEC Compl. ¶ 74.

103.   As RenovaCare's CEO explained in an October 9, 2015 email after he

discussed with Rayat:

> [J]ust talked to Harmel. We will enter an agreement as of
> Sep 1 with [IRC 1] for the entire branding, website, etc.
> activities. He will be on a retainer of $10,000 per month
> …
>
> In addition we will enter an agreement for investor
> relation activities[.] [T]hese payments we will wire after
> we have the agreement. This will be done by third party
> companies (e.g. thecheapinvestor.com) but will run also
> through [IRC 1's] company. That will be $60,000
> monthly for about 4 months.

SEC Compl. ¶ 75.

104.    The RenovaCare CEO's mention of "thecheapinvestor.com" refers to Fleming's investor-focused newsletter, and his explanation illustrates Defendants' business model—funding a short-term promotional campaign through a third-party "investor relations consultant" (at the time, IRC 1) who worked with a third-party stock promoter (at the time, Fleming)—an approach that mirrored Defendants' scheme two years later involving StreetAuthority. SEC Compl. ¶ 76.

105.    Bhogal was directly involved in directing the timing and content of RenovaCare press releases, ensuring that they coincided with third-party promotional activity. Bhogal served as RenovaCare's primary interface with IRC 1, and he organized weekly conference calls via Skype with RenovaCare's CEO and IRC 1 to discuss RenovaCare's investor relations program, including building content for RenovaCare's website and to map out RenovaCare's press releases over the ensuing months. SEC Compl. ¶ 77.

106.    In December 2016, for example, Bhogal had numerous contacts with IRC 1, RenovaCare's CEO, and other consultants to plan the content and timing of RenovaCare's press releases and other investor relations activities for the following year. SEC Compl. ¶ 78.

107.   Defendants' investor relations strategy set the groundwork for Rayat to enlist a new third-party stock promoter in 2017—StreetAuthority. SEC Compl. ¶ 79.

**2.    In July 2017, Rayat approached StreetAuthority to promote RenovaCare.**

108.   Prior to the Class Period, on or about July 26, 2017, while he was RenovaCare's controlling shareholder,[28] Rayat solicited StreetAuthority for a promotional campaign. StreetAuthority, an online financial publisher of investment newsletters with a dedicated subscriber base, whose CEO, owner, and operator during the Class Period, Lou Betancourt, was a long-time friend of Rayat and a RenovaCare shareholder.[29] The promotional campaign would include promotions

---

[28] By July 2017, Rayat owned approximately 65 percent of RenovaCare's stock (approximately 52 million shares) and was the company's controlling shareholder. As of May 2020, Rayat controlled 75 percent of RenovaCare: https://www.sec.gov/Archives/edgar/data/1016708/000117184320003732/f10k_050620.htm#a_025 (last accessed Nov. 11, 2022). As of December 2020, Rayat controlled 72 percent of RenovaCare: https://www.sec.gov/Archives/edgar/data/0001016708/000117184321002192/f10k_032321.htm (last accessed Nov. 11, 2022). As of January 1, 2021, Rayat owned 71,101,453 million shares of common stock, or 81.3 percent of the company's outstanding shares of common stock.

[29] According to a *Seeking Alpha* article entitled "RenovaCare: Many Catalysts, Untold Downside," written during the Class Period, Betancourt owned 2,100 shares of RenovaCare common stock at the time of publication of the Predictions Report and promotional campaign discussed herein. *See* https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Nov. 9, 2022).

for RenovaCare and another company that Rayat controlled, SolarWindow.[30] SEC Compl. ¶ 80.

109.    That day, Rayat spoke to Betancourt on the phone, and later emailed marketing materials related to SolarWindow and RenovaCare's SkinGun to Betancourt. Rayat was interested in the promotion because he wanted to increase RenovaCare's stock price and trading volume, which would benefit him and his close associates who owned the Company's stock. *See* SEC Compl. ¶¶ 80-81.

---

[30] Rayat acted as Chairman of the Board of Directors of SolarWindow. This company's stock is quoted on the OTC Markets (OTC ticker symbol: WNDW) and purports to be developing and marketing windows for residential and commercial buildings that generate electricity from solar energy. During the Class Period, Rayat was a controlling shareholder of this company, and Bhogal and Sidhu were also substantial shareholders. *See* https://www.solar window.com/2018/03/solarwindow-board-directors-elects-majority-stockholder-harmel-s-rayat-chairman/ and https://www.businesswire.com/news/home/20180315005583/en/SolarWindow-Board-of-Directors-Elects-Majority-Stockholder-Harmel-S.-Rayat-as-Chairman (discussing Rayat's appointment as Chairman of the Board and longtime involvement in the company) (last accessed Nov. 9, 2022); https://sharesleuth.com/solarwindow-technologies-inc-a-green-energy-company-with-multiple-red-flags/ (discussing, in relevant part, Rayat's ownership of SolarWindow and RenovaCare) (last accessed Nov. 9, 2022).

It is also believed that Bhogal served as a consultant to SolarWindow from February 1, 2014, through his company Vector Asset Management LLC, and became a Director on August 1, 2017. Sidhu was an employee of SolarWindow before 2010. Fleming was an investor relations consultant to SolarWindow during the Predictions Campaign. SolarWindow was featured in the Predictions Campaign with RenovaCare based on Rayat's agreement, and similarly paid StreetAuthority through the same third-party investor relations consultants, including Fleming.

110.    On July 28, 2017, Betancourt suggested to Rayat that StreetAuthority feature RenovaCare and SolarWind in StreetAuthority's annual "Predictions Report." Betancourt noted that this could "create awareness of both companies" and persuade StreetAuthority subscribers to invest in RenovaCare and SolarWind. Betancourt further stated that StreetAuthority was interested in "partnering up" with Rayat to advertise on various online media platforms. Betancourt proposed that RenovaCare and SolarWind each pay StreetAuthority $50,000 per month to fund the planned promotional campaign, and Rayat agreed by stating it was a "great idea," and then arranged to discuss the proposal in more detail. SEC Compl. ¶ 81.

111.    On August 1, 2017, in an email to StreetAuthority employees after Rayat's call with StreetAuthority representatives, a colleague at StreetAuthority wrote Betancourt:

> I want to pursue a marketing partnership with Harmel/[IRC 1] for this promotion. We will disseminate this promotion to all our lists, but for it to have the kind of impact we all want, we're going to need to rent outside lists and promote it on Google/YahooFinance/etc.

SEC Compl. ¶ 82.

112.    In reply, Betancourt agreed, and noted that "Harmel initially called me about advertising and promoting his companies." SEC Compl. ¶ 83.

44

113.    Between July 28 and August 31, 2017, Rayat discussed the details of the promotional campaign with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August 2017. SEC Compl. ¶ 84.

114.    On September 4, 2017, shortly after Rayat's trip to StreetAuthority's headquarters in Austin, Texas, Betancourt emailed Rayat to confirm that "StreetAuthority will be featuring both [RenovaCare and SolarWind] in its annual 'Predictions' report and promotions for Game-Changing Stocks," one of StreetAuthority's investor-focused newsletters. RenovaCare and SolarWind would be StreetAuthority's lead "predictions." Betancourt also asked if Rayat was "interested in exploring and participating in this marketing program"—referred to within Street Authority as the "Predictions Campaign"—which could include "developing native ads that can run within Google, Yahoo Gemini, Taboola, Dianomi, Outbrain and other Content Display Networks." These advertising platforms later became the subject of focused discussions with Rayat. SEC Compl. ¶ 86.

115.    Later that day, Rayat responded:

> [N]othing would make me happier than working with [StreetAuthority] in spreading the word to investors and dramatically improving [RenovaCare's and SolarWind's] awareness in the investment community, which I wholeheartedly believe will help [RenovaCare and SolarWind] raise additional capital and get senior

listings, which in turn will allow institutional investors to jump in."

So, and as it relates to 1) being featured in the annual 'Predictions' report, 2) participating in marketing programs, 3) developing research reports and 4) being featured in Game-Changing Stocks and StreetAuthority Daily, please know that I am very interested in exploring how we can work together.

*See* SEC Compl. ¶ 87.

116.    After expressing his interest to Betancourt in participating in all of the key elements of what would regularly be referred to as the Predictions Campaign, Rayat suggested they speak the next day. SEC Compl. ¶ 88.

### 3.    Confidential Witness accounts corroborate Rayat and RenovaCare's solicitation of StreetAuthority and involvement in creating and paying for the Predictions Report.

117.    Significantly, Confidential Witnesses corroborate Rayat and RenovaCare's involvement in the StreetAuthority promotional campaign.

118.    Confidential Witness ("CW") 1, a former Marketing Assistant and Advertising Coordinator who worked in StreetAuthority's Austin, Texas, headquarters from September 2016 to February 2018 and reported to StreetAuthority's Marketing Manager, who in turn reported to Betancourt, described Street Authority's Predictions Report as a report that featured the "big hitters." According to CW 1 the report "typically … had different levels where you could pay for these packages and it would tell you what the best stocks to invest in are, and there were a couple differently priced ones." CW 1 further stated that such

reports ran "maybe twice a year" and were designed to feature the "big hitters." CW 1 stated that companies could pay to be featured in the Predictions Report.

119.   CW 1 corroborated the existence of RenovaCare's promotional campaign and stated that CW 1 learned about StreetAuthority's promotional campaign with RenovaCare during a meeting toward the end of CW 1's tenure with StreetAuthority: "I think it was around the holidays [in 2017] when they talked about it or shortly after[.]" When asked about Betancourt's involvement, CW 1 stated that Betancourt attended StreetAuthority's weekly managers' meetings (attended by managers from editorial, marketing, and advertising) and that staff "would have to run everything by him."

120.   CW 2, a former Graphic Designer who worked at StreetAuthority in the company's headquarters from April 2016 to 2019 and was responsible for building most of the graphics supplied by StreetAuthority's editorial team and updating StreetAuthority's website, also corroborated the existence of StreetAuthority's Predictions Report promotional campaign with RenovaCare. CW 2 stated that CW 2 remembered StreetAuthority's promotional campaign with RenovaCare for its SkinGun product, including the before-and-after photos of a patient who purportedly recovered from severe burns in just a few days after using the SkinGun.

121.   CW 2 stated that CW 2 received the before-and-after photos from StreetAuthority's editorial team and posted them to the company's website: "I … remember working on some graphics for that," continuing, "That's basically the content I was provided. [I was] the graphic designer [and was told], 'We want to use these pictures to be on the site.' … I do remember some of that stuff … I do remember the company providing those graphics to be added to the site…. They were some before-and-after pictures…. I believe it was like an infomercial, before-and-after kind of thing." CW 2 continued that CW 2 would have received the before-and-after pictures from CW 2's supervisors on StreetAuthority's editorial team. Recalling directives from supervisors, CW 2 remembered supervisors stating, "'OK, here's some pictures that you need to post.'" CW 2 said the before-and-after photos were likely sent directly to StreetAuthority from RenovaCare or taken from RenovaCare's website. CW 2 also said there was no discussion within StreetAuthority about the validity of the RenovaCare before-and-after photos. Instead, CW 2 commented, "Sometimes when we work under pressure, we just post the pictures. There was never any kind of meetings or any kind of discussion about where these pictures came from. They provided me them, and my job as a graphic designer was to post them."

48

122.   CW 2 also posted substantive content about RenovaCare to StreetAuthority's website, including text that was sent to CW 2 in a Microsoft Word document.

123.   Additionally, CW 3, a former Marketing Manager who worked at StreetAuthority from October 2016 to February 2020, also corroborated the existence of and RenovaCare's payment for the promotional campaign. CW 3 worked in the company's Austin, Texas, headquarters and was responsible for managing the production of new and existing products; tracking analytics and performance; writing and managing marketing emails; and editing daily web marketing content. CW 3 remembered seeing the before-and-after photos of a patient who purportedly recovered from severe burns in just a few days after using RenovaCare's SkinGun.

124.   When asked about the promotional campaign, CW 3 said CW 3 likely first learned about the RenovaCare promotional campaign in fall 2017 or possibly even earlier: "They got started on that one [(the Predictions Report)] pretty early because that one is a bit more involved and required more writeups." Corroborating CW 1, CW 3 said CW 3 would have learned about the promotional campaign about three months prior to the writing and release of the Predictions Report, likely during a meeting that included CEO Lou Betancourt: "We would have been talking about the writing of the predictions and talking about the stocks

themselves. We had a thing where we would go through all of them and look at them. [The report] was usually written and finished and proofread by the middle of November, and then [we] started promoting it immediately for Black Friday or Cyber Monday."

125.   CW 3 further recalled StreetAuthority publishing the RenovaCare Predictions Report in StreetAuthority's Top Stock Advisors. CW 3 stated, "One of the primary forms of advertising or getting people to sign up for products was to do longform copy on various stocks…. RenovaCare was, if I remember correctly, in our [2018] Predictions Report. We all thought it was really cool – because conceptionally it is very cool…. [RenovaCare] sent us promotional materials, and then we just incorporated that into our [2018] Predictions Report. And then we promoted that for maybe six months."

126.   CW 3 further stated that RenovaCare also sent StreetAuthority some research related to its SkinGun. Additionally, CW 3 was "90% sure" that StreetAuthority's promotional campaign for RenovaCare was limited to the Predictions Report. CW 3 continued that there were no questions or issues raised about the validity of the before-and-after photos or any other materials about RenovaCare.

127.   Additionally, CW 3 recalled that StreetAuthority simultaneously ran a promotional campaign for another company controlled by RenovaCare CEO

Harmel Rayat called SolarWindow Technologies,[31] and that SolarWindow was promoted as a "top stock." CW 3 commented that the Predictions Report articles on featured stocks like RenovaCare were typically about four pages of text and the 2018 Predictions Report featured RenovaCare, SolarWindow Technologies, and 11 other stocks.

128.    Of the stocks featured in StreetAuthority's Predictions Reports, CW 3 could not recall StreetAuthority receiving payments from any companies ***other than from RenovaCare*** and SolarWindow. CW 3 further stated that StreetAuthority's work featuring RenovaCare and SolarWindow in its Predictions Report was "basically identical to any other stock that … our analysts would pick out and promote … ***other than we were being paid some commission or whatever to do so***." (Emphasis added.)

129.    When asked specifically about Rayat's involvement in the promotional campaign, CW 3 stated that StreetAuthority CEO Betancourt referred to Rayat during meetings: "We all knew who Harmel [Rayat] was. ***I think Harmel asked Lou or invited Lou to do a paid placement*** … ***I knew that they were friends prior to that***. ***Lou was like, 'Yeah, Harmel has these companies, and we really***

---

[31] *See supra* n.30 above (describing Rayat's involvement in SolarWindow Technologies and RenovaCare).

*like them, so we're going got put them in the Predictions Report.*'" (Emphasis added.)

130.    When asked about the impact of the promotional campaign, CW 3 stated, "In theory, all paid placements [with StreetAuthority] – they did have significant positive effect on [companies'] trading."

### 4.    Unbeknownst to investors, Rayat was closely involved in managing development and execution of the promotional campaign.

131.    Between July and October 2017, Defendants RenovaCare, Rayat, Bhogal, Sidhu, and Fleming worked closely with StreetAuthority representatives to create promotional materials to be used in the Predictions Campaign. SEC Compl. ¶ 89. However, Defendants' role and involvement in the promotional campaign was never disclosed to investors until after OTC Markets issued its letter and the end of the Class Period.

132.    Specifically, Rayat provided StreetAuthority with extensive information on RenovaCare and the purported efficacy of the "SkinGun," the Company's experimental medical device. SEC Compl. ¶ 89. Rayat actively worked with StreetAuthority to create StreetAuthority's promotional materials, including the Predictions Report.

133.    Moreover, Rayat had frequent contact with StreetAuthority and RenovaCare employees and consultants in the United States, over the phone,

email, and other interstate means in furtherance of StreetAuthority's promotion. Rayat discussed the details of the promotion with StreetAuthority representatives on several occasions, including an in-person meeting at StreetAuthority's headquarters in Austin, Texas, in late August 2017. SEC Compl. ¶ 84.

134.    Additionally, RenovaCare's website and press releases, all of which were developed under Bhogal's supervision, were the primary source of promotional content used for the StreetAuthority promotion. SEC Compl. ¶ 90.

135.    The planning and discussions between Rayat and StreetAuthority about RenovaCare's promotional campaign continued into October 2017. By at least September 2017, StreetAuthority began drafting materials for its paid promotion of RenovaCare. All or most of the information used in promotional materials during the campaign was provided to StreetAuthority by Rayat in emails, attachments, or links to RenovaCare's website or third-party websites. Virtually all of this information came from RenovaCare's investor relations program, which was managed by Rayat and Bhogal through IRC 1, who later worked with StreetAuthority. SEC Compl. ¶ 91.

136.    After working closely with Defendants Rayat, Bhogal, Sidhu, and Fleming, StreetAuthority publicly launched the Predictions Campaign on or about October 24, 2017. Rayat reviewed and commented on draft promotional materials,

including the Predictions Report that was the heart of the campaign, prior to their release. SEC Compl. ¶ 92.

