**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE RENOVACARE, INC. SECURITIES LITIGATION | Case No. 2:21-cv-13766-BRM-ESK<br><br>Motion Date: January 16, 2024<br>**Oral Argument Requested** |

**PLAINTIFFS' OMNIBUS OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

**LITE DEPALMA GREENBERG**
**& AFANADOR, LLC**
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (admitted *pro hac vice*)
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

*(additional counsel on signature page)*

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .........................................................................................................1

II.  SUMMARY OF THE FRAUD ....................................................................................2

     A.   RenovaCare's Business.......................................................................................2

     B.   Defendants' Fraud..............................................................................................2

          1.   Defendants laid the groundwork for their pump-and-dump
               scheme by conducting insider sales, opening brokerage
               accounts, and registering shares for sale between 2007 and
               2017.........................................................................................................2

          2.   After accumulating and registering RenovaCare shares,
               Defendants developed an aggressive investor relations program
               and scalped their shares. ........................................................................3

               a.   Defendants developed a robust investor relations
                    program to pump a company with no products and no
                    revenue. ......................................................................................3

               b.   Rayat solicited StreetAuthority to promote RenovaCare.................4

               c.   Rayat concealed payments to StreetAuthority by
                    funneling money through undisclosed third-party
                    investor relations companies and providing inadequate
                    disclosures....................................................................................5

               d.   The promotional campaign touted materially false
                    statements and thereby inflated RenovaCare's stock
                    price.............................................................................................6

               e.   The Promotions Campaign inflated RenovaCare's stock
                    price, and Defendants quickly began dumping their
                    shares............................................................................................6

               f.   RenovaCare and Rayat issued a materially false press
                    release denying any involvement in the Promotions
                    Campaign when confronted by OTC Markets Group,
                    Inc. ..............................................................................................7

               g.   Defendants issued reassurances, denied any
                    wrongdoing, and threatened legal action for defamation

while they continued perpetrating their pump-and-dump scheme.............................................................................9

3.  RenovaCare misrepresented the effectiveness of its disclosure controls throughout the Class Period. .........................................12

C.  Defendants' wrongdoing earned them millions of dollars.................................12

1.  Defendants sold millions of shares during the pump-and-dump scheme................................................................................12

2.  Rayat violated ethics policies by failing to reveal promotional activities. ............................................................................13

D.  The façade begins to crumble. .................................................................13

1.  Defendants admitted ineffective disclosure controls and ineffective procedures.................................................................13

2.  The truth emerged when the SEC charged RenovaCare with securities fraud. .....................................................................13

III.  STANDARD OF REVIEW ...........................................................................14

IV.  ARGUMENT.............................................................................................14

A.  Plaintiffs' claims are not time-barred because the statute of limitations period started when the SEC filed its complaint in June 2021. ...........................14

1.  Defendants bear the burden of establishing a statute of limitations defense. ......................................................................15

2.  Plaintiffs discovered their claims when the SEC filed its complaint in May 2021. ...................................................................17

3.  None of the pre-critical date events cited by Defendants triggered inquiry notice...........................................................20

a.  Defendants' reassurances and denials dissipated any purported storm warnings in early 2018. ......................................20

b.  The April 2019 internal control weakness disclosure did not mention the undisclosed promotional campaign or provide any evidence supporting scienter.....................................23

4.  The statute of repose did not begin to run against Sidhu until the date of the last wrongful act alleged against him................................24

B.      Plaintiffs adequately allege market manipulation in violation of Section 9(a)(2). .................................................................................................25

      1.      The SAC alleges that Bhogal engaged in manipulative trading activity for the purpose of inducing others to purchase or sell RenovaCare stock. ...................................................................................26

      2.      The SAC alleges that Bhogal and Sidhu's manipulative trading affected the stock price. ...............................................................................28

C.      Plaintiffs adequately allege that Defendants made materially false and misleading statements and omissions of material facts. ........................................30

      1.      The SAC alleges that Rayat and Bhogal are liable for making false and misleading statements and material omissions. ..........................30

            a.      Rayat and Bhogal were "makers" of the January 8 Press Release Statements......................................................................30

            b.      RenovaCare, Rayat, and Bhogal had a duty to disclose the stock promotion campaign. ......................................................32

                (1)      Rayat, RenovaCare, and Bhogal had a duty to disclose the stock promotion campaign to make the January 8 Press Release not misleading. ......................................................33

                (2)      Rayat and RenovaCare had a duty to disclose the stock promotion campaign because they controlled it. ...............34

      2.      Capitol Information Group .......................................................................37

D.      Plaintiffs adequately allege that Defendants perpetrated a pump-and-dump scheme in violation of Rules 10b-5(a) and (c).............................................37

      1.      The SAC alleges a pump-and-dump scheme that extends beyond Defendants' false and misleading statements and omissions....................................................................................................38

      2.      Plaintiffs adequately allege a scheme liability claim against Sidhu. .....................................................................................................42

            a.      The SAC alleges that Sidhu engaged in deceptive conduct in violation of Rules 10b-5(a) and (c). ............................42

            b.      The SAC adequately alleges that Sidhu's actions caused Plaintiffs' losses. ...........................................................................43

E.    Plaintiffs adequately allege that Capitol Information Group is liable for securities fraud violations committed by StreetAuthority. ....................................44

    1.    The Asset Purchase Agreement is neither properly authenticated nor integral to the SAC. .......................................................44

    2.    CIG's arguments regarding successor liability are premature. ..................46

    3.    Plaintiffs are entitled to the fraud-on-the-market presumption and *Affiliated Ute* presumption. ..................................................47

        a.    Plaintiffs are entitled to the fraud-on-the-market presumption because they allege that RenovaCare stock traded on an efficient market. ...........................................48

        b.    Plaintiffs are entitled to the *Affiliated Ute* presumption. ...............50

F.    Plaintiffs state claims for control person and Section 20(b) liability because they allege underlying violations of the securities laws............................51

    1.    Plaintiffs state a control person liability claim because they allege underlying violations of the Exchange Act. ....................................51

    2.    Courts recognize a private right of action under Section 20(b). .................52

G.    Plaintiffs state claims against Treadstone and Blackbriar as relief defendants. ........................................................................................53

V.    CONCLUSION..........................................................................................53

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alki Partners, L.P. v. Vatas Holding GmbH*,
769 F. Supp. 2d 478 (S.D.N.Y. 2011)..................................................................................49

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Cap. Mgmt., L.P.*,
435 F.3d 396 (3d Cir. 2006)..............................................................................................16

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................................38

*Barcelo v. Teva Pharms. USA, Inc.*,
2020 WL 1666116 (S.D. Tex. Apr. 2, 2020)........................................................................46

*Bethel v. Jendoco Constr. Corp.*,
570 F.2d 1168 (3d Cir. 1978)..............................................................................................22

*Blount v. Conn. Gen. Life Ins. Co.*,
2002 WL 31974405 (D. Or. July 2, 2002)............................................................................45

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................................48

*Casco v. Ponzios RD, Inc.*,
2021 WL 3124321 (D.N.J. July 23, 2021)............................................................................37

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ......................................................................21

*Cohen v. Citibank, N.A.*,
954 F. Supp. 621 (S.D.N.Y. 1996)......................................................................................52

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010)..................................................................................28

*Cortina v. Anavex Life Scis. Corp.*,
2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ......................................................................36

*In re CytRx Corp. Sec. Litig.*,
2015 WL 5031232 (C.D. Cal. July 13, 2015)........................................................................41

*In re Data Access Sys. Sec. Litig.*,
103 F.R.D. 130 (D.N.J. 1984)............................................................................................49

*DeMarco v. Lehman Bros., Inc.*,
   309 F. Supp. 2d 631 (S.D.N.Y. 2004)................................................................19

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................21

*In re Exxon Mobil Corp. Sec. Litig.*,
   500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007)......................................25

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
   843 F.3d 1257 (11th Cir. 2016) ................................................................36, 41

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ................................................................40

*Garcia v. Fannie Mae*,
   794 F. Supp. 2d 1155 (D. Or. 2011) ................................................................45

*GFL Advantage Fund, Ltd. v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001)................................................................43

*Giles v. Phelan, Hallinan & Schmieg, LLP*,
   901 F. Supp. 2d 509 (D.N.J. 2012) ................................................................45

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ................................................................31

*Harris v. Diamond Dolls of Nevada, LLC*,
   2021 WL 5862741 (D. Nev. Nov. 24, 2021) ................................................................45

*He v. China Zenix Auto Int'l Ltd.*,
   2020 WL 3169506 (D.N.J. June 12, 2020)................................................................26

*Hicks v. N.J. Dep't of Corr.*,
   2019 WL 5587324 (D.N.J. Oct. 30, 2019)................................................................37

*In re Honeywell Int'l Inc. Sec. Litig.*,
   211 F.R.D. 255 (D.N.J. 2002)................................................................48

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017)................................................................49

*Hull v. Glob. Digital Sols., Inc.*,
   2018 WL 4380999 (D.N.J. Sept. 14, 2018) ................................................................48

*JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*,
   997 F. Supp. 2d 710 (E.D. Mich. 2014)................................................................40

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)..................................................................................30, 34, 52

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997)..................................................................................37

*JPMorgan Chase Bank, N.A. v. Javice*,
    2023 WL 4546409 (D. Del. July 13, 2023) .............................................................30

*Klumpp v. Bandit Indus., Inc.*,
    113 F. Supp. 2d 567 (W.D.N.Y. 2000) ....................................................................46

*LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*,
    318 F.3d 148 (2d Cir. 2003)....................................................................................17

*Marton v. Carosella & Russo Enters., Inc.*,
    2015 WL 9287036 (E.D. Pa. Sept. 23, 2015) .........................................................45

*McCullough v. Advest, Inc.*,
    2017 WL 3675787 (W.D. Pa. Aug. 25, 2017) .........................................................25

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
    543 F.3d 150 (3d Cir. 2008).............................................................................. *passim*

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)....................................................................................16, 17, 24

*Metro Container Grp. v. AC&T Co., Inc.*,
    2023 WL 2955888 (E.D. Pa. Apr. 14, 2023) ..........................................................47

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)......................................................................41

*N. Sound Cap. LLC v. Merck & Co., Inc.*,
    2015 WL 5055769 (D.N.J. Aug. 26, 2015) .............................................................25

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ................................................................................34, 36

*Oppenheimer v. Prudential Sec. Inc.*,
    94 F.3d 189 (5th Cir. 1996) .....................................................................................46

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000).....................................................................................18

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization
    Transactions, Inc.*,
    730 F.3d 263 (3d Cir. 2013)......................................................................15, 17, 19, 21

*Phillips v. Cty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008)..................................................................................14

*Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*,
2023 WL 4173010 (D.N.J. June 26, 2023) .....................................................46, 47

*Rabin v. NASDAQ OMX PHLX LLC*,
712 F. App'x 188 (3d Cir. 2017) ...........................................................................50

*Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*,
449 F. Supp. 3d 449 (D.N.J. 2020) ..................................................................44, 45

*Ryan v. Rexworks, Inc.*,
2008 WL 4066363 (D.N.J. Aug. 26, 2008) ...........................................................47

*S.E.C. v. Amah*,
2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023).......................................................32

*S.E.C. v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998)...................................................................................53

*S.E.C. v. Chiase*,
2011 WL 6176209 (D.N.J. Dec. 12, 2011).............................................................53

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................................................................40

*S.E.C. v. Competitive Techs., Inc.*,
2005 WL 1719725 (D. Conn. July 21, 2005) .........................................................27

*S.E.C. v. Curshen*,
888 F. Supp. 2d 1299 (S.D. Fla. 2012) .............................................................37, 40

*S.E.C. v. Dynkowski*,
2015 WL 12851237 (D. Del. July 29, 2015) ..........................................................38

*S.E.C. v. Fiore*,
416 F. Supp. 3d 306 (S.D.N.Y. 2019).....................................................................40

*S.E.C. v. Gallagher*,
2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023)........................................................26

*S.E.C. v. GPL Ventures LLC*,
2022 WL 158885 (S.D.N.Y. Jan. 18, 222) .............................................................41

*S.E.C. v. Hwang*,
2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023).......................................................27

*S.E.C. v. J.W. Barclay & Co.*,
442 F.3d 834 (3d Cir. 2006)..................................................................................53

*S.E.C. v. Lek Sec. Corp.*,
276 F. Supp. 3d 49 (S.D.N.Y. 2017)................................................................26, 28

*S.E.C. v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ......................................................................................41

*S.E.C. v. Rivero*,
2023 WL 2238700 (D.N.J. Feb. 27, 2023) ..............................................................33

*S.E.C. v. SeeThruEquity, LLC*,
2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)...........................................................41

*S.E.C. v. Stringer*,
2003 WL 23538011 (D. Or. Sept. 3, 2003) .............................................................52

*S.E.C. v. Vuuzle Media Corp.*,
2023 WL 4118438 (D.N.J. June 22, 2023) ..............................................................53

*S.E.C. v. Zvodihikov*,
2020 WL 634184 (D.N.J. Feb. 10, 2020) .................................................................52

*Schiro v. Cemex, S.A.B. de C.V.*,
438 F. Supp. 3d 194 (S.D.N.Y. 2020)......................................................................24

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .............................................................48, 49

*Snyder v. Farnam Cos., Inc.*,
792 F. Supp. 2d 712 (D.N.J. 2011) .........................................................................46

*In re SolarWinds Corp. Sec. Litig.*,
595 F. Supp. 3d 573 (W.D. Tex. 2022).....................................................................34

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
404 U.S. 6 (1971)....................................................................................................52

*Swack v. Credit Suisse First Boston*,
383 F. Supp. 2d 223 (D. Mass. 2004) ......................................................................41

