<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE RENOVACARE, INC. SECURITIES LITIGATION | Case No. 2:21-cv-13766 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are three Motions to Dismiss Plaintiffs' Second Amended Class Action Complaint[1] ("SAC") (ECF No. 91) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) filed by: (1) Defendants RenovaCare, Inc. ("RenovaCare" or the "Company"), Harmel Rayat ("Rayat"), Jatinder Bhogal ("Bhogal"), and 1420527 Alberta Ltd. ("Alberta Ltd.") (collectively, the "RenovaCare Defendants") (ECF No. 135); (2) Defendant Capitol Information Group, Inc. d/b/a StreetAuthority.com (formerly StreetAuthority, LLC) ("CIG") (ECF No. 136); and (3) Defendants Jeetenderjit Singh Sidhu ("Sidhu"), Treadstone Financial Group LLC ("Treadstone LLC"), and Blackbriar Asset Management Ltd. ("Blackbriar Ltd.") (collectively, the "Sidhu Defendants," and together with the RenovaCare Defendants and CIG, "Defendants") (ECF No. 137). Plaintiffs filed an omnibus opposition to the Motions. (ECF No. 147.) Defendants filed their respective replies. (ECF Nos. 149–51.) Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, the RenovaCare Defendants' Motion to Dismiss (ECF No. 135) is **GRANTED IN PART** and

---

[1] Lead Plaintiff Diana Deidan brings this putative class action individually and on behalf of all others similarly situated. (ECF No. 91.)

**DENIED IN PART**; CIG's Motion to Dismiss (ECF No. 136) is **GRANTED**; and the Sidhu Defendants' Motion to Dismiss (ECF No. 137) is **GRANTED IN PART** and **DENIED IN PART**.

I.    BACKGROUND

   A.    **Factual Background**

For the purpose of these motions to dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

This is a federal securities putative class action on behalf of persons and entities that purchased or acquired RenovaCare securities between August 14, 2017 and May 28, 2021 (the "Class Period"). (ECF No. 91 ¶ 1.) RenovaCare currently advertises itself as a medical and development stage company engaged in research and development, business development, and capital raises. (*Id.* ¶ 2.) RenovaCare owns the CellMist System, which consists of a treatment method for burn patients including cell isolation for the regeneration of human skin cells and other tissues, and an experimental solution sprayer medical device to deliver healing cells to burn wound treatment areas known as the "SkinGun."[2] (*Id.*) RenovaCare's common stock is traded on the over-the-counter market (the "OTC Market") under the symbol "RCAR." (*Id.* ¶ 61.) Rayat has been the Company's majority and controlling shareholder since 1999. (*Id.*) As of March 24, 2022, Rayat

---

[2] As late as 2013, RenovaCare operated under the name of Janus Resources Inc. and purported to be in the business of oil-and-gas production. (*Id.* ¶ 97.) Eventually the Company's business plan was altered and in the middle of 2013 the Company purchased the technology related to the SkinGun. (*Id.*)

also serves as RenovaCare's interim President, Chief Executive Officer, Chief Financial Officer, and Secretary. (*Id.* ¶ 65.)

Plaintiffs allege there was a longstanding, concealed, and wide-reaching fraudulent stock promotion scheme (the "Scheme") to artificially increase the share price and trading volume of RenovaCare's common stock that was never disclosed to investors. (*Id.*) The Scheme was intended to permit Defendants to sell their RenovaCare shares at an inflated price and involved a number of steps including: (i) accumulating millions of shares of RenovaCare stock at below-market prices and distributing them; (ii) coordinating the registration of restricted shares for resale and depositing them as "free trading" shares in brokerage accounts in the United States and Canada; (iii) promoting RenovaCare stock to investors through a paid promotional campaign via a third-party company while intending to sell the Company's stock—a practice known as "scalping"; (iv) disseminating materially false statements in a press release and a Form 8-K filed with the Securities Exchange Commission (the "SEC"), both of which contained statements denying any involvement in the promotional campaign; (v) orchestrating RenovaCare press releases to coincide with the third-party company's promotion; and (vi) manipulative trading across multiple accounts to support the share price and trading volume of RenovaCare stock while selling over one million of shares to monetize the scheme. (*Id.* ¶ 6.)

The foundation for the Scheme included the arranged sale of below-market value RenovaCare stock, an aggressive investor relations program, and the establishment of brokerage accounts held by various entities so that RenovaCare's stock could be sold once the stock price was "pumped." (*Id.* ¶ 3.) Between 2007 and 2013, Rayat sold millions of RenovaCare shares to

entities owned and controlled by Sidhu[3] and Bhogal[4] that assisted in the fraud by transacting in RenovaCare stock. (*Id.* ¶¶ 4, 73.) These transactions allowed Bhogal and Sidhu to acquire millions of shares of RenovaCare stock for little or no money, and in exchange, Rayat received debt or equity interests that permitted him to maintain a financial interest in later sales of these shares. (*Id.*) In 2008, Sharon Fleming ("Fleming")[5] acquired 300,000 RenovaCare shares in a private transaction with the Company. (*Id.* ¶ 74.)

Sidhu, Bhogal, Rayat, and Fleming closely coordinated brokerage accounts that were used for trading RenovaCare shares. (*Id.* ¶¶ 79–88.) Pursuant to federal securities laws, the RenovaCare shares in Sidhu and Bhogal's brokerage accounts were restricted from sale as of April 2017. (*Id.* ¶ 83.) On June 6, 2017, RenovaCare amended a Form S-1 Registration Statement ("S-1")—which was already pending with the SEC—to add Sidhu and Bhogal's shares to the list of shares that the Company sought to register for resale.[6] (*Id.* ¶ 85.) On July 15, 2017, the SEC declared RenovaCare's amended S-1 effective, removing any restrictions on the ability of Rayat, Bhogal, and Sidhu to sell their shares. (*Id.* ¶ 87.) In June and October 2017, Rayat and Sidhu orchestrated below-market sales of RenovaCare stock that would later be used to pay StreetAuthority, LLC

---

[3] Sidhu owned and controlled Blackbriar Ltd. and Treadstone LLC. (*Id.* ¶ 40.) Sidhu received the RenovaCare stock either directly from Rayat or in transactions financed by Rayat. (*Id.*) Sidhu served on the Board of Directors of RenovaCare's predecessor entity from September 2008 through 2010. (*Id.*)

[4] Bhogal owned and controlled Alberta Ltd. and received the RenovaCare stock in transactions financed or arranged by Rayat. (*Id.* ¶ 39.) Bhogal also served as an advisor to RenovaCare through his wholly owned consulting firm Vector Asset Management, Inc. ("Vector") from August 1, 2013 through June 26, 2018, when he was appointed as RenovaCare's Chief Operating Officer. (*Id.*)

[5] Fleming served as a third-party investor relations consultant to RenovaCare through her wholly owned consulting firm Inspiren LLC ("Inspiren"). (*Id.* ¶ 41.)

[6] The prior version of the S-1 had sought to register approximately 2 million RenovaCare shares owned by Rayat and other friends and associates. (*Id.* ¶ 85.)

("StreetAuthority").[7] (*Id.* ¶ 76–78.)

In July 2017, Rayat first approached StreetAuthority to promote RenovaCare and another company that Rayat controlled, SolarWindow. (*Id.* ¶ 108.) Betancourt and Rayat agreed that RenovaCare and SolarWindow would each pay StreetAuthority $50,000.00 per month for a stock promotional campaign (the "Promotional Campaign").[8] (*Id.* ¶¶ 110, 138, 159.) Rayat arranged for the payments to be made through three separate third-party investor relations companies including Inspiren for the purpose of concealing Rayat and RenovaCare's involvement. (*Id.* ¶¶ 138, 158–67.) StreetAuthority agreed to use the money to pay for advertising and other distribution costs related to the publication and dissemination of its promotion of RenovaCare and SolarWindow. (*Id.* ¶ 159.)

Ultimately, RenovaCare and SolarWindow were StreetAuthority's "lead predictions" for its annual Predictions Report. (*Id.* ¶¶ 13, 114.) The substance of the Promotional Campaign relevant to this matter focused on RenovaCare stock as well as the SkinGun and included false "before and after" pictures of a burn patient purportedly treated with the SkinGun. (*Id.* ¶¶ 13, 16.) The Promotional Campaign claimed that the SkinGun was a "revolutionary wound-healing device," and encouraged readers to buy RenovaCare stock and hold it for "10, 20x, even 40x gains." (*Id.* ¶ 179.) Further, the Promotional Campaign misleadingly claimed that the SkinGun

---

[7] StreetAuthority was an online financial publishing and research company that sold subscriptions to its investment research bulletins and newsletters. (*Id.* ¶ 42.) StreetAuthority was co-founded, owned, and operated by Lou Betancourt ("Betancourt"), a long-time friend of Rayat. (*Id.* ¶ 12.) In early 2019, StreetAuthority was acquired by Investing Daily, a division of CIG that is an online and print publishing company serving various markets. (*Id.* ¶ 42.) After the acquisition, StreetAuthority's domain name (StreetAuthority.com) became a division of CIG, and Plaintiffs allege StreetAuthority began operating as a fictitious business d/b/a CIG. (*Id.*)

[8] Each year, StreetAuthority built a promotional campaign called the "Predictions Campaign" around an annual "Predictions Report." (*Id.* ¶ 13.)

5

would be approved by the Food and Drug Administration (the "FDA") because RenovaCare had submitted a 510(k) application. (*Id.* ¶ 184.) However, RenovaCare did not have a pending 510(k) application before the FDA. (*Id.* ¶ 185.)

While the Promotional Campaign was ongoing, Bhogal sold millions-of-dollars' worth of RenovaCare stock through Alberta Ltd., a company in which Rayat held a substantial financial interest. (*Id.* ¶ 18.) Through the use of the aforementioned brokerage accounts, Sidhu also sold millions-of-dollars' worth of RenovaCare stock and engaged in manipulative trading to artificially inflate the market for RenovaCare as late as February 2018. (*Id.* ¶¶ 19, 279, 281, 282, 284.) Similarly, Fleming sold over 50,000 RenovaCare shares and also engaged in manipulative trading. (*Id.* ¶ 20.)

The Scheme was initially "discovered in January 2018," and this discovery resulted in a regulatory investigation, a litigation release filed by the SEC, and a downgrade of RenovaCare's stock by the OTC Markets Group, Inc. ("OTC Markets Group").[9] (*Id.* ¶ 5.) On January 2, 2018, OTC Markets Group learned of StreetAuthority's ongoing promotion of RenovaCare. (*Id.* ¶ 207.) Thereafter, OTC Markets Group sent RenovaCare a letter on January 3, 2018 wherein OTC Markets Group demanded that RenovaCare make public disclosures regarding the Promotional Campaign (the "OTC Markets Letter").[10] (*Id.* ¶ 212.) In response, on January 8, 2018, RenovaCare issued a press release (the "January 2018 Press Release") that "publicly disclosed" the January 3, 2018 inquiry from OTC Markets Group. (*Id.* ¶¶ 169, 224, 226.) The January 2018 Press Release

---

[9] OTC Markets Group, the entity that supervised the exchange on which RenovaCare stock was listed, is an American financial market providing price and liquidity information for almost 100,000 over-the-counter securities. (*Id.* ¶ 5 n.2.)

[10] OTC Markets Group has a strict disclosure policy regarding company promotions, as the motivation to provide false information through promotional campaigns could impact the integrity of OTC Markets Group. (*Id.* ¶ 208.)

disclosed that RenovaCare, through its investor relations agencies, paid $90,005.00 for out-of-pocket costs incurred by unnamed investor relations agencies relating to the dissemination of the StreetAuthority publications. (*Id.* ¶ 226.) Additionally, the January 2018 Press Release stated that "the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading" and that RenovaCare "had no editorial control over the content," "is not affiliated in any way with the authors of the annual predictions report or its publisher," and "was not involved in the creation, or directing the dissemination, of the report." (*Id.*) After issuing the January 2018 Press Release, Defendants resumed their coordinated trading of RenovaCare stock. (*Id.* ¶¶ 265–69.)

Throughout the month of February 2018, RenovaCare dealt with multiple instances of bad publicity. On February 8, 2018, an online financial media company ("Media Company 1") published an article on RenovaCare that, among other things, called it "the most dangerous stock covered to date." (*Id.* ¶ 272.) On February 12, 2018, Media Company 1 issued another negative article suggesting that RenovaCare was involved in a pump-and-dump scheme (together with Media Company 1's February 8, 2018 article, "Media Company 1's Articles"). (*Id.* ¶ 280.) On the same date, TheStreetSweeper ("StreetSweeper"), an investigative reporting website, published an article entitled "RenovaCare: Many Catalysts, Untold Downside" that exposed deficiencies with RenovaCare's business operations, products, financials, insider trading practices, and RenovaCare's questionable response to the OTC Markets Letter (the "StreetSweeper Article"). (*Id.* ¶ 248.) Specifically, the StreetSweeper Article raised questions about the Company's operations and highlighted that: (i) despite being a roughly $600 million market cap company, RenovaCare "is operated by one full-time employee and three part-time contractors . . . including the CEO"; (ii) the SkinGun was "acquired on the cheap [(for only $400,000)] and has not been

7

presented to the FDA for approval"; (iii) within its 35 years of existence, RenovaCare had no sales, little cash, big operating losses, and auditors expressed doubt that the company could continue as a going concern; (iv) RenovaCare had "[h]eavy, sometimes misleading promotions, questioned by [OTC Markets Group]"; (v) Rayat was formerly in trouble with the SEC for unlawful stock promotion; and (vi) RenovaCare's operations were suspicious when compared to financial/operations data from RenovaCare's industry competitor. (*Id.* ¶ 249.)