137.    After the Predictions Campaign launched in late October 2017, Rayat received reports from StreetAuthority regarding the campaign's performance, and weighed in on advertising content and "placements." He also stopped and started the advertising "spend" for the campaign based on external events, including the OTC Markets inquiry described in detail below. SEC Compl. ¶ 93.

138.    Notably, in terms of the advertising "spend," Rayat arranged for RenovaCare and SolarWindow to each pay StreetAuthority $50,000 per month for the promotional campaign and, as will be discussed further in section V.D. below, arranged for the payment to be made through third-party companies for the fraudulent purpose of concealing Rayat's and the RenovaCare's involvement.

139.    From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to its subscriber base. SEC Compl. ¶ 94.

140.    Throughout the campaign, Rayat continued to be closely involved in the drafting, distribution, and dissemination of StreetAuthority's promotional materials. SEC Compl. ¶ 94. For example, on or around November 28, 2017, Rayat traveled to StreetAuthority headquarters in Austin, Texas, to meet with Betancourt and his staff, including the copy writer for the Predictions Campaign. The next

day, having had a chance to reflect on their discussion and "examine the results of the last 30 plus days" that they provided, Rayat gave StreetAuthority a series of explicit instructions:

1. Focus on Gemini [an online advertising platform];

2. Have separate single company ads and landers, so that one single company is the focus of the report … I think this will definitely have more impact;

3. A few days later, a special report goes out on the other company so that we get another chance at the investor

SEC Compl. ¶ 95.

141.   Rayat then suggested that if the copywriter "can get the copy tweaked right away, we can start this new strategy sooner than later." SEC Compl. ¶ 96.

142.   Rayat explicitly linked his "suggestions" to future payments to StreetAuthority, stating that "we have to show meaningful results to the CEOs [of RenovaCare and SolarWindow], who need to make another transfer shortly," referring to the next $50,000 monthly payments to StreetAuthority from RenovaCare and SolarWindow. SEC Compl. ¶ 97.

143.   On or around December 4, 2017, a StreetAuthority employee sent Rayat a text message attaching a draft version of the "separate single company ads and landers" he had requested that related to the Predictions Campaign. SEC Compl. ¶ 98.

144.    On or around December 5, 2017, Rayat had another telephone conference call with StreetAuthority representatives. After that call, the StreetAuthority employee informed Rayat that "we're ready to launch on ad networks whenever we're given the green light." The next day, Rayat responded and approved the decision to restart the advertising campaign: "I say we start up the machinery :)." SEC Compl. ¶ 99.

145.    On numerous other occasions, including on or around December 20, 2017, Rayat asked StreetAuthority employees to report on the performance of the Predictions Campaign, and weighed in on how they should proceed. SEC Compl. ¶ 100.

146.    Ultimately, without disclosing RenovaCare or Rayat's involvement, StreetAuthority disseminated the promotional materials in emails to its subscriber base, as well as on the internet more broadly in banner advertisements on search engines, social media sites, and other internet platforms.

147.    Defendants also knew, or were reckless in not knowing, that it was unlawful to promote RenovaCare stock while they intended to sell RenovaCare stock without disclosing this fact to investors. For example, as a recidivist securities law violator, Rayat was well aware of the rules surrounding stock promotion. Significantly, in 2000, Rayat had settled a case with the Securities and Exchange Commission in which he was charged with violating Section 17(b) of

the Securities Act for failing to disclose compensation received relating to a stock promotion. *SEC v. EquityAlert.Com, Inc. and Harmel S. Rayat*, No. cv-00-146 (D. Ariz. Aug. 24, 2000). SEC Compl. ¶ 105.[32]

148.   Nonetheless, Defendants schemed to defraud investors by orchestrating and financing a promotion through StreetAuthority without disclosing their intent to sell, and later, their orchestrated sales of RenovaCare stock.

### 5.   Notwithstanding RenovaCare and Rayat's nondisclosure, StreetAuthority and Betancourt had a duty to disclose the paid RenovaCare stock promotional campaign but did not.

149.   Section 17(b) of the Securities Act imposes a duty to disclose that a stock promoter received consideration for promoting a company's securities. 15 U.S.C. §77q(b). Section 17(b) provides that:

> It shall be unlawful for any person, by the use any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicly to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment

---

[32] Rayat was previously chairman of EquityAlert.com, a financial information website in the late 1990s/early 2000s. EquityAlert.com was involved in an unlawful stock promoter scheme similar to the instant case. There, Rayat acted as the promoter company (similar to StreetAuthority here) to promote small cap companies' stocks with the intention to capitalize on the promotion by selling unregistered securities given to EquityAlert.com by the promoted companies when the stock price rose. *See* https://www.sec.gov/litigation/admin/33-8306.htm (last accessed Nov. 9, 2022); https://www.wsj.com/articles/SB937602605516369098 (last accessed Nov. 9, 2022); https://www.seclaw.com/emailpumpanddump1003/ (last accessed Nov. 9, 2022).

service, or communication, which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

150.   The SEC has also issued investor bulletins alerting investors to the use of stock promoters that state that, to protect investors from being misled by such materials, the federal securities laws require stock promoters to disclose the entity that retained them and the amount and type of any payments that they received as compensation for their engagement.

151.   StreetAuthority and Betancourt never disclosed Rayat and RenovaCare's paid promotional campaign in furtherance of disseminating the Predictions Report to investors, nor did it disclose that it was receiving payments from them in exchange for publishing the Reports.

152.   For example, the disclosures in StreetAuthority's RenovaCare promotional materials pursuant to Securities Act Section 17(b) stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for RenovaCare.

153.   As discussed below, however, Rayat arranged for third-party investor relations companies, not RenovaCare, to make direct payments to StreetAuthority. Rayat's payment arrangement—which concealed the company's and its controlling shareholder's involvement in and potential financial incentives to StreetAuthority

in promoting the stock—had the effect of reducing investor skepticism regarding the truthfulness of the campaign by making it appear to investors that StreetAuthority was offering an objective and fair assessment of RenovaCare's stock.

154.    Thus, the Predictions Report and promotional campaign freely circulated to StreetAuthority's subscriber base as intended by Rayat and the other Defendants.

155.    A screenshot of the Predictions Report is immediately below:



**SPECIAL REPORT**

# 13 Shocking Investment Predictions for 2018

## ...From The Research Team Whose Annual Predictions Have Returned Up To 569%

### #1: RenovaCare, Inc. [Ticker: RCAR]

Wednesday, February 7, 2018

On behalf of the research staff at *Game-Changing Stocks*, we'd like to thank you for requesting our new investment report.

Today we'd like to share with you the name and trading symbol of one of the most urgent stock recommendations we have ever made. It is an opportunity that our six-man research team believes offers explosive profit potential in 2018 and beyond.

Image: StreetAuthority Report to promote RenovaCare, dated February 7, 2018.[33]

### C. RenovaCare Represents That Its Disclosure Controls Are Effective but Fails to Publicly Disclose Its Ongoing Promotional Campaign with StreetAuthority and Betancourt

156.    On August 14, 2017, the beginning of the Class Period and well after Rayat had solicited StreetAuthority for the Predictions Report promotional campaign, RenovaCare filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017. That quarterly report stated, in relevant part:

> **Disclosure Controls and Procedures**
>
> … Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

157.    However, the Form 10-Q never disclosed RenovaCare's ongoing publishing arrangement with StreetAuthority and Betancourt that was already underway. Nor is there any mention of StreetAuthority or risk factors associated with the promotion.

---

[33] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Nov. 10, 2022).

**D.     Rayat Concealed Payments for StreetAuthority's Promotional Campaign by Funneling Money Through Undisclosed Third-Party Investor Relations Companies and Providing Inadequate Disclaimers**

158.   Not only did RenovaCare and Rayat not disclose their involvement with StreetAuthority's promotional campaign, but they also concealed how the campaign was funded.

159.   Before StreetAuthority launched its promotion of RenovaCare, Betancourt and Rayat orally agreed that StreetAuthority would receive $100,000 per month for the promotion. Specifically, Rayat arranged to have both RenovaCare and SolarWindow each pay StreetAuthority $50,000 per month. StreetAuthority agreed to use that money to pay for advertising and other distribution costs relating to the publication and dissemination of its promotion of RenovaCare and SolarWindow. *See* SEC Compl. ¶ 81.

160.   However, rather than have RenovaCare pay StreetAuthority directly, Rayat arranged to pay StreetAuthority through third-party investor relations companies that Rayat had hired in the past for other promotional campaigns.

161.   Rayat and Bhogal selected these third-party investor relations companies: IRC 1, followed by Fleming, and followed finally by IRC 2. Each of these third-party service providers worked on the StreetAuthority promotion at the direction of Rayat and Bhogal. Although IRC 1 was replaced before the StreetAuthority promotion began, Fleming and IRC 2 each invoiced RenovaCare

and SolarWindow for StreetAuthority's work promoting the companies, thereby

obscuring a direct link between RenovaCare and StreetAuthority. *See* SEC Compl.

¶ 101.

162.   IRC 1 was a long-time business associate of Rayat, Fleming, and

Bhogal and provided investor relations services to Rayat and RenovaCare

beginning no later than 2014. Rayat arranged for RenovaCare to pay IRC 1 a

$2,500 per month retainer. The only service IRC 1 provided in exchange for this

money was to prepare invoices and route payments between RenovaCare and

StreetAuthority.[34] At all times during IRC 1's retention, Rayat remained

StreetAuthority's primary source of information regarding RenovaCare. SEC

Compl. ¶ 102.

163.   Shortly before the Predictions Campaign launched on October 24,

2017, Rayat replaced IRC 1 with Fleming, under the same payment terms and with

the same limited duties. Fleming served as a third-party investor relations

consultant to RenovaCare through her wholly owned consulting firm, Inspiren.

Rayat arranged for RenovaCare to pay Fleming a $2,500 per month retainer to

prepare invoices and route payments between RenovaCare and StreetAuthority.

This arrangement—which Fleming characterized as a "personal favor" to Rayat—

---

[34] *See* SEC Compl. ¶ 25.

served to further conceal RenovaCare's and Rayat's involvement in and funding of the StreetAuthority promotion. SEC Compl. ¶ 103.

164.   On October 18, 2017, pursuant to Rayat's instructions, Fleming had an introductory phone call with several representatives of StreetAuthority, after which they provided wire instructions for her to funnel payments from RenovaCare and SolarWindow. SEC Compl. ¶ 104.

165.   By late December 2017, Rayat and Bhogal directed RenovaCare's transition from Fleming to IRC 2, and Bhogal instructed IRC 2 regarding how to manage the StreetAuthority promotion on RenovaCare's behalf. SEC Compl. ¶ 113. On December 20, 2017, for example, Bhogal was copied on an email from IRC 2 to RenovaCare's CEO forwarding a "Market Services Agreement" and an initial invoice to RenovaCare "[f]urther to my conversations with Jay [(Bhogal)]." Thereafter, Bhogal was in regular communication with IRC 2 as the Predictions Campaign continued into January and February 2018. SEC Compl. ¶ 113. IRC 2 fully transitioned into Fleming's role on or around January 3, 2018. SEC Compl. ¶ 109.

166.   Fleming assisted in IRC 2's transition. Among other things, Fleming provided IRC 2 with the disclaimer she used while working with StreetAuthority, and then Rayat and Bhogal provided IRC 2 with guidance on updating the disclaimer for the StreetAuthority promotional campaign, and directed him to

update and share it with StreetAuthority to be used in the promotional campaign. The updated disclaimer was almost identical, except it replaced references to Fleming with IRC 2, and clarified that "out of pocket expenses" paid by RenovaCare included funding for the Promotions Campaign. SEC Compl. ¶ 114.

167.   After talking to Bhogal and Rayat, on December 29, 2017, IRC 2 sent Betancourt "the attached disclaimer for updating your records pertaining to" RenovaCare and SolarWindow, which StreetAuthority then followed the instructions and updated their promotional materials. SEC Compl. ¶ 115.

168.   These communications, among others, demonstrate that Defendants controlled the content of the disclaimer, which never clearly disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares during the promotion. SEC Compl. ¶ 116.

169.   Defendant RenovaCare only publicly disclosed the existence of and payment to these investor relations companies ***for the first time*** in RenovaCare's January 8, 2018 press release responding to the OTC Markets inquiry (well after StreetAuthority's campaign had begun).

170.   Defendants could have accurately disclosed their involvement in the Predictions Campaign, and their intent to sell. In an email on October 3, 2017, Betancourt asked Rayat to provide "disclaimer" language for StreetAuthority to use in the Predictions Campaign. Rayat contacted RenovaCare's Director, who

provided draft disclaimer language that had been used in earlier third-party promotions of RenovaCare by The Cheap Investor, Fleming's newsletter. Rayat provided this disclaimer to Betancourt, who worked with a lawyer referred by RenovaCare's outside counsel to review it. SEC Compl. ¶ 106.

171.    In its final form, the disclaimer disclosed that StreetAuthority was compensated, and disclosed the ownership of RenovaCare shares by certain individuals involved in the Predictions Campaign, but it ***did not*** clearly explain that Rayat and RenovaCare were funding the Predictions Campaign, or that they were directly involved in creating and distributing promotional materials related to the campaign. The language of the disclaimer that appeared in the promotional materials was very similar to the draft that Rayat gave Betancourt but substituted Fleming and Inspiren for IRC 1 and substituted StreetAuthority for The Cheap Investor. SEC Compl. ¶ 107.

172.    Rather than clearly disclosing that Rayat and RenovaCare were funding the Predictions Campaign, the disclaimer stated that StreetAuthority did "not receive any direct cash payments in connection with the production of paid advertisements" for RenovaCare, which had the effect of reducing investor skepticism regarding the truthfulness of the campaign and gave investors the impression that it was an objective recommendation of RenovaCare, when, in fact, it was orchestrated and funded by Rayat and RenovaCare. SEC Compl. ¶ 108.

173.    Furthermore, this disclaimer failed to disclose a number of material facts relating to the Defendants' involvement in the promotion and intent to sell during it, including that: (1) RenovaCare was featured in the Predictions Report based on a verbal agreement between Rayat and StreetAuthority that RenovaCare would fund the Predictions Campaign; (2) Rayat, Bhogal, and Sidhu directly and indirectly owned and controlled millions of RenovaCare shares; (3) Rayat, Bhogal, Fleming, and Sidhu intended to sell their RenovaCare shares during the promotion; (4) Bhogal and Sidhu were actively selling RenovaCare shares as of November 8, 2018, while the promotion was on-going; (5) Fleming began actively selling RenovaCare shares as of January 3, 2018, when she transitioned her work with StreetAuthority on RenovaCare's behalf to IRC 2; and (6) Rayat held financial interests in entities through which Bhogal and Sidhu sold stock. SEC Compl. ¶ 109.

174.    Some of StreetAuthority's promotional materials, including the Predictions Report, contained this disclaimer while others, including periodic promotional emails and advertisements related to the campaign, included more limited language or no disclaimer at all. SEC Compl. ¶ 110.

175.    Defendants controlled the content of the disclaimer, which never disclosed Defendants' involvement in the campaign or Defendants' intent to sell RenovaCare shares while the company was being promoted. Rayat and Fleming

had the authority to direct StreetAuthority to amend its disclaimer, given their direct involvement in the Predictions Campaign and the fact they were funding the campaign through RenovaCare. SEC Compl. ¶ 111.

176.   In fact, StreetAuthority acknowledged RenovaCare and Rayat's influence and ability to direct StreetAuthority. For example, on January 3, 2018, Betancourt sent an internal email concerning issues relating to its spending on the campaign, and stated, "It is very important that we spend the budget equally – $50,000/month for each RCAR and $50,000/month for [SolarWindow]. I think this is important to ensure that RCAR does not withdraw from the marketing program." Similarly, StreetAuthority's publisher testified that Rayat had influence over the Predictions Campaign because he "controlled the purse strings at the end of the day." SEC Compl. ¶ 112.

177.   Throughout StreetAuthority's campaign, RenovaCare continued to secretly funnel money to Street Authority. RenovaCare's CEO approved all of the payments from RenovaCare to IRC 1, Fleming, and IRC 2, while he knew, or was reckless in not knowing, that they were ultimately going to StreetAuthority for the promotion. On November 9, 2017, for example, RenovaCare's CEO approved the company to pay $46,000 to IRC 1 based on invoices IRC 1 sent RenovaCare's CEO charging the company $43,500 for the StreetAuthority promotion and $2,500 for IRC 1's monthly retainer.

178.   Rayat and Bhogal devised this deceptive payment scheme on behalf of RenovaCare to conceal from the investing public that RenovaCare was, in fact, paying StreetAuthority for the promotion. Rayat knew, or was reckless in not knowing, that StreetAuthority would have to disclose in its promotional materials any payments RenovaCare made to StreetAuthority pursuant to Section 17(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(b).

**E.   StreetAuthority's Promotional Campaign, Under Rayat's Direction, Highly Touted Materially False Statements About RenovaCare's SkinGun**

179.   StreetAuthority's promotional materials highly touted RenovaCare, notwithstanding the fact that the Company had no revenue and no commercially available product. For example, the promotional materials claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains." SEC Compl. ¶ 117.