*Takata v. Riot Blockchain, Inc.*,
2020 WL 2079375 (D.N.J. Apr. 30, 2020) ..............................................................42

*Teachers' Ret. Sys. of La. v. Qwest Commc'ns Int'l Inc.*,
2005 WL 2359311 (D. Colo. Sept. 23, 2005)..........................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................14

*U.S. v. Schiff*,
  538 F. Supp. 2d 818 (D.N.J. 2008) ......................................................................33

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*,
  2014 WL 7179989 (S.D.N.Y. Dec. 10, 2014) .......................................................52

*Weikel v. Tower Semiconductor Ltd.*,
  183 F.R.D 377 (D.N.J. 1998)................................................................................46

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007)..................................................................................50

*Xu v. Direxion Shares ETF Trust*,
  2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023)..................................................28, 29

*Xu v. Gridsum Holding Inc.*,
  624 F. Supp. 3d 352 (S.D.N.Y. 2022)...................................................................30

*York Cty. on Behalf of Cty. of York Ret. Fund v. HP, Inc.*,
  65 F.4th 459 (9th Cir. 2023) ...........................................................................16, 19

*In re ZZZZ Best Sec. Litig.*,
  864 F. Supp. 960 (C.D. Cal. 1994) .......................................................................41

**STATUTES**

15 U.S.C. § 77q(b) ......................................................................................................50

15 U.S.C. § 78i(a)(2)...................................................................................................25

**OTHER AUTHORITIES**

111 P.L. 203, 929P(c) .................................................................................................52

*S.E.C. v. Rayat, et al.*,
  No. 1:21-cv-4777, ECF No. 249 (S.D.N.Y. Oct. 17, 2023)......................................1

*Takata v. Riot Blockchain, Inc.*,
  No. 3:18-cv-02293, ECF No. 251 (D.N.J. Aug. 25, 2023)......................................41

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| Class Period | August 14, 2017, to May 28, 2021 (date inclusive) |
| Complaint | Second Amended Complaint filed December 15, 2022, ECF No. 91 |
| ¶ __ | Complaint, ¶ __. |
| RenovaCare MTD Mem. | Memorandum of Law in Support of Defendants RenovaCare, Inc., Harmel Rayat, Jatinder Bhogal and 1420527 Alberta Ltd.'s Motion to Dismiss the Second Amended Complaint, ECF No. 135-1 |
| CIG MTD Mem. | Defendant Capitol Information Group, Inc.'s Memorandum of Law in Support of Motion to Dismiss, ECF No. 136-1 |
| Sidhu MTD Mem. | Memorandum of Law in Support of the Motion to Dismiss by Defendants Jeetenderjit Singh Sidhu, Treadstone Financial Group LLC, and Blackbriar Asset Management Ltd., ECF No. 137-1 |
| RenovaCare Defendants | Defendants RenovaCare, Inc., Harmel Rayat, Jatinder Bhogal and 1420527 Alberta Ltd., collectively |
| CIG | Defendant Capitol Information Group, Inc. |
| Sidhu Defendants | Defendants Jeetenderjit Singh Sidhu, Treadstone Financial Group LLC, and Blackbriar Asset Management Ltd., collectively |

## I.    INTRODUCTION

In deciding Defendants' three motions to dismiss, the Court is presented with the following primary issues:

- The statute of limitations begins to run when a reasonably diligent plaintiff has inquiry notice of the facts constituting a securities violation. When questions arose in early 2018 about the Predictions Campaign, Defendants vigorously (and falsely) denied any connection to the campaign. Did their protestations dissipate any purported storm warnings and thereby prevent a reasonably diligent plaintiff from discovering all elements of a securities claim at that time?

- Section 9(a)(2) of the Securities Act prohibits securities transactions conducted to affect a security's price and induce others to trade it. Plaintiffs allege that, as part of the Predictions Campaign, Bhogal and Sidhu intentionally engaged in coordinated trading activity that artificially inflated RenovaCare's stock price and stimulated trading activity. Do these allegations state a market manipulation claim?

- To be liable for false and misleading statements and material omissions, a defendant must have "ultimate authority" over the statement. Plaintiffs allege that Rayat and Bhogal exercised ultimate authority over, and therefore were "makers" of, RenovaCare's statements and the Predictions Campaign, giving them a duty to disclose material information to make their statements not misleading. Were Rayat and Bhogal "makers" of RenovaCare's statements and the Predictions Campaign?

As Plaintiffs explain below, the answer to all three of these questions is "yes." And in answering them, this brief will illustrate how Defendants fail to satisfy their burden to dismiss any of the SAC's other claims, including scheme liability, control person liability, and Section 20(b) liability, and disgorgement of ill-gotten gains from the relief defendants.[1] Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss.

---

[1] Despite challenging Plaintiffs' claims in this case, the Sidhu Defendants have entered into a consent judgment in a related SEC case that requires Sidhu to pay $2,650,000 and enjoins him from violating various provisions of the securities laws, including Sections 9(a)(2), 10(b), 17(a), 20(b), 20(e), and 21(d)(2). *See* Judgment, *S.E.C. v. Rayat, et al.*, No. 1:21-cv-4777, ECF No. 249 (S.D.N.Y. Oct. 17, 2023).

## II.    SUMMARY OF THE FRAUD

### A.    RenovaCare's Business

RenovaCare is a company with no revenue and no commercialized products, whose common stock is traded on the over-the-counter ("OTC") market. ¶¶ 60–63. Rayat has been the company's majority and controlling shareholder since 1999. ¶ 61.

In July 2013, RenovaCare purchased the CellMist System, purportedly consisting of a treatment method for skin burns (the "CellMist Solution") and a "SkinGun" medical device to apply the CellMist Solution to patients. ¶¶ 60, 63. RenovaCare is no longer is conducting research and development on the CellMist System, which never received regulatory approval and is operated by a single full-time employee and three part-time contractors. ¶¶ 63, 64, 66. Rayat currently serves as RenovaCare's interim President, CEO, CFO, and Secretary. ¶ 65.

### B.    Defendants' Fraud

Defendants' scheme ran from 2007 until February 2018, proceeding in phases. ¶¶ 67–71.

### 1.    Defendants laid the groundwork for their pump-and-dump scheme by conducting insider sales, opening brokerage accounts, and registering shares for sale between 2007 and 2017.

The scheme's first phase involved Defendants' accumulation of millions of dollars' worth of RenovaCare shares at below-market prices through coordinated related-party transactions. ¶ 72. From 2007 until 2013, Rayat, Bhogal, Sidhu, and Defendant Sharon Fleming engaged in a series of transactions and loans that allowed Bhogal and Sidhu to acquire millions of RenovaCare shares for little or no money, while Rayat maintained a financial interest in any later sale of those shares. ¶¶ 73–75. Rayat, Bhogal, Sidhu, and Fleming also coordinated the opening and use of brokerage accounts to hold the RenovaCare shares that they were accumulating in advance of the pump-and-dump. ¶¶ 79–94. Sidhu provided advice and maintained Bhogal's and Rayat's accounts, along with his own, including by monitoring the

accounts and transferring shares among entities and accounts. ¶¶ 79–82, 84, 88–90. Several years then passed, until in 2017, in the months preceding the pump-and-dump scheme, Defendants engaged in transactions to accumulate additional stock at below-market prices and simultaneously provide RenovaCare with the cash necessary to execute the pump-and-dump. ¶¶ 76–78.

In June 2017, at Bhogal's and Sidhu's request, RenovaCare caused approximately nine million shares owned by Bhogal, Sidhu, and Fleming to be registered for resale, freeing Defendants to trade their shares as they pleased. ¶¶ 84–88.

**2.     After accumulating and registering RenovaCare shares, Defendants developed an aggressive investor relations program and scalped their shares.**

The scheme's next phase was to aggressively promote RenovaCare while selling its shares, a practice known as "scalping." ¶ 95.

**a.     Defendants developed a robust investor relations program to pump a company with no products and no revenue.**

Despite RenovaCare's lack of a marketable product, Rayat and Bhogal developed a robust investor relations operation within RenovaCare that included a company website and a steady stream of optimistic press releases touting the company's prospects. ¶ 96. Rayat and Bhogal also hired and worked with multiple third-party consultants, through whom they orchestrated, funded, and directed a paid promotional campaign. ¶ 96, 101–03. Sidhu discussed the investor relations strategy to increase the share price. ¶ 102.

Bhogal had primary responsibility for building and managing RenovaCare's investor relations and public relations operations. ¶ 98. He regularly communicated with other Defendants, attended RenovaCare board meetings, developed its website, directed the timing and content of RenovaCare's press releases, and coordinated the various companies that were being paid to tout RenovaCare's stock. ¶¶ 98–106. For example, Bhogal ensured that RenovaCare's

press releases coincided with third-party promotional activity, and he organized weekly conference calls with RenovaCare's CEO and a third-party investor relations consultant to discuss the investor relations program, build content for RenovaCare's website, and map out RenovaCare's press releases over the ensuing months. ¶ 105. Sidhu worked on the promotional materials. ¶ 131.

### b.    Rayat solicited StreetAuthority to promote RenovaCare.

In July 2017, Rayat solicited StreetAuthority, an online financial newsletter publisher, for a promotional campaign designed to increase RenovaCare's stock price and trading volume. ¶¶ 108–09. Defendant Lou Betancourt, StreetAuthority's CEO, was a long-time friend of Rayat and a RenovaCare shareholder. ¶ 108. Over the next six weeks, Rayat, Betancourt, and other StreetAuthority employees hatched a plan whereby Rayat's companies would pay StreetAuthority monthly to tout the companies' stocks in its annual "Predictions Report" and through native online advertisements. ¶¶ 110–16.

Unbeknownst to investors, Rayat, Bhogal, Sidhu, and Fleming were closely involved in managing the campaign's development and execution, providing StreetAuthority with extensive information on RenovaCare and the SkinGun and working directly with StreetAuthority to create promotional materials. ¶¶ 131–33. These materials came from Rayat and Bhogal via emails, attachments, and links to content from RenovaCare's investor relations program, which all were developed under Bhogal's supervision. ¶¶ 134–35. Rayat personally reviewed and commented on draft promotional materials, including the Predictions Report that was at the campaign's core, prior to their release. ¶ 136.

Rayat's direct involvement continued throughout the Predictions Campaign. ¶¶ 137–45. Specifically, Rayat received reports regarding the campaign's performance, weighed in on content, stopped and started the advertising "spend" based on external events, and arranged for

RenovaCare's monthly payments to StreetAuthority to be routed through third-party companies. ¶¶ 137–38. He also remained closely involved in the drafting, distribution, and dissemination of promotional materials by giving feedback and explicit instructions, linking future payments to StreetAuthority with adherence to his orders. ¶¶ 140–45.

Three confidential witnesses corroborated details of Rayat's solicitation of StreetAuthority and his involvement in creating and paying for the Predictions Report. ¶¶ 117–30.

    **c.**     **Rayat concealed payments to StreetAuthority by funneling money through undisclosed third-party investor relations companies and providing inadequate disclosures.**

Throughout the campaign, RenovaCare and Rayat concealed payments to StreetAuthority by funneling money through undisclosed third-party investor relations companies and providing inadequate disclosures. ¶¶ 158, 177–78. Instead of invoicing RenovaCare directly for its work, StreetAuthority invoiced a series of third parties to obscure the link between StreetAuthority and RenovaCare. ¶¶ 159–67. The contracts between RenovaCare and these third parties made clear that the only services the companies provided were preparation of invoices and routing of payments from RenovaCare to StreetAuthority. ¶¶ 162–68. Throughout, Rayat and Bhogal remained StreetAuthority's primary sources of information regarding RenovaCare. ¶¶ 162–68.

Rayat and Bhogal personally controlled the content of StreetAuthority's disclaimers, which repeatedly failed to disclose RenovaCare's funding of the Predictions Campaign. ¶¶ 166–74. Instead, the disclaimers misleadingly claimed that StreetAuthority had "not receive[d] any direct cash payments" for its promotion of RenovaCare. ¶¶ 171–72. Further, the disclaimers omitted the material fact that the payments were concealed by Defendants' use of third parties as conduits. ¶ 173. Some promotional materials did not include any disclaimers at all. ¶ 174.

Despite having the authority and control to correct the materially false and misleading disclaimers, Rayat took no steps to do so. ¶¶ 175–76.

> **d.      The promotional campaign touted materially false statements and thereby inflated RenovaCare's stock price.**

StreetAuthority's Predictions Campaign consisted of outright false statements, provided by Rayat, regarding the SkinGun's efficacy and the likelihood of FDA approval. ¶¶ 179–90. Among the most egregious lies pushed by the Predictions Campaign involved photographs purporting to show the SkinGun's effects in healing a patient's severe burn wounds in only three days. ¶¶ 180–81. Despite actual knowledge of their falsity, Rayat provided StreetAuthority with these photographs and the false claims that the SkinGun healed the patient's wounds in three days, and he did nothing to set the record straight. ¶¶ 182–83, 186, 190. No one at StreetAuthority questioned the veracity of Rayat's photographs or claims before publishing them. ¶¶ 120–121, 126. Rayat also personally approved draft promotional materials claiming that RenovaCare had submitted a 510(k) filing to the FDA permitting the marketing of a medical device, despite actual knowledge that RenovaCare did not have such a filing pending with the FDA. ¶¶ 184–89.

> **e.      The Promotions Campaign inflated RenovaCare's stock price, and Defendants quickly began dumping their shares.**

The Predictions Campaign had its intended effect of inflating RenovaCare's stock price. ¶ 191. Internet users clicked on tens of thousands of RenovaCare ads associated with the campaign, and RenovaCare stock saw increases in volume and price that corresponded with the campaign's timing. ¶¶ 192–93. When the StreetAuthority promotion went live on October 24, 2017, RenovaCare stock traded at around $3 per share, and its daily trading volume was about 10,000 shares per day. ¶ 195. Two weeks later, on November 7, 2017, RenovaCare stock had risen to nearly $4 per share (up about 30%), and trading volume was over 60,000 shares (up

about 500 percent). ¶ 195. By early January 2018, RenovaCare's share price had risen approximately 58 percent since the day before the campaign started. ¶ 193.