In response, RenovaCare issued a press release on February 12, 2018 entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, StreetSweeper, Affiliated with Felon Convicted of Securities Fraud" (the "February 12, 2018 Press Release"). (*Id.* ¶ 255.) RenovaCare accused StreetSweeper of undertaking "irresponsible and nefarious actions" designed to "damage the public trust" by "spreading 'short and distort' commentary" about the company and reiterated RenovaCare's supposed "incredible strides" and the upcoming "major milestone" of an initial FDA filing. (*Id.* ¶ 256.) Thereafter, RenovaCare issued two more misleading press releases on February 15, 2018 and February 21, 2018.[11] (*Id.* ¶¶ 275–76.) On February 21, 2018, RenovaCare's share price reached an all-time high of over $10.50 per share. (*Id.* ¶¶ 283, 289.)

On February 23, 2018, after becoming aware of further promotional activity related to RenovaCare, OTC Markets Group downgraded the Company's stock to its lowest tier, the Pink Open Market, also known as the "pink sheets," and placed a "*Caveat Emptor*" warning and skull and crossbones symbol[12] on RenovaCare's company profile (the "February 2018 Downgrade").

---

[11] The February 15, 2018 Press Release announced a "successful FDA meeting," even though the meeting had occurred a year earlier. (*Id.* ¶ 275.) The February 21, 2018 Press Release announced that RenovaCare had "secure[d] a patent victory," but this "victory" had occurred months earlier in December 2017. (*Id.* ¶ 276.)

[12] OTC Markets Group "designates certain securities with '*Caveat Emptor*' and places a skull and crossbones icon next to the stock's ticker symbol on OTC Markets Group's websites, data feeds

8

(*Id.* ¶ 286.) RenovaCare's stock price simultaneously dropped approximately thirty percent, from $9 per share to $6.28 per share. (*Id.* ¶ 237.) In further response to the StreetSweeper Article, RenovaCare issued another press release entitled "RenovaCare Takes Action to Protect Shareholder Interests" on March 5, 2018 (the "March 5, 2018 Press Release"). (*Id.* ¶ 257.) The March 5, 2018 Press Release did not address the content of the StreetSweeper Article, but instead used "*ad hominem* arguments" and, although not addressing StreetSweeper by name, stated that "a known short and distort syndicate has engaged in an ongoing smear campaign of disseminating grossly misleading, inaccurate and distorted facts and misinformation, including false allegations of insider sell[ing]." (*Id.*)

On April 12, 2019, over a year after RenovaCare issued the January 8, 2018 Press Release denying the statements in the OTC Markets Letter, RenovaCare admitted in SEC filings that its disclosure controls and procedures were ineffective (the "April 2019 Disclosure"). (*Id.* ¶¶ 25, 298.) RenovaCare identified several material weaknesses in internal control over financial reporting including: an "[i]neffective control environment due to an insufficient number of independent board members"; "[i]neffective design, implementation, and documentation of internal controls impacting financial statement accounts and general controls over technology"; and "[i]neffective monitoring controls related to the financial close and reporting process." (*Id.* ¶ 298.)

On May 28, 2021, the SEC issued a litigation release (the "SEC Complaint") stating that RenovaCare was being charged with alleged securities fraud because of RenovaCare's undisclosed

---

and social media, as notice of a potential public interest concern associated with the security, and to caution investors to exercise additional care and perform thorough due diligence before making any investment decision. OTC Markets Group may designate a security undergoing promotion as *Caveat Emptor*, if, in OTC Markets Group's determination, the stock promotion presents a public interest concern or if the company has not made adequate current information available to investors." (*Id.* ¶ 237 n.41.)

role in the Promotional Campaign with StreetAuthority. (*Id.* ¶ 354.) The SEC Complaint alleged that Rayat "arranged, and caused RenovaCare to pay for, a promotional campaign designed to increase the company's stock price." (*Id.*) Additionally, the SEC Complaint alleged that in January 2018, when OTC Markets Group had requested that RenovaCare explain its relationship to the Promotional Campaign, "Rayat and RenovaCare then drafted and issued a press release and a Form 8-K that contained material misrepresentations and omissions denying Rayat's and the company's involvement in the promotion." (*Id.*) Specifically, the SEC Complaint alleged that "Rayat was closely involved in directing the promotion and editing promotional materials," by providing "false information to StreetAuthority regarding the efficacy of RenovaCare's experimental burn-wound healing medical device." (*Id.* ¶ 355.) This false information included images of a burn patient who purportedly recovered from severe burns in three days using the SkinGun, when in reality, the images were taken five years apart. (*Id.*) The SEC also alleged RenovaCare's claim that it had a 510(k) application for the SkinGun pending before the FDA was false. (*Id.*) Further, the SEC Complaint alleged that Rayat arranged for third parties to make monthly payments to StreetAuthority's publisher "for the fraudulent purpose of concealing Rayat's and the company's involvement," and that Rayat "knew or was reckless in not knowing that the publisher was required to disclose payments from RenovaCare" under Section 17(b) of the Securities Act of 1933 (the "Securities Act"). (*Id.* ¶ 356.) Following the SEC Complaint's issuance, the Company's stock price fell $0.66, or 24.8 percent, over three consecutive trading sessions to close at $2.00 per share on June 2, 2021. (*Id.* ¶ 357.)

### B.     Procedural History[13]

On July 16, 2021, the original class action complaint was filed in this matter, previously bearing the caption *Boller v. RenovaCare, Inc. et al.*, Civ. A. No. 21-13766 (BRM)(ESK). (ECF No. 1.) This original class action complaint named RenovaCare, Rayat, and Thomas Bold ("Bold") as defendants and brought the following two claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"): Count I (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder), and Count II (Violation of Section 20(a) of The Exchange Act). (*Id.*) Thereafter, another prospective plaintiff filed a complaint in a separate action titled *Solakian v. RenovaCare, Inc. et al.*, Civ. A. No. 21-13930 (BRM)(ESK). On November 23, 2021, the Honorable Edward S. Kiel, U.S.M.J.[14] consolidated *Solakian* and *Boller*, appointed Diana Deidan as lead plaintiff, and ordered that Civil Action No. 21-13766 would constitute the Master Docket bearing the caption *In Re RenovaCare, Inc. Securities Litigation* ("*In Re RenovaCare*"). (ECF No. 34.) On February 11, 2022, Plaintiffs filed the First Amended Class Action Complaint naming RenovaCare, Rayat, Bold, CIG, and Betancourt as defendants and bringing the following three claims pursuant to the Exchange Act: Count I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder); Count II (Violations of Section 20(a) of the Exchange Act); and Count III (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder). (ECF No. 37.)

On February 14, 2022, Judge Kiel consolidated *Emberland v. Rayat*, Civ. A. No. 21-20569

---

[13] This matter was initially assigned to the Honorable Susan D. Wigenton, U.S.D.J. Thereafter, this matter was reassigned to the undersigned. (ECF No. 3.) On December 15, 2023, this matter was reassigned to the Honorable Jamel K. Semper, U.S.D.J. (ECF No. 148.) On January 11, 2024, this matter was again reassigned to the undersigned. (ECF No. 152.)

[14] Judge Kiel was recently sworn in as a District Judge and now bears the title the Honorable Edward S. Kiel, U.S.D.J.

(BRM)(ESK), *Vargas v. Rayat*, Civ. A. No. 22-00053 (BRM)(ESK), and *Meyer v. Rayat*, Civ. A. No. 22-00430 (the "Shareholder Derivative Actions") into *In Re RenovaCare*. (ECF No. 38.) On February 24, 2022, Plaintiffs filed a Motion for Reconsideration of the February 14, 2022 consolidation. (ECF No. 39.) On September 23, 2022, Judge Kiel entered an Order granting the Motion for Reconsideration thereby separating the Shareholder Derivative Actions from *In Re RenovaCare*.[15] (ECF No. 88.)

On December 15, 2022, Plaintiffs filed the SAC bringing the following claims pursuant to the Exchange Act: Count I (Violations of Section 9(f) of the Exchange Act[16] Against Defendants Bhogal, Sidhu, and Fleming; Count II (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants); Count III (Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants); Count IV (Violations of Section 20(a) of the Exchange Act Against Defendants Rayat, Bold, and Betancourt); and Count V (Violations of Section 20(b) of the Exchange Act Against Defendants Rayat, Bhogal, Sidhu, and Fleming). (ECF No. 91.) In the SAC, Plaintiffs brought claims against RenovaCare, Rayat, Bold, Bhogal, Sidhu, Fleming, CIG, Betancourt, Treadstone Financial Group Ltd. ("Treadstone Ltd."), Treadstone LLC, Blackbriar, and Alberta Ltd.[17] (*Id.*) On July 11, 2023,

---

[15] Judge Kiel separately consolidated the Shareholder Derivative Actions and ordered that Civ. A. No. 21-20569 would constitute the Master Docket and that the matter would bear the caption, *In Re RenovaCare Derivative Litigation*. (ECF No. 88.)

[16] The SAC cites to Section 9(e) of the Exchange Act (*see generally* ECF No. 91), however, the express private right of action for Section 9(a) is codified at Section 9(f). 15 U.S.C. § 78i(f). Section 9(e) merely provides that "the terms 'put,' 'call', 'straddle', 'option', or 'privilege' as used in [Section 9] shall not include any registered warrant, right, or convertible security." 15 U.S.C. § 78i(e).

[17] Plaintiffs filed executed affidavits of service as to Fleming and Betancourt. (ECF Nos. 96, 102.) As of the date of this Opinion, neither Fleming nor Betancourt have answered or otherwise pled to the SAC.

Plaintiffs filed a Notice of Voluntary Dismissal as to their claims against Bold and Treadstone Ltd. (ECF No. 104.)

On October 10, 2023, Defendants filed their respective Motions to Dismiss the SAC. (ECF Nos. 135–37.) On December 11, 2023, Plaintiffs filed an omnibus opposition to the Motions. (ECF No. 147.) On January 10, 2024, Defendants filed their respective replies. (ECF Nos. 149–151.)

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This

"plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

**B.    Rule 9(b)**

Pursuant to Federal Rule of Civil Procedure 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and

other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (citations omitted); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (holding that a "plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue") (citations omitted). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated on other grounds by Twombly*, 550 U.S. at 557.

The heightened pleading standard set forth in Rule 9(b) "has been rigorously applied in securities fraud cases." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (citing *In re Burlington Coat Factory*, 114 F.3d at 1417). Further, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). To sufficiently allege fraud under the PSLRA, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, & n.12 (1976)). In order to satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged." *Tellabs*, 551 U.S. at 324.

## III.   DECISION

The Court first addresses the parties' arguments related to the timeliness of Plaintiffs' claims. Next, the Court addresses CIG's assertion that Plaintiffs have not sufficiently alleged that CIG is liable as a successor-in-liability. The remainder of the opinion addresses the RenovaCare Defendants and the Sidhu Defendants' Motions to Dismiss relative to each count of the SAC.

### A.      Timeliness of Plaintiffs' Claims

Defendants assert Plaintiffs' claims are time barred by the relevant statute of limitations. Alternatively, the Sidhu Defendants submit Plaintiffs' claims, to the extent they are premised on the Sidhu Defendants' conduct preceding December 15, 2017, are barred by the statute of repose. A district court may grant the dismissal of untimely claims on a 12(b)(6) motion where "the face of the complaint demonstrates that the plaintiff's claims are untimely." *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (citation and internal quotations omitted). The time limitations for Plaintiffs' securities fraud claims is "the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). "[C]ourts have consistently referred to the shorter time period as a statute of limitations and the longer period as a statute of repose." *In re Exxon Mobile Corp. Sec. Litig.*, 500 F.3d 189, 199 (3d Cir. 2007).[18] The Court addresses the arguments related to the statute of limitations and the statute of repose in turn.