180.   In describing the basis for its recommendation, StreetAuthority's promotional materials highlighted and described a case study of one patient who had severe burns on his arm ("Patient A") that the SkinGun purportedly healed "without scarring—in just three days." The promotional materials further showed the following purported "before" and "after" SkinGun-treatment pictures of Patient A, which was discussed and corroborated by CWs 2 and 3 above:

68



SEC Compl. ¶ 118.

181.    These pictures and statements were false: (1) the SkinGun did not heal Patient A's wounds in three days—Instead, his skin remained discolored for at least a year after treatment; (2) the "before" photo was not Patient A's arm, instead depicting a patient with more severe burns; and (3) the "after" picture was taken several years after his injury, not three days later. SEC Compl. ¶ 119.

182.    As discussed above, Rayat was the source of these false claims and pictures. As corroborated by CW 3, Rayat provided materials containing these false pictures and claims about Patient A's SkinGun treatment to StreetAuthority. For example, on July 26, 2017, Rayat emailed RenovaCare marketing materials to StreetAuthority that contained Patient A's false before-and-after pictures, and on September 21, 2017, Rayat emailed StreetAuthority additional marketing materials that contained the false claim that the SkinGun healed Patient A's arm in three days. SEC Compl. ¶ 120.

183.    When sending these materials to StreetAuthority, Rayat knew that it would be disseminated to investors and knew, or was reckless in not knowing, that

the materials contained false information. Notably, RenovaCare employees had discussed the actual results of Patient A's treatment with Rayat, and sent Rayat an accurate summary of his treatment, as early as July 23, 2014. The summary Rayat received that day explained that Patient A's arm took months to heal, and it contained accurate pictures illustrating Patient A's course of treatment, and not the pictures of Patient A that Rayat later sent to StreetAuthority. SEC Compl. ¶ 121.

184.    StreetAuthority's promotional materials also claimed that the SkinGun "could soon be approved by the FDA [Food and Drug Administration]. … RenovaCare has submitted a 510(k) filing to the FDA, which permits the marketing of a medical device. Now it's just a matter of waiting on the FDA … so this device can be rolled out at every burn unit in the country." SEC Compl. ¶ 122.

185.    However, at the time, RenovaCare did not have a pending 510(k) filing with the FDA; in fact, it had only applied to the FDA for approval to use in clinical studies, not in general clinic or hospital settings, and RenovaCare had withdrawn that application more than a year earlier. SEC Compl. ¶ 122.

186.    Additionally, prior to the release of the StreetAuthority promotion, Rayat reviewed draft promotional materials that contained these false claims but did nothing to correct them. For example, on October 3, 2017, Betancourt emailed Rayat a draft Predictions Campaign promotion for StreetAuthority's Game-Changing Stocks newsletter that contained the false statements regarding FDA

approval, the fake "before" and "after" pictures, and the false claim that Patient

A's "arm healed without scarring—in just three days" recovery. After reviewing

the draft, Rayat called Betancourt to suggest at least one change concerning the

possibility of the FDA's approval of the SkinGun, but he ***did not*** suggest that

StreetAuthority correct the false statements or replace the pictures in the draft. SEC

Compl. ¶ 125. StreetAuthority subsequently made Rayat's suggested change to its

promotional materials.

187.    Further, in an internal email dated October 10, 2017, the lead copy

writer for the Predictions campaign circulated a document entitled "HIO report

with 2 picks—Editorial Review, Harmel Changes" and wrote:

> Here is the report back, with Harmel's changes input
>
> …
>
> fyi, the doc that [Betancourt] reviewed with Harmel was one of the promos where nothing was identified, not this hybrid report where Harmel's stocks are identified.
>
> …
>
> He should probably review this at some point.

SEC Compl. ¶ 126.

188.    Three versions of the draft promotion circulated internally at

StreetAuthority on October 10, 2017, all with filenames including "Harmel

Changes," one of which included a comment that the copy writer had deleted

language that "Har[m]el doesn't want us to talk about." SEC Compl. ¶ 127.

71

189.    When reviewing the draft promotional materials concerning RenovaCare, Rayat knew, or was reckless in not knowing, that the statements about the FDA approval were false. Shortly before that time, in an email between Rayat and an acquaintance on April 14, 2017, Rayat discussed RenovaCare's regulatory strategy, and Rayat explained that RenovaCare did not have a pending 510(k) application. SEC Compl. ¶ 123.

190.    Rayat also knew, or was reckless in not knowing, that the StreetAuthority promotions containing these false statements and fake "before" and "after" pictures would be disseminated to investors, because he reviewed StreetAuthority's draft promotional materials prior to their release to the investing public, but, as discussed, he did nothing to correct them. SEC Compl. ¶ 124.

## F.    StreetAuthority's RenovaCare Promotional Campaign Successfully Inflated RenovaCare's Stock Price

191.    All in all, StreetAuthority's promotional campaign of RenovaCare that Rayat solicited, concealed the payments for, and worked closely with StreetAuthority to create and distribute was a success.

192.    During the course of the promotional campaign, internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority. For instance, one of the several online platforms StreetAuthority used to promote RenovaCare alone generated over 20,000 clicks from internet users. SEC Compl. ¶ 195.

193.    RenovaCare stock saw an uptick in volume and price that correlated with StreetAuthority's promotional campaign. On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase. SEC Compl. ¶ 195.

## G.    Shortly After the Predictions Campaign was Launched, Defendants Began Selling RenovaCare Shares

194.    Defendants quickly took advantage of the stock pump they had secretly engineered.

195.    The StreetAuthority promotion of RenovaCare went public on October 24, 2017. At the time, RenovaCare stock was trading around $3 per share, and its daily trading volume was about 10,000 shares per day. SEC Compl. ¶ 128. By early November, the Predictions Campaign began to have its intended effect. On November 7, 2017, RenovaCare stock price rose to nearly $4 per share (up about 30 percent from October 24), and trading volume was over 60,000 shares (up about 600 percent). SEC Compl. ¶ 128.

196.    In early November 2017, while Fleming and Rayat worked with StreetAuthority and RenovaCare on the promotional campaign, Sidhu and Bhogal began selling RenovaCare shares in a highly coordinated manner. Their trades tracked the Predictions Campaign, and evidences their knowing participation in the scheme. SEC Compl. ¶ 129.

197.   On November 8, 2017, Bhogal and Sidhu began selling RenovaCare shares. Between November 8 and December 7, 2017, they sold more than 100,000 shares at historically high prices. SEC Compl. ¶ 130.

198.   In early December 2017, Rayat directed StreetAuthority to pause advertising related to the Predictions Campaign while he considered how to maximize the effectiveness of the campaign. On December 8, 2017, Bhogal and Sidhu stopped trading. SEC Compl. ¶ 131.

199.   On or about December 11, 2018, Rayat directed StreetAuthority to resume advertising the Predictions Campaign. Bhogal and Sidhu again waited for the campaign to impact the market before both resumed selling RenovaCare stock. Between December 18, 2017, and January 3, 2018, Sidhu sold over 30,000 shares, and Bhogal sold over 131,000 shares. SEC Compl. ¶ 132.

200.   On January 3, 2018, a day after Rayat and Bhogal replaced her with IRC 2 and she stopped handling RenovaCare's payments to StreetAuthority for the Predictions Campaign, Fleming sold 7,000 shares of RenovaCare stock. She did so despite having been directly involved in the campaign, and with knowledge that the paid promotion she had helped organize was ongoing. SEC Compl. ¶ 133.

201.   During the Predictions Campaign, Sidhu, Bhogal, and Fleming ultimately sold more than 1 million shares of RenovaCare stock through at least seven brokerage accounts. SEC Compl. ¶ 134.

202.   By November 8, 2017, Bhogal knew, or was reckless in not knowing, about the Predictions Campaign, including because: (1) Bhogal's transactions in RenovaCare stock tracked the timing and progress of the StreetAuthority promotion; (2) on September 21, 2017, Rayat forwarded to Bhogal an email between Rayat and StreetAuthority concerning the campaign; (3) on October 6, 2017, Bhogal participated in a phone call with StreetAuthority representatives and Rayat; (4) on October 31, 2017, Bhogal attended a RenovaCare Board meeting, a presentation for which included an item stating that the company planned to spend $300,000 on investor relations through March 2018, an amount consistent with Rayat's agreement that RenovaCare would pay Street Authority $50,000 per month to fund the campaign; (5) on November 8, 2017, a friend sent Bhogal a StreetAuthority campaign email promoting RenovaCare and SolarWindow; and (6) in September 2017, Bhogal received two emails concerning Rayat's attempts to sell his shares. SEC Compl. ¶ 135.

203.   By November 8, 2017, Sidhu knew, or was reckless in not knowing, about the Predictions Campaign, including because: (1) Sidhu's transactions in RenovaCare stock tracked the timing and progress of the campaign; (2) he was in daily contact with Rayat while Rayat worked on the campaign; (3) in August 2017, Rayat asked Sidhu to send a package to a StreetAuthority representative; (4) Sidhu planned two of Rayat's trips to visit StreetAuthority in Austin; (5) on November 2,

2017, Rayat sent Sidhu an email stating, "Jeet, I need to be in Austin for at least one night during the week of November 27 …. Let's discuss tomorrow"; (6) Sidhu managed and tracked the RenovaCare shares held by Rayat and Bhogal, and assisted with the company's private sales of stock to Rayat, Sidhu, and other of Rayat's friends in July and October 2017. SEC Compl. ¶ 136.

## H.    RenovaCare Continued to Misrepresent in Subsequent SEC Filings That Its Disclosure Controls Were Effective While Continuing to Conceal Rayat's Involvement with StreetAuthority

204.    From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials on the internet and to their subscriber base. However, Defendant RenovaCare, Rayat, and Bold continued to conceal RenovaCare's ongoing relationship with StreetAuthority and misrepresent the effectiveness of its disclosure controls.

205.    On November 14, 2017, RenovaCare filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2017. That quarterly report stated, in relevant part:

### Disclosure Controls and Procedures

Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to

be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

206. Despite the above representation about effective disclosure controls, and similar to RenovaCare's Form 10-Q for the period ended June 30, 2017, Defendant RenovaCare, Rayat, and Bold failed to disclose RenovaCare's ongoing publishing arrangement with StreetAuthority. Nor is there any mention of StreetAuthority or risk factors associated with the promotion.

## I. RenovaCare and Rayat Made and Issued a Materially False Press Release Denying Their Involvement in StreetAuthority's Promotional Campaign When Confronted by OTC Markets

207. The truth began to emerge on or around January 2, 2018, when OTC Markets, which supervised the OTCQB Tier[35] in which RenovaCare's stock was quoted, learned of StreetAuthority's ongoing promotion of RenovaCare.

208. OTC Markets has a strict disclosure policy regarding company promotions, as the motivation to provide false information through such campaigns

---

[35] The OTCQB, also called "The Venture Market," is the middle tier of the over-the-counter (OTC) market for U.S. stocks. It was created in 2010 and consists mainly of early-stage and developing U.S. and international companies that are not yet able to qualify for the OTCQX but are not as speculative as the lowest-tier Pink Sheets. OTCQB companies must meet certain minimum reporting standards, pass a bid test, and undergo annual verification. *See* https://www.investopedia.com/terms/o/otcqb.asp (last visited Nov. 10, 2022).

could severely impact the integrity of the OTC Markets.[36] OTC Markets's policy states, in relevant part, that:

    a.    "Public availability of adequate current information is a core principal of OTC Markets Group's disclosure-based philosophy and the OTCQX and OTCQB Rules. Reputable public companies are expected to release quickly to the public any news or information which might reasonably be expected to materially affect the market for its securities."

    b.    "***Management of a public company also has the responsibility to dispel unfounded rumors, misinformation or false statements which result in unusual market activity. Misleading and manipulative promotion clearly fall into this area of concern and must be immediately addressed.***"

    c.    "Digital marketing has made it easier for investor relations professionals to reach millions of investors, but technology can also be abused by anonymous market manipulators for

---

[36] *OTC Markets' Group Policy on Stock Promotion*: https://www.otcmarkets.com/files/OTC_Markets_Group_Policy_on_Stock_Promotion.pdf (last accessed Nov. 10, 2022).

fraudulent promotional campaigns that harm the integrity of public markets and defraud investors."

d.    "Fraudulent promotional campaigns disseminate misleading information in a variety of manners, including e-mails, newsletters, social media outlets, press releases, videos, telephone calls, and/or hard mailers."

e.    "Common characteristics of misleading and manipulative promotion:

- ***Fail to clearly identify the sponsor of the promotion, and/or the promotion is sponsored or paid for by anonymous, unidentifiable 3rd parties***

* * *

- Provide little or no factual information about the company, omit material information

* * *

- Urge the investor to take action immediately as not to miss out on a great opportunity

- Fail to provide details or disclosures about the risk associated with the issuers security"

     f.    "***Anonymous paid promotion is often associated with unregulated parties or 'financiers' that have acquired securities in private market transactions and wish to generate demand so they can sell their shares in the public markets at inflated prices***"

     g.    "A company whose security is being promoted may not be directly involved or even aware of a promotion campaign for their securities, ***however all public companies have an obligation to provide accurate disclosure to investors and quickly address any misleading information that could affect the trading market for their securities.***"

     h.    "Misleading and manipulative promotion of companies with little or no assets or business activity is of concern to OTC Markets. Anonymous paid promotion of these companies may raise red flags with regulators."

(Emphases added.)

209.   As a result, companies that violate the disclosure policies can be removed from OTCQB Tier and relegated to the more risky OTC Pink Open Market Tier, which could have a material impact on the stock's trading and negatively affect its price. OTC Markets will also refer companies to the SEC,

FINRA, or other regulatory agencies "when we have concerns relating to stock promotion."[37]

210.    Similarly, OTC Markets's *Stock Promotion: Best Practices for Issuers* policy[38] states, in relevant part, the following:

a.    "The OTCQX Rules and OTCQB Standards require companies to make adequate, current information publicly available. ***Companies that sponsor or pay for promotion or other IR services are responsible for ensuring the accuracy of any disclosure or other materials associated with those services. The materials must also include appropriate disclosure that clearly identifies the promoter or IR firm's relationship to the issuer.***"

b.    "Be wary of shareholders who have gained significant control of a company's shares, and are in possession, or are coming into possession, of unrestricted shares – ***they may have an incentive to induce promotion secretly ("pump") in order to sell (dump) their freely tradable shares on the open market.***"

---

[37] *See id.*

[38] https://www.otcmarkets.com/files/Best_Practices_for_Issuers_Stock_Promotion.pdf (last accessed Nov. 10, 2022).

c.     "We have strong concerns regarding anonymous third-party promotion. Promoting or paying to promote a stock secretly, without adequate disclosure, is a significant source of misleading and manipulative information that harms market integrity."

d.     "If a company pays someone, directly or indirectly through an intermediary, to publish or publicize articles about its stock, this relationship and payment should be disclosed to the investing public."

e.     "***Ongoing payments and agreements for promotion or IR services should be disclosed as part of the issuer's typical reporting.*** The identity of any IR firm engaged by the issuer must be disclosed in a timely manner, including on the issuer's 'Company Profile' page on www.OTCMarkets.com and in other disclosure materials, where required."

f.     "***If your company was the subject of anonymous third-party promotion, you should identify the source of the promotion to understand who may be attempting to manipulate the market for your security.***"

(Emphasis added.)

82

211.   Additionally, Pink Sheets LLC ("Pink Sheets"), the leading provider of pricing and financial information for the OTC securities market (and referenced in the OTC Markets *Stock Promotion: Best Practices for Issuers* policy), petitioned the SEC to take immediate action to protect investors from "deceptive activities by securities promoters and their sponsors."[39] Pink Sheets advocated that "Promotional materials must identify promoters ***and their sponsors, and the nature and amount of consideration paid for the promotion***." (Emphasis added.)

212.   Consistent with the above policies, on January 3, 2018, OTC Markets sent RenovaCare a letter requiring the company make public disclosures relating to StreetAuthority's promotional campaign given RenovaCare's ongoing promotional activities.

213.   OTC Markets's January 3, 2018 letter demanded that RenovaCare issue a press release concerning its involvement in the StreetAuthority promotion, including:[40]

      a.    "the date on which the Company became aware of the promotional activities";

---

[39] https://www.sec.gov/rules/petitions/petn4-519.pdf (last accessed Nov. 10, 2022).

[40] *See* SEC Compl. ¶ 50.

b.  "[a] written summary of the Company's understanding of the promotional activities," and "*[i]f the company was involved in the dissemination or payment of promotional material, … direct language describing the company's involvement and a description of any engagements and/or agreements relating to the promotional material*";

c.  "*whether the company has editorial control over the content in the promotional materials*"; and

d.  "[w]hether, after inquiry of management, the directors and control persons, its officers, directors, any controlling shareholders (defined as shareholders owning 10% or more of the company's securities), or any third party service providers have, directly or indirectly, been *involved in any way (including payment of a third-party) with the creation or distribution of promotional materials* related to the Company and its securities."

(Emphases added.)

214.    Attached to the letter was a January 2, 2018 Predictions Campaign promotion for Game-Changing Stocks, a StreetAuthority newsletter. The promotional "copy" was based on information from RenovaCare's investor

relations program that had been provided to StreetAuthority by Rayat, and the promotional language had been reviewed by Rayat prior to publication. In fact, the promotion, which included the false statements about FDA approval and Patient A's course of treatment, as well as the fake "before and after" pictures, was an updated version of the promotion Betancourt emailed to Rayat for his review on October 3, 2017. SEC Compl. ¶ 138.