Defendants quickly took advantage of their stock pump. ¶ 194. Their coordinated trading behavior, which tracked the Predictions Campaign, demonstrates their knowing participation in the scheme. ¶ 196. Between November 8 and December 7, 2017, Bhogal and Sidhu sold more than 100,000 shares at historically high prices. ¶¶ 196–97. Then, when Rayat directed StreetAuthority to pause advertising in early December, Bhogal and Sidhu stopped trading on December 8. ¶ 198. When Rayat instructed StreetAuthority to resume advertising on December 11, Bhogal, Sidhu, and Fleming began selling again, offloading almost 170,000 additional shares to unsuspecting purchasers between December 18, 2017, and January 3, 2018. ¶¶ 199–200. Other allegations further demonstrate Bhogal and Sidhu's knowledge of the Predictions Campaign. ¶¶ 202–03.

> **f.    RenovaCare and Rayat issued a materially false press release denying any involvement in the Promotions Campaign when confronted by OTC Markets Group, Inc.**

OTC Markets Group, Inc. ("OTC Markets"), the entity that supervised the exchange on which RenovaCare's stock was listed, learned of StreetAuthority's ongoing promotion of RenovaCare on January 2, 2018. ¶ 207. Consistent with its strict disclosure policies regarding company promotions, OTC Markets sent a letter to RenovaCare on January 3, 2018, requiring the company to make public disclosures relating to StreetAuthority's ongoing promotional activities. ¶¶ 208–14.

Upon receipt of the letter, Rayat immediately instructed StreetAuthority to pause the Promotions Campaign, organized multiple conference calls that same day with Bhogal and others to discuss RenovaCare's response to the inquiry, and assembled a team to work on a draft press release responding to OTC Markets. ¶¶ 215–19. At the same time, Bhogal, Sidhu, and

Fleming stopped trading RenovaCare shares. ¶ 216. By the following day, Rayat, Bhogal, and others had begun drafting a press release, which Rayat, in coordination with Bhogal, continued to hone over the following days. ¶¶ 219–221. Bhogal also coordinated with the Company's investor relations consultant on the response. ¶ 219. In the days leading up to the press release's publication, Rayat and Bhogal participated in several conference calls with RenovaCare's CEO and its director and outside counsel to strategize about the draft press release. ¶¶ 218–21. Rayat was instrumental in drafting and disseminating the press release because he had the knowledge required to respond to OTC Markets' inquiry: he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with StreetAuthority to create and disseminate the promotional content. ¶ 217.

On January 8, 2018, Rayat emailed RenovaCare's CEO a final version of the draft press release, instructing the Company to add certain boilerplate language to the draft. ¶ 222. A few minutes later, RenovaCare's CEO forwarded Rayat's version of the press release to the Company's investor relations consultant, relaying Rayat's instructions regarding the boilerplate language. ¶ 222.

Rayat also controlled the timing of the press release's publication, instructing RenovaCare to issue the January 8 Press Release at 3:45 p.m., shortly before market close, to limit its impact. ¶ 225. Bhogal assisted with disseminating the press release and coordinated with the investor relations consultant to correct an issue with the timing. ¶ 225.

The release forcefully denied any culpability. It claimed, *inter alia*:

- RenovaCare "had no editorial control over the content" of the campaign.

- RenovaCare was "not affiliated in any way with the authors of the annual predictions report or its publisher."

- "[T]he substance of the material statements pertaining to the Company's technology and products are not materially false or misleading."

- RenovaCare and its officers, directors, controlling shareholder, and third-party service providers had "not been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual predictions report."

- RenovaCare "was not involved in the creation, or directing the dissemination, of the report."

¶¶ 226–34. The press release—which indicated the Company had sought information from controlling shareholders, such as Rayat—also omitted specific information requested by OTC Markets, including the date on which RenovaCare became aware of the promotional activity. ¶¶ 226, 235. Despite these blatant falsehoods and omissions, RenovaCare publicly filed a Form 8-K with the SEC on January 12, 2018, which attached a copy of the press release without correction or amendment. ¶ 243.

        g.    **Defendants issued reassurances, denied any wrongdoing, and threatened legal action for defamation while they continued perpetrating their pump-and-dump scheme.**

While Rayat and Bhogal were working on a response to OTC Markets' January 3, 2018 inquiry, they simultaneously were preparing to restart the Predictions Campaign. ¶¶ 262–63. To conceal RenovaCare's link to the campaign, Rayat and Bhogal tweaked the promotional materials to support their claim that the materials were based on publicly available information. ¶ 263.

At Rayat's instruction, the Predictions Campaign went live again on January 22, 2018. ¶¶ 263–64. Beginning on January 22, and continuing for the next several weeks, Bhogal, Sidhu,

and Fleming sold hundreds of thousands of shares, with trades occurring on most trading days during that period. ¶¶ 266–69.

This trading continued until February 7, 2018, when RenovaCare received an inquiry from an online financial media company questioning aspects of RenovaCare's scheme. ¶ 270. Rayat, Bhogal, and others immediately prepared a draft press release attacking the media company's credibility. ¶ 271.

On February 8, 2018, the online media company published its critical article. ¶ 272. Then, on February 12, 2018, another investigative reporting website published an article questioning RenovaCare's dubious practices and its response to the OTC Markets letter regarding the Predictions Campaign. ¶¶ 248–54.

In response, Rayat and Bhogal directed RenovaCare to issue a scathing press release on February 12, 2018, flatly denying any wrongdoing whatsoever. ¶ 272. RenovaCare accused the investigative reporting website of being an "Admitted Short-Seller . . . Affiliated with Felon Convicted of Securities Fraud" and undertaking "irresponsible and nefarious actions" designed to "damage the public trust" by "spreading 'short and distort' commentary" about the company and reiterated RenovaCare's supposed "incredible strides" and the upcoming "major milestone" of an initial FDA filing. ¶¶ 255-56.

Defendants were not finished: on March 5, 2018, RenovaCare issued another press release, this time attacking the investigative website for "engag[ing] in an ongoing smear campaign of disseminating grossly misleading, inaccurate and distorted facts and misinformation, including false allegations of insider seller" to "disparage the good reputation of RenovaCare and thereby enhancing their profit at the expense of Company stockholders." ¶¶ 257, 259. The company also threatened legal actions against the investigative website with

- 10 -

both FINRA and the SEC. ¶¶ 258. Lastly, RenovaCare stated in no uncertain terms: "RenovaCare confirms that none of its officers and directors have ever sold any Company shares; and, its majority stockholder, Kalen Capital Corporation, has not sold any Company shares since 2008." ¶ 260.

Defendants also employed other means of counteracting the negative news story in between its two press releases, including by doubling StreetAuthority's promotional budget for the Predictions Campaign beginning on February 8 and issuing press releases on February 15 and 21, announcing a "successful FDA meeting" and a "patent victory," respectively, despite both events having occurred the year prior. ¶¶ 273–77. And on February 9, 2018, Sidhu assisted RenovaCare in issuing a new Form S-1 that sought to register for resale over 4.4 million shares held by Rayat, Sidhu, and their associates. ¶ 285.

Throughout the time that Defendants were issuing these reassurances to the market, Sidhu, Bhogal, and Fleming were engaging in manipulative trading to bolster RenovaCare's share price and trading volume. ¶ 278. From February 8 through February 21, 2018, Sidhu and Fleming purchased over 150,000 additional shares of RenovaCare stock, and Bhogal placed additional buy orders (which were never executed) to support RenovaCare's share price. ¶¶ 278–83. As a result of Defendants' reassurances to the market following the negative articles, together with Defendants' manipulative trading, RenovaCare reached an all-time high price of over $10.50 per share on February 21, 2018. ¶ 283. On February 21 and 22, took advantage of these all-time high prices by resuming their coordinated selling of RenovaCare shares. ¶ 284.

On February 23, 2018, OTC Markets downgraded RenovaCare's stock because of the ongoing promotional activity, and RenovaCare's stock price dropped approximately 30 percent,

from $9 per share to $6.28 per share. ¶ 237. Shortly thereafter, Defendants abandoned their scheme and directed StreetAuthority to halt the Predictions Campaign. ¶¶ 286–87.

> **3.    RenovaCare misrepresented the effectiveness of its disclosure controls throughout the Class Period.**

Throughout the Class Period, RenovaCare represented that its disclosure controls were effective while simultaneously failing to publicly disclose its ongoing promotional campaign with StreetAuthority and Betancourt. For example, in Form 10-Qs filed in August and November 2017, RenovaCare did not disclose RenovaCare's ongoing publishing arrangement with StreetAuthority and Betancourt or any risk factors associated with the promotion. ¶¶ 156–57, 204–06. Even the OTC Markets letter failed to chasten Defendants: in a Form 8-K filed on February 27, 2018, and a Form 10-K filed on March 13, 2018, RenovaCare again failed to acknowledge the existence of its relationship with StreetAuthority or the risk factors associated with the promotion. ¶¶ 244–46.

**C.    Defendants' wrongdoing earned them millions of dollars.**

> **1.    Defendants sold millions of shares during the pump-and-dump scheme.**

Defendants' scheme allowed them to sell millions of RenovaCare shares at artificially inflated prices and obtain millions of dollars of ill-gotten gains. ¶¶ 288, 293. On October 23, 2017, shortly before the Predictions Campaign began, RenovaCare stock closed at $3.10 per share. ¶ 289. By January 5, 2018, it had risen to $4.91 per share, and on February 21, 2018, it traded at an all-time high of over $10.50 per share. ¶ 289.

Collectively, Sidhu, Bhogal, and Fleming sold more than one million shares during the Predictions Campaign through at least six separate accounts, collecting more than $7 million in trading proceeds. ¶ 290. Further, between December 2017 and February 2018, Sidhu transferred

another 750,000 shares to accounts outside the United States and then sold at least some of those shares on a U.S.-based exchange. ¶ 291.

While Sidhu, Bhogal, and Fleming engaged in this selling, Rayat continued to maintain millions of dollars of financial interests with Bhogal and Sidhu individually and through other entities that they owned and controlled. ¶ 292. These other entities, including 1420527 Alberta Ltd., Blackbriar Asset Management Ltd., and Treadstone Financial Group, LLC, received ill-gotten funds transferred to them or for their benefit by Defendants, and have no legitimate claim to the ill-gotten funds they directly or indirectly received. ¶¶ 294–97.

**2.      Rayat violated ethics policies by failing to reveal promotional activities.**

Throughout the scheme's duration, Rayat was bound by RenovaCare's Code of Corporate Governance and Ethics and Code of Ethics. ¶¶ 300, 308. By failing to promptly disclose, and by continuing to conceal, RenovaCare's promotional campaign with StreetAuthority, Rayat was in violation of RenovaCare's binding codes of conduct. ¶ 319; ¶¶ 300–320.

**D.      The façade begins to crumble.**

**1.      Defendants admitted ineffective disclosure controls and ineffective procedures.**

On April 12, 2019, RenovaCare filed its 2018 Form 10-K and admitted the ineffectiveness of its disclosure controls and procedures. ¶ 298. Then, on May 14, 2020, RenovaCare filed its 2019 Form 10-K, repeating its admission that its disclosure controls were ineffective. ¶ 299.

**2.      The truth emerged when the SEC charged RenovaCare with securities fraud.**

The truth of Defendants' scheme fully emerged when the SEC issued a litigation release stating that RenovaCare was being charged with securities fraud because of RenovaCare's undisclosed promotional campaign with StreetAuthority. ¶¶ 354–56. On this news,

- 13 -

RenovaCare's stock price fell $0.66, or 24.8%, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021. ¶ 357.

### III.    STANDARD OF REVIEW

In considering a motion to dismiss a securities fraud case, the court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Rather than parse allegations individually, the "court[] must consider the complaint in its entirety" to determine if Plaintiffs' claims are properly stated. *Id.* at 322. Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

### IV.    ARGUMENT

**A.    Plaintiffs' claims are not time-barred because the statute of limitations period started when the SEC filed its complaint in June 2021.**

A securities fraud claim is time-barred if filed more than two years after the date that a reasonably diligent plaintiff would have discovered facts constituting an actionable misrepresentation. Here, a reasonably diligent plaintiff would not have discovered facts constituting falsity and scienter until the SEC issued its litigation release in May 2021. Thus, Plaintiffs' original complaint in July 2021 and amendments in February and December 2022 are not time-barred.

Defendants contend that the relevant facts constituting their securities law violations became known to investors by February 2018 and April 2019, and thus that the statutory time to file ended no later than April 2021, rendering all Plaintiffs' claims time-barred. *See* RenovaCare MTD Mem. at 10–21, CIG MTD Mem. at 26–30, Sidhu MTD Mem. at 7–9. Not so.

- 14 -

Defendants point to multiple purported storm warnings in January and February 2018 that they contend would have alerted a reasonable investor to the facts underlying Plaintiffs' claims, *see* RenovaCare MTD Mem. at 13–19, but fail to mention that they vigorously denied all wrongdoing in response to those warnings. The Third Circuit has held repeatedly that these denials prevent inquiry notice from being triggered. *See, e.g.*, *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 277 (3d Cir. 2013) ("[R]eassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns.") (quoting *Merck*, 543 F.3d at 168 n.14).

Further, RenovaCare's admission of internal controls weaknesses in April 2019 could not have revealed an actionable misrepresentation regarding the undisclosed promotional campaign because the admission did not mention the campaign at all.