### 1.      Statute of Limitations

Defendants assert Plaintiffs' claims are time barred by the two-year statute of limitations

---

[18] "A statute of limitations is '[a] law that bars claims after a specified period.' . . . It is generally subject to a 'discovery rule,' meaning that it does not begin to run until the plaintiff is aware (or should be aware) of his claim. A statute of repose is '[a] statute barring any suit that is brought after a specified time since the defendant acted.' . . . It is generally not subject to a discovery rule." *Id.* at 194 n.6 (citations omitted).

set forth in 28 U.S.C. § 1658(b) because the SAC clearly alleges that the stock promotion scheme was "discovered" in January 2018. (ECF No. 135-1 at 14; ECF No. 136-1 at 28; ECF No. 149 at 2; ECF No. 150 at 13; ECF No. 151 at 2) (quoting ECF No. 91 ¶ 5). In the alternative, Defendants argue the statute of limitations began to toll on April 12, 2019 at the latest due to the contents of the April 2019 Disclosure. (ECF No. 135-1 at 20; ECF No. 136-1 at 28; ECF No. 137-1 at 8–9.) Defendants contend various "storm warnings" including the January 2018 Press Release, Media Company 1's Articles, the StreetSweeper Article, the February 2018 Downgrade and the simultaneous RenovaCare stock price drop of thirty percent (collectively, the "Storm Warnings") would have placed a reasonable investor on notice of the information they would need to plead the securities fraud claims. (ECF No. 135-1 at 13–17; ECF No. 136-1 at 28; ECF No. 137-1 at 8–9.) CIG argues the date the SEC files a complaint is not the date at which a reasonably diligent plaintiff could have discovered the alleged fraud. (ECF No. 136-1 at 28–29.)[19]

In opposition, Plaintiffs assert their claims are not barred by the statute of limitations because a reasonably diligent plaintiff would not have discovered facts constituting falsity and scienter until the SEC Complaint was issued on May 28, 2021. (ECF No. 147 at 14–24.) Plaintiffs contend Defendants' reassurances and denials of the Storm Warnings prevent Plaintiffs' inquiry

---

[19] The Sidhu Defendants also assert that Plaintiffs claims are untimely because they were not named as defendants until the SAC was filed on December 15, 2022. (ECF. 137-1 at 7.) Based off this filing date, the Sidhu Defendants submit, in a footnote, that "[t]he date of the SAC, which first named Sidhu as a defendant, cannot relate back to the original Complaint or the First Amended Complaint." (*Id.* at 7 n.3 (citing *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 544–45 (2010)).) Plaintiffs do not address the relation back argument in their opposition and the Sidhu Defendants do not raise this argument again in their reply. (*See* ECF Nos. 147, 151.) The Court declines to consider this argument because it was not adequately argued by either the Sidhu Defendants or Plaintiffs. *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *see also Casco v. Ponzios RD, Inc.*, Civ. A. No. 16-2084, 2021 WL 3124321, at *5 (D.N.J. July 23, 2021) ("Because Plaintiffs' argument . . . was only . . . at best, vaguely referenced in a footnote in Plaintiffs' Opening Memorandum, this issue was waived.").

notice from being triggered. (*Id.* at 20–23.) Plaintiffs submit the April 2019 Disclosure did not mention the undisclosed Promotional Campaign or provide any evidence supporting scienter. (*Id.* at 23–24.)

In reply, the RenovaCare Defendants submit the Storm Warnings that occurred in February 2018 after the January 2018 Press Release undermine any reassurances that investors may have taken from the January 2018 Press Release. (ECF No. 149. at 5–6.) The RenovaCare Defendants further argue Plaintiffs' arguments are misplaced because RenovaCare did not issue specific and express reassurances and denials of the Storm Warnings that occurred in February 2018. (*Id.* at 7–9.) Specifically, the RenovaCare Defendants contend neither the February 12, 2018 nor the March 5, 2018 Press Releases included statements denying the stock promotion scheme and Rayat's alleged involvement. (*Id.* at 8–9 (citing ECF No. 91 ¶¶ 255–60).)[20]

Under the discovery standard, the statute of limitations period for the federal securities claims at issue "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discovered the facts constituting the violation' [including scienter]—*whichever* comes first." *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Transactions, Inc.*, 730 F.3d 263, 276 n.6 (3d Cir. 2013) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)).[21] A fact is

---

[20] In their reply briefs, CIG and the Sidhu Defendants reiterate the arguments raised in their underlying briefs as to why Plaintiffs' claims are time barred. (*See* ECF No. 150 at 13–14, ECF No. 151 at 2–3.)

[21] In *Merck*, the Supreme Court "rejected and replaced [the Third Circuit's] inquiry notice standard with a discovery standard." *Pension Tr. Fund*, 730 F.3d at 272 (citing *Merck*, 559 U.S. 633). The Supreme Court explained, "[i]f the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" *Merck*, 559 U.S. at 651. The "inquiry notice" standard was rejected "[b]ecause [28 U.S.C. § 1658(b)] contains no indication that the limitations period should occur at some earlier moment before 'discovery,' [such as] when a plaintiff would have *begun* investigating." *Id.* (emphasis in original).

considered "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 275 (quoting *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.* 637 F.3d 169, 175 (2d Cir. 2011)). The analysis of whether federal securities claims are barred by the statute of limitations is "typically fact intensive, and thus, courts are reluctant to dismiss a complaint as untimely prior to discovery." *Hull v. Glob. Digit. Sols., Inc.*, Civ. A. No. 16-5153, 2017 WL 6493148, at *8 (D.N.J. Dec. 19, 2017) (citation omitted).

"In determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *Merck*, 559 U.S. at 653. Inquiry notice "is not necessarily the point at which the plaintiff would have discovered . . . 'facts constituting the violation,'" but rather, "the point where the facts would lead a reasonably diligent plaintiff to investigate further." *Id.* at 651. "[A] reasonably diligent plaintiff would undertake an investigation based on [storm warnings such as] the filing of related lawsuits, news articles and analyst's reports, [as well as] prospectuses, quarterly reports, and other information related to their investments . . . even when the information therein is not company-specific or security-specific." *Pension Tr. Fund*, 730 F.3d at 277 (citations and internal quotations omitted).[22] Inquiry notice and storm warnings "only play a supporting role because 'the limitations

---

[22] "The test for 'storm warnings' is an objective one, based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Benak v. Alliance Cap. Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002)). Storm warnings take numerous forms including "the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001) (citation and internal quotations omitted).

period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation, . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.'" *Id.* at 275 (quoting *Merck*, 559 U.S. at 653).

Here, the original class action complaint in this case was filed on July 16, 2021, and therefore "the critical date for timeliness purposes" is July 16, 2019, the date "two years before th[e] complaint was filed." *Merck*, 559 U.S. at 638. The Court will address Defendants' arguments as to when the statute of limitations was triggered in a chronological order.

Defendants' arguments that the SAC clearly alleges that the stock promotion scheme was "discovered" in January 2018 are misguided.[23] Paragraph 5 of the SAC does not expressly state that Plaintiffs were the ones to discover the Promotional Campaign; instead, the SAC merely states that it *was* discovered. (*See* ECF No. 91 ¶ 5 ("When the concealed stock promotion campaign was finally discovered in January 2018, the discovery triggered a regulatory investigation, the initiation of the pending lawsuit by the SEC, and a downgrade of RenovaCare's stock by OTC Markets Group.")) A detailed review of the SAC also guides the Court. The January 2018 Press Release, the only storm warning that had been publicly available at the time, merely disclosed that RenovaCare paid $90,005.00 for out-of-pocket costs incurred by unnamed investor relations agencies relating to the dissemination of the StreetAuthority publications. (*Id.* ¶ 226.) The January 2018 Press Release did not disclose any facts that would lead a reasonably diligent investor to discover Defendants' scienter to further the Scheme's purpose of fraudulently increasing the share

---

[23] Plaintiffs do not address this argument raised by Defendants. (*See generally* ECF No. 147.) The SAC alleges the following events in January 2018: OTC Markets Group uncovered StreetAuthority's ongoing promotion of RenovaCare on January 2, 2018 (ECF No. 91 ¶ 207); OTC Markets Group subsequently demanded RenovaCare make public disclosures regarding the Promotional Campaign (*id.* ¶ 212); and RenovaCare issued the January 2018 Press Release, disclosing it paid $90,005.00 for out-of-pocket costs incurred by unnamed investor relations agencies relating to the dissemination of the StreetAuthority publications (*id.* ¶¶ 169, 224, 226).

price and trading volume of RenovaCare's common stock.

Additionally, the January 2018 Press Release included reassurances that "the substance of the material statements pertaining to the Company's technology and products are not materially false or misleading" and that RenovaCare "had no editorial control over the content," "is not affiliated in any way with the authors of the annual predictions report or its publisher," and "was not involved in the creation, or directing the dissemination, of the report." (*Id.*) The Third Circuit has held that "[r]eassurances can dissipate apparent storm warnings if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *Benak v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 402 n.16 (3d Cir. 2006) (citation and internal quotations omitted). An investor of ordinary intelligence would have reasonably relied on RenovaCare's reassurances in the January 2018 Press Release. *See Pension Tr. Fund*, 730 F.3d at 277 (holding "despite widely-publicized reports about widespread problems with underwriting standards . . . an investor of ordinary intelligence would reasonably rely on [defendant]'s reassurances that the particular loans [at issue] were not afflicted with the common ailment"). Based on the foregoing, the Court finds that the statute of limitations was not triggered in January 2018.

Next, Defendants assert a series of storm warnings in February 2018 including Media Company 1's Articles, the StreetSweeper Article, the February 2018 Downgrade, and the simultaneous RenovaCare stock price drop of thirty percent triggered the statute of limitations.[24]

---

[24] The RenovaCare Defendants argue the amended S-1, which enabled Rayat, Bhogal, Sidhu, and others to sell their RenovaCare shares without restriction, when considered in tandem with the storm warnings in January and February 2018, "provided investors with a reasonable factual basis to allege their Section 9(f) claim against Bhogal by February 2018." (ECF No. 135-1 at 18 (citing ECF No. 91 ¶¶ 83, 85, 87).) The Court does not agree with this assertion as the amended S-1 merely removed restrictions on resale; it is doubtful that a reasonable investor would have been able to connect the dots and realize he or she could properly plead the alleged Section 9(f) violation at that time. (*See id.* ¶ 87.) The Court also notes the RenovaCare Defendants do not cite to any case law to support this argument.

The Court does not find these arguments persuasive. Media Company 1's Articles referred to RenovaCare as "the most dangerous stock covered to date" (ECF No. 91 ¶ 272), and suggested that RenovaCare was involved in a pump-and-dump scheme (*id.* ¶ 280). The StreetSweeper Article exposed deficiencies with RenovaCare's business operations, products, financials, insider trading practices, and RenovaCare's questionable response to the OTC Markets Letter (the "StreetSweeper Article"). (*Id.* ¶ 248.) The StreetSweeper Article also detailed that Rayat was previously in trouble with the SEC for illegal stock promotion. (*Id.* ¶ 249.) Neither Media Company 1's Articles, the StreetSweeper Article, nor the February 2018 Downgrade and the simultaneous RenovaCare stock price drop[25] provided Plaintiffs with the facts necessary to adequately plead the elements of their securities fraud claims with sufficient detail and particularity to survive a Rule 12(b)(6) motion and the heightened pleading standards of Rule 9(b) and the PSLRA. *See Pension Tr. Fund*, 730 F.3d at 275; *see also Hull*, 2017 WL 6493148, at *9 (finding storm warnings "did not reveal any facts that would lead a reasonably diligent investor to discover [d]efendants' scienter, *i.e.*, to allegedly perpetuate schemes of inflating [defendant company]'s stock for acquisition purposes, a necessary component of a § 10(b) claim"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, Civ. A. No. 03-1519, 2012 WL 1680097, at *7 (D.N.J. May 11, 2012) ("Viewed in the light most

---

[25] The Court is not persuaded by the RenovaCare Defendants' reliance on *Barbee v. Amira Nature Foods, Ltd.* for the notion that the significant drop in RenovaCare's stock price constituted a sufficient storm warning. (ECF No. 135-1 at 17 (citing *Barbee v. Amira Nature Foods, Ltd.*, Civ. A. No. 21-12894, 2023 WL 4627744, at *7 (D.N.J. July 19, 2023)).) In *Barbee*, the court merely held that a "market collapse" may constitute a "clear storm warning" to put the plaintiff on "inquiry notice" and then cited to two pre-*Merck* decisions. *Id.* (citing *Brimo v. Corp. Express, Inc.*, 229 F.3d 1135 (2d Cir. 2000)); *In re Adelphia Commc'ns Corp.*, Civ. A. No. 03-1529, 2005 WL 1278544, at *10 (S.D.N.Y. May 31, 2005)). As noted above, inquiry notice and storm warnings "only play a supporting role because 'the limitations period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered the facts constituting the violation, . . . irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.'" *Pension Tr. Fund*, 730 F.3d at 275 (quoting *Merck*, 559 U.S. at 653).

favorable to Plaintiffs, the Washington Post article published in August of 2001 does not meet [the scienter pleading] standard. Although . . . this article showed the *possibility* that [d]efendants acted with scienter, this article did not raise a *strong inference* that [d]efendants had the necessary state of mind. At best, the Washington Post article shows facts indicating that [d]efendants made a materially false statement by withholding data.")

Further, RenovaCare again issued misleading press releases in response. The February 12, 2018 Press Release was entitled "RenovaCare Issues Stern Response to Admitted Short-Seller, StreetSweeper, Affiliated with Felon Convicted of Securities Fraud" and accused StreetSweeper of undertaking "irresponsible and nefarious actions" designed to "damage the public trust" by "spreading 'short and distort' commentary" about the company and reiterated RenovaCare's supposed "incredible strides" and the upcoming "major milestone" of an initial FDA filing. (ECF No. 91 ¶¶ 255–56.) Although not completely relevant to the Scheme, RenovaCare also issued misleading press releases on February 15, 2018 and February 21, 2018 intended to obfuscate the discourse surrounding the Company. (*Id.* ¶¶ 275–76.) The March 5, 2018 Release was entitled "RenovaCare Takes Action to Protect Shareholder Interests" and without addressing StreetSweeper by name stated "a known short and distort syndicate has engaged in an ongoing smear campaign of disseminating grossly misleading, inaccurate and distorted facts and misinformation, including false allegations of insider sell[ing]." (*Id.* ¶ 257.) These reassurances again "dissipate[d]" the storm warnings contained in Media Company 1's Articles, the StreetSweeper Article, and the February 2018 Downgrade as well as the simultaneous RenovaCare stock price drop. *See Benak*, 435 F.3d at 402 n.16; *see also Pension Tr. Fund*, 730 F.3d at 277; *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) ("[E]xpress denials of the reported allegations could have allayed a reasonable investor's

concerns."); *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003) ("There are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management."). Therefore, the Court finds that the statute of limitations was not triggered in February 2018.