215.   On January 3, 2018, a few hours after RenovaCare received OTC Markets's inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign while he, Bhogal, and RenovaCare considered how to respond to the inquiry. SEC Compl. ¶ 140.

216.   As of January 3, 2018, Sidhu and Bhogal were actively selling RenovaCare shares, and Fleming had just begun selling RenovaCare shares after her duties were transitioned to IRC 2. After RenovaCare received the inquiry from OTC Markets, Bhogal, Fleming and Sidhu stopped trading, and did not sell any more shares for nearly a week. SEC Compl. ¶ 141.

217.   In response to OTC Markets's letter, Rayat was instrumental in drafting and disseminating RenovaCare's press release in response to OTC Market's demand. Rayat was in the best position to provide the substantive detail in response to OTC Market's inquiry because, on behalf of RenovaCare, he had

solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with them to create and disseminate the promotion.

218.   On January 3, 2018, Rayat had several conference calls with RenovaCare's CEO, RenovaCare's director and outside counsel ("RenovaCare's Director"), and Bhogal to discuss the company's strategy in responding to OTC Markets. SEC Compl. ¶ 142.

219.   By January 4, 2018, Rayat had assembled a team and was working on a draft press release, with Bhogal's assistance. Bhogal had numerous discussions with IRC 2 concerning RenovaCare's response, and provided information for IRC 2 to share with Rayat and RenovaCare in the drafting of the release. Rayat again had several conference calls with the RenovaCare director, RenovaCare's CEO, and Bhogal to discuss the draft press release. Bhogal also received several of the coordinating emails. SEC Compl. ¶ 143.

220.   On January 5, 2018, RenovaCare's Director emailed Rayat, RenovaCare's CEO, and Bhogal to request a follow-up conference call "to discuss/review and edit the revised draft" of the press release. Shortly thereafter, Rayat replied to suggest they talk on January 7, 2018, and noted that he would send his comments on the draft press release later by the following day. That day, Rayat also had several calls with RenovaCare's Director to discuss the draft. SEC Compl. ¶ 144.

86

221.   On January 7, 2018, Rayat, RenovaCare's CEO, and RenovaCare's Director again discussed RenovaCare's draft press release. A draft press release dated shortly after the call contained only minor differences from the draft the company would ultimately issue. SEC Compl. ¶ 145.

222.   On January 8, 2018, at 12:57 p.m., Rayat emailed RenovaCare's CEO a final version of the draft press release and instructed the Company to add its boilerplate "about us" and "disclaimer" language to the draft. A few minutes later, at 1:14 p.m., RenovaCare's CEO forwarded the draft press release to IRC 2, noting that it was the final draft of the press release. As Rayat had instructed, RenovaCare's CEO requested that the consultant add the "about us" and "disclaimer" language, then issue the press release at 3:45 p.m. SEC Compl. ¶ 146.

223.   Rayat possessed the knowledge required to answer OTC Market's inquiry regarding the StreetAuthority campaign and had ultimate control of the content and dissemination of the press release to the public. Rayat's continuous involvement in the press release's drafting, culminating in his January 8, 2018 email to RenovaCare's CEO, followed by the CEO's response, demonstrates Rayat's authority and control over the content of the statement and his intent to disseminate it to the public.

224.   On January 8, 2018, RenovaCare publicly issued its press release statement response, as drafted by Rayat and Renovacare, to OTC Markets via

BusinessWire ("January 8 Press Release"). It was not signed by any individual.

SEC Compl. ¶ 147.

225.   Rayat instructed RenovaCare to issue the January 8 Press Release at

3:45 p.m., because he wanted to limit the potential impact of the Press Release by

releasing it shortly before the market closed at 4 p.m. Bhogal assisted Rayat and

RenovaCare in disseminating the January 8 Press Release, and he helped IRC 2 to

correct an issue with this timing. SEC Compl. ¶ 148. To further reduce the market

impact of the January 8 Press Release, Rayat and RenovaCare also issued

RenovaCare's year-end "Shareholder Update" at 9 a.m. on January 9, 2018. SEC

Compl. ¶ 149.

226.   Specifically, the Company stated the following in the January 8 Press

Release:

> [O]n January 3rd, 2018, OTC Markets . . . informed the
> Company that OTC Markets had become aware of
> promotional activities concerning the Company.
>
> OTC Markets provided an example, dated January 2nd,
> 2018, of the promotional material for reference. It is the
> Company's understanding that the material provided was
> part of an annual predictions report used in part to generate
> new subscribers for various newsletters owned by
> StreetAuthority LLC, an independent publisher founded in
> 2001. ***The Company had no editorial control over the
> content*** and was one of thirteen companies independently
> selected, researched and mentioned. The annual
> predictions report was disseminated during the last quarter
> of 2017. During this time, 2,190,000 shares traded, only

2% more than the average quarterly volume of 2,139,375 shares during all of 2017.

Subsequently, later in the 4th quarter, a material announcement regarding a failed challenge to a RenovaCare patent was made public. On December 20th, 2017, a press release was issued by Avita Medical Limited disclosing that its petition for an Inter Partes Review with the Patent Trial and Appeal Board ("PTAB") to invalidate all claims in U.S. Patent No. 9,610,430 (owned by the Company) was denied. This press release was followed by an article in Stockhead on December 21st, 2017, which more fully reported on the PTAB denying Avita Medical Limited's petition, and, thereby, upholding the patentability of RenovaCare's technology.

After the issuance of Avita Medical's press release and the follow-up article in Stockhead on December 21st, 2017, the trading volume of the Company's common stock increased 84% to 62,829 shares per day between December 20th and December 29th, versus 32,720 per day previously between December 1st through December 19th, 2017.

*The Company is not affiliated in any way with the authors of the annual predictions report or its publisher.* The Company issues press releases in the regular course of business and includes in its filings (the "SEC Filings") with the [SEC] the material business activities of the Company, and investors are encouraged to rely on the information provided directly by the Company in such press releases and SEC Filings.

*In the report, the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading*, even though the report has significantly simplified the descriptions of the clinical indications and outcomes related to the use of the Company's cell spray for the treatment of burns and wounds, and used promotional, advisory and superfluous language in describing the Company, its products and its

stock. Moreover, the author comments on the Company's interaction with the U.S. Food and Drug Administration and the performance of RenovaCare's stock. The Company does not know the basis for such opinions or conclusions arrived-at by the author. Investors are reminded to rely upon the Company's own statements, press releases, and filings with the SEC for information related to these matters.

Following notification from OTCQB Markets, the Company immediately made inquiries of its executive officers, directors, controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities) and third-party service providers regarding their involvement in the creation or distribution of promotional materials related to the Company and its securities.

***To the Company's knowledge, the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly:***

- ***not been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities***; and

- **not** sold or purchased (other than in than in private placements conducted by the Company as described below) any shares of common stock of the Company within the last 90 days. The Company's former service provider, Inspiren Media LLC, originally acquired 5,000 shares of the Company on July 25th, 2008 and sold on January 3rd, 2018, after termination of its agreement with the Company. All activity in the Company's common stock by the Company's executive officers, directors and controlling shareholders has been disclosed by such officer,

director and shareholder in the Company's SEC Filings.

***The Company was not involved in the creation, or directing the dissemination, of the report.*** Through its investor relations agencies, the Company paid $90,005.25 between October 24th, 2017 and January 2nd, 2018, as part of its contractual agreement to pay for out of pocket costs, including reimbursement of dissemination related costs, incurred by the investor relations agency.

Between the period January 1st, 2017, and November 11th, 2017, the Company retained Omnicor Media LLC to provide public, media and investor relations services. Between the period October 16th, 2017 and December 31st, 2017, the Company retained INspiren LLC to provide public, media and investor relations agencies. Since January 1st, 2018, Damaak Group LLC has been providing public, media and investor relations services to the Company.

(Emphases added.)

227. Rather than fairly and accurately disclose Rayat's and RenovaCare's continuous and ongoing relationship with StreetAuthority from the outset of StreetAuthority's promotional campaign, the January 8 Press Release contained numerous material misrepresentations and omissions that concealed Rayat's and RenovaCare's involvement in it.

228. First, the January 8 Press Release stated that RenovaCare conducted an inquiry of all relevant persons, including controlling shareholders such as Rayat, "regarding their involvement in the creation or distribution of promotional materials," and stated that "the Company, its executive officers, directors or, its

controlling shareholder, or any third-party service providers have, directly or indirectly[] **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities." (Emphasis in original.)

229.    This statement was materially false. Rayat was RenovaCare's controlling shareholder and, as discussed herein and corroborated by confidential witness accounts, Rayat was directly involved in the creation of StreetAuthority's promotional materials, including the Predictions Report. Among other things, he: (i) provided detailed information about RenovaCare to StreetAuthority representatives, including the lead author of the Predictions Report; (ii) reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign; and (iii) consulted with StreetAuthority throughout the campaign concerning advertising and distribution of the Predictions Report and other promotional materials related to RenovaCare. By providing information to StreetAuthority from the outset and reviewing and commenting on drafts before and during the promotion. Rayat was also involved in the distribution of StreetAuthority's promotional materials by consulting with StreetAuthority on several occasions concerning its distribution strategy and suggesting and approving changes to the promotion that StreetAuthority implemented.

230.   In addition, Rayat and RenovaCare's third-party investor relations consultants, including Fleming, were all involved in the distribution of StreetAuthority's promotional material by covertly funding the Predictions Campaign with $50,000 a month, and Rayat had numerous discussions with StreetAuthority regarding how campaign promotional materials should be distributed.

231.   Second, the January 8 Press Release claimed that RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher." This was materially false. As discussed herein, RenovaCare was affiliated with StreetAuthority because the company was a paying customer, paying StreetAuthority $50,000 per month to run StreetAuthority's promotion, including its annual Predictions Report. The company was also affiliated with StreetAuthority because Rayat had been working closely with StreetAuthority on the promotion as RenovaCare's agent as corroborated by confidential witness accounts.

232.   Third, the January 8 Press Release claimed that RenovaCare "had no editorial control over the content" of StreetAuthority's RenovaCare-related promotional materials. This was materially false. As discussed herein, Rayat, acting as an agent for the company, reviewed, commented on, and edited StreetAuthority's promotional materials before and throughout StreetAuthority's

promotional campaign, and on several occasions, StreetAuthority incorporated Rayat's changes before publicly releasing the promotional materials.

233.  Additionally, Rayat and RenovaCare had the "power of the checkbook"—if either was dissatisfied with the content of the Predictions Report or other promotional materials, or the timing or content of advertising related to the Predictions Campaign, they could have refused to fund the campaign at the outset or at any time during the campaign.

234.  Fourth, the January 8 Press Release stated that RenovaCare "was not involved in the creation, or directing the dissemination, of [StreetAuthority's Predictions] report." This statement was materially false. As discussed herein and corroborated by confidential witness accounts, Rayat, on behalf of RenovaCare, was involved in the creation of the Predictions Report. He provided detailed information to StreetAuthority to include in the report and he reviewed and commented on draft promotions and advertisements before and during the Predictions Campaign. Rayat, on behalf of RenovaCare, was also involved in directing the dissemination of the report by discussing StreetAuthority's plan for disseminating the promotional materials and suggesting and approving changes to its dissemination on several occasions. He also weighed in on the timing, content, and placement of advertisements related to the campaign, all of which were funded by RenovaCare. For example, on January 3, 2018, a few hours after RenovaCare

received OTC Markets' inquiry, Rayat instructed StreetAuthority to pause the Predictions Campaign. In addition, RenovaCare provided StreetAuthority the funding for the dissemination of StreetAuthority's promotional materials.

235.   Fifth, the January 8 Press Release contained material omissions, including specific information required by OTC Markets, that, if addressed, would have required Rayat and RenovaCare to admit their awareness and involvement in StreetAuthority's campaign and the Predictions Report. Under OTC Markets policies regarding stock promoters, OTC Markets required that RenovaCare disclose "the date on which it became aware of the promotional activities," and yet the company failed to disclose that Rayat, on behalf of the company, was aware of the campaign since at least July 2017 when he approached StreetAuthority, and that RenovaCare's CEO and the Company was aware of the campaign by at least November 8, 2017, when RenovaCare's CEO received an invoice from Fleming that included line items for "StreetAuthority – Media Spend" and "StreetAuthority - $50,000 Monthly Fee." SEC Compl. ¶ 159.

236.   The misrepresentations and omissions in the January 8 Press Release were material. The potential for small companies with illiquid and low-priced shares to fund false promotional campaign schemes to increase company's stock price and trading volume to benefit corporate insiders and controlling shareholders, as was done here, is precisely why RenovaCare's false January 8 Press Release is

material. As cited above at length, OTC Markets' disclosure policies seek to address this very issue. RenovaCare's compliance with OTC Markets' policies on company promotions, if violated, could result in the Company's removal from the OTCQB Tier and be relegated to the lesser traded OTC Pink Open Market Tier, which would certainly have a substantial impact on RenovaCare's stock trading and negatively affect its price.

237.    In fact, on February 23, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity.[41] SEC Compl. ¶ 162. The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share. SEC Compl. ¶ 162.

---

[41] As described in *OTC Markets Group Policy on Stock Promotion* (*see* above), "OTC Markets Group designates certain securities with 'Caveat Emptor' and places a skull and crossbones icon next to the stock's ticker symbol as it appears on OTC Markets Group's websites, data feeds and social media, as notice of a potential public interest concern associated with the security, and to caution investors to exercise additional care and perform thorough due diligence before making any investment decision. OTC Markets Group may designate a security undergoing promotion as Caveat Emptor, if, in OTC Markets Group's determination, the stock promotion presents a public interest concern or if the company has not made adequate current information available to investors." *See* https://www.otcmarkets.com/files/OTC_Markets_Group_Policy_on_Stock_Promotion.pdf (last accessed Nov. 10, 2022).

238. Consistent with OTC Markets' disclosure policies, a reasonable investor would have wanted to know, in making an investment in RenovaCare stock, that RenovaCare's controlling shareholder was assisting and paying for a promotional campaign that encouraged investors to purchase RenovaCare stock. A reasonable investor would have also wanted to know that Defendants were covering up the source of the funding for the promotional campaign.

239. Defendants RenovaCare, Rayat, and Bold—as corporate insiders— knew, or were reckless in not knowing, that the January 8 Press Release was false when they made and issued it to the investing public. Given their personal participation in the StreetAuthority promotion in the months leading up to the January 8 Press Release, Defendants knew, or were reckless in not knowing, that the January 8 Press Release contained material misstatements and omissions that Rayat approved in the final draft and sent to RenovaCare's CEO with instructions prior to disseminating it to the investing public.

240. Based on his involvement in the Predictions Campaign on RenovaCare's behalf, Rayat possessed the knowledge required to accurately answer OTC Market's inquiry regarding the campaign, and as RenovaCare's controlling shareholder he had ultimate control over the content and dissemination of the press release to the public. Rayat's involvement in the drafting process, including his January 8, 2018 email to RenovaCare's CEO, and the CEO's

adherence to his instructions, also demonstrates his authority and control over the content and public dissemination of the statement.

241.   As an agent and controlling shareholder of RenovaCare, and the individual acting on behalf of RenovaCare with respect to the promotion, Rayat's knowledge is imputed to RenovaCare. Furthermore, by January 8, 2018, RenovaCare's CEO was aware that the company was involved with StreetAuthority's promotional campaign, as he had previously approved several payments to the investor relations companies that he knew, or was reckless in not knowing, that related to the StreetAuthority promotion. The company also relied upon Rayat's knowledge of the promotional campaign when preparing the January 8 Press Release, included his substantive comments on the press release, and followed his directions when disseminating it to the public.

242.   Simply put, Rayat caused RenovaCare to issue the misleading January 8, 2018 Press Release in order to further conceal Defendants' role in both the Predictions Campaign and the overall fraudulent scheme to manipulate and scalp RenovaCare stock.

243.   Despite all the above, on January 12, 2018, RenovaCare publicly filed a Form 8-K with the SEC, signed by RenovaCare's CEO, that attached a copy of

the January 8, 2018 Press Release without correction or amendment,[42] which

further misled investors from knowing RenovaCare's intimate involvement in

StreetAuthority's promotional campaign.

**J.    Defendants Continue Misleading Investors About RenovaCare's Disclosure Controls in Spite of OTC Markets's Letter**

244.    Even after RenovaCare issued the January 8, 2018 Press Release and

the OTC Markets' downgrade, Defendants RenovaCare, Rayat, and Bold

continued to mislead investors about the effectiveness of the Company's disclosure

controls on February 27, 2018, when RenovaCare filed its Form 8-K with the SEC

for the period ended February 21, 2018.[43] Despite the ongoing StreetAuthority

promotion, OTC Markets letter, and February 23 OTC Markets downgrading

action, RenovaCare again failed to acknowledge the existence of its relationship

with StreetAuthority. Further, the Company failed to provide an adequate response

to an investigative reporting website (*see* Section V.K. below).