Finally, Sidhu argues that the five-year statute of repose bars any claims against him to the extent they are premised on misconduct occurring more than five years before Plaintiffs filed their SAC (*i.e.*, December 15, 2017). Sidhu MTD Mem. at 9–10. But the statute of repose begins to run on the date of the last, not first, alleged wrongful act. Because the SAC alleges specific wrongdoing by Sidhu as late as February 2018, the statute of repose does not bar any of Plaintiffs' claims against Sidhu, all of which were filed before February 2023 (*i.e.*, five years after the last allegation against him).

    **1.**    **Defendants bear the burden of establishing a statute of limitations defense.**

"[B]ecause a statute of limitations is an affirmative defense, 'the burden of establishing its applicability to a particular claim rests with the defendant.'" *Pension Tr. Fund*, 730 F.3d at 271 (quoting *Drennen v. PNC Bank Nat'l Assoc.*, 622 F.3d 275, 292 (3d Cir. 2010)).

To evaluate whether a complaint is time barred, a court first identifies "the critical date," which is the date "two years before th[e] complaint was filed." *Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010). Next, it determines which facts are alleged to have occurred before and after that date. *Id*. at 638–44. Then, the court must determine whether "the facts constituting the violation," including scienter, were discoverable before the critical date. *Id*. at 653–54. A defendant satisfies its burden of establishing a statute of limitations defense by showing "either (1) the plaintiff could have pleaded an adequate complaint based on facts discovered prior to the critical date and failed to do so, or (2) the complaint does not include any facts necessary to plead an adequate complaint that were discovered following the critical date." *York Cty. on Behalf of Cty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 466 (9th Cir. 2023).

In the securities context, discovery depends on "[w]hether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 543 F.3d 150, 161 (3d Cir. 2008), *aff'd sub nom. Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (quoting *Benak ex rel. Alliance Premier Growth Fund v. Alliance Cap. Mgmt., L.P.*, 435 F.3d 396, 400 (3d Cir. 2006)). "[T]he term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further," but "that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" *Merck*, 559 U.S. at 633. "Nothing in the text suggests that the limitations period can sometimes begin before 'discovery' can take place." *Id*. at 651.

New information constitutes a storm warning only when it puts potential plaintiffs "on inquiry notice of actionable misrepresentations under the securities laws." *In re Merck*, 543 F.3d

at 166–67 (citing *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 218 (3d Cir. 2007)). Courts "must analyze the existence of storm warnings relative to [plaintiffs' claims] in order to determine whether [plaintiffs] were on inquiry notice of the alleged fraud." *Id*. at 167.

Importantly for this case, the Third Circuit has held repeatedly that "reassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *Pension Tr. Fund*, 730 F.3d at 277 (quoting *In re Merck*, 543 F.3d at 158 n.14); *see also Benak*, 435 F.3d at 402 n.16 (same); *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) (citing cases) ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management.").

Finally, the Third Circuit's "past inquiry notice decisions have taken into account the market reaction to disclosures that purportedly constitute storm warnings." *In re Merck*, 543 F.3d at 167 (citing cases). A storm warning's impact on share price is relevant "[b]ecause information that is material to reasonable investors is immediately incorporated into the stock price[.]" *Id.* at 168 (citing *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)) (asserting court's "holding is further supported" by fact that defendant's "stock price did not have any significant movement following" the identified disclosure).

### 2.  Plaintiffs discovered their claims when the SEC filed its complaint in May 2021.

Plaintiffs filed their original complaint on July 16, 2021, *see* ECF No. 1, so applying the *Merck* framework, the statute of limitations "critical date" is July 16, 2019. *Cf. Merck*, 559 U.S. at 638. Plaintiffs allege that on May 28, 2021—almost two years after the critical date—the SEC issued a litigation release "stating that RenovaCare was being charged with alleged securities

- 17 -

fraud because of RenovaCare's undisclosed promotional campaign with StreetAuthority." ¶ 354. This litigation release triggered the statute of limitations period because it provided the facts constituting Defendants' securities violations, including falsity and scienter.

The SEC complaint alleged that between July 2017 and January 2018, Rayat "arranged, and caused RenovaCare to pay for, a promotional campaign designed to increase the company's stock price." ¶ 354. The SEC further alleged that in January 2018, when OTC Markets requested that RenovaCare explain its relationship to the promotion, "Rayat and RenovaCare then drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying Rayat's and the company's involvement in the promotion." ¶ 354.

The complaint explained that "Rayat was closely involved in directing the promotion and editing promotional materials" by providing "false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device." ¶ 355. This false information included images of a burn patient who purportedly recovered from severe burns in three days, when in reality, the images were taken five years apart. ¶ 355. The SEC also alleged that RenovaCare's claim in its promotional materials that it had a 510(k) application pending before the FDA was false because RenovaCare did not have such an application pending. ¶ 355.

The SEC complaint further alleged that Rayat arranged for monthly payments to the publisher "to be made through third parties for the fraudulent purpose of concealing Rayat's and the company's involvement," and that Rayat knew, or was reckless in not knowing, that the publisher was required to disclose payments from RenovaCare pursuant to Section 17(b) of the Securities Act. ¶ 356.

These allegations were "immediately incorporated into the stock price," *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1425 (3d Cir. 1997)), and RenovaCare stock declined almost 25% over three consecutive trading sessions following these revelations. ¶ 357. This precipitous decline reflected that, for the first time, the market (and Plaintiffs) had specific evidence of all elements of a securities violation, including Defendants' manipulative market activity, their false and misleading statements and material omissions, and critically, their scienter throughout the scheme.

The Third Circuit and many other courts recognize the significance of SEC actions and securities lawsuits in providing notice to securities plaintiffs of actionable wrongdoing, frequently holding that these events trigger the statute of limitations period. *See, e.g.*, *Pension Tr. Fund*, 730 F.3d at 277 ("reasonably diligent plaintiff[s] would have begun to inquire" when separate class of plaintiffs filed complaint alleging violations of the Securities Act); *York Cty.*, 65 F.4th at 466–68 (SEC order put defendant's "prior statements in a new context, revealing that ostensibly innocuous statements were actually intentional misrepresentations"); *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 637 (S.D.N.Y. 2004) (plaintiffs "had no basis for believing that [defendant] had intentionally lied . . . until the SEC disclosed [defendant's] emails to the public"); *Teachers' Ret. Sys. of La. v. Qwest Commc'ns Int'l Inc.*, 2005 WL 2359311, at *4 (D. Colo. Sept. 23, 2005) (SEC complaint "is a clear indication that the government agency charged with enforcement of the securities laws . . . had concluded that there were sufficient facts to support allegations of securities fraud in a civil case" and "amounts to notice to the plaintiff"). The same applies here: armed with the detailed allegations proffered by the SEC following its investigation into Defendants' fraudulent scheme, Plaintiffs filed their complaint weeks later. *See* ECF No. 1.

**3.** **None of the pre-critical date events cited by Defendants triggered inquiry notice.**

Despite statute of limitations arguments appearing in all three briefs, Defendants do not address the May 2021 release's significance.[2] Instead, Defendants argue only that Plaintiffs could have pleaded their claims based on information available by February 2018 or, at the very latest, April 2019. They are wrong about both dates.

**a.** **Defendants' reassurances and denials dissipated any purported storm warnings in early 2018.**

First, Defendants argue that storm warnings about RenovaCare's paid stock promotion campaign came to light in January and February 2018, and that, combined with other allegations in the SAC, "no later than February 2018, [Plaintiffs] were in possession of information that they allege was fraudulently omitted from the RenovaCare public filings and also information [constituting scienter]." RenovaCare MTD Mem. at 13–19. These supposed storm warnings include (1) RenovaCare's January 8, 2018 press release responding to the OTC Markets inquiry; (2) the negative news stories published on February 8 and 12, 2018; (3) the February 23, 2018 downgrade of RenovaCare's stock to the OTC Pink Open Market Tier and placement of the "Caveat Emptor" warning on RenovaCare's company profile; and (4) the drop in RenovaCare's stock price following the OTC Markets downgrade. *Id.* at 13–15.

None of these purported storm warnings triggered inquiry notice because RenovaCare, at Rayat's and Bhogal's direction, issued full-throated denials of all wrongdoing, vigorously defended their own conduct, and released (ostensibly) positive information about RenovaCare to counter any negative publicity. *See* Sections II(B)(2)(f)–(g). These reassurances, which took the

---

[2] CIG is the only defendant to discuss the SEC action at all, making the (uncontroversial) observation that the SEC litigation release represents the latest possible date for discovery. *See* CIG MTD Mem. at 28–29.

form of multiple press releases and disclosures in RenovaCare's regulatory filings, reasonably reassured investors and prevented Plaintiffs from discovering facts constituting falsity. *Cf. In re Merck*, 543 F.3d at 167–72 (FDA warning and negative article did not constitute storm warning where defendant "continued to reassure the investing public" that it stood behind its claims); *Pension Tr. Fund*, 730 F.3d at 277 ("an investor of ordinary intelligence would reasonably rely on" defendant's "two reassuring, specific statements . . . that dissipated the general storm warnings"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) ("[E]xpress denials of the reported allegations could have allayed a reasonable investor's concerns."); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *5 (S.D.N.Y. May 24, 2018) (rejecting statute of limitations argument where defendants "countered" negative statements with explicit denials of any wrongdoing).

Defendants, however, do not acknowledge these reassurances and denials. Instead, they cite cases in which inquiry notice was triggered by defendants' admissions—not denials—of the facts underlying plaintiffs' claims. *See* RenovaCare MTD Mem. at 12 (citing *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 201 (S.D.N.Y. 2020) (defendant disclosed facts constituting basis of plaintiffs' claims); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1326 (3d Cir. 2002) (defendant filed Form 8-K revealing previous statements' falsity)). Had Defendants admitted their connections to the Predictions Campaign in early 2018, then their cases would have applied. But Defendants' reassurances and denials distinguish this case.

It has since emerged that Defendants' denials and reassurances ranged from aggressively misleading (*e.g.*, that StreetAuthority had not received any "direct" payments from RenovaCare) to unabashed lies (*e.g.*, that RenovaCare had "not been involved in any way (including payment of a third-party) with the creation or distribution of promotional materials, including the annual

- 21 -

predictions report"). *See supra* Sections II(B)(2)(f)–(g). But Plaintiffs should not be blamed for failing to see through the lies. Defendants, not Plaintiffs, are responsible for this fraud and cover-up.

Indeed, Plaintiffs were not the only ones who believed Defendants' reassurances: even after the events of January and February 2018, RenovaCare's stock price was higher than it had been before the pump-and-dump scheme began in late October 2017. On October 23, 2017, shortly before the Promotions Campaign began, RenovaCare's stock closed at $3.10. ¶ 289. On January 5, 2018, after Defendants' first purported storm warning, the stock had risen to $4.91 per share. ¶ 289. On February 21, 2018, after three of Defendants' four purported storm warnings, RenovaCare's stock reached an all-time high of over $10.50 per share, representing a ***238% increase*** from before the campaign. ¶ 289. Even after RenovaCare's stock was downgraded to the Pink Open Market Tier on February 23, 2018, RenovaCare stock traded at $6.28 per share—more than double the share price before the promotion began. ¶ 381. And following Defendants' particularly heated March 5, 2018 press release, RenovaCare's share price surged almost 30% over the following two days, to $6.44 per share.[3] This market movement suggests that Defendants' four purported storm warnings did not put a reasonable investor on notice of actionable securities fraud. *Cf. In re Merck*, 543 F.3d at 171 (citing *Berry v. Valence Tech., Inc.*, 175 F.3d 699, 705 (9th Cir. 1999)) (holding that share price's rebound "supports a conclusion that the letter did not constitute a sufficient suggestion of securities fraud to trigger a storm warning of culpable activity under the securities laws").

---

[3] Insofar as the Court must consider facts beyond those appearing on the SAC's face to resolve Defendants' statute of limitations arguments, dismissal is inappropriate. *See Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (a court may not dismiss a complaint on statute of limitations grounds unless the bar is "apparent on the face of the complaint").

The resilience of RenovaCare's share price in response to Defendants' reassurances starkly contrasts with Defendants' cited cases. *See* RenovaCare MTD Mem. at 17 (citing *Johnny Karp Invs., LLC v. Kyriakoulis*, 2020 WL 1284551, at *4 (D.N.J. Mar. 18, 2020), *aff'd,* 837 F. App'x 938 (3d Cir. 2021) (investment "had already lost the vast majority of its value"); *Barbee v. Amira Nature Foods, Ltd.*, 2023 WL 4627744, at *7 (D.N.J. July 19, 2023) (stock price had fallen over 90%)).

Defendants' arguments regarding scienter fare no better. They contend that the fact of Rayat's majority shareholder status, prior SEC action against Rayat, and RenovaCare's amended Form S-1 Registration Statement constitute facts sufficient to allege scienter. RenovaCare MTD Mem. at 16–17, 18–19. But Defendants neither explain why these facts constitute scienter nor provide any legal authority stating that these factors, taken individually or together, satisfy the heightened pleading standard embodied in Rule 9 and the PSLRA to allege scienter with particularity.

> **b.      The April 2019 internal control weakness disclosure did not mention the undisclosed promotional campaign or provide any evidence supporting scienter.**

Defendants also argue that RenovaCare's April 12, 2019 admission in its 2018 Form 10-K that its disclosure controls and procedures were ineffective triggered the statutory period. RenovaCare MTD Mem. at 19–21; CIG MTD Mem. at 27–28; Sidhu MTD Mem. at 8–9. But RenovaCare's regulatory filings did not put Plaintiffs on notice of either the falsity of Defendants' prior statements or Defendants' scienter in making them.