Lastly, the Court addresses Defendants' arguments that the statute of limitations began to toll on April 12, 2019 at the latest due to the contents of the April 2019 Disclosure. In the April 2019 Disclosure, RenovaCare admitted that its disclosure controls and procedures were ineffective. (ECF No. 91 ¶¶ 25, 298.) RenovaCare identified several material weaknesses in internal control over financial reporting. (*Id.* ¶ 298.) However, the April 2019 Disclosure did not disclose any information that would lead a reasonably diligent plaintiff to discover the facts constituting Plaintiffs' claims including Defendants' scienter, manipulative market activity, and their false and misleading statements and material omissions in furtherance of the Scheme. Therefore, the Court finds that the statute of limitations was not triggered in April 2019 because the April 2019 Disclosure did not provide Plaintiffs with the facts necessary to adequately plead the elements of their securities fraud claims with sufficient detail and particularity to survive a Rule 12(b)(6) motion and the heightened pleading standards of Rule 9(b) and the PSLRA. *See Pension Tr. Fund*, 730 F.3d at 275; *see also Hull*, 2017 WL 6493148, at *9; *Alaska Elec.*, 2012 WL 1680097, at *7.

Rather, the Court finds that a reasonably diligent plaintiff would have discovered the facts necessary to plead the elements of their securities claims with sufficient detail and particularity to survive a 12(b)(6) motion on May 28, 2021 when the SEC Complaint was filed. *Pension Tr. Fund*, 730 F.3d at 275. SEC actions and securities lawsuits have been held to toll the statute of limitations

period and provide notice of actionable wrongdoing as well as the ability to adequately plead a securities complaint. *See Pension Tr. Fund*, 730 F.3d at 277 (finding that "reasonably diligent plaintiff[s] would have begun to inquire" when a separate class of plaintiffs filed a complaint alleging violations of the Securities Act); *see also DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 637 (S.D.N.Y. 2004) (holding plaintiffs "had no basis for believing that [defendant] had intentionally lied . . . until the SEC disclosed [defendant's] emails to the public"). The SEC Complaint was the first point at which a reasonably diligent plaintiff would have been provided with sufficient information to plead Defendants' scienter, manipulative market activity, and their false and misleading statements and material omissions. (*See* ECF No. 91 ¶¶ 354–56.) Although a reasonably diligent plaintiff may have started an investigation based on one or more of the Storm Warnings, the statute of limitations does not begin to run until a reasonably diligent plaintiff would have discovered sufficient facts to adequately plead the alleged securities violations, *Pension Tr. Fund*, 730 F.3d at 277, which here would not have occurred until May 28, 2021 when the SEC Complaint was filed.

Accordingly, Defendants' Motions to Dismiss the SAC on statute of limitation grounds is **DENIED**. Defendants may renew their statute of limitations defense at a later stage. *See Hull*, 2017 WL 6493148, at *10 (denying defendants' motion to dismiss 10(b) claim as untimely but noting defendants "may renew their timeliness defense on a summary judgment motion").

### 2.    Statute of Repose

The Sidhu Defendants argue the statute of repose bars any claims against them to the extent they are premised on misconduct occurring more than five years before Plaintiffs filed their SAC. (ECF No. 137-1 at 9–10; ECF No. 151 at 3–4.) In opposition, Plaintiffs assert the statute of repose does not bar any of their claims against the Sidhu Defendants because it did not begin to run until

February 2018, which is the date of the last wrongful acts alleged against Sidhu. (ECF No. 147 at 24–25.)

The five-year statute of repose set forth in 28 U.S.C. § 1658(b)(2) "begins to run on the date of the alleged misrepresentation." *In re Exxon Mobile*, 500 F.3d at 200. "Although the law in this area is somewhat unresolved, the majority of courts have held that the statute of repose in § 1658(b)(2) begins to run on the date of the last alleged misrepresentation regarding related subject matter." *McCullough v. Advest, Inc.*, Civ. A. No. 17-407, 2017 WL 3675787, at *3 (W.D. Pa. Aug. 25, 2017), *aff'd on other grounds*, 754 F. App'x 109 (3d Cir. 2018) (collecting cases); *N. Sound Cap. LLC v. Merck & Co., Inc.*, Civ. A. No. 13-7240, 2015 WL 5055769, at *11 (D.N.J. Aug. 26, 2015), *rev'd on other grounds*, 702 F. App'x 75 (3d Cir. 2017) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014)) ("A statute of repose . . . puts an outer limit on the right to bring a civil action. That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant."); *see Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017) (quoting *CTS Corp.*, 573 U.S. at 8) (holding, although not in the context of claims under the Exchange Act, that "statutes of repose begin to run on 'the date of the last culpable act or omission of the defendant'").[26]

Here, the latest misrepresentation by Sidhu that Plaintiffs allege is in February 2018. (*See*

---

[26] In their reply brief, the Sidhu Defendants also describe the issue of when the statute of repose begins to run as an "unresolved question of law." (ECF No. 151 at 4.) Notwithstanding, the Sidhu Defendants place reliance on a District of Connecticut decision that "expressly rejected *McCullough*'s statement that a 'majority of courts' hold that the statute of repose begins to run on the date of the last alleged misrepresentation, instead observing that 'the weight of authority,' including the 'more recent' case law, 'holds that the statute of repose . . . begins to run from the date of each alleged misrepresentation or omission that could constitute a violation of Section 10(b) of the Exchange Act.'" (*Id.* at 3 (quoting *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 334 n.17 (D. Conn. 2021)). The Court is not persuaded by the Sidhu Defendants' reliance on *In re Teva* as *In re Teva* relies on non-binding, out-of-circuit district court decisions. *See In re Teva*, 512 F. Supp. 3d at 333–34.

ECF No. 91 ¶¶ 279, 281, 282, 284.) The Court therefore finds that Plaintiffs' claims against the Sidhu Defendants are not barred by the five-year statute of repose because Plaintiffs brought their claims against the Sidhu Defendants in December 2022, *i.e.*, within five years of the last alleged misrepresentation against them. Accordingly, the Sidhu Defendants' Motion to Dismiss the SAC on statute of repose grounds is **DENIED**.

### B.    Plaintiffs Have Not Sufficiently Pled CIG Is Liable As A Successor-In-Liability for Securities Fraud Violations Committed By StreetAuthority

CIG asserts Plaintiffs have failed to allege that CIG should be held liable solely because it purchased assets from StreetAuthority. (ECF No. 136-1 at 11–19.) CIG notes the only allegations against itself is that CIG was "formerly StreetAuthority, LLC." (*Id.* at 11 (citing ECF No. 91 ¶ 42).) CIG submits it entered into an asset purchase agreement (the "APA")[27] with StreetAuthority and other entities, which "confirms that CIG merely purchased certain assets from StreetAuthority . . . and never has been 'formerly' [sic] StreetAuthority which continued to exist as a separate and distinct entity." (*Id.*) CIG argues that pursuant to the express terms of the APA, it did not agree to assume StreetAuthority's liabilities. (*Id.* at 12–16.) Primarily in reliance upon Texas law,[28] CIG argues it is not a successor-in-liability to StreetAuthority and therefore cannot be held liable to Plaintiffs. (*Id.*)

In opposition, Plaintiffs assert the Court cannot consider the APA as it is not integral to the SAC, properly authenticated, or "explicitly referenced." (ECF No. 147 at 44–45.) Plaintiffs submit

---

[27] CIG contends the APA is "integral to or explicitly relied upon in the complaint" and therefore the Court may consider the APA and its provisions. (*Id.* at 8 n.7; ECF No. 150 at 4–6.) CIG's counsel attached the APA as an exhibit to its Motion and declared it "is a true and correct copy." (ECF No. 136-2 ¶ 5.)

[28] CIG submits Texas law governs the interpretation of the APA pursuant to the APA's "Governing Law" provision. (ECF No. 136-1 at 12.)

CIG's counsel "cannot properly authenticate the agreement" because "he did not sign the document, and he does not allege that he has *any* personal knowledge of it." (*Id.* at 44.) Additionally, Plaintiffs argue CIG's arguments regarding successor liability are premature. (*Id.* at 46–47.) Plaintiffs contend an exception to successor liability may apply under New Jersey law[29] and therefore they are entitled to discovery on this issue. (*Id.* at 47.)

In reply, CIG asserts Plaintiffs' failure to plead the facts of successor liability is a standalone basis to dismiss the SAC. (ECF No. 150 at 3.) CIG also contends the APA is indisputably authentic.[30] (*Id.* at 6–9.) Further, CIG submits "the authenticity of the APA could not be seriously disputed" because "[CIG's counsel] served as deal counsel to CIG as purchaser . . . and thus has personal knowledge of the authenticity of the APA." (*Id.* at 7–8.) CIG argues discovery is not necessary to resolve Plaintiffs' successor liability claim and that Plaintiffs' claims against CIG should be dismissed. (*Id.* at 9–13.)

### 1. The Court Will Not Consider the APA

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9

---

[29] Plaintiffs submit the Court should apply New Jersey law to successor liability because the Court "must disregard" the APA. (*Id.* at 46 n.17.)

[30] CIG provided a declaration of CIG's chief operating officer who signed the APA on behalf of CIG in support of its reply. (ECF No. 150-2.)

(3rd Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated '[w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)).

Here, Plaintiffs assert claims against CIG for material misstatements or omission under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) (Count II) and scheme liability under Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) (Count III). The extent of the allegations against CIG are that "[i]n early 2019, StreetAuthority was acquired by Investing Daily, a division of [CIG], an online and print publishing company serving various markets. After the acquisition, StreetAuthority's domain name StreetAuthority.com became a division of CIG and began operating as a fictitious business name (d/b/a) for CIG." (ECF No. 91 ¶ 42.)[31] The SAC does not contain any allegations as to CIG's actions related to Plaintiffs' claims for securities violation. (*See generally* ECF No. 91.) Instead, as Plaintiffs put it, the SAC "alleges that CIG is liable as StreetAuthority's successor." (ECF No. 147 at 50 n.21.) CIG correctly asserts that just because the APA is not "explicitly referenced," this aspect of the pleading is not determinative of whether the Court may consider the APA. *See In re Burlington Coat Factory*, 114 F.3d at 1426 ("[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited. . . . Plaintiffs cannot prevent

---

[31] The SAC also cites to a URL for a press release entitled "Investing Daily Continues Rapid Growth by Acquiring 10 Street Authority Investment Publications," which states: "Capitol Information Group . . . acquired the assets of [StreetAuthority, LLC]." (EF No. 91 ¶ 42 n.9.)

a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.") Although Plaintiffs' claims for securities violations are not based on the APA, it certainly appears that the APA is *integral to* the SAC in establishing Plaintiffs' theory that CIG acquired StreetAuthority and is liable as a successor-in-interest. *See B&S Int'l Trading Inc. v. Meer Enters. LLC*, Civ. A. No. 18-11546, 2020 WL 5088257, at *4 (D.N.J. Aug. 28, 2020) (noting the parties did not dispute this issue and finding an asset purchase agreement integral to complaint in successor liability claim).

However, Plaintiffs argue that the APA is not "properly authenticated." (ECF No. 147 at 44–45.) In support of its Motion, CIG provided two declarations from its counsel (ECF Nos. 136-2, 150-1), as well as a declaration from its Chief Operating Officer (ECF No. 150-2), attesting to the authenticity of the APA. Notwithstanding, the Court will not engage in an evidentiary determination at this stage given that Plaintiffs dispute the authenticity of the APA.[32] Therefore,

---

[32] There may be a basis for the Court to consider the APA and to reject Plaintiffs' authenticity arguments at this stage. *See Atl. Neurosurgical Specialists, PA ex rel. Patient DC v. Anthem Blue Cross & Blue Shield*, Civ. A. No. 20-10415, 2021 WL 4148149, at *2 n.4 (D.N.J. Sept. 10, 2021) (considering a document at the motion to dismiss stage, citing to Federal Rule of Evidence 901, and finding "Plaintiff's argument that Defendants failed to properly authenticate this document is misplaced as Defendants submitted the Declaration of . . . a 'Senior Legal Specialist' employed by [defendant], who provided a sworn statement of her personal knowledge"); *see also* Fed. R. Evid. 901 (providing that a document may be authenticated by: "testimony of a witness with knowledge: that the document 'is what it is claimed to be'; and its 'appearance, contents, substance, internal patterns, or other distinctive characteristics'"). But the vast majority of case law uses the language "undisputedly authentic" in analyzing whether a district court may consider an extraneous document as part of a motion to dismiss. *See Trump Casino*, 7 F.3d at 368 n.9; *see also Est. of Roman v. City of Newark*, 914 F.3d 789, 796–97 (3d Cir. 2019) (providing that a district court may consider documents "that a defendant attaches as an exhibit to a motion to dismiss," if it is "undisputedly authentic" and "the [plaintiff's] claims are based [on them]"); *Premier Orthopaedic Assoc. of S. N.J., LLC v. Anthem Blue Cross Blue Shield*, 675 F. Supp. 3d 487, 492 (D.N.J. 2023) ("Because [plaintiff] disputes the [document]'s authenticity, this Court declines to consider it."); *Second Wave Acquisition, LLC v. Exceptional Software Strategies, Inc.*, Civ. A. No. 19-02870, 2021 WL 615122, at *6 (D. Md. Feb. 17, 2021) ("Because [plaintiffs] challenge the authenticity of the Asset Purchase Agreements, the Court may not consider [defendant]'s exhibits . . . at this juncture.").

the Court will not consider the APA.