245.    Instead, Defendants RenovaCare, Rayat, and Bold continued to

mislead investors about the effectiveness of the Company's disclosure controls on

March 13, 2018, when RenovaCare filed its annual report on Form 10-K with the

---

[42] https://www.sec.gov/Archives/edgar/data/0001016708/000147793218000 202/rcar_ex992.htm (last accessed Nov. 10, 2022).

[43] https://www.sec.gov/Archives/edgar/data/0001016708/00014779321800 1040/rcar_8k.htm (last accessed Nov. 10, 2022).

SEC for the period ended December 31, 2017. That annual report stated, in relevant part:

> **Evaluation of and Report on Internal Control over Financial Reporting**
>
> Based on [an] evaluation, management, after evaluating the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), have concluded that, as of December 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

246.    Despite the above representation about effective disclosure controls, Defendants RenovaCare, Rayat, and Bold failed to disclose RenovaCare's ongoing publishing arrangement with StreetAuthority. Nor is there any mention of StreetAuthority or risk factors associated with the promotion.

**K.    Defendants Failed to Adequately Respond to or Clarify a Scathing Report Published by an Investigative Reporting Website Regarding RenovaCare's Business Operations and Undisclosed Stock Promotion Practices**

247.    As mentioned in the section above, RenovaCare failed to provide an adequate response to an investigative reporting website and continued to issue misleading SEC disclosures—even after suffering the OTC Markets downgrading that resulted from the January 8 Press Release.

248.    On February 12, 2018, an investigative reporting website, TheStreetSweeper, published an article entitled "RenovaCare: Many Catalysts,

Untold Downside" on *Seeking Alpha*[44] that exposed deficiencies with RenovaCare's business operations, products, financials, insider trading practices, and, more relevant here, RenovaCare's questionable response to OTC Markets's letter relating to StreetAuthority's promotional campaign (the "StreetSweeper Article").

249.   The StreetSweeper Article raised questions about the Company's operations and highlighted that despite being a roughly $600 million market cap company, RenovaCare "is operated by one full-time employee and three part-time contractors … including the CEO"; that the SkinGun was "acquired on the cheap [(for only $400,000)] and has not been presented to the FDA for approval"; that within its 35 years of existence, RenovaCare had no sales, little cash, big operating losses, and auditors expressed doubt that the company could continue as a going concern; that RenovaCare had "***[h]eavy, sometimes misleading promotions, questioned by [OTC Markets]***"; that Rayat, RenovaCare's controlling stockholder was a foreign stock promoter who was formerly in trouble with the SEC[45]; and RenovaCare's operations were suspicious when compared to confirmed

---

[44] https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Nov. 10, 2022).

[45] The article describes the SEC action against Rayat for his unlawful stock promoter role while operating EquityAlert.com in the late 1990s/early 2000s. *See* n.32 above (discussing EquityAlert.com and Rayat).

financial/operations data from RenovaCare's industry competitor. (Emphasis added.)

250.   The StreetSweeper Article stated that RenovaCare "has not responded to the questions TheStreetSweeper emailed several times to the company, including those about Mr. Rayat's ownership or his SEC settlements." Further, the author commented on Rayat's past history as a stock promoter for EquityAlert.com that, "These stock-promotion-related incidents don't directly affect RenovaCare, but investors and potential investors need to be aware of the majority owner's [(Rayat's)] history."

251.   The StreetSweeper Article also summarized OTC Markets's investigation into RenovaCare's promotional activities and OTC Markets's January 3, 2018 letter. The author wrote, "The exchange over which the stock trades came knocking at RenovaCare's door on Jan. 3 about 'promotional activities concerning the company.' The OTC had noticed promoters StreetAuthority and Stockhead said some really nice things about RenovaCare. A huge spike in trading volume and stock price followed those pumps, OTC noted. StreetAuthority, for example, wrote about [RenovaCare as] 'The most spectacular medical breakthrough of 2018.' The promoter added 'RenovaCare has submitted a 510-K filing to the FDA… Now it's just a matter of waiting on the FDA.' But wait. The application *has not* been submitted. ***RenovaCare could have requested that***

***StreetAuthority fix the error, but there's no evidence that has happened***. Instead, RenovaCare's 8-K reveals another issue of concern…." (Emphasis added.)

252.    Regarding RenovaCare's promotional campaign, The StreetSweeper Article continued on and questioned RenovaCare's response to the OTC Markets letter in its January 12, 2018 8-K filing where RenovaCare denied any involvement in the creation, or directing the dissemination, of the StreetAuthority promotional campaign but stated that RenovaCare paid $90,005.25 to investor relations companies.[46] The author pointed out the contradictory nature of RenovaCare's response and posed a rhetorical statement to readers: "So, RenovaCare states it had **no influence** on creating the promoter's report … even though the company **paid $90,000** for the report." (Emphasis in original.) The author provided the following report screenshot of an example of StreetAuthority's ongoing promotional campaign for RenovaCare, citing StreetAuthority as the source:

---

[46] https://www.sec.gov/Archives/edgar/data/1016708/000147793218000202/rcar_ex992.htm (last accessed Nov. 11, 2022).



**SPECIAL REPORT**

# 13 Shocking Investment Predictions for 2018

## ...From The Research Team Whose Annual Predictions Have Returned Up To 569%

### #1: RenovaCare, Inc. [Ticker: RCAR]

**Wednesday, February 7, 2018**

On behalf of the research staff at *Game-Changing Stocks*, we'd like to thank you for requesting our new investment report.

Today we'd like to share with you the name and trading symbol of one of the most urgent stock recommendations we have ever made. It is an opportunity that our six-man research team believes offers explosive profit potential in 2018 and beyond.

253.    The StreetSweeper Article also highlighted that StreetAuthority, in its disclosures in RenovaCare's promotional campaign, was paid by RenovaCare for the promotion through a third-party investor relations company, Damaak Group LLC. This payment "include[d] $50,000 per month for 'investment predictions' reports." The author also noted that StreetAuthority disclosed that Betancourt, StreetAuthority's president, owns 2,100 shares of RenovaCare common stock. The author commented, "***Solid companies aren't typically promoted by professional promoters***." (Emphasis added.)

104

254.    The StreetSweeper Article concluded that it was awaiting a response to its questions from RenovaCare and that "RenovaCare still hasn't answered our multiple emails or calls seeking comment." Additionally, the author stated, "We do have grave concerns about this company's future and expect to share management's answers with investors…. Right now – considering RenovaCare's part-time CEO, stalled product, heavy promotions, OTC questions, majority shareholder concerns, low financial condition and poor comparison to its nearest rival – we're having a hard time justifying a fraction of its current market valuation."

255.    On the same day as publication of the StreetSweeper's February 12, 2018 article, RenovaCare issued a press release entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, Streetsweeper, Affiliated with Felon Convicted of Securities Fraud."[47] RenovaCare's response was inadequate because it failed to use this opportunity to clarify or specifically address the article's contents. Instead, RenovaCare maintained its innocence and continued misleading investors until the truth was finally revealed by the SEC's May 28, 2021 complaint (discussed in

---

[47] https://www.renovacareinc.com/2018/02/renovacare-issues-stern-response-to-admitted-short-seller-streetsweeper-affiliated-with-felon-convicted-of-securities-fraud/ (last accessed Nov. 10, 2022).

Section VII.A. (The Truth Emerges) below), which ultimately caused RenovaCare's inflated stock price to drop and thereby harm investors.

256.   Specifically, RenovaCare stated in its response that the StreetSweeper Article was "spreading 'short and distort' commentary on companies it targets for short selling, in this case RenovaCare." The Company quoted Defendant Thomas Bold and stated, "'We will not be distracted by the irresponsible and nefarious actions of these short sellers and a handful of internet posters…. 'We have an obligation to expose those who prey on our shareholders for short-term profits and attempt to damage the public trust.'" The Company then threw in a red herring and commented, "'Meanwhile, our clinical and regulatory teams continue to make incredible strides, with our next major milestone being our initial FDA filing. We are determined to bring our breakthrough stem cell therapy to market with the ongoing strong support of our shareholders.'" The Company then provided pictures of burn victims who allegedly successfully recovered using the SkinGun and touted its technology.

257.   In further retaliation and in reaction to the drop in its stock price on February 27, 2018, on March 5, 2018, RenovaCare issued a follow-up press release, entitled "RenovaCare Takes Action to Protect Shareholder Interests,"[48]

---

[48] https://www.renovacareinc.com/2018/03/renovacare-takes-action-protect-shareholder-interests/ (last accessed Nov. 11, 2022).

attacking TheStreetSweeper using *ad hominem* arguments, failing once again to address the content of the StreetSweeper Article. The retaliatory press release stated that RenovaCare "has received video evidence showing what appears to be predatory trading practices of several FINRA member firms in its stock." Although not mentioning TheStreetSweeper by name, the response was very likely aimed at TheStreetSweeper.[49]

258.   Specifically, the press release stated that "RenovaCare has informed investigatory agents of FINRA about these extensive and, in the Company's opinion, potentially illegal, ongoing predatory trading practices, engaged in by certain FINRA member firms, as more fully shown in the video." The Company speculated that, "These firms may be covertly collaborating with the short seller syndicate targeting the Company." RenovaCare continued, "The Company is proceeding with the filing of a formal complaint regarding these 'bear raid' trading practices with both FINRA and the SEC and will explore all potential private legal remedies available to it."

---

[49] For example, RenovaCare states in the press release the following: "As reported to stockholders on February 12, 2018, a known 'short and distort' syndicate has engaged in an ongoing smear campaign of disseminating grossly misleading, inaccurate and distorted facts and misinformation, including false allegations of insider seller." The StreetSweeper Article was published on February 12, 2018.

259. The press release further stated that "These short sellers spread false rumors and innuendos of impropriety with business affiliates, partners, and collaborators to disparage the good reputation of RenovaCare and thereby enhancing their profit at the expense of Company stockholders. Often, this is accomplished by the 'short and distort' syndicate enlisting members of the media and others, who may unwittingly write stories based on the grossly misleading and inaccurate statements of fact." RenovaCare then falsely advocated its position in protecting shareholders: "RenovaCare strongly believes that it has an obligation to protect its stockholders from adverse financial and reputational harm caused by these unfounded and potentially illegal activities. Such actions undermine the integrity of the Company, its management and its majority stockholder, Kalen Capital Corporation."

260. Lastly, as will be discussed further below, RenovaCare falsely and misleading misrepresented that, "RenovaCare confirms that none of its officers and directors have ever sold any Company shares; and, its majority stockholder, Kalen Capital Corporation, has not sold any Company shares since 2008."

261. Despite RenovaCare's lengthy attacks on TheStreetSweeper's motivations, RenovaCare failed to use the press release to address any of the StreetSweeper Article's investigation, especially as related to StreetAuthority's promotional campaign. A reasonable investor would have expected that

108

RenovaCare would at least address some of the substance in the StreetSweeper Article. RenovaCare had a perfect opportunity to clarify its promotional activities but failed to do so. Instead, RenovaCare continued to mislead investors by omitting any sort of explanation, meaningful response, or clarification related to StreetAuthority's promotion. Contrary to RenovaCare's representation in the press release that it sought to protect shareholders, investors would only learn about the truth of the promotional campaign once the SEC brought its May 28, 2021 action and investors were harmed when RenovaCare's stock price dropped in response (discussed more fully below in Section VII.A.).

**L.    After Issuing the January 8 Press Release, Defendants Restarted the Predictions Campaign and Resumed Trading**

262.    Meanwhile, after issuing the false January 8 Press Release and while RenovaCare continued to publicly deny and conceal any involvement with StreetAuthority, Defendants restarted the Predictions Campaign, resumed selling shares behind the scenes, and engaged in deceptive conduct to support RenovaCare's share price and trading volume.

**1.    Defendants restarted the StreetAuthority promotion.**

263.    While Rayat, RenovaCare's CEO, and Bhogal were working on a response to the OTC Markets inquiry, Rayat and Bhogal were working with IRC 2 to prepare and restart the Predictions Campaign. On January 5, 2018, they initiated a review of StreetAuthority's promotional materials to allow StreetAuthority to

support the claim that the promotional "copy" was based on publicly available information. During this process, IRC 2 and the Company identified several misstatements, and corrected some of them. While the review was ongoing, and notwithstanding ongoing and extensive communications with StreetAuthority regarding the promotional campaign, RenovaCare issued the January 8 Press Release disavowing any affiliation with StreetAuthority or involvement in the campaign. SEC Compl. ¶ 168.

264.    On January 22, 2018, Defendants, IRC 2, and StreetAuthority completed the content review, and Rayat authorized StreetAuthority to resume the Predictions Campaign. SEC Compl. ¶ 169.

### 2.    Defendants resumed their coordinated trading.

265.    After issuing the false and misleading January 8 Press Release, Defendants also resumed trading RenovaCare stock. On January 9, 2018, Fleming bought 370 shares, despite the fact that RenovaCare stock was trading near a historic high, and the fact that she owned more than 100,000 shares at a lower cost basis. Her trading was intended to create an artificial impression of demand for the stock to assist in maintaining share price and trading volume and counteract any negative market reaction to the January 8 Press Release. SEC Compl. ¶ 170.

266.    Between January 9 and January 22, 2018, Bhogal and Sidhu sold some shares, but after January 22, 2018, Defendants' trading pattern took off,

again in a coordinated fashion. Bhogal, Sidhu, and Fleming all started by selling small amounts until about a week after StreetAuthority resumed the Predictions Campaign, when they began taking turns selling large quantities of shares. SEC Compl. ¶ 171.

267.   First, Bhogal ramped up his selling to over 50,000 shares per day on January 26. On January 30, 2018, Bhogal sold 133,900 shares through Alberta Ltd.'s account, which left him with only about 10,000 shares in that account. SEC Compl. ¶ 172.

268.   Second, on January 31, 2018, Sidhu ramped up his activity, selling over 150,000 shares that day and at least 50,000 shares per day for the rest of that week. Fleming also continued to sell on most trading days in this time period, selling approximately 25,000 shares between January 29 and February 2, 2018. SEC Compl. ¶ 173.

269.   This coordinated pattern of trading continued until February 7, 2018, when another threat to Defendants' scheme emerged. SEC Compl. ¶ 174.

**3.    Rayat and Bhogal caused RenovaCare to issue press releases to counteract negative press and complement the Predictions Campaign**

270.   On February 7, 2018, RenovaCare received an inquiry from an online financial media company ("Media Company 1"). Media Company 1 asked

RenovaCare to answer several questions that suggested Media Company 1's view that RenovaCare was involved in a pump-and-dump scheme. SEC Compl. ¶ 175.

271.   IRC 2 discussed Media Company 1's inquiry with Bhogal and Rayat, and they decided to take action to counteract anticipated negative market reaction to the planned article. Bhogal, Rayat, and others immediately prepared a draft RenovaCare press release attacking the credibility of Media Company 1 and the negative article they anticipated. SEC Compl. ¶ 176.

272.   The next morning, on February 8, 2018, Media Company 1 published an article on RenovaCare that, among other things, called it "the most dangerous stock covered to date."[50] In response, Rayat and Bhogal directed RenovaCare to issue a press release on February 12, 2018. Rather than responding to the facts in Media Company 1's article, this press release attacked the credibility of its authors. SEC Compl. ¶ 177.[51]

---

[50] TheStreetSweeper (discussed in section V.K. above) also published an article on February 8, 2018 stating that RenovaCare was "one of the more dangerous stocks we've covered[.]" This article substantially mirrors the February 12, 2018 article discussed above. *See* https://www.hvst.com/posts/renovacare-rcar-multiple-catalysts-untold-downside-wLmTDl4r (last accessed Nov. 11, 2022).

[51] This RenovaCare press release was also discussed in section V.K. above detailing RenovaCare's response to the TheStreetSweeper article entitled "RenovaCare: Many Catalysts, Untold Downside" on *Seeking Alpha*. *See* https://seekingalpha.com/article/4145626-renovacare-many-catalysts-untold-downside (last accessed Nov. 11, 2022); https://www.renovacareinc.com/2018/02/renovacare-issues-stern-response-to-

273.    Defendants further attempted to counteract this negative news by doubling StreetAuthority's promotional budget for the Predictions Campaign. On the morning of February 8, 2018, IRC 2 emailed StreetAuthority, ordering the promoter to double the advertising budget for the next two weeks "from its current spend of $12,500 to $25,000 per week." Soon thereafter, Rayat contacted another StreetAuthority representative and reiterated the request, noting that "It's kinda important that it gets turned on sooner rather than later." StreetAuthority quickly implemented these instructions. SEC Compl. ¶ 178.

274.    Rayat also consulted with StreetAuthority to strategize ways to respond to Media Company 1's negative coverage. In response, on February 12, 2018, Betancourt emailed Rayat and other StreetAuthority representatives and stated:

> "What can we do?
>
> I recommend, if [RenovaCare] will issue any PR release, that you should not address this article at all. The release should be about a positive story about Renova[C]are. ***If you have news on the FDA or your submission to the FDA address that*** … .
>
> My sense is that I do not think this negative story has received a great deal of press/readership. The stock is up .54% and trading volume is pretty decent at mid-day.

---

admitted-short-seller-streetsweeper-affiliated-with-felon-convicted-of-securities-fraud/ (last accessed Nov. 11, 2022).