RenovaCare's 2018 Form 10-K stated that its "disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting as discussed and defined in Management's Report on Internal Control over Financial Reporting[.]" ¶ 298. RenovaCare went on to identify several specific material weaknesses in its internal control over

financial reporting: an "[i]neffective control environment" due to too few independent board members and insufficient oversight; "[i]neffective design, implementation, and documentation of internal controls impacting financial statement accounts and general controls over technology"; and "[i]neffective monitoring controls related to the financial close and reporting process." ¶ 298.[4]

Notably absent from these disclosures is any mention whatsoever of the underlying cause of the internal control deficiency—*i.e.*, Defendants' scheme and undisclosed promotional campaign. Without mentioning the campaign, this filing cannot have put a reasonable investor on inquiry notice of fraud related to it or that Defendants had acted with scienter. By contrast, in *Schiro*, 438 F. Supp. 3d at 201, the defendant's disclosure described the specific conduct that was the crux of Plaintiffs' allegations: that an internal probe revealed $20 million in payments that the plaintiffs alleged were undisclosed bribes. *See* RenovaCare MTD Mem. at 20–21 (citing *Schiro*).Without facts constituting scienter, Plaintiffs would not have triggered the running of the clock for statute of limitations. *See Merck*, 559 U.S. at 653–54 (discovery includes facts constituting scienter).[5]

### 4.   The statute of repose did not begin to run against Sidhu until the date of the last wrongful act alleged against him.

Sidhu argues that the statute of repose bars any claims premised on misconduct alleged to have occurred before December 15, 2017. Sidhu MTD Mem. at 9–10. "Although the law in this

---

[4] On May 14, 2020, RenovaCare filed its 2019 Form 10-K, in which it repeated its general statement of ineffective disclosure controls and procedures, this time specifying: "Because of the Company's limited resources, there are limited controls over information processing." ¶ 299. RenovaCare then repeated this same language on March 31, 2021, in its 2020 Form 10-K. ¶ 299.

[5] Despite addressing scienter as it relates to disclosures in January and February 2018 regarding the stock promotion campaign, Defendants say nothing about scienter as it relates to the April 2019 disclosures.

area is somewhat unresolved, the majority of courts have held that the statute of repose in § 1658(b)(2) begins to run on the date of the last alleged misrepresentation regarding related subject matter." *McCullough v. Advest, Inc.*, 2017 WL 3675787, at *3 (W.D. Pa. Aug. 25, 2017), *aff'd*, 754 F. App'x 109 (3d Cir. 2018) (citing cases); *see also N. Sound Cap. LLC v. Merck & Co., Inc.*, 2015 WL 5055769, at *11 (D.N.J. Aug. 26, 2015), *reversed on other grounds*, 702 F. App'x 75 (3d Cir. 2017) (citing *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014)) ("A statute of repose . . . is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant.").

Sidhu, meanwhile, cites two out-of-circuit district court opinions. *See* Sidhu MTD Mem. at 9. And his only binding authority, *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189 (3d Cir. 2007), *as amended* (Nov. 20, 2007), does not address the narrow issue here of whether the repose period runs from the date of the first or last misrepresentation. *See id.* at 200 (holding that the repose period "begins to run on the date of the alleged misrepresentation").

Here, Plaintiffs allege specific wrongdoing by Sidhu as late as February 2018 (*see* ¶¶ 279, 281, 282, 284), so the statute of repose is measured from that date. Because Plaintiffs brought their claims against Sidhu in December 2022, the five-year statute of repose does not bar any of their claims.

**B.      Plaintiffs adequately allege market manipulation in violation of Section 9(a)(2).**

Section 9(a)(2) of the Exchange Act prohibits "effect[ing] . . . a series of transactions in any security registered on a national securities exchange . . . for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). To state a claim under section 9(a)(2), a plaintiff must allege:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of

> inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price.

*He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at \*13 (D.N.J. June 12, 2020) (citation omitted). Defendants challenge elements 3 and 5, above. RenovaCare MTD Mem. at 23–24; Sidhu MTD Mem. at 19–20.[6] For the reasons discussed below, Plaintiffs have stated a claim for violation of Section 9(a)(2).

### 1. The SAC alleges that Bhogal engaged in manipulative trading activity for the purpose of inducing others to purchase or sell RenovaCare stock.

The RenovaCare Defendants argue that the SAC fails to allege that Bhogal "entered into *any* wash sales or matched orders such that he could be found to have violated Section 9(a)(1)." RenovaCare MTD Mem. at 22. But Plaintiffs do not bring a claim for violation of Section 9(a)(1), and Section 9(a) creates liability for trading activity other than wash sales and matched orders. Rather, any behavior that "constitute[s] market manipulation" is actionable under Section 9(a), and while it may include "wash sales, matched orders, or rigged prices," it "can also encompass 'open-market activity' that is not expressly prohibited, such as 'short sales and large or carefully timed purchases or sales of stock.'" *S.E.C. v. Gallagher*, 2023 WL 6276688, at \*14 (S.D.N.Y. Sept. 26, 2023) (quoting *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007)).

"Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Id.*, 2023 WL 6276688, at \*14. Manipulative intent is "normally inferred from the circumstances of the case." *S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 62 (S.D.N.Y. 2017) (finding SEC adequately alleged Section 9(a)(2)

---

[6] The RenovaCare Defendants also challenge whether Bhogal engaged in actionable trading activity, but they rely on Section 9(a)(1), not Section 9(a)(2), the provision pursuant to which Plaintiffs assert their claim. *See* RenovaCare MTD Mem. at 22–23. Nevertheless, Plaintiffs still address that element below.

violation where complaint alleged manipulative trading activity was "designed to create a false impression of supply or demand for securities and to induce other market participants to purchase or sell securities."); *see also S.E.C. v. Hwang*, 2023 WL 6124041, at *13 (S.D.N.Y. Sept. 19, 2023) (finding allegations that defendant engaged in trading activity "with the intent of sending false pricing signals to the market about the true demand for the securities" plausibly alleged manipulative intent); *S.E.C. v. Competitive Techs., Inc.*, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005) (finding allegations that defendants acted with the purpose of inducing others to trade in the stock were sufficient).

Here, the SAC's allegations support the inference that Bhogal engaged in trading activity intended to manipulate RenovaCare's stock price and induce others to buy or sell it. The SAC alleges that Bhogal began acquiring large quantities of RenovaCare shares for little or no money and that the shares were registered shortly before the stock promotion campaign so that he could sell them without restriction. ¶¶ 73, 84–85, 87. Bhogal—in his role as a "strategic advisor" to RenovaCare through his wholly owned consulting firm Vector Asset Management, Inc.—and the other Defendants then orchestrated the stock promotion campaign with StreetAuthority and worked closely with StreetAuthority to create the promotional materials. ¶¶ 39, 108, 131, 134–136. Meanwhile, Bhogal devised a deceptive payment scheme on behalf of RenovaCare to conceal RenovaCare's control of the promotion campaign from investors. ¶¶ 6, 170–78. The stock promotion campaign successfully inflated RenovaCare stock and increased the trading volume. ¶¶ 191–93, 195. Bhogal, in coordination with other Defendants, then sold his shares in a manner that tracked the stock promotion campaign. ¶¶ 196–99, 216, 226, 262.

Bhogal also took steps to bolster RenovaCare's share price and trading volume: he first stopped selling shares to depress the price, then began aggressively buying them at historically

high prices to inflate the market. ¶ 278. On February 20–21, 2018, Bhogal also placed several buy orders for RenovaCare stock to further support its price and trading volume, which "created a false impression of demand for the stock at the order prices." ¶ 283.[7] Bhogal did this to "manipulate the market for the purpose of inducing [RenovaCare stock's] purchase or sale by others." *Id.* During the stock promotion campaign, Bhogal sold over 490,000 shares and reaped over $2.6 million in sale proceeds. ¶ 290.

Accordingly, the SAC adequately alleges that Bhogal engaged in manipulative trading[8] to induce others to purchase or sell RenovaCare stock.

### 2.    The SAC alleges that Bhogal and Sidhu's manipulative trading affected the stock price.

Finally, Plaintiffs have adequately alleged that Bhogal and Sidhu's manipulative trading[9] affected the RenovaCare stock price. *See* RenovaCare MTD Mem. at 23–24; Sidhu MTD Mem. at 19–20. The SAC alleges that "[d]uring the course of the promotional campaign, internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority" and "RenovaCare stock saw an uptick in volume and price that correlated with StreetAuthority's promotional

---

[7] The fact that these orders were never executed (¶ 283) is of no consequence. *Lek Sec. Corp.*, 276 F. Supp. 3d at 62 (citing cases) ("[C]ourts and regulators have found that a 'series of transactions' that create 'actual or apparent' active trading encompasses not only executed trades but also bids and orders to purchase or sell securities.").

[8] The authority RenovaCare, Rayat, Bhogal, and Alberta Ltd. rely upon (*see* RenovaCare MTD Mem. at 23) is inapposite. *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) (involving a claim under Section 9(a)(1) and allegations that are only "bald conclusions"); *Xu v. Direxion Shares ETF Trust*, 2023 WL 5509151, at *10 (S.D.N.Y. Aug. 25, 2023) ("[T]he [complaint] lacks any conceivable, factual basis for the allegation that Defendants manipulated the price of the Funds' shares: rank speculation simply will not do.").

[9] In addition to adequately alleging that Bhogal engaged in manipulative trading (*see supra*, Section IV(B)(1)), the SAC also adequately alleges that Sidhu engaged in the same manipulative activity. *See* ¶¶ 73, 76–77, 84–85, 87, 101, 131, 173, 196–99, 203, 216, 262, 266, 268, 278–79, 284.

campaign." ¶¶ 192–193. When the promotion campaign began, RenovaCare stock was trading at roughly $3 per share with a daily trading volume of about 10,000 shares per day, and by early November, the stock price had risen to nearly $4 per share with a trading volume of over 60,000 shares per day. ¶ 195. On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately 58 percent increase." ¶ 193. Both Bhogal and Sidhu sold their shares in a manner that tracked the stock promotion campaign. ¶¶ 196–99, 216, 262.

Further, between February 12 and 16, 2018, Sidhu purchased shares "with no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others." ¶ 282. Shortly thereafter, on February 20 and 21, 2018, Bhogal "placed several buy orders . . . to further support RenovaCare's share price and trading volume" and create the "false impression of demand for the stock at the order prices." ¶ 283. RenovaCare stock then reached an all-time high of over $10.50 per share on February 21, 2018. *Id.* Accordingly, Plaintiffs have adequately alleged price impact.[10]

---

[10] RenovaCare Defendants' reliance on *Xu* (*see* RenovaCare MTD Mem. at 31) is unavailing because unlike here, where Plaintiffs have alleged specific examples of how the manipulative trading activity impacted RenovaCare's share price, in that case, the complaint "lack[ed] any conceivable, factual basis for the allegation that Defendants manipulated the price of the Funds' shares." *Xu*, 2023 WL 5509151, at *10.

C.    **Plaintiffs adequately allege that Defendants made materially false and misleading statements and omissions of material facts.[11]**

1.    **The SAC alleges that Rayat and Bhogal are liable for making false and misleading statements and material omissions.**

a.    **Rayat and Bhogal were "makers" of the January 8 Press Release Statements.[12]**

The RenovaCare Defendants argue that the SAC fails to allege that Rayat and Bhogal were the "makers" of, *inter alia*, the materially false and misleading statements in the January 8 Press Release. RenovaCare MTD Mem. at 29–30. But the SAC adequately alleges that Rayat and Bhogal exercised ultimate authority over the January 8 Press Release, such that they were makers of the statements therein.

"For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). "The evidence that someone is a statement maker may be 'implicit from surrounding circumstances.'" *JPMorgan Chase Bank, N.A. v. Javice*, 2023 WL 4546409, at *4 (D. Del. July 13, 2023) (quoting *Janus*, 564 U.S. at 142); *see also Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 359 (S.D.N.Y. 2022) ("'[U]ltimate authority' . . . can be found if implicit in surrounding circumstances, or, in other words, evidenced by various indicia of control."). "A statement can have multiple makers." *JPMorgan*, 2023 WL 4546409, at *4.

---

[11] Plaintiffs no longer advance a claim against Sidhu under Count II for false and misleading statements.

[12] RenovaCare, Rayat, Bhogal, and Alberta Ltd. concede that Rayat was the maker of the following statements: (1) April 6, 2018 Form S-1/A Filing, (2) April 25, 2018 Prospectus, (3) April 12, 2019 Form 10-K, (4) May 14, 2020 Form 10-K. Accordingly, Plaintiffs do not address those misstatements here.

Here, the SAC alleges the specific facts of Rayat and Bhogal's extensive involvement in drafting and disseminating the January 8 Press Release, demonstrating their ultimate authority over it. The SAC alleges that both Rayat and Bhogal took part in the fraudulent stock promotion scheme and therefore knew that RenovaCare was paying for StreetAuthority to promote its stock. ¶¶ 3–4. After RenovaCare received OTC Market's inquiry, between January 3, 2018, and January 7, 2018, Rayat participated in several conference calls with RenovaCare's CEO, director, and outside counsel, and Bhogal to strategize about the response. ¶¶ 218–21. Bhogal also coordinated with RenovaCare's investor relations consultant on the response. ¶ 219. Rayat assembled the team to work on the draft press release and provided comments to the draft. ¶¶ 219–20. He emailed RenovaCare's CEO the final version of the press release and instructed him to add certain boilerplate language. ¶ 222. RenovaCare's CEO followed Rayat's instructions, forwarding Rayat's final version of the press release to the Company's investor relations consultant and directing the consultant to incorporate the boilerplate language Rayat requested. ¶ 222. Rayat ultimately controlled when the press release went public, instructing the Company to wait until 3:45 to issue it "because he wanted to limit the potential impact of [it] by releasing it shortly before the market closed at 4 p.m." ¶ 225. Bhogal also worked with the investor relations consultant to "correct an issue with [the] timing" of the release. ¶ 225. These circumstances support that Rayat and Bhogal had ultimate authority over the January 8 Press Release. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) (defendant had ultimate authority over another executive's false statement to the media because defendant drafted the statement, emailed it to various executives, identified it as "our media holding statement," and it was read to the media verbatim).