> **2.     Plaintiffs Have Not Adequately Pled CIG Is Liable As StreetAuthority's Successor**

Under New Jersey law,[33] "[t]he general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller." *Pub. Serv. Elec. & Gas Co. v. Cooper Indus., LLC*, 678 F. Supp. 3d 611, 620 (D.N.J. 2023) (quoting *Lefever v. K.P. Hovnanian Enters.*, 734 A.2d 290, 292 (N.J. 1999)). There are four traditional exceptions to this general rule: "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability." *Id.* (citation omitted).

Here, Plaintiffs solely allege StreetAuthority was acquired by CIG in early 2019 (well after the events of the Promotional Campaign) and "StreetAuthority's domain name StreetAuthority.com became a division of CIG and began operating as a fictitious business name (d/b/a) for CIG," (ECF No. 91 ¶ 42), without alleging any additional facts to support their claims against CIG. Plaintiffs have failed to properly allege any exceptions to the general rule of successor

---

[33] To determine whether Plaintiffs have sufficiently pled CIG is a successor-in-liability, the Court will apply New Jersey law. *See Weikel v. Tower Semiconductor, Ltd.*, 183 F.R.D. 377, 400 (D.N.J. 1998) ("In construing matters of State law in pendent claims or in state law matters otherwise subsidiary to its federal question jurisdiction, a federal court . . . is duty-bound to apply the law of the state in which it sits."). Accordingly, the Court will not undertake a choice-of-law analysis as CIG and Plaintiffs did not brief this issue separate from the effect of the choice-of-law provision in the APA. Further, "[d]ue to the factual inquiry that may be necessary to properly weigh the Restatement factors, 'it can be inappropriate or impossible for a court to conduct [a choice-of-law] analysis at the motion to dismiss stage when little or no discovery has taken place.'" *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 718 (D.N.J. 2011) (quoting *In re Samsung DLP Television Class Action Litig.*, Civ. A. No. 07–2141, 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009)).

liability. Instead, Plaintiffs rely on "mere conclusory statements" which do not set forth a plausible claim for successor liability against CIG. *Iqbal*, 556 U.S. at 678. Therefore, the Court finds a basis to dismiss Plaintiffs' claims against CIG. *See A&E Harbor Transp., Inc. v. Tri-Coastal Design Grp., Inc.*, Civ. A. No. 20-18509, 2021 WL 663747, at *2 (D.N.J. Feb. 19, 2021) (granting motion to dismiss for failure to plead "sufficient facts to make plausible . . . successor liability"); *see also Munezon v. Peters Advisors, LLC*, 553 F. Supp. 3d 187, 209 (D.N.J. Aug. 11, 2021) (dismissing complaint when the complaint did not contain specific allegations as to a successor liability exception because "[w]ithout them . . . [plaintiff] fails to plead successor liability"). Accordingly, CIG's Motion to Dismiss the SAC is **GRANTED**.[34]

### C.   The RenovaCare Defendants and the Sidhu Defendants' Motions to Dismiss Count I of the SAC As Against Bhogal and Sidhu for Failing to Sufficiently Allege Market Manipulation in Violation of Section 9(f) of the Exchange Act

The RenovaCare Defendants argue the Court should dismiss Plaintiffs' market manipulation claim under Section 9 of the Exchange Act (Count I of the SAC) as against Bhogal because the SAC does not allege: (1) Bhogal engaged in the specific type of trading activity prohibited under Section 9(a)(1)[35]; (2) Bhogal's trading of RenovaCare stock was done for the purpose of inducing others to purchase or sell RenovaCare stock as prohibited under Section 9(a)(2); and (3) Bhogal's stock sales and unexecuted buy orders manipulated the stock price. (ECF No. 135-1 at 21–24.) The Sidhu Defendants similarly argue the Court should dismiss Plaintiffs'

---

[34] Because the Court dismisses the SAC as to CIG based on Plaintiffs' failure to set forth a plausible claim for successor liability against CIG, the Court will not address CIG's remaining arguments as to why Plaintiffs have failed to properly allege claims for material misstatements or omission under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) (Count II), and scheme liability under Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) (Count III).

[35] Plaintiffs assert they "do not bring a claim for violation of Section 9(a)(1)." (ECF No. 147 at 26.)

claim for market manipulation as against Sidhu because Plaintiffs do not allege that Sidhu's allegedly manipulative trading affected the price of any of their own purchases or sales of RenovaCare securities. (ECF No. 137-1 at 19–20.)

In opposition, Plaintiffs assert they have adequately alleged market manipulation in violation of Section 9(a)(2) of the Exchange Act against Bhogal and Sidhu because the SAC alleges that they engaged in manipulative trading which induced others to purchase or sell RenovaCare stock. (ECF No. 147 at 26–28, 28 n.9.) Additionally, Plaintiffs argue that the SAC sufficiently alleges Bhogal and Sidhu's manipulative trading affected the Company's stock price. (*Id.* at 28–29.)

In reply, the RenovaCare Defendants assert the SAC fails to plausibly allege that Bhogal acted with "manipulative intent" when selling his RenovaCare shares. (ECF No. 149 at 10.) Further, the RenovaCare Defendants argue Plaintiffs' "allegations about unexecuted buy orders and Bhogal's alleged intent for doing so are conclusory and lack sufficient supporting factual details." (*Id.* at 11.) The Sidhu Defendants submit "Plaintiffs' Opposition provides no meaningful response" to their argument that the SAC does not draw a link between Sidhu's trading and RenovaCare's stock price as required to state a claim under Section 9(a)(2). (ECF No. 151 at 4.) The Sidhu Defendants reiterate that the SAC "fails to allege whether or how Sidhu's purchases affected the price of RenovaCare securities, let alone allege that Plaintiffs themselves purchased or sold securities at an affected price." (*Id.*)

Section 9(a)(2) of the Exchange Act prohibits "effect[ing] . . . a series of transactions in any security registered on a national securities exchange . . . for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). To state a claim under Section 9(a)(2), a plaintiff must allege:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, [that] (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price.

*He v. China Zenix Auto Int'l Ltd.*, Civ. A. No. 18-15530, 2020 WL 3169506, at *13 (D.N.J. June 12, 2020) (citation and internal quotations omitted). The RenovaCare Defendants and Sidhu Defendants dispute the adequacy of the SAC's pleading of the third and fifth elements. (*See* ECF No. 135-1 at 23–24; ECF No. 137-1 at 19–20.) Therefore, the Court focuses its analysis on these two elements.

> **1.      The SAC Sufficiently Alleges that Bhogal and Sidhu Engaged in Manipulative Trading For the Purpose of Inducing Others to Purchase Or Sell RenovaCare Stock**

"Section 9(a) 'proscribes specific behavior . . . that may constitute market manipulation.'" *SEC v. Gallagher*, Civ. A. No. 21-8739, 2023 WL 6276688, at *14 (S.D.N.Y. Sept. 26, 2023) (quoting *SEC v. Competitive Techs., Inc.*, Civ. A. No. 04-1331, 2005 WL 1719725, at *6 (D. Conn. July 21, 2005)). Generally, market manipulation includes "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). "Market manipulation can also encompass 'open-market activity' that is not expressly prohibited, such as 'short sales and large or carefully timed purchases or sales of stock.'" *Gallagher*, 2023 WL 6276688, at *14 (quoting *SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007)). Notably, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) "Proof of a violation of § 9(a)(2) requires evidence of 'manipulative motive and willfulness,' which are normally inferred from the circumstances of the case." *SEC v. Lek Sec. Corp.*, 276 F.

Supp. 3d 49, 62 (S.D.N.Y. 2017) (quoting *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969)).

Here, Plaintiffs allege sufficient facts to support their claim that Bhogal and Sidhu engaged in trading activity intended to manipulate RenovaCare's share price and induce others to purchase or sell it. (*See, e.g.*, ECF No. 91 ¶¶ 73, 85–87 (Bhogal and Sidhu acquired large quantities of RenovaCare shares and thereafter the shares were registered so that they could be sold without restriction during the Scheme); *id.* ¶¶ 39–40 (Bhogal and Sidhu transacted in RenovaCare shares in furtherance of the Scheme); *id.* ¶¶ 39, 108, 131, 134–36 (Bhogal orchestrated the Promotional Campaign through his wholly owned consulting firm, Vector); *id.* ¶¶ 196–99 ("In early November 2017 . . . Sidhu and Bhogal began selling RenovaCare shares in a highly coordinated manner. Their trades tracked the [Promotional Campaign], and evidences their knowing participation in the scheme."); *id.* ¶ 278 (Bhogal and Sidhu "took steps to bolster RenovaCare's share price and trading volume. . . . First, they stopped selling shares, which could depress the share price, Second, they soon began aggressively buying RenovaCare stock at historically high prices to artificially inflate the market."); *id.* ¶ 283 ("Bhogal placed several buy orders for RenovaCare stock to further support RenovaCare's share price and trading volume. Although these orders were never executed, they created a false impression of demand for the stock at the order prices. . . . These buy orders were intended to manipulate the market for the purpose of inducing its purchase or sale by others."); *id.* ¶ 290 (During the Promotional Campaign, Bhogal sold over 491,000 shares and reaped over $2.6 million in sale proceeds and Sidhu sold over 332,000 shares and reaped over $2.8 million in sales proceeds).)

Drawing all inferences in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly pled that Bhogal and Sidhu engaged in manipulative trading for the

purpose of inducing others to purchase or sell RenovaCare shares in violation of Section 9(a)(2) of the Exchange Act. *See Lek Sec. Corp.*, 276 F. Supp. 3d at 62 (finding SEC adequately alleged Section 9(a)(2) violation where complaint alleged manipulative trading activity was "designed to create a false impression of supply or demand for securities and to induce other market participants to purchase or sell securities"); *see also SEC v. Hwang*, Civ. A. No. 22-3402, 2023 WL 6124041, at *13 (S.D.N.Y. Sept. 19, 2023) (finding allegations that defendant engaged in trading activity "with the intent of sending false pricing signals to the market about the true demand for the securities" sufficiently alleged manipulative intent).

### 2.    Plaintiffs Have Adequately Pled that Bhogal and Sidhu's Manipulative Trading Affected RenovaCare's Stock Price

Section 9 limits a private right of action to "person[s] who . . . purchase or sell any security at a price which was affected by [the alleged manipulative] act or transaction." 15 U.S.C. § 78i(f). "Under this clause it is clear that the party claiming injury must plead and prove some change in price, because of the prohibited acts. He must either have entered a false market or paid a false price to enter a genuine market." *Rosenberg v. Hano*, 121 F.2d 818, 821 (3d Cir. 1941); *see MTB Inv. Partners, LP v. Siemens Hearing Instruments, Inc*., Civ. A. No. 12-00340, 2013 WL 12149253, at *7 (D.N.J. Feb. 19, 2013) ("[T]he law in this Circuit is clear that section 9(a) liability must be predicated on a purchase or sale at a price affected by the offending conduct.") (citation omitted). Here, Plaintiffs have satisfied this requirement by alleging the following: Bhogal and Sidhu sold their shares in a coordinated manner that essentially tailed the Promotional Campaign (ECF No. 91 ¶¶ 196–99); "internet users clicked on tens of thousands of RenovaCare ads created by StreetAuthority" pursuant to the Promotional Campaign resulting in "an uptick in volume and price" for RenovaCare stock (*id.* ¶¶ 192–93); "On October 23, 2017, RenovaCare's stock price closed at $3.10 per share, and by January 5, 2018, it had risen to $4.91 per share, an approximately

36

58 percent increase" (*id.* ¶ 193); Sidhu coordinated the purchase of shares between February 12

and 16, 2018 "with no economic justification other than to manipulate the share price and trading

volume by creating a false impression of investor interest in the stock for the purpose of inducing

its purchase or sale by others" (*id.* ¶ 282); on February 20 and 21, 2018, Bhogal "placed several

buy orders . . . to further support RenovaCare's share price and trading volume" and create the

"false impression of demand for the stock at the order prices" (*id.* ¶ 283); RenovaCare stock then

reached an all-time high of over \$10.50 per share on February 21, 2018 (*id.*). Based on these

allegations, Plaintiffs have sufficiently pled that Bhogal and Sidhu's manipulative trading affected

the RenovaCare share price.[36]

Accordingly, the RenovaCare Defendants and the Sidhu Defendants' Motions to Dismiss

Count I of the SAC are **DENIED**.

### D. The RenovaCare Defendants' Motion to Dismiss Count II of the SAC for Failing to Sufficiently Allege False Statements in Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)[37]

The RenovaCare Defendants assert that Plaintiffs' claim for material misstatements or

omissions (Count II of the SAC) should be dismissed because: (1) RenovaCare, Rayat, and Bhogal

---

[36] The RenovaCare Defendants and the Sidhu Defendants do not cite to persuasive case law in support of their assertion that Plaintiffs have failed to allege Bhogal and Sidhu's manipulative trading affected the stock price. (*See* ECF No. 135-1 at 23–24; ECF No. 137-1 at 19–20; ECF No. 149 at 10–11; ECF No. 151 at 4.) For example, the RenovaCare Defendants' reliance on *Xu v. Direxion Shares ETF Tr.*, Civ. A. No. 22-5090, 2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023) is misplaced. In that case, the Southern District of New York found that the operative complaint "lack[ed] any conceivable, factual basis for the allegation that Defendants manipulated the price of the [index-based ETFs] shares." *Id.* at *10. Whereas here, Plaintiffs have alleged a significant factual basis from which the Court can plausibly infer that Bhogal and Sidhu engaged in manipulative trading that affected RenovaCare's share price.