Regarding additional marketing exposure, I spoke with [another StreetAuthority representative] to crank up the spend. …

**I think it is important to keep a steady spend to keep [the] volume up and the stock price up."**

SEC Compl. ¶ 179 (emphasis added).

275.    Just as Betancourt suggested, RenovaCare issued a press release on February 15, 2018, announcing a "successful FDA meeting," despite the fact that the meeting had occurred **a year earlier**.[52] Rayat and Bhogal were involved in the drafting and dissemination of this press release, which was intended to complement the promotional campaign and Defendants' manipulative trading. SEC Compl. ¶ 180.

276.    A week later, Defendants Rayat and Bhogal coordinated another RenovaCare press release with the Predictions Campaign. On February 21, 2018, Rayat and Bhogal drafted and disseminated another RenovaCare press release announcing that RenovaCare "secures [a] patent victory."[53] In fact, this "victory" had occurred months earlier, in December 2017. Shortly after this press release was issued, Rayat forwarded a link to Betancourt and another StreetAuthority representative, stating that the release was "fresh off the presses and still warm."

---

[52] https://www.renovacareinc.com/2018/02/renovacare-announces-successful-fda-meeting/ (last accessed Nov. 11, 2022).

[53] https://www.renovacareinc.com/2018/02/renovacare-secures-patent-victory-continues-bolster-ip-portfolio/ (last accessed Nov. 11, 2022).

Betancourt replied, "Just read the story … Need to figure out how to leverage this news on other media." SEC Compl. ¶ 181.

277.    Furthermore, on February 23, 2022, working at Rayat's and/or Bhogal's direction, IRC 2 emailed StreetAuthority to provide internet links "for the most recent news related to [RenovaCare and SolarWindow] to update your copy." By "copy," IRC 2 meant StreetAuthority's promotional materials. SEC Compl. ¶ 182.

### 4.    Defendants supported the scheme through manipulative trading.

278.    By February 8, 2018, Sidhu, Bhogal, and Fleming also took other steps to bolster RenovaCare's share price and trading volume by engaging in manipulative trading in violation of Section 9(e). First, they stopped selling shares, which could depress the share price. Second, they soon began aggressively buying RenovaCare stock at historically high prices to artificially inflate the market. SEC Compl. ¶ 183.

279.    On February 9, 2018, Sidhu bought 15,000 RenovaCare shares. Despite owning millions of shares at no cost basis, he bought additional shares at then-near historic high prices of more than $7 per share. This purchase had no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock. SEC Compl. ¶ 184.

280.   On February 12, 2018, Media Company 1 issued another negative article suggesting that RenovaCare was involved in a pump-and-dump scheme. SEC Compl. ¶ 185.

281.   In response, that same day and continuing throughout that week, Sidhu purchased more RenovaCare stock. In all, between February 9, 2018, and February 16, 2018, Sidhu purchased over 155,000 shares of RenovaCare stock at near historically high prices, often placing purchase orders at or above the highest market prices at the time, which increased the effect of his orders on the market. Again, Sidhu had no economic justification for these purchases other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others. SEC Compl. ¶ 186.

282.   In coordination with Sidhu, between February 12 and 16, 2018, Fleming also placed several purchase orders and ultimately purchased 3,200 shares of RenovaCare stock, with no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others. SEC Compl. ¶ 187.

283.   Bhogal also engaged in manipulative trading during this period. On February 20 and 21, 2018, Bhogal placed several buy orders for RenovaCare stock

to further support RenovaCare's share price and trading volume. Although these orders were never executed, they created a false impression of demand for the stock at the order prices. At the time, RenovaCare stock reached a new all-time high of over $10.50 per share, and Bhogal held millions of shares of RenovaCare stock at a low or no cost basis. These buy orders were intended to manipulate the market for the purpose of inducing its purchase or sale by others. SEC Compl. ¶ 188.

284.   From February 21 to 22, 2018, Fleming and Sidhu resumed selling shares as the Predictions Campaign continued. At the time, Sidhu, Bhogal, and Fleming knew, or were reckless in not knowing, that they were engaged in manipulative trading of RenovaCare stock, based on the highly coordinated nature of their trading with each other's trades and with the ongoing promotional activity, the nature and timing of their purchases, and the fact that they all owned substantial shares at a low or no cost basis at a time they were buying more stock at historically high prices. SEC Compl. ¶ 190.

**5.    On February 9, 2018, RenovaCare filed a new Form S-1 with the SEC seeking to register millions of restricted shares owned by Defendants.**

285.   In the midst of the pump-and-dump scheme, Defendants also sought to "reload" on stock by registering additional restricted RenovaCare shares to be sold. On February 9, 2018, RenovaCare issued a new Form S-1 that sought to

register for resale over 4.4 million shares held by Rayat and his associates, including: (i) 2.42 million shares held by Kalen Capital; (ii) 900,000 shares bought at below-market prices in October 2017 and held by Cindy Bains, a friend of Rayat; (iii) 508,636 shares held by Bhogal through Alberta Ltd.; and (iv) 355,000 shares held by Sidhu.[54] The shares RenovaCare sought to register included shares purchased in the July and October 2017 offerings. Sidhu assisted RenovaCare's filing of the February 9, 2018 S-1 by providing information on his, Rayat's, and Bhogal's share holdings. SEC Compl. ¶ 191.

### 6.    In February 2018, the stock promotion scheme collapsed.

286.    On February 23, 2018, after becoming aware of further promotional activity related to RenovaCare, OTC Markets downgraded the Company's stock to the OTC Pink Open Market Tier, also known as the "pink sheets," and placed a "Caveat Emptor" ("buyer beware") warning and skull and crossbones symbol on RenovaCare's company profile. SEC Compl. ¶ 192.

287.    After OTC Markets acted in response to the ongoing promotional activity, RenovaCare's share price plummeted, and Defendants abandoned their scheme. Shortly thereafter, Defendants directed StreetAuthority to halt the Predictions Campaign. SEC Compl. ¶ 193.

---

[54] *See* https://www.sec.gov/Archives/edgar/data/1016708/000147793218000750/rcar_s1.htm (last accessed Nov. 11, 2022).

**M.    The Scheme's Final Result: the Defendants Reaped Millions**

288.    The fraudulent stock promotion scheme orchestrated by Defendants was ultimately successful, allowing Defendants to sell millions of shares of RenovaCare stock at artificially inflated prices and obtain millions of dollars of ill-gotten gains.

**1.    RenovaCare's share price and trading volume increased dramatically during the Predictions campaign.**

289.    As internet users clicked on tens of thousands of RenovaCare ads during the StreetAuthority promotional campaign, RenovaCare's share price and trading volume increased dramatically. For example, a single online platform, one of several that StreetAuthority used to promote RenovaCare, generated over 20,000 clicks from internet users. On October 23, 2017, shortly before the Predictions Campaign began, RenovaCare stock price closed at $3.10 per share. By January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase, and on February 21, 2018, RenovaCare stock traded at an all-time high of over $10.50 per share. SEC Compl. ¶ 195.

**2.    Defendants reaped millions from their sales of RenovaCare shares at artificially inflated prices.**

290.    Collectively, Defendants reaped millions from the scheme. During the StreetAuthority promotional campaign, Sidhu, Bhogal, and Fleming ultimately sold more than one million shares of RenovaCare stock through at least six separate accounts and obtained more than $7 million in trading proceeds:

| Account Holder | Beneficial Owner | Brokerage Firm | How Acquired Shares | Shares Sold Between October 24, 2017 and February 28, 2018 | Sale Proceeds |
|---|---|---|---|---|---|
| Treatdsone LLP (Defendant) | Jeet Sidhu | Broker-Dealer A | Treadstone Ltd. Purchase from Rayat in exchange for preferred shares | 265,839 | $1,598,185 |
| Jeet Sidhu | Jeet Sidhu | Broker-Dealer B | Collingwood purchase in 2013 in exchange for loan from Rayat, and open market purchases in February 2018 | 332,360 | $2,867,023 |
| Alberta Ltd. (Defendant) | Jatinder Bhogal | Broker-Dealer B | Alberta Ltd. Purchase from Rayat in exchange for preferred shares | 491,364 | $2,659,410 |
| Sharon Fleming | Sharon Fleming | Broker-Dealer C | July 2008 company private placement when Rayat was its CEO | 52,200 | $380,802 |
| **TOTAL** | | | | | **$7,505,420.00** |

SEC Compl. ¶ 196.

291.   In addition to the above sales, between December 2017 and February 2018, Sidhu transferred another 500,000 of Blackbriar Ltd.'s RenovaCare shares to an account with a broker-dealer outside the United States, and sold at least some of those shares on a U.S.-based exchange during the Relevant Period. Sidhu also transferred another 250,000 shares in his name that originated from Collingwood's purchase in 2013 to an account with a broker-dealer outside the United States, and

sold at least some of those shares on a U.S.-based exchange during the relevant period. Sidhu ultimately sold RenovaCare shares from five brokerage accounts while the Predictions Campaign was ongoing. SEC Compl. ¶ 197.

292.    While Defendants engaged in this selling, Rayat continued to maintain millions of dollars of financial interests with Bhogal and Sidhu individually and/or through entities they owned and controlled, including Alberta Ltd. and Blackbriar Ltd. SEC Compl. ¶ 198.

293.    Collectively, Rayat, Bhogal, Sidhu, and Fleming acted through RenovaCare to monetize the scheme by distributing millions of shares of RenovaCare stock to themselves and entities they controlled, and to ensure that the shares were registered for resale in advance of the StreetAuthority promotional campaign. The scheme involved several deceptive acts, misrepresentations, and omissions, including scalping, manipulative trading, and false statements, all of which violated the securities laws. Defendants are liable for these acts, misrepresentations, and omissions, notwithstanding the fact that they did so to some extent through or by means of other individuals and entities. SEC Compl. ¶ 200.

   **3.    Defendants Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta, Ltd. received ill-gotten gains.**

294.    Defendant Treadstone Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants. Treadstone Ltd. has no legitimate claim to the ill-

gotten funds it directly or indirectly received, and accordingly, Treadstone Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants. SEC Compl. ¶ 201.

295.    Defendant Treadstone LLC received ill-gotten funds transferred to it or for its benefit by the Defendants. Treadstone LLC has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Treadstone LLC should be required to disgorge the amounts it directly or indirectly received from Defendants. SEC Compl. ¶ 202.

296.    Defendant Blackbriar Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants. Blackbriar Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Blackbriar Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants. SEC Compl. ¶ 203.

297.    Defendant Alberta, Ltd. received ill-gotten funds transferred to it or for its benefit by the Defendants. Alberta, Ltd. has no legitimate claim to the ill-gotten funds it directly or indirectly received, and accordingly, Alberta, Ltd. should be required to disgorge the amounts it directly or indirectly received from Defendants. SEC Compl. ¶ 204.

N.    **Over a Year After the Stock Promotion Scheme Collapsed, Defendants Admit in SEC Filings That RenovaCare's Disclosure Controls and Procedures Were Not Effective**

298.    On April 12, 2019, over a year after RenovaCare issued the January 8 Press Release denying the statements in OTC Markets's letter, RenovaCare finally admitted its disclosure controls and procedures were ineffective. On that day, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018. That annual report stated, in relevant part:

> Based upon [an] evaluation, our Principal Executive Officer and Acting Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that ***our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting*** as discussed and defined in Management's Report on Internal Control over Financial Reporting referred to below.
>
> * * *
>
> Management has identified the following material weaknesses in our internal control over financial reporting:
>
> - ***Ineffective control environment*** due to an insufficient number of independent board members, insufficient oversight of work performed, and the lack of compensating controls over financial reporting due to limited personnel;
>
> - ***Ineffective design, implementation, and documentation of internal controls*** impacting financial statement accounts and general controls over technology pertaining to user access and segregation of duties, banking and

> disbursements, and financial accounting system applications; and

- • ***Ineffective monitoring controls*** related to the financial close and reporting process, including management's risk assessment process and its identification, evaluation, and timely remediation of control deficiencies.

(Emphases added.)

299.  Following this disclosure, on May 14, 2020, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019, repeating the ineffectiveness of the Company's disclosure controls. That annual report stated, in relevant part:

> Based upon [an] evaluation, our [CEO] and Acting Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that ***our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting*** as discussed and defined in Management's Report on Internal Control over Financial Reporting referred to below.
>
> * * *
>
> Management identified the following material weaknesses in our internal control over financial reporting as of December 31, 2019:
>
> ***Because of the Company's limited resources, there are limited controls over information processing.***

(Emphases added.)

> On March 31, 2021, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020, that again repeated the ineffectiveness of the

Company's disclosure controls. That annual report stated, in relevant part:

Based upon [an] evaluation, our [CEO] and Principal Financial Officer concluded, as of the end of the period covered by this Annual Report that *our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting* as discussed and defined in Management's Report on Internal Control over Financial Reporting referred to below.

\* \* \*

Management identified the following material weaknesses in our internal control over financial reporting as of December 31, 2020:

*Because of the Company's limited resources, there are limited controls over information processing.*

(Emphases added.)

## O. Defendants Rayat and Bold Violated the Company's Ethics Policies by Failing to Reveal Their Promotional Campaign Activities with StreetAuthority

300.    Notwithstanding all the above, Defendants Rayat and Bold, as officers and/or directors of RenovaCare, were bound by the Company's Code of Corporate Governance and Ethics (the "Code of Corporate Governance and Ethics"),[55] which sets out basic principles to guide, as well as specific requirements to bind, all directors, officers, and employees of RenovaCare, who are required to know and

---

[55] https://uploads.renovacareinc.com/wp-content/uploads/2021/06/23164403/Code-of-Corporate-Governance-And-Ethics.pdf (last accessed Nov. 11, 2022).

conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

301.    The Code of Corporate Governance and Ethics specifically states that it "applies to all employees, officers and directors of RenovaCare Technologies, Inc., its subsidiaries and affiliates."

302.    To further illustrate the importance and binding nature of the specific requirements placed upon Defendants Rayat and Bold, the Code of Corporate Governance and Ethics states that:

> RenovaCare's reputation depends on you maintaining the highest standards of conduct in all business endeavors. You have a ***personal responsibility*** to protect this reputation, to "do the right thing," and to act with honesty and integrity in all dealings with customers, business partners and each other. ***You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice***.
>
> \*        \*        \*
>
> ***You are accountable for reading, understanding and adhering to this [Code of Corporate Governance and Ethics]***. Further, compliance with all laws, rules and regulations related to Company activities is mandatory and your conduct must be such as to avoid even the appearance of impropriety.

(Emphases added.)

303.    In a section titled, "Conflicts of Interest," the Code of Corporate Governance and Ethics states the following:

> ***Company policy prohibits conflicts of interest***. A "conflict of interest" occurs when your private interest interferes in any way with the interests of RenovaCare.
>
>        \*       \*       \*
>
> You owe a duty to RenovaCare to advance its legitimate interests. ***You are prohibited from*** competing with the Company and from ***using corporate property, information or position for personal opportunities or gain.*** You may not use or offer for use RenovaCare resources (time, technology, property or information) for non RenovaCare business.

(Emphases added.)

304.    The section of the Code of Corporate Governance and Ethics titled

"Financial Management and Disclosure" states the following:

> The Company must disclose to the SEC, current security holders and the investing public information that is required, and any additional information that may be necessary to ensure the required disclosures are not misleading or inaccurate. ***The Company requires you to participate in the disclosure process, which is overseen by the [CFO] and/or [CEO].***
>
>        \*       \*       \*
>
> ***Officers and employees must fully comply with their disclosure responsibilities in an accurate and timely manner or be subject to discipline of up to and including termination of employment.***

(Emphases added.)

305.    In a section titled, "Accounting Standards," the Code of Corporate

Governance and Ethics states the following:

> RenovaCare maintains its accounting records and prepares its financial statements in accordance with accounting principles generally accepted in the U.S. (GAAP) and with statutory accounting principles, as promulgated by the [SEC] and other regulating authorities. ***If you are aware or have reason to believe that there are violations of either law or policy regarding the Company's financial records or operations, you are obligated to report such information promptly.***

(Emphases added.)

306.    The section of the Code of Corporate Governance and Ethics titled "Reporting of Any Illegal or Unethical Behavior; Points of Contact" states further Defendants Rayat and Bold's duty to disclose:

> If you are aware of any illegal or unethical behavior or if you believe that an applicable law, rule or regulation or this [Code of Corporate Governance and Ethics] has been violated, the matter must be promptly reported to the [CEO], the [CFO] or the Corporate Ethics & Compliance Committee.

307.    Upon information and belief, the Company maintained versions of the Code of Corporate Governance and Ethics during the Class Period that imposed the same, or substantially and materially the same or similar, duties on, among others, Defendants Rayat and Bold, as those set forth above.

308.    Defendants Rayat and Bold, as officers and/or directors of RenovaCare, were also bound by the Company's Code Ethics (the "Code of

Ethics"),[56] which, similar to the Company's Code of Corporate Governance and Ethics, sets out basic principles to guide, as well as specific requirements to bind, all directors, officers, and employees of RenovaCare, who are required to know and conduct themselves in accordance therewith, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

309.   The Code of Ethics specifically states that it "applies to all [o]fficers, [d]irectors, and [e]mployees of the company and its affiliates."