- 31 -

Further, it is reasonable to infer that Rayat controlled the content of the press release because he was "in the best position to provide the substantive detail," given that "he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments to them, and worked closely with them to create and disseminate the promotion." ¶ 217; *see also S.E.C. v. Amah*, 2023 WL 6386956, at \*10 (S.D.N.Y. Sept. 28, 2023) (holding defendant had "ultimate authority" over statements' contents because, *inter alia*, he was the only person who accessed accounts, analyzed investment options, and designed investment strategy). The January 8 Press Release expressly acknowledged that the Company had consulted him on the press release. *See* ¶ 226 ("Following notification from OTCQB Markets, the Company immediately made inquiries of its . . . controlling shareholders[.]").

Accordingly, the Court should deny the motion to dismiss Count II against Rayat and Bhogal insofar as they argue that they were not "makers" of the January 8 Press Release.

> **b.    RenovaCare, Rayat, and Bhogal had a duty to disclose the stock promotion campaign.**

The RenovaCare Defendants argue that Count II should be dismissed because StreetAuthority, not RenovaCare, had the duty to disclose the stock promotion campaign pursuant to Section 17(b) of the Securities Act. RenovaCare MTD Mem. at 25–26. This argument is incorrect for two reasons: First, RenovaCare, Rayat, and Bhogal had a duty to disclose the campaign to make their statements in the January 8 Press Release not misleading. And second, Rayat and RenovaCare had a duty to disclose the campaign because they ultimately controlled it.

> **(1)      Rayat, RenovaCare, and Bhogal had a duty to disclose the stock promotion campaign to make the January 8 Press Release not misleading.**

A defendant has "a duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading." *S.E.C. v. Rivero*, 2023 WL 2238700, at *7 (D.N.J. Feb. 27, 2023). "The duty to disclose 'necessary' information to make the statements not misleading arises when each statement was made." *U.S. v. Schiff*, 538 F. Supp. 2d 818, 830 (D.N.J. 2008). To determine whether an omitted fact is material and necessary information, the Court considers "whether 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available.'" *Rivero*, 2023 WL 2238700, at *7 (citation omitted).

Here, Rayat, RenovaCare, and Bhogal had a duty to disclose the stock promotion campaign to make the January 8 Press Release not misleading. The SAC alleges that on January 3, 2018, OTC Markets wrote to RenovaCare "requiring the company [to] make public disclosures relating to StreetAuthority's promotional campaign," including whether the company paid for, had editorial control over, or was involved in the creation and distribution of the promotional material. ¶¶ 212–13. In response, RenovaCare issued the January 8 Press Release, which, *inter alia*, denied that it had editorial control over the promotional content or that the "Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers" directly or indirectly were involved with the creation of distribution of promotional materials. ¶ 226. As discussed above, both Rayat and Bhogal, acting on behalf of RenovaCare, controlled the January 8 Press Release. Thus, they had a duty to disclose the material information that they omitted, including that: (a) Rayat, the controlling shareholder, was extensively involved in the stock promotion campaign (¶ 229); (b) RenovaCare was funding the

stock promotion campaign through third-party investor relations consultants and was therefore affiliated with StreetAuthority (¶ 230); (c) Rayat provided the content of the stock promotion materials to StreetAuthority and had editorial control over them (¶¶ 232, 234); and (d) Rayat approached StreetAuthority in July 2017 about the stock promotion campaign (¶ 35).

**(2)     Rayat and RenovaCare had a duty to disclose the stock promotion campaign because they controlled it.**

While generally "only an article's maker, not its benefactor, has a duty to disclose that it was paid for," the duty to disclose will arise if the defendant would "qualify as a maker." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 103 (2d Cir. 2022). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *cf. In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 586 (W.D. Tex. 2022) (defendant was "maker" of statement where he "reviewed and approved" it).

Here, the SAC alleges that Rayat, acting on behalf of RenovaCare, had ultimate control over the promotional materials. The SAC alleges that Rayat, "on behalf of RenovaCare," "solicited StreetAuthority to run the [promotional] campaign . . . and worked closely with them to create and disseminate the promotion." ¶ 217. Rayat "provided StreetAuthority with extensive information on RenovaCare and the purported efficacy of the 'SkinGun'" and "worked with StreetAuthority to create StreetAuthority's promotional materials." ¶ 132. Rayat "was the source of . . . false claims and pictures" included in promotional materials. ¶¶ 180, 182. Rayat had "frequent contact" with StreetAuthority employees about the promotion. ¶ 133. "All or most of the information used in promotional materials during the campaign was provided to StreetAuthority by Rayat in emails, attachments, or links to RenovaCare's website or third-party websites." ¶ 135. StreetAuthority "worked closely" with Rayat and Bhogal and Rayat "reviewed

- 34 -

and commented on draft promotional materials . . . prior to their release." ¶ 136. For example, before the StreetAuthority promotion was released, Rayat reviewed draft promotional materials that contained false claims about RenovaCare having a pending 510(k) filing with the FDA and had fake before-and-after pictures purporting to depict an arm before being treated with the SkinGun and three days after being treated with the SkinGun. ¶¶ 182, 184, 186. Nevertheless, Rayat failed to correct the false statements or pictures, despite providing other changes to the promotional materials, which StreetAuthority implemented. ¶ 186.

Rayat also "weighed in on advertising content and 'placements.'" ¶ 137. Throughout the promotional campaign, "Rayat continued to be closely involved in the drafting, distribution, and dissemination of StreetAuthority's promotional materials," including by meeting with a StreetAuthority copywriter in person on November 28, 2017. ¶ 140. The day after the meeting, "Rayat gave StreetAuthority a series of explicit instructions" as to the promotional campaign, and "suggested that if the copywriter 'can get the copy tweaked right away, we can start this new strategy sooner than later,'" linking his suggestions to future payments of StreetAuthority. ¶¶ 140-42. In or around December 4, 2017, StreetAuthority sent Rayat drafts of ads and landers upon his request, and waited to launch them until Rayat gave them the "green light." ¶ 143-44. Further, "[o]n numerous other occasions . . . Rayat asked StreetAuthority employees to report on the performance of the Predictions Campaign, and weighed in on how they should proceed." ¶ 145.[13] These allegations sufficiently establish that Rayat and RenovaCare had ultimate

---

[13] The SAC also alleges that Defendants controlled the content of StreetAuthority's disclaimer, which misleadingly failed to disclose that Rayat and RenovaCare were funneling money to support the campaign, and devised a deceptive payment scheme to conceal that RenovaCare was paying for the promotion. ¶¶171–75, 178.

authority over the promotional materials and therefore had a duty to disclose the stock promotion campaign.

Defendants' citations are unavailing. *See* RenovaCare MTD Mem. at 27–28. In *Noto*, the Second Circuit explicitly acknowledged that a "disclosure is required when a corporate statement would otherwise be 'inaccurate, incomplete, or misleading[.]'" *Noto*, 35 F.4th at 104 (citation omitted). It premised its dismissal on the complaint's failure to allege that the defendants had a duty to disclose the existence of a paid promotional campaign because it contained only conclusory allegations of control. *Id.* at 103–04. While the complaint alleged that defendants "furnished information and language for, prepared, reviewed, approved, and/or ratified the articles," it was devoid of allegations that the "defendants collaborated with the authors to such an extent that they controlled the articles' publication" or that they "even saw them before their publication." *Id.*

Defendants' other authorities address similar allegations. *See In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1272 (11th Cir. 2016) (alleging only that "defendants worked in conjunction with stock promoters . . . particularly with respect to the timing of articles by the stock promoters and company press releases"); *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *1, *5 (S.D.N.Y. Dec. 29, 2016) (alleging only that the defendants "caused, directed, and authorized" the promotional materials, and failed to identify any duty to disclose a paid promotional campaign).[14]

Here, Plaintiffs identify two bases for Defendants' duty to disclose the promotional campaign that are independent of the Securities Act's anti-touting statute: (1) by denying

---

[14] The court in *Cortina* also held that the complaint failed to adequately allege a paid promotional campaign in the first instance. *Id.* Here, Plaintiffs adequately allege (and Defendants do not dispute) the existence of a paid campaign.

RenovaCare's involvement in the campaign in the January 8 Press Release, Defendants gave investors the false impression that the StreetAuthority promotion materials were based on objective third-party analysis, when in fact the materials had been dictated by individuals who had a direct interest in propping up RenovaCare's stock price; and (2) Plaintiffs allege specific facts demonstrating that Rayat and RenovaCare controlled the campaign. Accordingly, RenovaCare, Rayat, and Bhogal had a duty to disclose the paid promotional campaign when they crafted the January 8 Press Release.

### 2. Capitol Information Group

In a footnote, CIG contends that Plaintiffs have not alleged it was the maker of any statements. CIG MTD Mem. at 19 n.10. The Court should decline to consider this argument, as CIG raised this conclusory argument in passing and failed to adequately support the argument or brief the issue. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Casco v. Ponzios RD, Inc.*, 2021 WL 3124321, at *5 (D.N.J. July 23, 2021) ("Because Plaintiffs' argument . . . was only . . . at best, vaguely referenced in a footnote in Plaintiffs' Opening Memorandum, this issue was waived."); *Hicks v. N.J. Dep't of Corr.*, 2019 WL 5587324, at *6 n.9 (D.N.J. Oct. 30, 2019) ("The Court declines to consider this argument . . . because it is insufficiently briefed.").

### D. Plaintiffs adequately allege that Defendants perpetrated a pump-and-dump scheme in violation of Rules 10b-5(a) and (c).

Plaintiffs allege that Defendants executed a pump-and-dump scheme that deceived the investing public, artificially inflated the market price of RenovaCare shares, and caused Plaintiffs to purchase RenovaCare shares at those artificially inflated prices. ¶¶ 394–402. "A pump-and-dump stock scheme is a classic violation of" Rules 10b–5(a) and (c). *S.E.C. v. Curshen*, 888 F.

Supp. 2d 1299, 1307 (S.D. Fla. 2012); *see also S.E.C. v. Dynkowski*, 2015 WL 12851237, at \*1 (D. Del. July 29, 2015) ("[I]nvolvement in [] pump-and-dump schemes in order to artificially inflate the price of securities . . . is an actionable misrepresentation under the securities laws.").

But the RenovaCare Defendants seek dismissal of this scheme liability count by arguing that Plaintiffs have merely "repackage[d] their false statement claim from Count II and call it a scheme to defraud claim in Count III." RenovaCare MTD Mem. at 33. They contend that "[t]here is nothing inherently deceptive under the securities law about a public company paying publishers to promote the company and its stock," and that "[a]fter stripping away the allegations about failing to disclose the paid stock promotion campaign, there is nothing left of Plaintiffs' scheme to defraud claim." RenovaCare MTD Mem. at 33–34. Further, Sidhu argues that Plaintiffs do not allege that he engaged in any deceptive conduct as required to state a scheme liability claim against him, Sidhu MTD Mem. at 13–19, and that Plaintiffs fail to allege that his actions caused any losses. Sidhu MTD Mem. at 21–22. These arguments ignore Plaintiffs' detailed allegations and should be rejected.

**1.      The SAC alleges a pump-and-dump scheme that extends beyond Defendants' false and misleading statements and omissions.**

"[I]t is possible for liability to arise under both subsection (b) and subsections (a) and (c) of Rule 10b–5 out of the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). Such is the case here.

Plaintiffs allege an extensive deceptive scheme beyond the misrepresentations and omissions underlying their 10b–5(b) claim. Defendants had active, day-to-day involvement in an extensive scheme whereby they: (1) accumulated millions of shares at below-market-value

- 38 -

prices, registered those shares for sale, and opened brokerage accounts, *see supra*, Section II(B)(1); (2) developed an aggressive investor relations program to pump RenovaCare, despite it having no products and no revenue, *see supra*, Section II(B)(2)(a); (3) solicited StreetAuthority, an online financial newsletter publisher, whose CEO was a personal friend of Rayat's and a RenovaCare shareholder, for a promotional campaign designed to increase RenovaCare's stock price and trading volume, *see supra*, Section II(B)(2)(b); (4) concealed their payments to StreetAuthority by funneling money through undisclosed third-party investor relations companies and providing inadequate disclosures, *see supra*, Section II(B)(2)(c); (5) participated in the preparation, dissemination, and approval of false statements about RenovaCare in a calculated fashion, *see supra*, Section II(B)(2)(d); (6) engaged in a coordinated and continuous course of conduct to disguise the statements' falsity and their connection to them by issuing materially false press releases and reassuring statements denying any wrongdoing while they continued perpetrating their scheme, *see supra*, Sections II(C)(2)(d), (f), (g); (7) planned and edited well-timed article releases, published both directly and through third-party promoters, with targeted content to artificially inflate the value of company stock and raise revenue, *see supra*, Sections II(B)(2)(f)–(g); (8) dumped millions of shares on unsuspecting investors at inflated prices, thereby obtaining millions of dollars of ill-gotten gains *see supra*, Sections II(B)(2)(e), II(C)(1); (9) squirreled away some of those ill-gotten gains in shell entities with no legitimate claim to the money, *see supra*, Section II(C)(1); (10) and all the while violated OTC Markets policies, RenovaCare's Code of Corporate Governance and Ethics, and its Code of Ethics, *see supra*, Section II(C)(2).