[37] In response to the Sidhu Defendants' arguments seeking dismissal of Count II as to Sidhu (ECF No. 137-1 at 10–13), Plaintiffs state they "no longer advance a claim against Sidhu under Count II for false and misleading statement" (ECF No. 147 at 30 n.11). Accordingly, the Sidhu Defendants' Motion to Dismiss Count II of the SAC as to Sidhu is **GRANTED**.

did not have a duty to disclose the Promotional Campaign; and (2) Bhogal and Rayat were not the "makers" of RenovaCare's alleged false statements. (ECF No. 135-1 at 24–31.) In opposition, Plaintiffs argue the SAC sufficiently alleges that Bhogal and Rayat are liable for making false and misleading statements as well as material omissions because they were "makers" of the alleged statements and had a duty to disclose. (ECF No. 147 at 30–37.) The Court addresses each of the RenovaCare Defendants' arguments in turn.

Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5(b) applies this provision and provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5(b).

To state a claim for material misrepresentations or omissions under Section 10(b) and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentations or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citations omitted).

      1.      **Plaintiffs Have Sufficiently Pled Rayat, But Not Bhogal, Was the "Maker" of RenovaCare's Alleged Untrue Statements Or Omissions In the January 2018 Press Release.**

Plaintiffs allege Bhogal and Rayat are liable for alleged false statements and omissions in

thirteen RenovaCare public filings from August 2017 to May 2020.[38] (*See* ECF No. 91 ¶¶ 321–53.) The RenovaCare Defendants argue (i) Bhogal was not the "maker" of false statements alleged in any of the thirteen RenovaCare public filings and (ii) Rayat was not the "maker" of nine of the thirteen RenovaCare public filings. (ECF No. 135-1 at 28–31.) In opposition, Plaintiffs submit Bhogal and Rayat were "makers" of the January 2018 Press Release because they had "ultimate authority." (ECF No. 147 at 30–32.) In reply, the RenovaCare Defendants submit Plaintiffs concede that Bhogal was not the "maker" of twelve of the public filings and that Rayat was not the "maker" of eight of the public filings. (ECF No. 149 at 13–14.) The RenovaCare Defendants also contend Bhogal and Rayat were not the "makers" of the alleged false statements in the January 2018 Press Release because Plaintiffs did not plead these allegations with the requisite particularity. (*Id.* at 12–13.)

Plaintiffs only address the RenovaCare Defendants' arguments related to the January 2018 Press Release. (*See* ECF No. 147 at 30–32.) By failing to address the remainder of the RenovaCare Defendants' arguments, Plaintiffs have waived their claims against Bhogal, to the extent they are premised on the other twelve public filings, and against Rayat, to the extent they are premised on the other eight public filings.[39] *See Jimenez v. T.D. Bank, N.A.*, Civ. A. No. 20-07699, 2021 WL 4398754, at *14 (D.N.J. Sept. 27, 2021) ("The failure to respond to a substantive argument to

---

[38] The Court did not list all thirteen of the public filings in the factual background section. The January 2018, March 5, 2018, and February 12, 2018 Press Releases as well as the April 2019 Disclosure are four of the thirteen. (*See* ECF No. 91 ¶¶ 321–53.) The other nine are: (1) August 14, 2017 Form 10-Q Filing; (2) October 18, 2017 Prospectus Supplement; (3) November 14, 2017 Form 10-Q Filing; (4) February 12, 2018 Form S-1 Filing; (5) February 27, 2018 Form 8-K Filing; (6) March 13, 2018 Form 10-K Filing; (7) April 6, 2018 Form S-1/A Filing; (8) April 25, 2018 Prospectus; (9) May 14, 2020 Form 10-K Filing. (*Id.*)

[39] The RenovaCare Defendants acknowledge Rayat signed and therefore was the "maker" of four of the public filings including: the April 6, 2018 Form S-1/A Filing, April 25, 2018 Prospectus, April 2019 Disclosure, and May 14, 2020 Form 10-K Filing. (ECF No. 135-1 at 31.)

dismiss a [claim], when a party otherwise files opposition, results in a waiver of that [claim].")
(quoting *Griglak v. CTX Mortgage Co., LLC*, Civ. A. No. 09-5247, 2010 WL 1424023, at *3
(D.N.J. Apr. 8, 2010)). Therefore, Plaintiffs' claims against Bhogal in Count II of the SAC are
dismissed to the extent those claims are premised on any public filing referenced in the SAC other
than the January 2018 Press Release. Similarly, Plaintiffs' claims against Rayat in Count II of the
SAC are dismissed to the extent those claims are premised on any public filing referenced in the
SAC other than the January 2018 Press Release, the April 6, 2018 Form S-1/A Filing, the April
25, 2018 Prospectus, the April 2019 Disclosure, and the May 14, 2020 Form 10-K Filing.

As to the January 2018 Press Release, the Court finds that Plaintiffs have adequately pled
Rayat was the "maker" of the alleged false statements contained therein. Only the person or entity
who "makes" the untrue statements or omissions may be liable under SEC Rule 10b-5(b). *Janus
Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("Rule 10b-5's private right
of action does not include suits against aiders and abettors."). "[T]he maker of a statement is the
person or entity with ultimate authority over the statement, including its content and whether and
how to communicate it." *Id.* "'[U]ltimate authority' . . . can be found if implicit in surrounding
circumstances, or, in other words, evidenced by various indicia of control." *Xu v. Gridsum Holding
Inc.*, 624 F. Supp. 3d 352, 359 (S.D.N.Y. 2022) (collecting cases). Further, "[a] statement can have
multiple makers." *JPMorgan Chase Bank, N.A. v. Javice*, Civ. A. No. 22-01621, 2023 WL
4546409, at *4 (D. Del. July 13, 2023) (citation omitted). In *Janus*, the Supreme Court analogized
this rule to the relationship between a speechwriter and a speaker. 564 U.S. at 143 ("Even when a
speechwriter drafts a speech, the content is entirely within the control of the person who delivers
it. And it is the speaker who takes credit—or blame—for what is ultimately said.").

Here, Plaintiffs allege the following facts relevant to the January 2018 Press Release: "Rayat was instrumental in drafting and disseminating RenovaCare's press release . . . Rayat was in the best position to provide the substantive detail in response to OTC Market's inquiry because . . . he had solicited StreetAuthority to run the campaign, concealed RenovaCare's payments" (ECF No. 91 ¶ 217); Rayat and Bhogal participated in several conference calls with RenovaCare's CEO, director, and outside counsel, to strategize the response to the OTC Markets Letter (*id.* ¶ 218); Bhogal coordinated with RenovaCare's investor relations consultant on the response (*id.* ¶ 219); Rayat assembled the team to work on the draft press release and provided comments to the draft (*id.* ¶¶ 219–20); Rayat emailed RenovaCare's CEO a final draft of the press release and instructed him to add boilerplate language (*id.* ¶ 222); RenovaCare's CEO followed Rayat's instructions and forwarded Rayat's final draft of the press release to the investor relations consultant (*id.*); Rayat determined when the January 2018 Press Release would be issued, instructing RenovaCare to wait until 3:45 p.m. "because he wanted to limit the potential impact of [it] by releasing it shortly before the market closed at 4 p.m." (*id.* ¶ 225); and Bhogal worked with the investor relations consultant to "correct an issue with [the] timing" of the release (*id.*). Based on these allegations, Rayat was clearly the person with ultimate authority over the January 2018 Press Release and controlled its "content and whether and how to communicate it." *See Janus*, 564 U.S. at 142; *see also Xu*, 624 F. Supp. 3d at 359–62.

However, the Court finds Plaintiffs have not plausibly pled Bhogal was the "maker" of the January 2018 Press Release. *See Janus*, 564 U.S. at 148 (finding defendant-entity was not the "maker" of the misleading statements because although the defendant-entity "was significantly involved," its assistance was subject to the defendant-maker's ultimate control and noting "[a]lthough [defendant-entity], like a speechwriter, may have assisted [defendant-maker] with

crafting what [defendant-maker] said in the prospectuses, [defendant-entity] did not 'make' those statements for purposes of Rule 10b-5"); *see also Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 539 (S.D.N.Y. 2014), *aff'd*, 639 F. App'x 664 (2d Cir. 2016) ("Any role [defendant] played in the drafting process or in distributing the offering materials is insufficient to impose primary liability under *Janus*."); *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, Civ. A. No. 17-1235, 2018 WL 1627266, at *10 (S.D.N.Y. Mar. 30, 2018) (dismissing claim under Rule 10b-5(b) and finding "Plaintiffs' allegations with respect to [defendant]'s relationship to the allegedly false and misleading statements insufficiently plead that [defendant] 'made' the statements under the rule of *Janus*. As the individual who 'drafted' the September 2012 8-K and 'at least reviewed' the other statements, [defendant] played a role much like that of a speechwriter, without any ultimate authority over the final content."). Accordingly, the RenovaCare Defendants' Motion to Dismiss Count II of the SAC as to Bhogal is **GRANTED**.

2.    **Plaintiffs Have Adequately Pled RenovaCare and Rayat Had a Duty To Speak Truthfully and Disclose the Extent of the Promotional Campaign in the January 2018 Press Release[40]**

The RenovaCare Defendants argue RenovaCare and Rayat did not have an affirmative duty to disclose the Promotional Campaign. (ECF No. 135-1 at 25–28.) In opposition, Plaintiffs assert RenovaCare and Rayat each had a duty to disclose the Promotional Campaign to make the January 2018 Press Release not misleading. (ECF No. 147 at 33–34.) Plaintiffs also argue Rayat and RenovaCare had a duty to disclose the Promotional Campaign "when they crafted the January [2018] Press Release" because they controlled it. (*Id.* at 34–37.)

The RenovaCare Defendants and Plaintiffs limited their arguments to the duty to disclose

---

[40] As the Court has already dismissed Plaintiffs' claims in Count II against Bhogal, the Court does not address the RenovaCare Defendants and Plaintiffs' arguments related to Bhogal's duty to disclose.

the Promotional Campaign. (*See* ECF No. 135-1 at 25–28; ECF No. 147 at 33–34; ECF No. 149 at 11–12.) Further, RenovaCare and Rayat's duty to disclose the Promotional Campaign is only specifically argued with respect to the January 2018 Press Release. (*See* ECF No. 147 at 33–34.)[41] The Court will only address the duty to disclose relative to the January 2018 Press Release. *See Ballas v. Tedesco*, 41 F. Supp. 2d 531, 533 n.2 (D.N.J. 1999) ("A moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief.").

Under Rule 10b-5, "[s]ilence, absent a duty to disclose, is not misleading." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *Laasko v. Endo Int'l, PLC*, Civ. A. No. 20-07536, 2022 WL 3444038, at *3 (D.N.J. Aug. 17, 2022) ("Liability attaches for both affirmative misstatements and misleading omissions, but the latter can only give rise to liability where the defendant had an affirmative duty to disclose the information in question.") (citing *Oran v. Stafford*, 226 F.3d 275, 285–86 (3d Cir. 2000)); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." (citation omitted)).

Even though "non-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty . . . there is [still] a duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or

---

[41] The RenovaCare Defendants did not address the duty to disclose specific to each of the thirteen public filings in their moving brief (*see* ECF No. 135-1 at 25–28), but then they claim in their reply brief that Plaintiffs concede they did not have a duty to disclose the Promotional Campaign in all public filings other than the January 2018 Press Release (*id.* at 11–12). The Court disagrees with the RenovaCare Defendants on this assertion as they did not submit arguments specific to each of the thirteen public filings in the same fashion that they did in support of their arguments related to whether Bhogal and Rayat were adequately pled as "makers." (*Compare* ECF No. 135-1 at 25–28, *with id.* at 28–31.)

volunteered, not misleading." *SEC v. Kearns*, 691 F. Supp. 2d 601, 616 (D.N.J. 2010) (citing *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) and *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989)) (internal quotations omitted). "The duty to disclose 'necessary' information to make the statements not misleading arises when each statement was made." *United States v. Schiff*, 538 F. Supp. 2d 818, 830 (D.N.J. 2008). "Omissions are 'material' [or necessary] for purposes of federal securities law if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Hoxworth v. Blinder, Robinson & Co.*, 903 F. 2d 186, 200 (3d Cir. 1990)) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

In the context of paid stock promotions, Section 17(b) of the Securities Act, commonly known as the "anti-touting" provision, places a duty on the publisher or promoter to disclose the payment received. *See* 15 U.S.C. § 77q(b) ("It shall be unlawful for any person . . . to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication, which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."); *see also Cortina v. Anavex Life Scis. Corp.*, Civ. A. No. 15-10162, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016) ("Section 17(b) . . . imposes a duty to disclose payment on the promoter who receives payment, but *not* on the issuer who hired and paid the promoter.") (emphasis in original).

Notwithstanding the "anti-touting" provision and the relevant case law applying it, the Court finds Plaintiffs have adequately pled RenovaCare and Rayat had a duty to speak truthfully about the Promotional Campaign in the January 2018 Press Release. The SAC alleges that the

OTC Markets Letter demanded that RenovaCare make public disclosures regarding the Promotional Campaign. (ECF No. 91 ¶ 212.) The SAC further alleges that RenovaCare thereafter issued the January 2018 Press Release, which included numerous material misrepresentations and omissions (*id.* ¶¶ 227–35), and misleadingly stated that "[t]he Company had no editorial control over the content" of the Promotional Campaign, and that "the Company, its executive officers, directors or, its controlling shareholder, or any third-party service providers" were not directly or indirectly involved with the creation or distribution of the promotional materials (*id.* ¶ 226). As discussed above, Plaintiffs have sufficiently pled Rayat was the "maker" of the January 2018 Press Release. Therefore, once Rayat, acting on behalf of RenovaCare, opened the door and began to make disclosures about the Promotional Campaign, he was required to "tell the whole truth." *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014)) ("It is well-established in [the Second] Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic. . . . That is because, at the moment the company chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim."); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty [to disclose] is not . . . a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues.").