310.   In a section titled, "Standard of Conduct," the Code of Ethics states the following:

> RenovaCare insists that all aspects of its business operations be conducted with honesty, integrity, fairness and with respect for those affected by its business activities. Similarly, RenovaCare expects the same in its relationships among those with whom it does business.
>
> All [e]mployees are expected to maintain and promote integrity and honesty in all business transactions. Employees must conduct themselves according to the highest ethical standards and are expected to apply ethical business practices in the administrative and financial affairs of RenovaCare business operations.
>
> There is no Code of Ethics that can expect to define suitable behavior for each situation, nor should it seek to do so. As such, [e]mployees are expected to exercise vigilance and make considered judgment of what is right and proper in any particular situation.

---

[56] https://uploads.renovacareinc.com/wp-content/uploads/2021/06/23174631/Code-of-Ethics.pdf (last accessed Nov. 11, 2022).

> While carrying out the business operations of RenovaCare, [e]mployees are expected to be accountable, truthful, trustworthy, conscientious, and committed to the highest standards of ethical business practices. ***As such, [e]mployees are required to avoid all impropriety as well as the appearance of impropriety when conducting RenovaCare business operations.***

(Emphasis added.)

311.    In a section titled, "Accuracy and Completeness of Accounting Records," the Code of Ethics states the following:

> RenovaCare's accounting and supporting documents must accurately and completely describe and represent the nature and result of RenovaCare's business operations. ***The results and activities of RenovaCare's operations must be presented in a fair and unbiased manner.***
>
> *            *            *
>
> ***Misappropriation, wrongful allocation, or improper use of the Company's assets and property, or the false entry to records and reports by any [e]mployee or by others must be reported to Board of RenovaCare.***

(Emphases added.)

312.    The section of the Code of Ethics titled "Accurate and Timely Communications" states Defendants Rayat and Bold's duty to disclose:

> RenovaCare expects [e]mployees to be ***completely truthful and forthright in all internal and external interactions and communications, whether with shareholders, clients, government agencies, or others.***
>
> ***Employees will ensure that all statements are accurate and complete with no misrepresentations which may mislead or misinform.*** In all cases, [e]mployees are

expected to provide full, prompt and accurate disclosure
to governmental agencies.

(Emphases added.)

313.    The section of the Code of Ethics titled "Disclosure Of Personal

Interest" further states the regarding Defendants Rayat and Bold's duty to disclose:

RenovaCare [e]mployees are expected to fully disclose
any personal interest(s) which could impinge or might
reasonably be considered by others to conflict with their
business dealings with industry.

***RenovaCare [e]mployees must not engage in personal
activities and financial interests that may conflict with
their responsibilities and obligations to the Company*** or
give assistance to competitors, in conflict with the interests
of RenovaCare or its clients.

(Emphasis added.)

314.    In the section titled "Annual Acknowledgment," the Company sets

forth the requirement that each employee shall "sign a statement annually that he

or she has read and understands RenovaCare's Code of Ethics."

315.    To further demonstrate the Company's intention of making the Code

of Ethics and its specific requirements binding on the RenovaCare employees, as

well as Defendants Rayat and Bold, the Code of Ethics requires that the signed

annual acknowledgment include a statement from the employee affirming "that he

or she is in full compliance with the [Code of Ethics]."

316.    Defendants Rayat and Bold, because of their positions of control and

authority as directors and/or officers of RenovaCare, were able to, and did, directly

131

and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RenovaCare.

317.    Because of their advisory, executive, managerial, and directorial positions with RenovaCare, Defendants Rayat and Bold had access to adverse, non-public information about the financial condition, operations, and improper representations of RenovaCare.

318.    At all times relevant hereto, Defendants Rayat and Bold were the agent of each other and of RenovaCare and were at all times acting within the course and scope of such agency.

319.    By failing to promptly disclose and continue concealing RenovaCare's promotional campaign with StreetAuthority, Defendants Rayat and Bold were in violation of the ethics policies for the reasons discussed herein.

320.    To discharge their duties, the officers and directors of RenovaCare were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of RenovaCare were required to, among other things:

      a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its

legal authority and disseminating truthful and accurate statements to the investing public;

b.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    properly and accurately guide shareholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

d.    remain informed as to how RenovaCare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws; and

e.    ensure that RenovaCare was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

321.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances[57] under which they were made, not misleading, and Defendants knew, or at least recklessly disregarded, that their representations were false and misleading at the time they made their representations for the following reasons as set for in more detail in Sections IV and V above. Specifically, Defendants failed to disclose to investors that: (i) at the direction of Rayat, RenovaCare engaged in a promotional campaign to issue misleading statements to artificially inflate the Company's stock price; (ii) when the OTC Markets inquired, RenovaCare and Rayat issued a materially false and misleading press release claiming that no director, officer, or controlling shareholder had any involvement in the purported third party's promotional materials; (iii) as a result of the foregoing, the Company's disclosure controls and procedures were defective; and (iv) as a result of the foregoing, Defendants'

---

[57] To the extent a false or misleading statement by Defendants that is identified in the paragraphs above is not repeated in this section, it is incorporated by reference.

positive statements about the Company's business, operations, and prospects were

materially misleading and/or lacked a reasonable basis.[58]

322.    The allegations set forth in this section are, in addition to the

allegations above, a further basis for Lead Plaintiff's Rule 10b-5(b) claim.

## A.    August 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls and Failed to Disclose the Stock Promotion Risk

323.    The Class Period begins on August 14, 2017, when RenovaCare filed

its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2017.

This report was signed by Defendant Bold, and stated, in relevant part:

> Based on [an] evaluation the CEO has concluded that as of the end of the period covered by this report, our disclosure controls and procedures are effective in ensuring that: (i) information required to be disclosed by us in reports that we file or submit to the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in applicable rules and forms and (ii) material information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to our management, including our CEO, as appropriate, to allow for accurate and timely decisions regarding required disclosure.

---

[58] The statements quoted in this section in ***bold and italicized*** typeface are materially false or misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false or misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

324.  Defendants' representations concerning the effectiveness of RenovaCare's disclosure controls was materially false and misleading for the reasons set forth in Section V above.

325.  Defendants' representations were also materially false and misleading because there Defendants fail to disclose and omit that that the promotional campaign, and any consequences associated with it as discussed herein, was a risk factor to the Company's stock price. Instead, Defendants simply state under Item 1A (Risk Factors): "Smaller reporting companies are not required to provide the information required by this item" and do not disclose *any* risk factors (Defendants do this in all of the Company's 10-Q filings during the Class Period).

326.  From October 2017 until at least January 2018, StreetAuthority actively disseminated its RenovaCare promotional materials, including the aforementioned Predictions Report, on the internet and to its subscriber base.

**B.    October 18, 2017 Prospectus Supplement Failed to Disclose Stock Promotion Risk**

327.  On October 18, 2017, RenovaCare filed a Prospectus Supplement to RenovaCare's Prospectus dated May 17, 2017. The Prospectus Supplement was signed by Defendant Bold. There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on

OTC Markets and the possibility of being downgraded, there is no discussion of

unlawful stock promotion as a risk that could cause such downgrading.

328.   The foregoing statements were materially false or misleading and/or

failed to disclose material facts necessary to make the statements made, in light of

the circumstances under which they were made, not misleading, for the reasons

identified in Section V above.

**C.    November 14, 2017 Form 10-Q Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls**

329.   On November 14, 2017, RenovaCare filed its quarterly report on

Form 10-Q with the SEC for the period ended September 30, 2017. The report was

signed by Defendant Bold and stated, in relevant part:

> Based on [an] evaluation the CEO has concluded that as
> of the end of the period covered by this report, our
> disclosure controls and procedures are effective in
> ensuring that: (i) information required to be disclosed by
> us in reports that we file or submit to the SEC under the
> Exchange Act is recorded, processed, summarized and
> reported within the time periods specified in applicable
> rules and forms and (ii) material information required to
> be disclosed in our reports filed under the Exchange Act is
> accumulated and communicated to our management,
> including our CEO, as appropriate, to allow for accurate
> and timely decisions regarding required disclosure.

330.   Defendants' representations concerning the effectiveness of

RenovaCare's disclosure controls was materially false and misleading for the

reasons set forth in Section V above.

**D.    Defendants' January 8, 2018 Statement Responding to OTC Markets' Letter (the January 8 Press Release)**

331.    On January 8, 2018, RenovaCare issued an unsigned statement

"comment[ing] on recent market activity." Specifically, the Company issued a

press release stating:

> [O]n January 3rd, 2018, OTC Markets . . . informed the Company that OTC Markets had become aware of promotional activities concerning the Company.
>
> OTC Markets provided an example, dated January 2nd, 2018, of the promotional material for reference. It is the Company's understanding that the material provided was part of an annual predictions report used in part to generate new subscribers for various newsletters owned by StreetAuthority LLC, an independent publisher founded in 2001. ***The Company had no editorial control over the content*** and was one of thirteen companies independently selected, researched and mentioned. The annual predictions report was disseminated during the last quarter of 2017. During this time, 2,190,000 shares traded, only 2% more than the average quarterly volume of 2,139,375 shares during all of 2017.
>
> Subsequently, later in the 4th quarter, a material announcement regarding a failed challenge to a RenovaCare patent was made public. On December 20th, 2017, a press release was issued by Avita Medical Limited disclosing that its petition for an Inter Partes Review with the Patent Trial and Appeal Board ("PTAB") to invalidate all claims in U.S. Patent No. 9,610,430 (owned by the Company) was denied. This press release was followed by an article in Stockhead on December 21st, 2017, which more fully reported on the PTAB denying Avita Medical Limited's petition, and, thereby, upholding the patentability of RenovaCare's technology.

After the issuance of Avita Medical's press release and the follow-up article in Stockhead on December 21st, 2017, the trading volume of the Company's common stock increased 84% to 62,829 shares per day between December 20th and December 29th, versus 32,720 per day previously between December 1st through December 19th, 2017.

**The Company is not affiliated in any way with the authors of the annual predictions report or its publisher.** The Company issues press releases in the regular course of business and includes in its filings (the "SEC Filings") with the [SEC] the material business activities of the Company, and investors are encouraged to rely on the information provided directly by the Company in such press releases and SEC Filings.

**In the report, the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading**, even though the report has significantly simplified the descriptions of the clinical indications and outcomes related to the use of the Company's cell spray for the treatment of burns and wounds, and used promotional, advisory and superfluous language in describing the Company, its products and its stock. Moreover, the author comments on the Company's interaction with the U.S. Food and Drug Administration and the performance of RenovaCare's stock. The Company does not know the basis for such opinions or conclusions arrived-at by the author. Investors are reminded to rely upon the Company's own statements, press releases, and filings with the SEC for information related to these matters.

Following notification from OTCQB Markets, the Company immediately made inquiries of its executive officers, directors, controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities) and third-party service providers regarding their involvement in the creation or distribution of

promotional materials related to the Company and its securities.

***To the Company's knowledge, the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers have, directly or indirectly:***

- **not** been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report, related to the Company and its securities; and

- **not** sold or purchased (other than in than in private placements conducted by the Company as described below) any shares of common stock of the Company within the last 90 days. The Company's former service provider, Inspiren Media LLC, originally acquired 5,000 shares of the Company on July 25th, 2008 and sold on January 3rd, 2018, after termination of its agreement with the Company. All activity in the Company's common stock by the Company's executive officers, directors and controlling shareholders has been disclosed by such officer, director and shareholder in the Company's SEC Filings.

The Company was not involved in the creation, or directing the dissemination, of the report. Through its investor relations agencies, the Company paid $90,005.25 between October 24th, 2017 and January 2nd, 2018, as part of its contractual agreement to pay for out of pocket costs, including reimbursement of dissemination related costs, incurred by the investor relations agency.

(Emphases added.)

332.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section V above.

**E.    February 12, 2018 Form S-1 Filing Failed to Disclose Stock Promotion Risk**

333.    The Company filed its Form S-1 on February 12, 2018. The Form S-1 was signed by Defendant Bold. It is materially misleading and false because of the same deficiencies in the October 18, 2017 Prospectus Supplement filing (*see* above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company. Additionally, even though Defendants mention RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

**F.    February 27, 2018 Form 8-K Filing Omitted Disclosure of the Promotional Campaign with StreetAuthority**

334.    On February 27, 2018, RenovaCare filed its Form 8-K with the SEC for the period ended February 21, 2018. The Form 8-K was signed by Defendant Bold. RenovaCare again failed to acknowledge or describe its relationship with StreetAuthority despite already having been downgraded by OTC Markets at the

time of filing the Form 8-K. Further, the Company failed to provide an adequate response to investigative reporting website TheStreetSweeper's February 12, 2018 *Seeking Alpha* article, as discussed herein. Thus, RenovaCare misrepresented the risks associated with its ongoing promotional campaign by completely omitting discussion of it and risks associated with negative reporting surrounding it.

335.    Defendant RenovaCare's February 27, 2018 Form 8-K was materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section V above.

## G.    March 13, 2018 Form 10-K Filing Misrepresented Effectiveness of RenovaCare's Disclosure Controls

336.    On March 13, 2018, RenovaCare filed its annual report on Form 10-K with the SEC for the period ended December 31, 2017. The Form 10-K was signed by Defendant Bold. That annual report stated, in relevant part:

> Based on [an] evaluation, management, after evaluating the effectiveness of our "disclosure controls and procedures" (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), have concluded that, as of December 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

337.    Defendants' representations concerning the effectiveness of RenovaCare's disclosure controls was materially false and misleading for the reasons set forth in Section V above.

## H.    April 6, 2018 Form S-1/A Filing Failed to Disclose Stock Promotion Risk

338.    The Company filed its Form S-1/A on April 6, 2018. The Form S-1/A was signed by Defendants Bold and Rayat. It is materially misleading and false because of the same deficiencies in the October 18, 2017, Prospectus Supplement filing (*see* above). There is no mention in the "Risks Relating to this Offering of Securities" and "Risks Related To Ownership of Our Common Stock" sections that the stock promotion campaign was a risk factor to the Company.

339.    Additionally, even though there is mention of RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

340.    RenovaCare, however, informed the market that RenovaCare's stock would be quoted by OTC Markets using the caveat emptor designation. RenovaCare states, in relevant part, the following in its filing:

> Prior to February 26, 2018, our stock was included for trading on the OTCQB; on February 23, 2018 we received an email notification from OTC Markets Group, Inc. (the "**OTC Markets**") which regulates the OTCQB informing us that effective immediately, our stock would be quoted

on the OTCPINK and that a caveat emptor designation would be assigned to our stock. This action was taken by OTC Markets pursuant to Section 4.2 of the OTCQB Standards, which generally provide that the OTC Markets may remove the Company's securities from trading on the OTCQB market immediately and at any time, without notice, if OTC Markets, in its sole and absolute discretion, believes that the continued inclusion of the Company's securities would impair the reputation or the integrity of OTC Markets or be detrimental to the interests of investors. ***Such concerns may include but are not limited to promotion, spam or disruptive corporate actions even when adequate current information is available.***

\*        \*        \*

While the Company is addressing the OTC Markets concerns, there is no assurance that it will be able to do so to the satisfaction of the OTC Markets. In the event we do not submit an application for listing on the OTCQB or if we do and the application is not approved, we expect that our stock will continue to trade on the OTCPINC, which could adversely affect the market liquidity of our common stock.

(Emphases added.)

341.    Although RenovaCare mentions the OTC Markets' investigation, this statement is false and misleading and omits material facts because it failed to disclose the underlying reason for the OTC Markets' investigation (the promotional campaign and the risks it would cause (two risks being the OTC Markets downgrade and SEC action)). Rather, RenovaCare misled the market and glosses over the promotional campaign as the primary risk and cause for the OTC Markets investigation by stating: "***Such concerns may include <u>but are not limited</u>***

___**to** *promotion, spam or disruptive corporate actions even when adequate current*___

___*information is available*___.” (Emphasis and underlining added.)

**I.    April 25, 2018 Prospectus Filing Failed to Disclose Stock Promotion Risk**

342.   The Company filed its Prospectus on April 25, 2018. It is materially

misleading and false because of the same deficiencies in the October 18, 2017

Prospectus Supplement filing (*see* above). There is no mention in the “Risks

Relating to this Offering of Securities” and “Risks Related To Ownership of Our

Common Stock” sections that the stock promotion campaign was a risk factor to

the Company. Additionally, even though there is mention of RenovaCare’s stock

being listed on OTC Markets and the possibility of being downgraded, there is no

discussion of unlawful stock promotion as a risk that could cause such

downgrading.

343.   The Prospectus also provides the exact same, non-specific disclosure

of the OTC Markets’ investigation that was previously disseminated in the

Company’s April 6, 2018 Form S-1/A, and also did not explain the underlying

reason (the promotional campaign and the associated risks) for the OTC Markets

investigation. Because of this, this disclosure was false and misleading for the

same reasons as the April 6, 2018 Form S-1/A filing.