To be sure, Defendants' false and misleading statements and omissions were relevant to their scheme. But Defendants oversimplify Plaintiffs' complaint by contending "there is nothing

left" of Plaintiffs' scheme liability claim beyond allegations of a failure to disclose a paid stock promotion campaign. *See* RenovaCare MTD Mem. at 34. "The fact that some of these alleged acts are closely connected to the alleged misrepresentations and omissions or that the alleged conduct was not disclosed until the alleged scheme unraveled does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1194 (D. Or. 2015). Plaintiffs here allege a much larger scheme than solely false statements, distinguishing their scheme liability claim from a 10b–5(b) claim. *Cf. S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 392 (S.D.N.Y. 2014) ("[T]he SEC has competently pled the existence of a larger scheme, one that went beyond mere misrepresentations to investors . . . . While the misstatements and omissions certainly furthered that scheme, they do not comprise the scheme in its entirety."); *JAC Holding Enters., Inc. v. Atrium Cap. Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014) ("The conduct charged comprises not just specific false statements . . . , but also the planning and carrying out of a comprehensive scheme, by specific steps, to mislead the buyers as to JAC's value[.]").

Courts across the country have held repeatedly that allegations like Plaintiffs' here are sufficient to sustain a scheme liability claim distinct from a false statement claim.[15] The Court should reach the same conclusion here.

---

[15] *See, e.g.*, *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 321 (S.D.N.Y. 2019) (allegations of "deceptive scheme involving multiple forms of market manipulation, as well as various misstatements or omissions, which, combined with a misleading promotional campaign, were designed to convince the public that there was more market interest in Plandai stock than in fact existed, encouraging the public to buy Plandai and then allowing Fiore to sell his shares at a profit" were "sufficient to establish scheme liability in violation of the securities laws"); *Curshen*, 888 F. Supp. 2d at 1308 (finding allegations that defendant "orchestrated the false media campaign" surrounding the company, which included "arranging for the posting of a false website" touting company developments and issuing press releases claiming fictitious

Defendants' citations are inapposite. In *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016), the Eleventh Circuit found it lawful to engage a third party to promote stock "through publications of boastful *but truthful* articles" (emphasis added), but here, the promotional campaign's statements were false. The Second Circuit in *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022), observed that the Supreme Court has held that "'dissemination of false or misleading statements with intent to defraud' does come within the scheme subsections," and did not "determine for ourselves whether the scheme liability claims in this complaint allege something beyond misstatements and omissions[.]" *Id.* (quoting *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1100 (2019)). And *Takata v. Riot Blockchain, Inc.*, No. 3:18-cv-02293, ECF No. 251 at 24–25 (D.N.J. Aug. 25, 2023), quotes *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020), for the proposition that a scheme liability claim must allege an objective

---

achievements, sufficient to allege scheme liability); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 239 (D. Mass. 2004) ("[Plaintiff] alleged not just that Wolfenberger issued one or two misleading research reports, but rather that over time he worked extensively with Dachis to issue bullish research reports . . . with the deliberate aim of boosting Razorfish's market price artificially. This adequately states a 'scheme' . . . under Rule[s] 10b–5(a) and (c)."); *In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 971–72 (C.D. Cal. 1994) (finding allegations that a defendant reviewed, edited, and approved press releases and other allegedly misleading documents that did not themselves constitute a violation of Rule 10b–5(b) but were part of an alleged scheme sufficient to support scheme liability); *S.E.C. v. GPL Ventures LLC*, 2022 WL 158885, at *9 (S.D.N.Y. Jan. 18, 222) (plaintiffs stated scheme liability claim where defendants "orchestrated and contrived a marketing apparatus" and used third-party promoters to "disguise[e] the fact that Defendants were funding the marketing or were otherwise involved . . . to artificially drive up the price of the[ir] securities . . . with a plan in place to ensure they could redeem them for a handsome profit"); *S.E.C. v. SeeThruEquity, LLC*, 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (scheme liability claim sustained where "complaint alleges that the defendants' entire business model, beyond any [specific] misstatements or omissions, is deceptive," including allegations that they "repeatedly made false or misleading statements in their research reports, press releases, and website"); *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *11–12 (C.D. Cal. July 13, 2015) (allegations including "hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement," together with "participat[ion] in the preparation of and/or disseminat[ion] or approv[al]" of false and misleading statements, sufficient to state scheme liability claim).

- 41 -

beyond making a misrepresentation or omission, but Plaintiffs here allege an entirely separate (and classic) objective: a pump-and-dump scheme.

> **2.    Plaintiffs adequately allege a scheme liability claim against Sidhu.**

Sidhu argues that Plaintiffs do not allege that he engaged in any deceptive conduct as required to state a scheme liability claim against him, Sidhu MTD Mem. at 13–19, and that Plaintiffs fail to allege that his actions caused any losses. *Id.* at 21–22. Both arguments misinterpret Plaintiffs' complaint and should be rejected.

> **a.    The SAC alleges that Sidhu engaged in deceptive conduct in violation of Rules 10b-5(a) and (c).**

"[S]ubsections (a) and (c) of Rule 10b-5 encompass a 'wide range of conduct' and are not limited to the prohibition of market manipulation." *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *15 (D.N.J. Apr. 30, 2020) (quoting *Lorenzo*, 139 S. Ct. at 1101). Further, "Section 10(b) prohibits not only 'manipulative' acts, but also 'deceptive' acts." *Id.* (citing 15 U.S. Code § 78j). An action that is "not necessarily deceptive by itself" may be "deceptive when viewed in the wider context of Plaintiff's allegations"—including, for instance, when done "as part of a scheme to pump-and-dump [company] stock." *Id.*

Sidhu tries to pigeonhole Plaintiffs' scheme liability claim by suggesting that it "pursue[s] two distinct theories of 'deceptive conduct,'" scalping and manipulative trading, and then attacking those "theories" narrowly. Sidhu MTD Mem. at 15. But Plaintiffs allege a wide-ranging and long-running pump-and-dump scheme in which Sidhu committed multiple deceptive acts. Sidhu personally participated in Defendants' accumulation of shares at below-market prices, ¶ 73; spearheaded the opening and use of brokerage accounts and registration of RenovaCare shares, ¶¶ 79–90; provided advice and maintained Bhogal's and Rayat's accounts, along with his own, including by monitoring the accounts and transferring shares among entities

and accounts, ¶¶ 79–82, 84, 88–90; provided StreetAuthority with extensive information on RenovaCare and the SkinGun and worked directly with StreetAuthority to create promotional materials, ¶¶ 131, 136; sold shares during the promotional campaign at historically high prices, ¶¶ 196–97; stopped and started his trading in coordination with other defendants, ¶¶ 197–203, 216, 266–69, 278–84; assisted RenovaCare in issuing a new Form S-1 that sought to register for resale over 4.4 million shares held by Rayat, Sidhu, and their associates, ¶ 285; and transferred shares to offshore accounts that he used to sell further shares. ¶ 291.

Plaintiffs' allegations regarding Sidhu's participation in a pump-and-dump scheme distinguish this case from *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001). *See* Sidhu MTD Mem. at 16–19. In the context of a Section 29(b) affirmative defense, the Third Circuit held that, absent other allegations of unlawful practices, it would not infer liability for market manipulation "simply because GFL engaged in substantial short selling of the stocks." *GFL Advantage Fund*, 272 F.3d at 198. The Third Circuit emphasized "the need to demonstrate that some action was taken to *artificially* depress or inflate prices, whether by purposely making false statements or by employing illegitimate, deceptive trading techniques," *id.* at 204 (emphasis in original), which Plaintiffs here amply allege in the form of a pump-and-dump scheme. Sidhu's acts in furtherance of this scheme "create[d] a false impression of supply and demand" for RenovaCare stock, as required for liability in the Third Circuit. *Id.* at 207.

Sidhu's deceptive acts taken as part of Defendants' pump-and-dump scheme state a claim against Sidhu for scheme liability.

### b.    The SAC adequately alleges that Sidhu's actions caused Plaintiffs' losses.

Sidhu misreads Plaintiffs' complaint in arguing that it does not allege that Sidhu's actions in furtherance of the pump-and-dump scheme caused Plaintiffs to suffer any losses. Sidhu MTD

Mem. at 21–22. Sidhu cites three paragraphs from the SAC to suggest that it alleges that Plaintiffs' losses were caused only by allegedly false and misleading statements and omissions made by other Defendants. Sidhu MTD Mem. at 21–22 (citing ¶¶ 371, 379–80). Indeed, Plaintiffs allege in those paragraphs that there is a class-wide presumption of reliance, ¶¶ 371–74, and that Defendants' material misrepresentations caused damages. ¶¶ 378–80. But Plaintiffs also allege that Defendants' scheme artificially inflated RenovaCare's market price and caused Plaintiffs to purchase RenovaCare securities at artificially inflated prices, ¶ 396; that Plaintiffs reasonably relied upon the market's integrity, ¶ 399; that Plaintiffs would have not have purchased RenovaCare stock had they been aware of Defendants' fraudulent scheme (or would not have done so at an inflated price), ¶ 400; and that Plaintiffs suffered damages as a direct and proximate result of Defendants' scheme, ¶ 401. These allegations sufficiently plead a causal link between Sidhu's actions and Plaintiffs' losses.

**E.    Plaintiffs adequately allege that Capitol Information Group is liable for securities fraud violations committed by StreetAuthority.**

**1.    The Asset Purchase Agreement is neither properly authenticated nor integral to the SAC.**

CIG improperly relies upon a purported asset purchase agreement, contending that the Court may consider it because it is incorporated in the SAC. CIG MTD Mem. at 8 n.7. The document is attached to a declaration from CIG's litigation counsel, Mr. Ryan F. Monahan, who represents that the document is a "true and accurate copy of the Asset Purchase Agreement." ECF. No. 136-2, ¶ 5. But he cannot properly authenticate the agreement: Mr. Monahan is CIG's outside counsel, he did not sign the document, and he does not allege that he has *any* personal knowledge of it. *Cf. Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 459 (D.N.J. 2020) (court can consider only documents that "plaintiff's claims are based upon" when they are "undisputedly authentic").

"Under most circumstances, an attorney has no personal knowledge of and is not competent to testify to the authenticity of documents generated before the litigation began or merely produced by his client. In other words, an attorney cannot acquire personal knowledge based on hearsay from his client." *Garcia v. Fannie Mae*, 794 F. Supp. 2d 1155, 1162 (D. Or. 2011). Mr. Moynahan "did not have any involvement with" the APA before litigation, so "he does not have sufficient personal knowledge" to authenticate it. *Harris v. Diamond Dolls of Nevada, LLC*, 2021 WL 5862741, at *4 (D. Nev. Nov. 24, 2021); *see also Blount v. Conn. Gen. Life Ins. Co.*, 2002 WL 31974405, at *4 (D. Or. July 2, 2002) (declining to infer that defendants' attorney could attest to authenticity of exhibits attached to his affidavit solely based on status as defense counsel).

Moreover, "[c]ourts generally may not consider material extraneous to the pleadings in resolving a motion to dismiss except those documents 'integral to or explicitly relied upon the complaint.'" *Red Hawk*, 449 F. Supp. 3d at 459 (citation omitted). "[A] document is not integral to a complaint unless the claims in the complaint are based on the extrinsic document in that the plaintiff relies on the submitted documents when asserting claims in the complaint." *Marton v. Carosella & Russo Enters., Inc.*, 2015 WL 9287036, at *1 (E.D. Pa. Sept. 23, 2015) (quotation marks and citation omitted); *see also Giles v. Phelan, Hallinan & Schmieg, LLP*, 901 F. Supp. 2d 509, 520 (D.N.J. 2012) (finding mortgage contracts were not integral to complaint where plaintiffs alleged "RICO, NJCFA, and UTPCPL claims based on abusive litigation practices and excessive fees," not contract breaches). Here, the purported asset purchase agreement is not explicitly referenced in the SAC, nor is it integral to the SAC, as Plaintiffs' claims for securities

- 45 -

law violations are not based on it. Accordingly, the Court must disregard the purported asset purchase agreement.[16]

### 2.    CIG's arguments regarding successor liability are premature.

Even if the Court considers the exhibit, CIG's argument that it cannot be liable as StreetAuthority's successor (*see* CIG MTD Mem. at 12–20) is premature and cannot be decided on a motion to dismiss. "In construing matters of State law in . . . state law matters otherwise subsidiary to its federal question jurisdiction, a federal court is duty-bound to apply the law of the state in which it sits." *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D 377, 400 (D.N.J. 1998) (citation omitted). Under New Jersey law,[17] generally, "when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller." *Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 2023 WL 4173010, at *5 (D.N.J. June 26, 2023) (citation omitted). But there are four exceptions to that rule: "(1) the successor expressly or

---

[16] The authority CIG relies upon (CIG MTD Mem. at 14–15) is inapposite. *See Klumpp v. Bandit Indus., Inc.*, 113 F. Supp. 2d 567, 570 (W.D.N.Y. 2000) (involving motion for summary judgment where asset purchase agreement was properly before the court); *Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 191, 193 n.4 (5th Cir. 1996) (complaint explicitly alleged a claim for liability based on "the existence of an indemnity provision in the Asset Purchase Agreement," the authenticity of which was not at issue).

[17] CIG argues Texas law must apply because it governs the purported asset purchase agreement (*see* CIG MTD Mem. at 12-13) but for the reasons discussed *supra*, Section IV(E)(1), the Court must disregard the purported asset purchase agreement. Accordingly, CIG's reliance on *Barcelo v. Teva Pharms. USA, Inc.*, 2020 WL 1666116, at *3 (S.D. Tex. Apr. 2, 2020) (*see* CIG Mem. at 14), which applied Texas law, is unavailing.