The RenovaCare Defendants correctly assert that "Courts routinely dismiss securities fraud claims against public companies where plaintiffs allege the companies committed fraud by failing to disclose paid stock promotion campaigns." (ECF No. 27 at 27.) However, drawing all inferences in favor of Plaintiffs, the Court finds the facts alleged set forth that Rayat is more than "an issuer

who merely [paid] an author to write positive articles on a stock." *Cf. Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 104 (2d Cir. 2022) (holding the complaint did not adequately allege defendants had duties to disclose that they paid for the publication of a promotional article because "[t]he articles themselves did little more than republish publicly-available content. Moreover, there is no allegation that the press releases, the content of which was captured in the articles themselves, were false or misleading."). For instance, Plaintiffs allege: (i) Rayat was extensively involved in the Promotional Campaign (ECF No. 91 ¶ 229); (ii) RenovaCare was funding the Promotional Campaign through third-party investor relation companies (*id.* ¶ 230); (iii) Rayat, on behalf of RenovaCare, provided the information behind the substance of the Promotional Campaign and had editorial control (*id.* ¶¶ 232, 234); and (iv) Rayat approached StreetAuthority in July 2017 regarding the potential of the Promotional Campaign (*id.* ¶ 35).

Accordingly, the RenovaCare Defendants' Motion to Dismiss Count II of the SAC as to Rayat[42] and RenovaCare is **DENIED**.

### E.   The RenovaCare Defendants and the Sidhu Defendants' Motions to Dismiss Plaintiffs' Claims Against Defendants in Count III of the SAC for Scheme to Defraud in Violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c)

In Count III, Plaintiffs raise claims against Defendants for a scheme to defraud in violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c). (ECF No. 91 ¶¶ 394–402.) Plaintiffs allege Defendants perpetrated the Scheme which "was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of RenovaCare securities; and (iii) cause Plaintiffs and the Class to purchase RenovaCare securities

---

[42] As held above, Plaintiffs' claims against Rayat in Count II of the SAC are dismissed to the extent those claims are premised on any public filing referenced in the SAC other than the January 2018 Press Release, the April 6, 2018 Form S-1/A Filing, the April 25, 2018 Prospectus, the April 2019 Disclosure, and the May 14, 2020 Form 10-K Filing.

at artificially inflated prices." (*Id.* ¶ 396.)

Claims under Rules 10b-5(a) and (c) are referred to as "'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011). To state a claim for relief for scheme liability, "a private plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009) (citations omitted).

### 1.   Plaintiffs Have Adequately Pled Claims for Scheme Liability Against the RenovaCare Defendants

The RenovaCare Defendants assert the Court should dismiss Plaintiffs' claims as against them in Count III of the SAC because Plaintiffs have not adequately pled a claim for a scheme to defraud in violation of Section 10(b) Exchange Act and SEC Rules 10b-5(a) and (c) as Plaintiffs do not allege they engaged in inherently deceptive conduct independent of the alleged "non-disclosure" of the Promotional Campaign that serves as the basis for their claims in Count II of the SAC. (ECF No. 135-1 at 32–34.)

In opposition, Plaintiffs argue Count III should not be dismissed because they have adequately alleged that Defendants engaged in a "pump-and-dump" scheme in violation of SEC Rules 10b-5(a) and (c). (ECF No. 147 at 37–43.) Plaintiffs submit the alleged "pump-and-dump" scheme includes allegations that extend beyond the allegations which serve the basis for their claims in Count II against Defendants for false and misleading statements and omissions. (*Id.* at 38–42.)

In reply, the RenovaCare Defendants assert "even when recast as a pump-and-dump scheme, Plaintiffs still fail to point to inherently deceptive conduct attributable to each [of]

RenovaCare, Rayat[,] and Bhogal that is independent of the false statements they allegedly made in the RenovaCare public reports." (ECF No. 149 at 14.) Additionally, the RenovaCare Defendants note the SAC does not allege that RenovaCare and Rayat "sold or dumped their shares." (*Id.*)

Importantly, "misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections [Rule 10b-5(a) and (c)]." *SEC v. Rio Tinto PLC*, 41 F.4th 47, 53 (2d Cir. 2022) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)). Notwithstanding, a defendant may be liable under SEC Rule 10b-5(b) as well as SEC Rules 10b-5(a) and (c) based on "the same set of facts, where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005); *see In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1194 (D. Or. 2015) ("The fact that some of these alleged acts are closely connected to the alleged misrepresentations and omissions or that the alleged conduct was not disclosed until the alleged scheme unraveled does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim.").

Plaintiffs have adequately pled claims for scheme liability against the RenovaCare Defendants by alleging a pump-and-dump scheme. *See SEC v. Dynkowski*, Civ. A. No. 09-361, 2015 WL 12851237, at *1 (D. Del. July 29, 2015) ("[I]nvolvement in [] pump-and-dump schemes in order to artificially inflate the price of securities . . . is an actionable misrepresentation under the securities laws.") (citing *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1307 (S.D. Fla. 2012)). As to the Scheme, Plaintiffs allege extensive factual allegations including that Defendants: (i) accumulated millions of shares of RenovaCare at below-market prices, registered those shares for sale, and opened brokerage accounts; (ii) developed an aggressive investor relations program to

pump RenovaCare, despite having no successful products; (iii) solicited StreetAuthority for the Promotional Campaign designed to increase RenovaCare's stock price and trading volume; (iv) concealed their payments to StreetAuthority by funneling money through undisclosed third-party investor relations companies and providing inadequate disclosures; (v) participated in the preparation, dissemination, and approval of misleading statements about RenovaCare; (vi) engaged in a coordinated and continuous course of conduct to disguise the statements' falsity by issuing materially misleading press releases; (vii) planned article releases with targeted content to artificially inflate the value of RenovaCare stock; (viii) obtained millions of dollars of ill-gotten gains; and (xi) placed some of the ill-gotten gains in shell entities with no legitimate claim to the money. (*See generally* ECF No. 91.)

District courts have denied motions to dismiss based on similar allegations and have held that plaintiffs adequately pled a scheme liability claim. *See Curshen*, 888 F. Supp. 2d at 1308 (finding plaintiffs adequately pled claim for scheme liability based on allegations that defendant "orchestrated the false media campaign," "arrang[ed] for the posting of a false website" touting company developments, and issued press releases claiming fictitious achievements); *see also Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 239 (D. Mass. 2004) ("[Plaintiff] alleged not just that [defendant] issued one or two misleading research reports, but rather that over time he worked extensively with [another individual] to issue bullish research reports . . . with the deliberate aim of boosting [the company]'s market price artificially. This adequately states a 'scheme' . . . under Rule[s] 10b-5(a) and (c)."); *SEC v. GPL Ventures LLC*, Civ. A. No. 21-6814, 2022 WL 158885, at *9 (S.D.N.Y. Jan. 18, 2022) (finding that plaintiffs adequately stated scheme liability claim where defendants "orchestrated and contrived a marketing apparatus" and used third-party promoters to "disguis[e] the fact that Defendants were funding the marketing or were

49

otherwise involved . . . to artificially drive up the price of the securities . . . with a plan in place to ensure they could redeem them for a handsome profit"); *In re CytRx Corp. Sec. Litig.*, Civ. A. No. 14-1956, 2015 WL 5031232, at *11–12 (C.D. Cal. July 13, 2015) (finding sufficient allegations for a scheme liability claim where plaintiffs alleged "hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the [defendant company]'s involvement").

Based on the foregoing, the Court finds Plaintiffs have adequately pled claims for scheme liability against the RenovaCare Defendants. Accordingly, the RenovaCare Defendants' Motion to Dismiss Count III of the SAC is **DENIED**.

### 2.    Plaintiffs Have Properly Pled a Scheme Liability Claim Against Sidhu

#### i.    Plaintiffs Have Sufficiently Alleged Sidhu Engaged in Deceptive Conduct in Furtherance of the Scheme

The Sidhu Defendants argue Plaintiffs' claims for scheme liability under Section 10(b) and Rules 10b-5(a) and (c) fail as against Sidhu because Plaintiffs do not allege that Sidhu engaged in any deceptive conduct. (ECF No. 137-1 at 13–19.) The Sidhu Defendants submit Plaintiffs do not properly allege a "scalping" claim against Sidhu because Plaintiffs do not allege Sidhu promoted RenovaCare stock. (*Id.* at 15–16.) The Sidhu Defendants also contend Sidhu's "alleged 'manipulative trading' consisting of 'stop[ping] selling shares' and then 'buying RenovaCare stock at historically high prices,' . . . cannot serve as a basis for scheme liability under Rules 10b5-(a) and (c)." (*Id.* at 16 (citation omitted).) In opposition, Plaintiffs assert they have adequately alleged a scheme liability claim against Sidhu because they allege Sidhu's deceptive actions were in furtherance of the "pump-and-dump" scheme. (ECF No. 147 at 42–43.) In reply, the Sidhu Defendants submit Plaintiffs rely on "allegations that Sidhu engaged in routine, permissible securities-market activities." (ECF No. 151 at 5.) The Sidhu Defendants also argue Plaintiffs'

allegations regarding Sidhu's involvement with StreetAuthority lack the particularity required by Federal Rule of Civil Procedure 9(b). (*Id.* at 6.)

"Commission of a manipulative or deceptive act in furtherance of a scheme to defraud is the initial step in the analysis of a Rule 10b–5(a) and (c) claim." *In re Able Lab'ys Sec. Litig.*, Civ. A. No. 05-2681, 2008 WL 1967509, at *20 (D.N.J. Mar. 24, 2008) (citation omitted). "[S]ubsections (a) and (c) of Rule 10b-5 encompass a 'wide range of conduct' and are not limited to the prohibition of market manipulation." *Takata v. Riot Blockchain, Inc.*, Civ. A. No. 18-02293, 2020 WL 2079375, at *15 (D.N.J. Apr. 30, 2020) (quoting *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019)).

Drawing all inferences in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged with particularity that Sidhu engaged in deceptive or manipulative acts in furtherance of the Scheme by alleging Sidhu: participated in Defendants' accumulation of shares and "acquire[d] millions of shares of RenovaCare stock for little or no money" (ECF No. 91 ¶ 73); led the opening and use of brokerage accounts and facilitated the removal of sale restrictions on RenovaCare shares (*id.* ¶¶ 79–90); maintained Bhogal's and Rayat's brokerage accounts, as well as his own, by frequently reviewing the accounts and transferring shares among different entities and accounts (*id.* ¶¶ 79–82); worked directly with StreetAuthority to create misleading promotional materials (*id.* ¶¶ 131, 136); sold shares during the Promotional Campaign at historically high prices (*id.* ¶¶ 196–97); stopped and started his trading in coordination with Defendants (*id.* ¶¶ 197–203, 216, 266–69, 278–84); assisted RenovaCare in issuing a new Form S-1 that sought to register for resale over 4.4 million shares held by Rayat, Sidhu, and their associates (*id.* ¶ 285); and transferred shares to offshore accounts that he used to

sell further shares (*id.* ¶ 291).[43]

  ii.  **Plaintiffs Have Sufficiently Alleged a Causal Link Between Sidhu's Deceptive or Manipulative Actions and Plaintiffs' Losses**

  The Sidhu Defendants also assert Plaintiffs' claims in Count III under Section 10(b) and Rules 10b-5(a) and (c) fail because Plaintiffs do not adequately plead their alleged losses were caused by Sidhu's alleged actions. (ECF No. 137-1 at 21; ECF No. 151 at 8–9.) In opposition, Plaintiffs argue the Sidhu Defendants have "misread[]" the SAC, and they have adequately alleged that Sidhu's actions caused Plaintiffs' losses. (ECF No. 147 at 43–44.)[44]

  "Under the PSLRA, a plaintiff asserting a claim under Section 10(b) bears the burden of proving 'loss causation,' *i.e.*, 'that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages.'" *Takata*, 2020 WL 2079375, at *17 (quoting 15 U.S.C. § 78u-4(b)(4)). Plaintiffs must "demonstrate that the defendants' deceptive conduct caused their claimed economic loss." *De Vito v. Liquid Holdings Grp., Inc.*, Civ. A. No. 15-6969, 2018 WL 6891832, at *38 (D.N.J. Dec. 31, 2018). "To survive a motion to dismiss, plaintiffs must allege facts sufficient to show that they suffered a monetary loss by purchasing shares whose prices were artificially inflated by defendants' fraudulent actions." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 635 (D.N.J. 2003). "Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA: all that is required is that plaintiff provide 'some

---

[43] *See Takata*, 2020 WL 2079375, at *15 (holding plaintiff adequately alleged a "deceptive and manipulative act" where defendant's action "while not necessarily deceptive by itself" may be "deceptive when viewed in the wider context of Plaintiff's allegations that [defendant] did [the action] in order to conceal his sales from the public as a part of scheme to pump-and-dump [the company]'s stock").