**J.    April 12, 2019 Form 10-K Filing Failed to Disclose Stock Promotion Risk**

344.    The Company filed its Form 10-K on April 19, 2019. The Form 10-K was signed by Defendant Ryat. It is materially misleading and false because there is no mention in the "Risk Factors" section that the stock promotion campaign was a risk factor to the Company. Additionally, even though there is mention of RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

**K.    May 14, 2020 Form 10-K Filing Failed to Disclose Stock Promotion Risk**

345.    The Company filed its Form 10-K on May 14, 2020. The Form 10-K was signed by Defendant Rayat. It is materially misleading and false because there is no mention in the "Risk Factors" section that the stock promotion campaign was a risk factor to the Company. Additionally, even though there is mention of RenovaCare's stock being listed on OTC Markets and the possibility of being downgraded, there is no discussion of unlawful stock promotion as a risk that could cause such downgrading.

**L.    Defendants' February 12, 2018 Response to the StreetSweeper Article**

346.    On February 12, 2018, RenovaCare issued a press release entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, Streetsweeper, Affiliated with Felon Convicted of Securities Fraud."

146

347.    Specifically, RenovaCare stated in its response that the StreetSweeper Article was "spreading 'short and distort' commentary on companies it targets for short selling, in this case RenovaCare." The Company quoted Defendant Thomas Bold and stated, "'We will not be distracted by the irresponsible and nefarious actions of these short sellers and a handful of internet posters…. 'We have an obligation to expose those who prey on our shareholders for short-term profits and attempt to damage the public trust.'"

348.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section V above. Specifically, RenovaCare failed to make any disclosure of its ongoing promotional campaign relationship and payment arrangement with StreetAuthority.

349.    Moreover, RenovaCare's immediate follow-up press releases on February 15, 2018, and February 21, 2018, to further distract from the StreetSweeper's article and touting RenovaCare's FDA relationship and intellectual property portfolio was materially false and/or misleading for the reasons identified in Section V above.

**M.    Defendants' March 5, 2018 Press Release Regarding Short-Sellers**

350.    On March 5, 2018, RenovaCare issued a press release entitled "RenovaCare Takes Action to Protect Shareholder Interests." In discussing the StreetSweeper Article, the press release stated that "These short sellers spread false rumors and innuendos of impropriety with business affiliates, partners, and collaborators to disparage the good reputation of RenovaCare and thereby enhancing their profit at the expense of Company stockholders. Often, this is accomplished by the 'short and distort' syndicate enlisting members of the media and others, who may unwittingly write stories based on the grossly misleading and inaccurate statements of fact."

351.    RenovaCare then advocated its position in protecting shareholders: "RenovaCare strongly believes that it has an obligation to protect its stockholders from adverse financial and reputational harm caused by these unfounded and potentially illegal activities. Such actions undermine the integrity of the Company, its management and its majority stockholder, Kalen Capital Corporation."

352.    Additionally, RenovaCare falsely and misleading misrepresented that, "RenovaCare confirms that none of its officers and directors have ever sold any Company shares; and, its majority stockholder, Kalen Capital Corporation, has not sold any Company shares since 2008."

353.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section V above. Specifically, RenovaCare failed to make any disclosure of its ongoing promotional campaign relationship and payment arrangement with StreetAuthority. This directly contradicts RenovaCare's representation that it "strongly believes that it has an obligation to protect its stockholders from adverse financial and reputational harm[.]" If RenovaCare sought to protect investors, it would have disclosed its paid promotional campaign with StreetAuthority and investors would have avoided being harmed when their share prices dropped as a result of the SEC's May 28, 2018 action brought almost three years after this press release was issued. Lastly, contrary to the press release's representation, Rayat, an officer/director of RenovaCare, was indirectly engaged in the sale of RenovaCare's stock through third-party entities, Bhogal, Sidhu, and Kalen Capital Corporation; and they engaged in trading activity to manipulate the stock price and profit.

## VII.   THE TRUTH EMERGES

### A.   Corrective Disclosure: the SEC Complaint Alleging That Defendants Committed Securities Fraud by Failing to Disclose RenovaCare's Promotional Campaign with StreetAuthority

354.   More of the truth emerged on May 28, 2021, when the SEC issued a litigation release stating that RenovaCare was being charged with alleged securities

fraud because of RenovaCare's undisclosed promotional campaign with StreetAuthority. According to the SEC's initially-filed complaint, between July 2017 and January 2018, Rayat "arranged, and caused RenovaCare to pay for, a promotional campaign designed to increase the company's stock price." In January 2018, when OTC Markets had requested that RenovaCare explain its relationship to the promotion, the complaint alleges that "Rayat and RenovaCare then drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying Rayat's and the company's involvement in the promotion."

355.    Specifically, "Rayat was closely involved in directing the promotion and editing promotional materials," by providing "false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device." Among other things, these promotional materials described a patient who purportedly recovered from severe burns in ***three days*** using RenovaCare's SkinGun, when in reality, the "before" and "after" pictures were taken ***five years*** apart. The materials also claimed that SkinGun "could soon be approved by the FDA [U.S. Food and Drug Administration] …. RenovaCare has submitted a 510(k) filing to the FDA …." However, at the time, the Company did not have a pending 510(k) application and had withdrawn its only application (seeking approval for use in clinical studies).

356.   The initially-filed SEC complaint also alleged that Rayat arranged for monthly payments to the publisher "to be made through third parties for the fraudulent purpose of concealing Rayat's and the company's involvement." According to the complaint, Rayat knew or was reckless in not knowing that the publisher was required to disclose payments from RenovaCare pursuant to Section 17(b) of the Securities Act of 1933, especially because in 2000, Rayat had settled a case with the SEC for violating the same statute.

357.   On this news, the Company's stock price fell $0.66, or 24.8 percent, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

358.   On August 30, 2022, the SEC filed an Amended Complaint against RenovaCare and Rayat alleging substantially the same allegations alleged herein. As is the case here, Bhogal, Sidhu, Fleming, Treadstone Ltd., Treadstone LLC, Blackbriar Ltd., and Alberta Ltd. were also added as Defendants. The Amended Complaint expanded and clarified the initial complaint, and provided additional details, including background information, regarding Defendants' fraudulent stock promotion scheme as detailed herein.

**B.    RenovaCare's Responsive Press Release Fails to Rebut Any Allegations in the SEC's Initial Complaint and Fails to Address Allegations Concerning the StreetAuthority Promotional Campaign**

359.    On June 1, 2021, RenovaCare issued a press release entitled "RenovaCare Responds to SEC Complaint"[59] broadly stating that "it intends to vigorously defend itself and its stockholders against" the SEC's allegations. Although RenovaCare stated that it "looks forward to presenting tangible evidence in support of its position," the Company did not describe what tangible evidence contradicted any of the SEC's allegations or the allegations contained herein related to the covert promotional campaign carried out by Defendants.

360.    Instead, the Company side-stepped addressing the SEC's allegations and states a red herring, touting that it "was granted full investigational Device Exemption by the FDA, enabling the Company to conduct a clinical trial to evaluate the safety and feasibility of its SkinGun™ and CellMist™ System for the treatment of burn wounds using skin cells obtained directly from the patient." The Company further stated that it intended to "initiate the clinical trial soon at four U.S. burn centers" to maintain investor optimism.

361.    In a further effort to distract investors from the SEC lawsuit, the Company reiterated that "The Company's SkinGun™ and CellMist™ System has

---

[59] https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Nov. 11, 2022).

been developed as a potential alternative to skin grafting and other treatment options, such as in vitro cultured skin epithelial cells that require a specialized and expensive external laboratory. In late 2019, RenovaCare was issued a patent allowing the Company's novel SkinGun™ device to spray a variety of tissues and cells, thus opening the door for its potential application in the regeneration of other tissues, beyond skin[.]"

362.   RenovaCare has not provided any further follow-up responses to the SEC's litigation and has not yet completed FDA clinical trials to evaluate the safety and feasibility of its SkinGun. In fact, on May 3, 2022, RenovaCare announced the termination of research and development for its StemCell Systems and SkinGun spray device. Given these developments, it is doubtful that RenovaCare will continue as a going concern.

363.   Lastly, RenovaCare has not publicly responded at all to the SEC's allegations, including extensive allegations in the SEC's Amended Complaint, concerning its undisclosed promotional campaign with StreetAuthority.

## VIII.  LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

364.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired RenovaCare securities during the Class Period, and who were damaged thereby (the "Class"). Excluded

from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

365.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RenovaCare's shares actively traded on the OTC. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of RenovaCare shares were traded publicly during the Class Period on the OTC. Record owners and other members of the Class may be identified from records maintained by RenovaCare or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

366.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

367.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

368.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of RenovaCare; and

        c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

369.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

370.    The market for RenovaCare's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or

155

misleading statements and/or failures to disclose, RenovaCare's securities traded at artificially inflated prices during the Class Period. On February 21, 2018, the Company's share price closed at a Class Period high of $10.65 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of RenovaCare's securities and market information relating to RenovaCare, and have been damaged thereby.

371.    During the Class Period, the artificial inflation of RenovaCare's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RenovaCare's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of RenovaCare and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the

Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

372. At all relevant times, the market for RenovaCare's securities was an efficient market for the following reasons, among others:

    a.    RenovaCare shares met the requirements for listing, and were listed and actively traded on the OTC, a highly efficient and automated market;

    b.    As a regulated issuer, RenovaCare filed periodic public reports with the SEC and/or the OTC;

    c.    RenovaCare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

    d.    RenovaCare was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public marketplace.

373.    As a result of the foregoing, the market for RenovaCare's securities promptly digested current information regarding RenovaCare from all publicly available sources and reflected such information in RenovaCare's share price. Under these circumstances, all purchasers of RenovaCare's securities during the Class Period suffered similar injury through their purchase of RenovaCare's securities at artificially inflated prices and a presumption of reliance applies.

374.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

375.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of RenovaCare who knew that the statement was false when made.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

376.   As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public;

and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal

securities laws. As set forth elsewhere herein in detail, Defendants Rayat and Bold,

by virtue of their receipt of information reflecting the true facts regarding

RenovaCare, their control over, and/or receipt and/or modification of

RenovaCare's allegedly materially misleading misstatements and/or their

associations with the Company which made them privy to confidential proprietary

information concerning RenovaCare, participated in concert with the other

Defendants to perpetuate the fraudulent scheme alleged herein.

377.   Lead Plaintiff reincorporates and repeats the above substantive

allegations relating to Defendants' scienter in this section.

## XII.   LOSS CAUSATION

378.   The market for RenovaCare's securities was open, well-developed

and efficient at all relevant times. As a result of these materially false and/or

misleading statements, and/or failures to disclose, RenovaCare's securities traded

at artificially inflated prices during the Class Period. Lead Plaintiff and other

members of the Class purchased or otherwise acquired RenovaCare's securities

relying upon the integrity of the market price of the Company's securities and

market information relating to RenovaCare, and have been damaged thereby.

379.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of RenovaCare's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about RenovaCare's business, operations, and prospects as alleged herein.

380.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RenovaCare's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated

prices, thus causing the damages complained of herein when the truth was revealed.

381.   Consequently because of the allegations described herein, on February 23, 2018, OTC Markets downgraded RenovaCare's stock to the OTC Pink Open Market Tier and placed a "Caveat Emptor" skull and crossbones label on RenovaCare's company profile due to the ongoing promotional activity. The company's stock price simultaneously dropped approximately 30 percent, from $9 per share to $6.28 per share.

382.   Then, on May 28, 2021, the SEC issued a litigation release stating that RenovaCare was being charged with securities fraud because the truth was revealed of the Company's undisclosed promotional campaign with StreetAuthority.[60] In response to the SEC action, on June 1, 2021, RenovaCare issued a press release entitled "RenovaCare Responds to SEC Complaint"[61] broadly stating that "it intends to vigorously defend itself and its stockholders against" the SEC's allegations. The Company's stock price fell $0.66, or 24.8

---

[60] https://www.sec.gov/litigation/litreleases/2021/lr25102.htm (last accessed Nov. 11, 2022); *see also SEC v. Rayat and RenovaCare, Inc.*, No. 1:21-cv-04777 (S.D.N.Y.).

[61] https://www.renovacareinc.com/2021/06/renovacare_responds_to_sec_complaint/ (last accessed Nov. 11, 2022).

percent, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021.

## COUNT I
### (Violations of Section 9(e) of the Exchange Act
### Against Bhogal, Sidhu, and Fleming)

383.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

384.    By engaging in the conduct alleged in the Complaint, specifically by conducting the manipulative trading in RenovaCare shares alleged in this Complaint, Bhogal, Sidhu, and Fleming, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or any facility of any national securities exchange, or for any member of a national securities exchange, with specific intent, effected, alone or with persons, a series of transactions in RenovaCare securities that created the actual or apparent trading in such security, or raised or depressed the price of such security, for the purpose of inducing the purchase or sale of such security by others.

385.    By reason of the foregoing, Bhogal, Sidhu, and Fleming violated, and, unless restrained and enjoined, will again violate Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(a).

## COUNT II
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

386.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

387.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase RenovaCare's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

388.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for RenovaCare's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

164

389.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about RenovaCare, as specified herein.

390.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of RenovaCare's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired RenovaCare's securities during the Class Period at artificially high prices and were damaged thereby.

391.   At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that RenovaCare was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class

would not have purchased or otherwise acquired their RenovaCare securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

392.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

393.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT III**
**(Violation of Section 10(b) of the Exchange Act**
**and Rule 10b5(a) and (c) Promulgated Thereunder**
**Against All Defendants)**

394.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

395.   This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Count nor prove in this case that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

396.   During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of RenovaCare securities; and (iii) cause Plaintiffs and the Class to purchase RenovaCare securities at artificially inflated prices.

397.   In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of RenovaCare stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

398.   Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included furnishing false and misleading statements that were used in stock promotional materials that did not disclose that StreetAuthority was being paid to issue these materials to its subscriber base, reviewing and approving the reports that were actually disseminated to investors, and failing to disclose that the Company was paying stock promoters to create stock promotions.

399.   Plaintiffs and the Class reasonably relied upon the integrity of the market in which RenovaCare securities traded.

400.    During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased RenovaCare securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

401.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of RenovaCare securities during the Class Period.

402.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of RenovaCare securities during the Class Period.

## COUNT IV
### (Violations of Section 20(a) of the Exchange Act
### Against Defendants Rayat, Bold, and Betancourt)

403.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

404.    Defendants Rayat, Bold, and Betancourt acted as controlling persons of RenovaCare and/or StreetAuthority within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the

Company and/or StreetAuthority's operations and intimate knowledge of the false

financial statements filed by the Company with the SEC and disseminated to the

investing public, Defendants Rayat, Bold, and Betancourt had the power to

influence and control and did influence and control, directly or indirectly, the

decision-making of the Company and/or StreetAuthority, including the content and

dissemination of the various statements which Lead Plaintiff contends are false and

misleading. By virtue of their high-level positions, Defendants Rayat, Bold, and

Betancourt had the power and authority to cause and prevent the Company and/or

StreetAuthority from engaging in the conduct complained of herein.

405.    In particular, Defendants Rayat, Bold, and Betancourt had direct and

supervisory involvement in the day-to-day operations of the Company and/or

StreetAuthority and, therefore, had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised

the same.

406.    As set forth above, Defendants Rayat, Bold, and/or Betancourt, along

with the other Defendants, each violated Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this

Complaint. By virtue of their position as controlling persons, Defendants Rayat,

Bold, and Betancourt are liable pursuant to Section 20(a) of the Exchange Act. As

a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff

and other members of the Class suffered damages in connection with their

purchases of the Company's securities during the Class Period.

### COUNT V
**(Violations of Section 20(b) of the Exchange Act**
**Against Rayat, Bhogal, Sidhu, and Fleming)**

407.   Lead Plaintiff repeats and re-alleges each and every allegation

contained above as if fully set forth herein.

408.   Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b), precludes any

person, directly or indirectly, from doing any act which would be unlawful under

the Exchange Act for such person to do, through or by means of any other person.

409.   By engaging in the conduct alleged in this Complaint, specifically by

knowingly or recklessly using StreetAuthority, a series of investor relations

consultants, and each other to promote RenovaCare common stock while intending

to sell and selling, arranging for payments to StreetAuthority to be made through a

series of third-party investor relations consultants for the fraudulent purpose of

concealing Rayat's and the company's involvement in the StreetAuthority

promotional campaign, organizing a false promotion of RenovaCare through

StreetAuthority, enabling Rayat to maintain a financial interest in the Defendants'

RenovaCare share sales, and concealing Rayat, Bhogal, Sidhu, and Fleming's

beneficial ownership, intent to sell, and/or sales of RenovaCare common stock,

Rayat, Bhogal, Sidhu, and Fleming, directly or indirectly, violated Section 20(b) of

the Exchange Act. These acts, done directly and/or indirectly through and by means of the third-party promoters, investor relations consultants, and each other, violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

410.   By reason of the foregoing, Rayat, Bhogal, Sidhu, and Fleming directly or indirectly, singly or in concert, have violated, and unless restrained and enjoined will continue to violate Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XIV.  DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated:  December 15, 2022

Respectfully submitted,

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

 */s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile:  (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for the Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (admitted *Pro Hac Vice*)
Wesley A. Wong
Lucas E. Gilmore
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
wesleyw@hbsslaw.com
lucasg@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*Pro Hac Vice*)
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

172

**POMERANTZ LLP**
Thomas H. Przybylowski
Jeremy A. Lieberman
(admitted *pro hac vice*)
J. Alexander Hood II
(admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
tprzybylowski@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff Diana Deidan*