Regardless, the determination of whether Texas law or New Jersey law applies here is another reason to deny the motion because the factual record is not sufficiently developed to decide that issue at this stage. *See Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 718 (D.N.J. 2011) ("Due to the factual inquiry that may be necessary to properly weigh the Restatement factors, 'it can be inappropriate or impossible for a court to conduct [a choice of law] analysis at the motion to dismiss stage when little or no discovery has taken place.'") (citation omitted).

- 46 -

impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability." *Pub. Serv. Elec. & Gas Co.*, 2023 WL 4173010, at *5 (citation omitted).

Thus, assuming *arguendo* CIG acquired only StreetAuthority's assets, Plaintiffs can still maintain a claim against CIG as a successor to StreetAuthority if an exception applies. Plaintiffs are entitled to discovery to determine whether such an exception applies. *See Ryan v. Rexworks, Inc.*, 2008 WL 4066363, at *6–7 (D.N.J. Aug. 26, 2008) (agreeing that "the successor liability issue [could not] be decided on the basis of the asset purchase agreements alone, and discovery must ensue prior to a determination of whether defendants [were] actually successors-in-interest"); *see also Metro Container Grp. v. AC&T Co., Inc.*, 2023 WL 2955888, at *3–4 (E.D. Pa. Apr. 14, 2023) (finding motion on successor liability issue premature because parties had not had sufficient opportunity to conduct discovery into issue). Accordingly, CIG's motion to dismiss should be denied as premature.

**3.    Plaintiffs are entitled to the fraud-on-the-market presumption and *Affiliated Ute* presumption.**

CIG argues that Plaintiffs are not entitled to the fraud-on-the market presumption or the *Affiliate Ute* presumption. CIG MTD Mem. at 22-26. For the reasons discussed below, Plaintiffs have adequately alleged that RenovaCare stock traded in an efficient market, entitling them to the fraud-on-the-market presumption. Alternatively, Plaintiffs have adequately alleged that the *Affiliated Ute* presumption applies.

a.    **Plaintiffs are entitled to the fraud-on-the-market presumption because they allege that RenovaCare stock traded on an efficient market.**

"Under the fraud on the market presumption, investor reliance on a statement is presumed where the statement is material and the security to which it relates trades in an efficient market—an open and developed market, in which the price of the security is presumed to reflect all publicly available information." *In re Honeywell Int'l Inc. Sec. Litig.*, 211 F.R.D. 255, 263 (D.N.J. 2002). Thus, "[t]o invoke the fraud-on-the-market theory, a plaintiff must first establish that the securities at issue traded in an open and efficient market." *Hull v. Glob. Digital Sols., Inc.*, 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018). "Importantly, at a motion to dismiss stage, 'the question . . . is not whether plaintiff has proved an efficient market, but whether he has pleaded one.'" *Id*. (citation omitted).

In determining whether a plaintiff has pled market efficiency, courts consider several factors, referred to as the *Cammer*[18] factors: "(1) percentage of weekly trading volume; (2) coverage of a company's stock in securities analyst reports; (3) the reported number of market-makers; (4) the company's eligibility to file an S-3 registration statement; and (5) quick responses in stock price caused by unexpected corporate events or financial releases." *Id.* (citing *Cammer*, 711 F. Supp. at 1286-87). These factors are not "a checklist that a plaintiff must pass in order to plead market efficiency," but rather are "an analytic tool to assist [the Court] in its analysis." *Id.* "[N]ot every factor need weigh in Plaintiff's favor or even be alleged . . . [at] the motion to dismiss stage." *Id.* at *10.[19]

---

[18] *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

[19] CIG relies on an out of circuit, non-binding opinion for the proposition that efficiency must be pled with particularity. *See* CIG MTD at 23–24 (citing *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1252 (C.D. Cal. 2015)). CIG offers no authority within this Circuit applying the heightened pleading standard in this context, and Plaintiffs are unable to find any.

Here, Plaintiffs have alleged that RenovaCare stock was traded on the OTC, a "highly efficient and automated market," under the symbol "RCAR." ¶ 35. In addition, "RenovaCare was followed by securities analysts employed by brokerage firms who wrote reports about the Company," which were "distributed to the sales force and certain customers of their respective brokerage firms" and publicly available. ¶ 372. RenovaCare also "regularly communicated with public investors" through "regular dissemination of press releases" and "other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services." ¶ 372. Further, "[a]s a regulated issuer, RenovaCare filed periodic public reports with the SEC and/or the OTC." ¶ 372. Accordingly, Plaintiffs have adequately alleged facts supporting an efficient market.

CIG nonetheless contends that Plaintiffs cannot rely upon the presumption because OTC markets are not efficient as a matter of law. CIG MTD Mem. at 23–24. But courts in this district have refused to apply that blanket rule, and merely recognize that there *may* be instances when OTC markets are not efficient. *See Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *17 (D.N.J. Dec. 19, 2017) ("Despite some courts finding that an OTC market may not be efficient, '[m]ost courts have held that where a stock is traded—in an over the counter market . . . versus on a national exchange—is not dispositive as to whether the market for that stock is efficient.'") (alterations in original); *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138 (D.N.J. 1984) (trading on the OTC market "may not" suffice to apply the "fraud-on-the-market theory").[20] For the reasons discussed above, this is not one of those instances.

_____

[20] Defendants' reliance on *ScripsAmerica, Inc.* is unavailing insofar as it is non-binding and conflicts with the authority in this circuit. 119 F. Supp. 3d at 1251 ("Scrips cannot invoke the fraud-on-the-market presumption of reliance because its shares trade on the OTC market."). *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011), also fails to

### b.  Plaintiffs are entitled to the *Affiliated Ute* presumption.

Plaintiffs also are entitled to the *Affiliated Ute* presumption. The *Affiliated Ute* presumption is a presumption of reliance that courts have recognized because "direct proof of such reliance is frequently unavailable," and it is "premised on a defendant-fiduciary's failure to disclose material facts he had an affirmative duty to disclose." *Rabin v. NASDAQ OMX PHLX LLC*, 712 F. App'x 188, 193-94 (3d Cir. 2017). "[A]n affirmative duty [to disclose] arises . . . when there is . . . a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." *Winer Family Tr. v. Queen*, 503 F.3d 319, 329 (3d Cir. 2007).

Here, for the reasons discussed *supra*, Section IV(C)(1)(b), Defendants Rayat, RenovaCare, and Bhogal had a duty to disclose the stock promotion campaign. Moreover, pursuant to Section 17(b) of the Securities Act, StreetAuthority (the predecessor to CIG) had a duty to disclose that RenovaCare and Rayat were funding the stock promotion campaign.[21] *See* 15 U.S.C. § 77q(b). The SAC alleges that StreetAuthority failed to do so. ¶ 151. Instead, StreetAuthority misleadingly stated that it "did 'not receive any direct cash payments in connection with the production of paid advertisements' for RenovaCare," giving the false impression that StreetAuthority was "offering an objective and fair assessment" of the Company, when in reality, Rayat arranged for third-party investor relations companies to submit payments to StreetAuthority for the promotion campaign on RenovaCare's behalf. ¶¶ 153, 160, 172. Accordingly, Plaintiffs have adequately alleged Defendants had an affirmative duty to disclose the stock promotion campaign, and the *Affiliated Ute* presumption should apply here.

---

support CIG's position because the court in that case did not conclude that OTC markets are never efficient as a matter of law.

[21] As discussed herein, the SAC adequately alleges that CIG is liable as StreetAuthority's successor.

**F.**    **Plaintiffs state claims for control person and Section 20(b) liability because they allege underlying violations of the securities laws.**

Defendants argue that Plaintiffs' control person and Section 20(b) claims (Counts IV and V, respectively) fail because Plaintiffs do not plead any underlying securities fraud claim or that Sidhu had "control" over any primary violation. RenovaCare MTD Mem. at 35; Sidhu MTD Mem. at 24–26. Defendants also argue that there is no private right of action for violations of Section 20(b). RenovaCare MTD Mem. at 35; Sidhu MTD Mem. at 22–24. None of these arguments is correct.

**1.**    **Plaintiffs state a control person liability claim because they allege underlying violations of the Exchange Act.**

Defendants contend that the SAC fails to plead any underlying securities fraud claim against them. RenovaCare MTD Mem. at 35; Sidhu MTD Mem. at 25. For the reasons provided elsewhere in this brief, Plaintiffs have stated underlying claims against Defendants, including Sidhu.

Additionally, Sidhu argues that Plaintiffs fail to allege that he had "control" over any of the primary violators. Sidhu MTD Mem. at 25–26. He points to Count IV, which is not brought against him, and a smattering of paragraphs from the complaint to contend that there are no allegations that he was a control person. Again, Sidhu simply ignores the portions of Plaintiffs' complaint that contradict his assertions. Plaintiffs allege that Sidhu caused RenovaCare to register his shares for resale, ¶¶ 84–89; that he worked closely with StreetAuthority representatives to create promotional materials for the Predictions Campaign, ¶¶ 131, 136; and that he assisted RenovaCare in issuing a new Form S-1 to register millions of shares for resale. ¶ 285.

## 2.   Courts recognize a private right of action under Section 20(b).

Sidhu asserts that, "[t]o counsel's knowledge, no court has ever found a private right of action under [Section 20(b)]," and that "[t]his Court should not be the first in the country . . . to hold that there is one." Sidhu MTD Mem. at 22–23. Yet Sidhu cites just such a case—from this very District, no less—in his own brief. *See id.* at 24 (quoting *S.E.C. v. Zvodihikov*, 2020 WL 634184, at *4 (D.N.J. Feb. 10, 2020)). In that case, Judge Arleo found the defendant liable for violation of Section 20(b). *Zvodihikov*, 2020 WL 634184, at *4; *see also, e.g., Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, 2014 WL 7179989, at *6 (S.D.N.Y. Dec. 10, 2014) (bringing Section 20(b) claim); *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 629-30 (S.D.N.Y. 1996) (same).[22]

Sidhu's statutory interpretation does not save his argument. *See* Sidhu MTD Mem. at 23–24. Section 20(b)'s language does not weigh against an implied private right of action. In fact, the Supreme Court has held that the same statutory language in Section 20(b) that prohibited conduct "shall be unlawful" creates an implied right of action under Section 10(b). *See Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under §10(b)."). And the court in *S.E.C. v. Stringer*, 2003 WL 23538011, at *6 (D. Or. Sept. 3, 2003), premised its discussion of Section 20(b) on its holding that Section 20(a) does not permit the SEC to bring an enforcement action, but that holding is no longer good law because Congress amended Section 20(a) in 2010 to clarify that it does permit an SEC enforcement action. *See* 111 P.L. 203, 929P(c). The Third

---

[22] Moreover, in *Janus*, Justice Breyer suggested that Section 20(b) may provide a basis for liability in situations where *Janus*'s holding forecloses Section 10(b) liability because a defendant was not the "maker" of a statement. *See Janus*, 564 U.S. at 158 ("If the majority believes, as its footnote hints, that § 20(b) could provide a basis for liability in this case . . . then it should remand the case for possible amendment of the complaint.") (Breyer, J., dissenting).

Circuit's analysis in *S.E.C. v. J.W. Barclay & Co.*, 442 F.3d 834, 843 n.14 (3d Cir. 2006), similarly predates this congressional action.

**G.      Plaintiffs state claims against Treadstone and Blackbriar as relief defendants.**

Sidhu argues that Plaintiffs have failed to state a claim for primary liability against Treadstone and Blackbriar, and because Sidhu contends that Plaintiffs fail to state a claim against him, he suggests that Plaintiffs fail to state a claim against Treadstone and Blackbriar also. Sidhu MTD Mem. at 26–27.

Sidhu correctly points out that Plaintiffs do not allege substantive wrongdoing by Treadstone and Blackbriar, but he is incorrect in arguing that Plaintiffs do not state a claim for disgorgement of ill-gotten funds. "Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *see also S.E.C. v. Vuuzle Media Corp.*, 2023 WL 4118438, at *10 (D.N.J. June 22, 2023) (ordering full disgorgement of profits of fraud from relief defendants); *S.E.C. v. Chiase*, 2011 WL 6176209, at *3–6 (D.N.J. Dec. 12, 2011) (same).

For the reasons provided elsewhere in this brief, Plaintiffs have stated a claim against Sidhu. They also allege that both Treadstone and Blackbriar received ill-gotten funds transferred to them or for their benefit by Defendants and have no legitimate claim to those funds. ¶¶ 294–97. Thus, the Court has the authority to order disgorgement of Treadstone and Blackbriar's ill-gotten funds.

## V.      CONCLUSION

Defendants duped regulators, the market, and their own investors to enrich themselves through an extensive pump-and-dump scheme. When whispers emerged about their undisclosed promotional campaign, they lied to cover their tracks. But eventually, the scheme unraveled and

the truth emerged, and the SAC's allegations state an array of claims for materially false

statements, market manipulation, scheme liability, and control person and derivative claims.

Defendants' motions to dismiss should be denied.

Respectfully submitted,
**LITE DEPALMA GREENBERG &
AFANADOR, LLC**

Dated: December 11, 2023

*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
bgreenberg@litedepalma.com

*Liaison Counsel for Lead Plaintiff Diana Deidan*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (admitted *pro hac vice*)
Lucas E. Gilmore (admitted *pro hac vice*)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Nathan Emmons (to be admitted *pro hac vice*)
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
nathane@hbsslaw.com

*Lead Counsel for Lead Plaintiff Diana Deidan*

**POMERANTZ LLP**
Murielle S. Walsh (admitted *pro hac vice*)
Jeremy A. Lieberman (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
mjsteven@pomlaw.com
jalieberman@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff Diana Deidan*