[44] The Court notes Plaintiffs and the Sidhu Defendants submitted limited arguments on this issue. (*See* ECF No. 137-1 at 21–22; ECF No. 147 at 43–44; ECF No. 151 at 8–9.)

indication of the loss and the causal connection that the plaintiff has in mind,' consistent with Rule 8(a)." *Dudley v. Haub*, Civ. A. No. 11-05196, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). Further, "[t]he issue of loss causation is usually not resolved on a motion to dismiss." *Id.* (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)); *see Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("[Plaintiff]'s burden to plead loss causation is 'not a heavy one,' and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss.'" (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 187 (2d Cir. 2015)).

Here, Plaintiffs have alleged a causal link between the Scheme and their losses by alleging the market significantly reacted to the Scheme. *See, e.g.*, (ECF No. 91 ¶ 396 (the Scheme carried out by Defendants "artificially inflate[d] the market price of RenovaCare securities," and "cause[d] Plaintiffs and the Class to purchase RenovaCare securities at artificially inflated prices"); *id.* ¶ 399 (Plaintiffs relied upon the integrity of the OTC Market); *id.* ¶ 400 (Plaintiffs would not have purchased RenovaCare securities if they had known of the Scheme); *id.* ¶ 401 ("As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of RenovaCare securities during the Class Period."); *id.* ¶¶ 283, 289, 357, 382 (RenovaCare's share price reached an all-time high of over $10.50 per share on February 21, 2018, but after the SEC Complaint was filed, the share price thereafter dropped to $2.00 per share on June 2, 2021). Specific to Sidhu, Plaintiffs allege his trading in furtherance of the Scheme played a role in artificially inflating RenovaCare's share price. *See, e.g.*, (*id.* ¶¶ 197–203, 216, 266–69, 278–84 (Sidhu sold his shares in a coordinated

manner with Defendants); *id.* ¶ 282 (Sidhu coordinated the purchase of shares between February 12 and 16, 2018 "with no economic justification other than to manipulate the share price and trading volume by creating a false impression of investor interest in the stock for the purpose of inducing its purchase or sale by others"); *id.* ¶ 283 (RenovaCare stock reached an all-time high of over $10.50 per share on February 21, 2018).

As Plaintiffs need only "provide some indication of the loss and the causal connection," *Dura Pharms.,* 544 U.S. at 347, the Court finds Plaintiffs have sufficiently alleged a causal link by generally alleging the Scheme artificially inflated prices and by specifically alleging a causal link between Sidhu's deceptive or manipulative actions in furtherance of the Scheme, *i.e.*, Sidhu's manipulative trading, and Plaintiffs' losses, *i.e.*, purchases of RenovaCare shares at artificially inflated prices. *See Jones*, 274 F. Supp. 2d at 635–36 (holding plaintiffs adequately pled causation where plaintiffs relied on generalized allegations); *see also EP Medsystems*, 235 F.3d at 885 ("Although . . . the allegation that it 'sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of [defendant company]' could have more specifically connected the misrepresentation to the alleged loss, *i.e.*, investment in a company with little prospects, when we draw all reasonable inferences in plaintiff's favor, we conclude that [plaintiff] has adequately alleged loss causation."); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, Civ. A. No. 20-3135, 2022 WL 4539119, at *20 (S.D.N.Y. Sept. 28, 2022) (finding allegations sufficiently pled loss causation because the allegations were "more than simply pleading inflated prices," instead the allegations "put defendants on notice of the loss to the class and the causal connection lead plaintiff has in mind").[45]

---

[45] The Court is not persuaded by the Sidhu Defendants' reliance on *Takata*, 2020 WL 2079375. In *Takata*, the Court held that the lead plaintiff had failed to adequately allege "loss causation with respect to the one deceptive act that [the defendant] is alleged to have committed" because "the

Accordingly, the Sidhu Defendants' Motion to Dismiss Count III of the SAC as to Sidhu is **DENIED**.

### F.      The Sidhu Defendants' Motion to Dismiss Counts II and III of the SAC As Against Treadstone LLC and Blackbriar Ltd. for Failure to State a Claim

The Sidhu Defendants assert Plaintiffs fail to state claims in Counts I, II, and III against Treadstone LLC and Blackbriar Ltd. because the SAC does not contain factual allegations supporting primary liability as to either of these entities.[46] (ECF No. 137-1 at 26.) The Sidhu Defendants submit "[a]t most, Plaintiffs' conclusory allegation that these entities 'assisted in the fraud' sound in the sort of aid-and-abetting liability that is unavailable to Plaintiffs in this civil action. (*Id.* at 26–27 (citing *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 191 (1994)).)

In opposition, Plaintiffs argue they have properly alleged claims for "disgorgement of ill-gotten funds." (ECF No. 147 at 53.) Plaintiffs assert the Sidhu Defendants' Motion to Dismiss the claims against Treadstone LLC and Blackbriar Ltd. must be denied because Plaintiffs have properly stated claims against Sidhu and they have alleged that the aforementioned entities "received ill-gotten funds transferred to them or for their benefit by Defendants and have no legitimate claim to those funds." (*Id.* (citing ECF No. 91 ¶¶ 294–97).)

In reply, the Sidhu Defendants assert: (1) the cases that Plaintiffs cite to in support of their

---

[c]omplaint [was] devoid of any allegation that [the deceptive act] was a 'substantial cause' of shareholders' economic losses or otherwise contributed in any way to a decline in [the company]'s stock price." *Id.* at *17–18. Here, however, Plaintiffs have sufficiently alleged Sidhu engaged in multiple deceptive or manipulative acts in furtherance of the Scheme and the Scheme resulted in artificially inflated prices and then ultimately a significant price drop once the SEC Complaint was filed.

[46] Plaintiffs do not raise a claim against Treadstone LLC or Blackbriar Ltd. in Count I of the SAC. (*See* ECF No. 91 ¶¶ 383–85.) Therefore, the Court only addresses whether Plaintiffs sufficiently state a claim against Treadstone LLC and/or Blackbriar Ltd. in Counts II and III of the SAC.

unpled claim for "disgorgement of ill-gotten funds" are all cases brought by the SEC; and (2) "Plaintiffs fail to identify a single case in which a court has sustained a private claim for 'disgorgement of ill-gotten funds' against a defendant who is not alleged to have violated the securities laws." (ECF No. 151 at 11–12.)

In Counts II and III, Plaintiffs assert claims against Treadstone LLC and Blackbriar Ltd. for violations of Section 10(b) of the Exchange Act. (*See* ECF No. 91 ¶¶ 386–402.) As Plaintiffs concede, they "do not allege substantive wrongdoing" by Treadstone LLC and Blackbriar Ltd. (ECF No. 147 at 53.) Plaintiffs have therefore failed to allege with particularity that these defendants violated Section 10(b). Plaintiffs cannot pursue their claims against Treadstone LLC and Blackbriar Ltd. under a theory that they are secondarily liable. *See Central Bank of Denver*, 511 U.S. at 191 ("[A] private plaintiff may not maintain an aiding and abetting suit under § 10(b).") Accordingly, the Sidhu Defendants' Motion to Dismiss Counts II and III of the SAC as to Treadstone LLC and Blackbriar Ltd. is **GRANTED**.[47]

---

[47] Elsewhere in the SAC, but not as part of Counts II or III, Plaintiffs allege Treadstone LLC and Blackbriar Ltd. "received ill-gotten funds transferred to it or for [their] benefit by the Defendants," do not have "a legitimate claim to the ill-gotten funds it directly or indirectly received," and "should be required to disgorge the amounts it directly or indirectly received from Defendants." (ECF No. 91 ¶¶ 295–96.) Disgorgement of ill-gotten gains is an "equitabl[e] remed[y] premised on the powers and discretion of the Court to prevent unjust gain and to deter others." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 434 (S.D.N.Y. 2007). "It is well-settled that disgorgement is an appropriate remedy for breach of federal securities laws." *Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349, 360 (S.D.N.Y. 2011) (citation omitted). However, the Court also notes "once ill-gotten gains have been disgorged to the SEC, there remains no unjust enrichment, and therefore, no basis for further disgorgement in a private action." *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990). *See Nat'l Westminster Bancorp N.J. v. Leone*, 702 F. Supp. 1132, 1140 (D.N.J. 1988) ("[P]laintiff may not recover from defendants any profits already disgorged to the SEC in the prior action."). As Plaintiffs have not sufficiently pled Treadstone LLC and Blackbriar Ltd. are liable under the Section 10(b) claims in Counts II and III of the SAC, the Court finds Plaintiffs' disgorgement theory of recovery against them also fails, to the extent it is related to Counts II and III.

**G.     The RenovaCare Defendants' Motion to Dismiss Plaintiffs' Claims Against Rayat in Count IV of the SAC for Control Person Liability in Violation of Section 20(a) of the Exchange Act**

The RenovaCare Defendants assert that Plaintiffs' claims for control person liability under Sections 20(a) of the Exchange Act should be dismissed because Plaintiffs do not plead any underlying securities fraud claims. (ECF No. 135-1 at 35.) Under Section 20(a) of the Exchange Act, "[o]ne can be liable . . . for controlling a company that committed securities fraud." *Intelli-Check, Inc.*, 274 F. Supp. 2d at 644. To state a claim under Section 20(a), the plaintiff must show: "(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Id.* at 645. The Court has held that Plaintiffs have sufficiently pled underlying violations against the RenovaCare Defendants in Counts I, II, and III of the SAC. Accordingly, the RenovaCare Defendants' Motion to Dismiss Count IV of the SAC is **DENIED**.

**H.     The RenovaCare Defendants and the Sidhu Defendants' Motion to Dismiss Plaintiffs' Derivative Claims Against Rayat, Bhogal, and Sidhu in Count V of the SAC for Violations of Section 20(b) of the Exchange Act**

The RenovaCare Defendants and the Sidhu Defendants assert that Plaintiffs' derivative claims under Section 20(b) should be dismissed as asserted against them because there is no private right of action for violations of Section 20(b). (ECF No. 135-1 at 35; ECF No. 137-1 at 22–24; ECF No. 151 at 9–10.) The Sidhu Defendants submit "no court has ever found a private right of action under [Section 20(b)]. . . . This Court should not be the first in the country, in the 85 years since the statute was adopted, to hold that there is one." (ECF No. 137-1 at 22–23.) The Sidhu Defendants also argue Plaintiffs' claims under Section 20(b) of the Exchange fail because Plaintiffs have not alleged Sidhu had "control" over a primary violation. (*Id.* at 25.) In opposition, Plaintiffs assert courts have "recognize[d] a private right of action under Section 20(b)." (ECF No. 147 at 52 (citing *SEC v. Zvodihikov*, Civ. A. No. 16-845, 2020 WL 634184, at *4 (D.N.J. Feb. 10,

2020); *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, Civ. A. No. 11-2327, 2014 WL 7179989, at *6 (S.D.N.Y. Dec. 10, 2014); *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 629–30 (S.D.N.Y. 1996)).)

Section 20(b) of the Exchange Act provides that "[i]t shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). "Few reported cases discuss the applicability of Section 20(b), but it is clear that the section requires a showing that a 'controlling person knowingly used the controlled person to commit the illegal act.'" *Cohen*, 954 F. Supp. at 630 (quoting *Moss v. Morgan Stanley*, 553 F. Supp. 1347, 1362 (S.D.N.Y.), *aff'd*, 719 F.2d 5 (1983)). Further, "liability under Section 20(b) of the Exchange Act" requires "(1) an underlying primary violation of the Exchange Act by a controlled person or entity; (2) Defendant had control over the primary violator; and (3) Defendant was a culpable participant in the fraudulent scheme." *Zvodihikov*, 2020 WL 634184, at *4.

The Court will not be the first to recognize a private cause of action under Section 20(b) of the Exchange Act.[48] *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 164–65 ("Concerns with the judicial creation of a private cause of action caution against its expansion. The decision to extend the cause of action is for Congress, not for us."). Further, at least one district court has expressly refused a private right of action. *See McLaughlin v. Campbell*, 410 F. Supp.

---

[48] The cases that Plaintiffs cite to do not support the assertion that Section 20(b) creates a private cause of action. Plaintiffs' reliance on *Zvodihikov*, 2020 WL 634184 is misplaced because that matter was brought by the SEC. Plaintiffs further cite to *Union Cent. Life Ins.*, 2014 WL 7179989, at *6 and *Cohen*, 954 F. Supp. at 629–30, but neither case addresses whether there is a private right of action under Section 20(b); instead, the courts in those cases dismissed claims brought under Section 20(b) for failure to state a claim.

1321, 1325 (D. Mass. 1976) (declining private of action under Section 20(b) and noting "neither the legislative history nor the language of [Section 20(b)]" provide a basis for a private right of action).

Accordingly, the RenovaCare Defendants and the Sidhu Defendants' Motions to Dismiss Count V of the SAC are **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, the RenovaCare Defendants' Motion to Dismiss (ECF No. 135) is **GRANTED IN PART** and **DENIED IN PART**; CIG's Motion to Dismiss (ECF No. 136) is **GRANTED**; and the Sidhu Defendants' Motion to Dismiss (ECF No. 137) is **GRANTED IN PART** and **DENIED IN PART**. All claims that have been dismissed, are dismissed **without prejudice**. Plaintiffs may, within sixty (60) days of the date of this Opinion, file a third amended class action complaint curing the deficiencies addressed herein.[49] Defendants may respond to the third amended class action complaint, if filed, as appropriate and consistent with applicable federal and local rules. An appropriate Order follows.

/s/ Brian R. Martinotti
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  June 3, 2024

---

[49] Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings after obtaining the Court's leave or the written consent of its adversary. Under this liberal rule, the Court must "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This lenient standard ensures that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (citation omitted). Given that this is the first motion to dismiss that the Court has addressed, the Court will permit Plaintiffs to file a third amended class action complaint.